UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

THE ROCKEFELLER UNIVERSITY,

        Plaintiff,

    v.
                              08-CV-2755 (KPC)(HP)

LIGAND PHARMACEUTICALS
INCORPORATED,

        Defendant.

**DECLARATION OF ANAT HAKIM IN OPPOSITION TO LIGAND
PHARMACEUTICALS INC.'S MOTION TO DISMISS, OR, IN THE
ALTERNATIVE, TO TRANSFER TO THE SOUTHERN DISTRICT OF
CALIFORNIA**

I, Anat Hakim, declare as follows:

1.      I am an attorney licensed to practice before all courts of the State of

New York and am employed by the law firm of Foley & Lardner LLP, attorneys of

record for defendant, The Rockefeller University.  I have personal knowledge of the

matters asserted herein and, if called as a witness to testify, I could and would

competently testify to the matters stated herein.

2.      Attached hereto as Exhibit "1" is a true and correct copy of

Summons and Complaint brought by The Rockefeller University against Ligand

Pharmaceuticals Incorporated, which The Rockefeller University filed in the Supreme

Court of the State of New York in the County of New York on March 4, 2008 at 9:02

a.m. EST.

3.      Attached hereto as Exhibit "2" is a true and correct copy of the 1992

license agreement between Ligand Pharmaceuticals Incorporated and The Rockefeller

University.

4.     Attached hereto as Exhibit "3" is a true and correct copy of a March 13, 2008 letter from Charles S. Berkman of Ligand Pharmaceuticals, Inc. to The Office of the General Counsel at The Rockefeller University.

5.     Attached hereto as Exhibit "4" is a true and correct copy of a March 17, 2008 letter from Anat Hakim to Charles S. Berkman of Ligand Pharmaceuticals, Inc.

6.     Attached hereto as Exhibit "5" is a true and correct copy of the complaint filed by Ligand Pharmaceuticals Incorporated against The Rockefeller University in the United States District Court, Southern District of California, on March 4, 2008 at 8:33 a.m. PST.

7.     Attached hereto as Exhibit "6" is a true and correct copy of a March 14, 2008 Notice of Filing of Notice of Removal and Notice of Removal, filed by Ligand Pharmaceuticals Incorporated on March 14, 2008.

8.     Attached hereto as Exhibit "7" is a true and correct copy of The Rockefeller University's Notice of Motion to Dismiss, or In the Alternative, To Stay or Transfer to the Southern District of New York, Memorandum in Support, and Supporting Exhibits, which The Rockefeller University filed in the Southern District of California on March 26, 2008.

9.     Attached hereto as Exhibit "8" are true and correct copies of (a) a June 17, 1992 letter from William H. Griesar of The Rockefeller University to David R. Robinson, President of Ligand Pharmaceuticals, Inc.; and (b) a December 22, 1992 letter (Bates stamped RU0002701.001) from James Darnell of The Rockefeller University to

Dr. Robert B. Stein of Ligand Pharmaceuticals.

10.    Attached hereto as Exhibit "9" is a true and correct copy of a January 20, 1993 fax from Lois Cousseau of Dr. Darnell's office to Ligand's Dr. John Rosen.

11.    I understand that (a) Ligand executives, including its President, John Higgins, Vice President and General Counsel, Charles Berkman, and Vice President of Business Development, Syed Kazmi, attended at least one meeting at the University on September 25, 2007; and (b) Ligand's President, John Higgins, was scheduled to attend meetings and an investor conference in New York during the week of March 3, 2008. My understanding is based on correspondence between the parties. Because such correspondence was made in the context of settlement negotiations, however, it is not attached hereto. It is, however, available to the Court if needed. In addition, attached hereto as Exhibit "10" are true and correct copies of (a) an Aug. 8, 2007 Ligand press release titled "Ligand Pharmaceuticals Announces Second Quarter Results" (at http://investors.ligand.com/releasedetail.cfm?ReleaseID=258992) which lists Ligand presentations in New York in September and October 2007; and (b) a Feb. 5, 2008 BNet Business Network web announcement (at http://findarticles.com/p/articles/mi_m0EIN/is_2008_Feb_5/ai_n24248123) titled "Ligand to Present at BIO CEO and Investor Conference on February 12."

12.    Pursuant to 28 U.S.C. 1746, I declare under penalty of perjury that the foregoing is true and correct.  I executed this Declaration on this 7th day of April, 2008 in Jupiter, Florida.

*Anat Hakim*

Anat Hakim

EXHIBIT 1

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

------------------------------------------------------------X

THE ROCKEFELLER UNIVERSITY,

                      Plaintiff,

          v.

LIGAND PHARMACEUTICALS, INC.,

                    Defendant.

------------------------------------------------------------X

**SUMMONS**

Index No. 08/600638

Date Purchased: 3/4/08

Plaintiff designates New York
County as the place for trial

To the above named Defendant:

      YOU ARE HEREBY SUMMONED to answer the complaint in this action, and to serve a copy of your answer, or if the complaint is not served with this summons, to serve a notice of appearance, on the plaintiff's attorneys within 20 days after service of this summons, exclusive of the day of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York); and in the case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

      The basis of the venue designated is NY CPLR § 503(a).

Dated: New York, New York
      March 4, 2008

Plaintiff's Address:
The Rockefeller University
1230 York Avenue
New York, New York 10065

NEW YORK
COUNTY CLERK'S OFFICE

MAR 04 2008

NOT COMPARED
WITH COPY FILE

FOLEY & LARDNER LLP

By: *Peter N. Wang* (PH)
      Peter N. Wang
      Anat Hakim
      Douglas S. Heffer
      90 Park Avenue
      New York, New York 10016
      (212) 682-7474
      Attorneys for Plaintiff

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-------------------------------------------------------------------X
                               :

THE ROCKEFELLER UNIVERSITY,         :       Index No.

                 Plaintiff,    :

                              :      **COMPLAINT**

            v.                 :      **JURY TRIAL REQUESTED**

LIGAND PHARMACEUTICALS, INC.    :

                 Defendant.   :

                               :
-------------------------------------------------------------------X

        Plaintiff, The Rockefeller University, by its attorneys, Foley & Lardner LLP,

complains and alleges as follows:

<u>**NATURE OF THE ACTION**</u>

        The Rockefeller University (the "University") owns groundbreaking inventions

that are powerful tools to screen for therapeutic drugs and that were discovered by its esteemed

faculty member Dr. James E. Darnell Jr. The University exclusively licensed this valuable

technology to defendant Ligand Pharmaceuticals, Incorporated ("Ligand") in 1992 ("1992

Agreement"). Working under a 1994 agreement with its exclusive sublicensee SmithKline

Beecham ("SKB", now GlaxoSmithKline) ("1994 SKB/Ligand Agreement") and using the

University's inventions, Ligand identified several pharmaceutical molecules and received several

milestone payments from SKB. Ligand has failed to pay the University its contractual share of

these milestone payments according to the 1992 Agreement, despite the University's repeated

requests. Instead, in August 2007, shortly before SKB requested approval from the Food and

Drug Administration of Promacta®, one of the pharmaceutical molecules identified under the

1994 SKB/Ligand Agreement, and before royalties on Promacta® are anticipated to be paid by

SKB to Ligand, Ligand notified the University that Ligand was unilaterally terminating the 1992

Agreement, although not permitted to do so by its terms. The University, having fully performed

NEW YORK
COUNTY CLERK'S OFFICE

MAR 0 4 2008

NOT COMPARED
WITH COPY FILE

Exhibit "1"
4

its contractual obligation and faced with Ligand's refusal to honor its payment obligations under the 1992 Agreement, has no other recourse but to file this action.

## PARTIES

1.      Plaintiff The Rockefeller University is, and at all times mentioned herein was, a New York corporation whose principal place of business is at 1230 York Avenue, New York, NY 10065.

2.      Defendant Ligand Pharmaceuticals, Inc. is, and at all times mentioned herein was, a Delaware corporation whose principal place of business is at 10275 Science Center Drive, San Diego, CA 92121. Ligand is a biotechnology company engaged in the discovery and development of new drugs.

## JURISDICTION AND VENUE

3.      This Court has personal jurisdiction over defendant pursuant to CPLR § 301, 302.

4.      Venue is proper in this county pursuant to CPLR § 503(a).

## BACKGROUND OF THE UNIVERSITY-LIGAND COLLABORATION

5.      Founded in 1901, Plaintiff The Rockefeller University is the nation's first biomedical research university. Today, it is internationally renowned for research and graduate education in the biomedical sciences, chemistry and physics. A total of 21 scientists associated with the University have received the Nobel Prize in medicine and physiology or chemistry, 17 University scientists have received Lasker Awards, five have been named MacArthur Fellows and 11 have garnered the National Medal of Science. More than one-third of the current faculty are elected members of the National Academy of Sciences.

6.      Dr. James E. Darnell Jr., M.D. has been a professor at The Rockefeller University since 1974. A pioneering researcher in the field of gene regulation, he is The Rockefeller University Vincent Astor Professor and head of the University's Laboratory of Molecular Cell Biology. Dr. Darnell is an elected member of the National Academy of Sciences.

7.      Prior to Dr Darnell's pioneering research, it was not understood how a large and diverse group of regulatory proteins called cytokines cause cells in the human body to change

2

NYC_154137.1

their behavior in response to changes in the environment. Cytokines play an important role in regulating the human body, for example, stimulating the immune system to fight infection and activating red blood cell or platelet formation. Among Dr Darnell's many discoveries, he elucidated how the binding of a cytokine to a cell surface receptor is communicated to the nucleus of a cell to regulate the expression of a small and select number of genes. The pathway Dr Darnell discovered involves the binding of a cytokine to a cell surface receptor causing certain proteins, which he called Signal Transducers and Activators of Transcription, or STAT proteins, to accumulate in the nucleus, bind to specific genes, cause them to be expressed and thereby change cell behavior ("STATs Pathway").

8.     Dr. Darnell received numerous awards for his pioneering discovery and characterization of the STAT pathway, including the 2002 Albert Lasker Award for Special Achievement in Medical Science: "For an exceptional career in biomedical science during which he opened two fields in biology - RNA processing and cytokine signaling - and fostered the development of many creative scientists." In 2003, the White House awarded Dr. Darnell the National Medal of Science, the nation's highest honor for lifetime achievement in fields of scientific research. Other awards Dr. Darnell has received include the 1997 Passano Award, the 1994 Paul Janssen Prize in Advanced Biotechnology and Medicine and the 1986 Gairdner Foundation International Award.

9.     Dr Darnell invented, based on his understanding of the STAT pathway, a high throughput screen ("HTS") for discovery of new pharmaceuticals that are agonists or antagonists of cytokines. An agonist is a pharmaceutical that binds the same cell surface receptor as the cytokine, while an antagonist is a pharmaceutical that prevents binding of the cytokine to its cell surface. Dr. Darnell's HTS invention was disclosed in a Rockefeller University patent application filed in September 1993. In the HTS, a cell is exposed to a potential pharmaceutical and the activity of a reporter gene, designed by Dr Darnell based on his knowledge of the STATs Pathway, is monitored. Potential pharmaceuticals that mimic cytokine activity and therefore serve as agonists are identified.

3

## 1992 LICENSE AGREEMENT BETWEEN THE UNIVERSITY AND LIGAND

10.     The pioneering STATs Pathway technology that Dr. Darnell discovered and developed while at the University (and which was owned by the University) promised to be a powerful tool to screen for therapeutic drugs. To allow Dr. Darnell's groundbreaking discovery to be utilized for the public good, the University entered into negotiations with Ligand to use this discovery, including HTS, to find valuable new pharmaceuticals.

11.     After negotiation, on September 30, 1992, the University and Ligand entered into a License Agreement. A true and correct copy of the 1992 Agreement is attached hereto as Exhibit A and incorporated herein by reference.

12.     In the 1992 Agreement, the University granted Ligand a sole exclusive world-wide license, under the University's broadly-defined Licensed Patent Rights and Technical Information relating to the STATs Pathway technology, "to make, have made, use and sell Products or practice Processes." *See Exhibit A at Section 2.1.* The license grant to Ligand included an exclusive world-wide license to all developments of Dr. Darnell's laboratory relating to the STATs Pathway technology, existing as of the effective date of the 1992 Agreement and for five years thereafter. *See id. at Section 1.4.* In connection with the 1992 Agreement, Dr. Darnell and members of his laboratory did in fact collaborate with Ligand for years regarding the STATs Pathway technology. Over the course of several years, Dr. Darnell provided essential technical information, materials and insight to Ligand relating to the STATs Pathway technology. In addition, the University filed several patent applications and was issued several patents, describing aspects of its pioneering STATs Pathway technology.

13.     The technical information and expertise about STATs Pathway technology that Ligand acquired from the University pursuant to the 1992 Agreement was essential to the development of, among other things, a HTS to identify cytokine agonists. The HTS was key to the identification and development of pharmaceutical drug candidates.

14.     In return for the University's exclusive world-wide license to this pioneering

4

STATs Pathway technology, Ligand obligated itself to:

    a.   "diligently seek to develop Products and/or Processes" using or based on the STATs Pathway technology provided to it under the 1992 Agreement. *See id. at Section 2.7;*

    b.   make certain cash payment to the University during the first five years of the Agreement and to give the University an equity interest in Ligand. *See id. at Sections 2.2 and 2.3; and*

    c.   pay the University a portion of any payments Ligand received from any third party "to secure the right to use Technical Information or to sell Products or Processes," (*see id. at Section 2.5)* and a royalty on Ligand's own "Net Sales of Products and on its net revenues . . . received from performance of Processes for a third party." (*see id. at Section 2.4*).

    15.   Section 2.5 of the 1992 Agreement, which addresses Ligand's payment obligations to the University with respect to milestone and royalty payments it receives from third parties provides:

> In the case of payments made to Ligand by a third party to secure the right to use Technical Information or to sell Products or Processes, Ligand will pay to Rockefeller and NYU twenty-five percent (25%) of the payments made to Ligand by the third party; provided, however, that in the situation where the payment to Ligand is based on the third party's revenues arising from sale of a Product or use of a Process, then Ligand shall pay to Rockefeller and NYU the lesser of twenty-five percent (25%) of the payment received from the third party or a royalty calculated pursuant to Section 2.4 by treating the third party's sales of such Products and Processes as Ligand sales. Payments by a third party to Ligand to purchase equity in Ligand and to fund research at Ligand which do not generate net revenue as defined in Section 2.4 shall not be subject to sharing under this Section 2.5.

    16.   Section 2.4 of the 1992 Agreement, which addresses Ligand's royalty payment obligations to the University based on Ligand's own sales of Products or performance of Processes, provides:

> Ligand will pay a royalty of five percent (5%) of its Net Sales of Products and on its net

5

revenues, i.e., gross revenues less fully burdened costs, received from performance of Processes for a third party. The royalty shall be paid for a term which is the longer of ten (10) years, or, on a country by country basis, expiration of the last patent in the Licensed Patent Rights having a claim which reads on the Product or Process or a method of making or using the Product or Process. Only one royalty will be owed on a Product or Process in the circumstance where the Product or Process is covered by multiple claims in the Licensed Patent Rights. Royalty payments made under this Section 2.4 and under Section 2.5 shall be made to Rockefeller and NYU in the ratio ninety percent (90%) to Rockefeller and ten percent (10%) to NYU.

17.     The 1992 Agreement provides that it "shall be interpreted and governed in accordance with the laws of the State of New York." *See id. at Section 13.*

## 1994 RESEARCH, DEVELOPMENT, AND LICENSE AGREEMENT BETWEEN LIGAND AND SMITHKLINE BEECHAM

18.     On December 29, 1994, Ligand entered into an exclusive research and development collaboration and license with SmithKline Beecham. On information and belief, under the 1994 SKB/Ligand Agreement, the HTS technology that was developed using the University's STATs Pathway technology was to be used by Ligand and SKB to discover and characterize small molecule, orally bioavailable drugs for the treatment of a variety of blood cell deficiencies. On information and belief, Ligand sub-licensed to SKB the STATs Pathway technology that the University exclusively licensed to Ligand.

19.     The 1994 SKB/Ligand Agreement entitles Ligand to payments from SKB for certain milestones reached in connection with the development of research compounds or products as well as royalty payments. In announcing Ligand's collaboration with SKB, Ligand's then-Senior Vice President and Chief Scientific Officer stated in a February 6, 1995 press release:

> We are delighted to have this, our second STATs collaboration within two years of licensing in this exciting technology from Rockefeller University. Our signal transduction area of research affords numerous drug targets to control gene expression. This alliance with the excellent research team at SB provides critical mass and expertise to exploit our recent insights in STATs and HGFs to create new medicines.

## DISPUTE BETWEEN THE UNIVERSITY AND LIGAND CONCERNING THE DEVELOPMENT OF PHARMACEUTICAL CANDIDATES

20.     The SKB/Ligand collaboration has led to the identification and development of several pharmaceutical compounds that act via the STATs Pathway, including but not limited to PROMACTA®/REVOLADE® ("PROMACTA®"), an orally active, non-peptide, small molecule thrombopoietin ("TPO") mimetic for the treatment of thrombocytopenia. Thrombocytopenia, or a low number of platelets in the blood, can be a life-threatening condition. Platelets are necessary to the normal process of blood clotting. When someone experiences thrombocytopenia, a cut or bruise might not heal quickly, or at all, without medical intervention. Therefore, patients with a low platelet cell count must take special precautions, and suffer significant risk.

21.     On information and belief, in the fourth quarter of 2007, SKB submitted to the Food & Drug Administration a New Drug Application for PROMACTA® for the treatment of short-term idiopathic thrombocytopenic purpura (ITP). ITP is a disorder characterized by low platelet counts leaving patients at risk of episodes of spontaneous bruising, mucosal bleeding, and in severe cases intracranial hemorrhage.  On information and belief, if approved, PROMACTA® would be the first approved oral TPO mimetic.  On information and belief, in the fourth quarter of 2007, SKB initiated two Phase III trials in connection with the use of PROMACTA® for hepatitis C, and SKB is studying PROMACTA® for chemotherapy-induced thrombocytopenia (CIT).  On information and belief, at least one additional pharmaceutical compound, SB-559448, also developed as part of the SKB/Ligand collaboration, and described as a backup compound to PROMACTA®, is in Phase I clinical trials.

22.     On information and belief, Ligand also has its own thrombopoietin program, which it commenced after its research program with SKB ended, and that program has resulted in the identification and development of Ligand's lead, small-molecule TPO mimetic, LGD-4665, which acts via the STATs Pathway by binding to the thrombopoeitin receptor in a manner

7

similar to TPO and activates the production of platelets by the bone marrow. As of December 2007, Ligand reported that LGD-4665 generated positive Phase I results. Ligand also has stated that it expects to advance the development of LGD-4665 for multiple indications. On information and belief, several additional next generation molecules are in the research phase at Ligand with promising TPO mimetic activities.

23.    On information and belief, each of the compounds described in Paragraphs 20 -22 above, constitute a "Product", as that term is defined in Section 1.5 of the 1992 Agreement. Section 1.5 of the 1992 Agreement defines "Product" as follows:

> any product which embodies or the use of which employs any invention(s) described or claimed in Licensed Patent Rights or for which Technical Information was essential to the discovery or development thereof.

24.    The 1992 Agreement defines "Licensed Patent Rights" as follows:

> (a) the patent application(s) set forth on Exhibit "A" attached hereto and all patents which may issue thereon;
> (b) the patent applications which are divisionals, continuations, continuations-in-part, reissues, renewals, foreign counterparts, extensions or additions of the patents and/or applications described in (a) and (b) of this paragraph 1.3, and all patents which may issue thereon;
> (c ) and all other patent applications, and patents issuing thereon, filed to cover Technical Information, including divisionals, continuations-in-part, reissues, renewals, foreign counterparts, extensions or additions and patents which may issue thereon.

25.    The 1992 Agreement defines "Technical Information" as follows:

> any and all technical data, information processes, materials and know-how, whether or not patentable, owned by Rockefeller and existing or capable of description in a tangible form relating to peptidyl hormone mediated gene expression (a) developed in the laboratory of Dr. James Darnell of Rockefeller or Dr. David Levy of NYU as of the Effective Date and (b) which is subsequently developed at Rockefeller in the laboratory of Dr. James Darnell during the period ending five (5) years form the Effective Date.

26.    Consequently, under Section 2.5 of the 1992 Agreement, the University is entitled to at least 25% of milestone and royalty payments paid to Ligand by SKB to date in connection with such Products. Similarly, to the extent that Ligand has entered into collaborations with

8

other third parties from which Ligand has received or is entitled to receive payments for Products subject to Section 2.5 of the 1992 Agreement, the University would be entitled to 25% of such payments.

27.     This includes at least $1.91 Million Dollars, which is equal to 25% of the Eight Million Dollars in milestone payments SKB has already made to Ligand to date in connection with the development of PROMACTA® and SB-559448, minus amounts Ligand previously paid the University. *See Exhibit A at Section 2.5.* In addition, to the extent that the Ligand/SKB collaboration results in additional milestone payments by SKB to Ligand in connection with the continued development of PROMACTA®, SB-559448 or the development of other compounds, the University would be entitled to 25% of such milestone payments.

28.     To date, Ligand has refused to pay the University its portion of the milestone payments and has taken the position that no further milestone payments are or will be owing to the University.

29.     In addition to 25% of milestone payments received by Ligand, the University is also entitled to 25% of any royalty payments that SKB would pay to Ligand on sales of PROMACTA®. To the extent that the Ligand/SKB collaboration results in the commercialization of products other than PROMACTA®, such as, for example, products based on SB-559448, the University would be entitled to 25% of royalty payments made to Ligand based on sales of those products as well. Ligand has taken the position that the University is not entitled to any royalties under the 1992 Agreement.

30.     A couple of months before SKB submitted its New Drug Application for PROMACTA® to the Food & Drug Administration, and by letter dated August 9, 2007, Ligand informed the University that Ligand was providing written notice that "Ligand is exercising its right to terminate the above-referenced Agreement. Pursuant to Section 11.2, this termination will be effective on November 7, 2007."

31.     On September 25, 2007, representatives of Ligand and the University met to discuss Ligand's purported termination notice and the University's position that the 1992

9

Agreement could not be terminated after full performance by the University. At the meeting, the University notified Ligand that it was exercising its audit rights under Section 4.2 of the 1992 Agreement.

32. On October 10, 2007, the University sent Ligand its preliminary audit request and a tolling agreement, which was effective through January 31, 2008.

33. On or about November 13 or 14, 2007, the University initiated its audit of Ligand. To date, Ligand has refused to fully and adequately comply with the University's audit requests, as amended.

34. On January 17, 2008, the University and Ligand entered into an Amended Tolling Agreement, which was effective through March 3, 2008.

## FIRST CAUSE OF ACTION

### (Breach of Contract Against Ligand)

35. Plaintiff incorporates by reference each and every allegation contained in paragraphs 1 through 34 of this Complaint as though fully set forth herein.

36. The 1992 Agreement between the University and Ligand is a valid and binding contract between the University and Ligand.

37. Upon information and belief, Plaintiff alleges that Defendant has failed to perform and is in material breach of at least its payment obligations under the 1992 Agreement as described in the foregoing paragraphs of this Complaint. As a direct and proximate result of the breach, the University has been damaged in an amount according to proof at trial, but no less than $1.91 Million Dollars.

38. Plaintiff the University has fully performed all of its obligations and otherwise complied with all the terms and conditions of the 1992 Agreement.

39. Plaintiff the University is entitled to recover damages from Defendant for Defendant's material breach of the 1992 Agreement alleged in this Complaint in an amount to be proven at trial.

10

## SECOND CAUSE OF ACTION

### (Unjust Enrichment/Constructive Trust)

40.     Plaintiff incorporates by reference each and every allegation contained in paragraphs 1 through 39 of this Complaint as though fully set forth herein.

41.     A civil plaintiff may recover under the doctrine of unjust enrichment by showing that (a) the plaintiff conferred a benefit on the defendant; (b) the defendant appreciated or enjoyed such benefit; and (c) under the circumstances, it was unfair for the defendant to accept or retain the benefit without paying for it.

42.     At Ligand's specific request, and since 1992, the University provided to Ligand valuable information, know-how and services since 1992 relating to STATs Pathway technology.

43.     The University shared such information, know-how and services while Ligand and the University were in a confidential relationship.

44.     Ligand enjoyed such information, know-how and services and was and has been enriched by such information, know-how and services.

45.     Ligand was and has been unjustly enriched at the University's expense because Ligand has not compensated the University for such information, know-how and services.

46.     The reasonable value of the information, know-how and services that the University provided to Ligand and for which the University has not been compensated to date is no less than $1.91 million.

47.     In equity and good conscience, Ligand should be required to return no less than $1.91 million to the University.

48.     The University has no adequate remedy at law by which it can be compensated for this injury.

49.     By virtue of the foregoing, the University has been damaged in an amount to be proven at trial, but in no event less than $1.91 million.

50.     The University also is entitled to a constructive trust on past and future payments made to Ligand by third parties in connection with the valuable information, know-how and

11

services that the University transferred to Ligand, including but not limited to past payments received and future payments in connection with PROMACTA® and/or SB-559448.

## THIRD CAUSE OF ACTION

### (Quantum Meruit)

51.     Plaintiff incorporates by reference each and every allegation contained in paragraphs 1 through 50 of this Complaint as though fully set forth herein.

52.     Since 1992, the University provided to Ligand valuable information, know-how and services relating to STATs Pathway technology in good faith and with the expectation, based on the parties' discussions, that the University would receive compensation for this valuable information, know-how and services.

53.     Ligand accepted the benefit of the University's valuable information, know-how and services, but has not compensated the University

54.     By virtue of the foregoing, the University has been damaged in an amount to be proven at trial, but in no event less than $1.91 million.

## FOURTH CAUSE OF ACTION

### (Specific Performance of Contractual Right to Perform Audit)

55.     Plaintiff incorporates by reference each and every allegation contained in paragraphs 1 through 54 of this Complaint as though fully set forth herein.

56.     The University is entitled to conduct an audit under Section 4.2 of the 1992 Agreement in order to determine the payments due from Ligand to the University under the 1992 Agreement.

57.     The records that would enable the University, through its auditor, to determine the payments due from Ligand to the University under the 1992 Agreement, are within Ligand's possession and control.

58.     Ligand has failed to provide many records that were requested by the University to its auditor.

59.     The University has no adequate remedy at law.

12

60. The University is thus entitled to perform an audit of Ligand pursuant to Section 4.2 of the 1992 Agreement.

## FIFTH CAUSE OF ACTION

### (Declaratory Relief Against Ligand)

61. Plaintiff incorporates by reference each and every allegation contained in paragraphs 1 through 60 of this Complaint as though fully set forth herein.

62. An actual controversy now exists as to the rights and obligations of Plaintiff the University and Defendant Ligand with respect to the 1992 Agreement. Upon information and belief, Plaintiff the University contends that it is entitled to certain milestone and/or royalty payments provided for under the 1992 Agreement in connection with Defendant's identification and continued development of at least PROMACTA® and SB-559448. Defendant Ligand disputes Plaintiff the University's contention, and asserts that it has no obligation to Plaintiff the University under the 1992 Agreement in connection with PROMACTA® or any other compound or product.

63. Plaintiff University desires a declaration from this Court as to its rights and Defendant's obligations under the 1992 Agreement confirming that:

    a.  PROMACTA®, SB-559448, and LGD 4665 each are a "Product", within the meaning of term as defined in the 1992 Agreement;

    b.  The University is entitled to, and Ligand is obligated to pay, 25% of all milestone payments and other consideration related to PROMACTA® and/or SB-559448, now due under the 1992 Agreement, including 25% of the milestone payments of $2 Million, $1 Million, $2 Million, and $1 Million relating to PROMACTA® and 25% of the milestone payment of $2 Million relating to SB-559448, as provided by Section 2.5 of the 1992 Agreement.

13

c.  The University is entitled to, and Ligand will be obligated to pay in the future, 25% of all milestone and/or royalty payments and other consideration related to PROMACTA® and/or SB-559448 which shall become due under the 1992 Agreement hereafter.

d.  The University is entitled to 25% of milestone and/or royalty payments paid to Ligand by any third party in connection with any Product as that term is defined in the 1992 Agreement.

e.  The University is entitled to a 5% royalty on Ligand's Net Sales of Ligand Products that Ligand may bring forward on its own, and not in connection with a third party, as set forth in Section 2.4 of the 1992 Agreement.

64.  A judicial declaration is necessary and appropriate at this time so that the parties may ascertain their rights and obligations under the 1992 Agreement and Plaintiff the University may obtain the relief to which it is entitled.

WHEREFORE, The Rockefeller University prays for judgment as follows:

1.  Damages according to proof at trial, including interest;

2.  Specific performance of the audit initiated by the University, pursuant to Section 4.2 of the 1992 Agreement;

3.  A constructive trust imposed on payments (milestone and royalty) received from a third-party by Ligand, including but not limited to such payments made in connection with PROMACTA® and/or SB-559448, and on Ligand's Net Sales of Ligand Products that Ligand may bring forward on its own;

4.  A Court Declaration confirming that:

14

a. PROMACTA®, SB-559448, and LGD 4665 each are a "Product", within the meaning of the term as defined in the 1992 Agreement;

b. The University is entitled to, and Ligand is obligated to pay, 25% of all milestone payments and other consideration related to PROMACTA® and/or SB-559448, now due under the 1992 Agreement, including 25% of the milestone payments of $2 Million, $1 Million, $2 Million, and $1 Million relating to PROMACTA® and 25% of the milestone payment of $2 Million relating to SB-559448, as provided by Section 2.5 of the 1992 Agreement.

c. The University is entitled to, and Ligand will be obligated to pay in the future, 25% of all milestone and/or royalty payments and other consideration related to PROMACTA® and/or SB-559448 which shall become due under the 1992 Agreement hereafter.

d. The University is entitled to 25% of milestone and/or royalty payments paid to Ligand by any third party in connection with any Product as that term is defined in the 1992 Agreement.

e. The University is entitled to a 5% royalty on Ligand's Net Sales of Ligand Products that Ligand may bring forward on its own, and not in connection with a third party, as set forth in Section 4.2 of the 1992 Agreement.

5. Costs of suit; and

6. Such other and further relief as the Court may deem just and proper.

15

7.      The University requests a jury trial on all issues so triable.


Dated: New York, New York
       March 4, 2008

                              FOLEY & LARDNER LLP

                              By: *Peter N. Wang*
                                   Peter N. Wang
                                   Anat Hakim
                                   Douglas S. Heffer
                                   90 Park Avenue
                                   New York, New York 10016
                                   (212) 682-7474
                                   Attorneys for Plaintiff The Rockefeller
                                   University

# EXHIBIT A

# LICENSE AGREEMENT

AGREEMENT made as of the __30th__ day of __September__, 1992 ("Effective Date") by and between LIGAND PHARMACEUTICALS INCORPORATED ("Ligand"), a corporation organized and existing under the laws of the State of Delaware, having a principal place of business at 9393 Towne Centre Drive, San Diego, California 92121, and THE ROCKEFELLER UNIVERSITY ("Rockefeller"), a nonprofit education corporation organized and existing under the laws of the State of New York, having an office at 1230 York Avenue, New York, New York 10021.

## W I T N E S S E T H:

WHEREAS, Dr. James Darnell and his colleagues at Rockefeller and at NYU have developed valuable technology and know-how relating to peptidyl hormone mediated gene expression, including application for patents thereon, which constitutes core technology to be licensed hereunder;

WHEREAS, NYU has assigned to Rockefeller its rights to the core technology;

WHEREAS, Rockefeller has the right to grant exclusive license rights with respect to such core technology and to future developments relating thereto made at Rockefeller in the manner described herein; and

WHEREAS, Ligand wishes to obtain the exclusive license rights described herein for commercial development and application;

NOW, THEREFORE, in consideration of the mutual benefits to be derived hereunder, the parties hereto agree as follows:

agree\rockefeller
09\18\92

1. <u>Definitions</u>

The following terms will have the meanings assigned to them below when used in this Agreement.

1.1 "Party" shall mean either Ligand or Rockefeller and "Parties" shall mean Ligand and Rockefeller.

1.2 "Affiliate" shall mean a corporation or other entity which directly or indirectly controls, is controlled by or under common control with Ligand. An entity shall be regarded as in control of another if it owns, or directly or indirectly controls, at least 50% of the voting stock or other ownership interest of the other entity, or if it directly or indirectly possesses the power to direct or cause the direction of the management and policies of the other entity by any means whatsoever.

1.3 "Licensed Patent Rights" shall mean

(a) the patent application(s) set forth on Exhibit "A" attached hereto and all patents which may issue thereon;

(b) the patent applications which are divisionals, continuations, continuations-in-part, reissues, renewals, foreign counterparts, extensions or additions of the patents and/or applications described in (a) and (b) of this paragraph 1.3, and all patents which may issue thereon;

(c) and all other patent applications, and patents issuing thereon, filed to cover Technical Information, including divisionals, continuations-in-part, reissues, renewals, foreign counterparts, extensions or additions and patents which may issue thereon.

1.4 "Technical Information" shall mean any and all technical data, information processes, materials and know-how,

agree\rockefeller
09\18\92

2

Exhibit "1"
22

whether or not patentable, owned by Rockefeller and existing or
capable of description in a tangible form relating to peptidyl
hormone mediated gene expression (a) developed in the laboratory of
Dr. James Darnell of Rockefeller or Dr. David Levy of NYU as of the
Effective Date and (b) which is subsequently developed at
Rockefeller in the laboratory of Dr. James Darnell during the
period ending five (5) years from the Effective Date.

1.5    "Product" shall mean any product which embodies or
the use of which employs any invention(s) described or claimed in
Licensed Patent Rights or for which Technical Information was
essential to the discovery or development thereof.

1.6    "Process" shall mean any process which embodies or
the practice of which employees any invention(s) described or
claimed in Licensed Patent Rights or for which Technical
Information was essential to the discovery or development thereof.

1.7    "Territory" shall mean the entire world.

1.8    "Net Sales" shall mean, in the case of sales to
non-Affiliates, the invoiced price by Ligand or Affiliates less (a)
customary trade quantity and cash discounts actually allowed and
taken; (b) allowances actually given for returned, rejected or
recalled Products; actual charges for bad debts; (c) freight and
insurance if included in the price; government mandated rebates;
and (d) value added tax, sales, use or turnover taxes, excise
taxes, and custom duties included in the invoiced price.

2.    License Rights
2.1    Rockefeller hereby grants to Ligand a sole
exclusive license, including the right to grant royalty bearing
sublicenses under terms consistent with this Agreement under
Licensed Patent Rights and Technical Information, to make, have
made, use and sell Products or practice Processes in any country of

agree\rockefeller
09\18\92                          3

the Territory, except to the extent that Rockefeller's right to do so may be limited under the provisions of the following:

       (a)    35 United States, Section 201 et seq., and regulations and rules promulgated thereunder, or

       (b)    other applicable laws or regulations of the United States;

Provided only that Rockefeller is satisfied that the licensee is making a substantial and good faith effort to achieve practical application of the subject invention and its public use, Rockefeller agrees to use reasonable and proper efforts to extend exclusivity of the license consistent with the aforesaid U.S. government rights and policies should U.S. government action limit such exclusivity.

2.2    In consideration of the Ligand stock to be issued to Rockefeller and NYU as described in Section 2.3 and the cash payments to be made pursuant to Section 2.3, the license to Ligand under Section 2.1 shall be deemed to be fully paid up for research purposes including for the purposes of research done by Ligand or a Ligand sublicensee or collaboratively with a third party to the extent that the third party payments to Ligand do not exceed its fully burdened costs for performance of such research and development.

2.3    On the Effective Date, Ligand shall transfer to Rockefeller and NYU collectively a total of 150,000 shares of Series G Preferred Stock pursuant to Stock Transfer Agreements of even date herewith, 100,000 shares of which will vest on the Effective Date and 50,000 shares of which will vest in two installments of 25,000 shares on the first and second anniversaries hereof unless this Agreement is sooner terminated as provided herein. On the Effective Date, Ligand will also grant Rockefeller and NYU collectively, five year, net issuance warrants to purchase

Exhibit "1"
24

a total of 100,000 shares of Ligand common stock vesting and exercisable as follows:

> (i)     a total of 50,000 shares vesting at the third anniversary of the Effective Date and exercisable at $14.00 per share; and

> (ii)    a total of 50,000 shares vesting at the fourth anniversary of the Effective Date exercisable at the fair market value on the vesting date.

As further consideration, Ligand will make cash payments to Rockefeller and NYU pursuant to the following schedule:

> (a) On the Effective Date;
> Rockefeller     $45,000
> NYU             $ 5,000

> (b)     $67,500 to Rockefeller and $7,500 to NYU when the current Technical Information is successfully transferred to Ligand as described in Section 5;

> (c)     $67,500 to Rockefeller and $7,500 to NYU on each of the 1st – 4th anniversaries of the Effective Date.

> 2.4     Ligand will pay a royalty of five percent (5%) of its Net Sales of Products and on its net revenues, i.e., gross revenues less fully burdened costs, received from performance of Processes for a third party. The royalty shall be paid for a term which is the longer of ten (10) years or, on a country by country basis, expiration of the last patent in the Licensed Patent Rights having a claim which reads on the Product or Process or a method of making or using the Product or Process. Only one royalty will be owed on a Product or Process in the circumstance where the Product or Process is covered by multiple claims in the Licensed Patent Rights. Royalty payments made under this Section 2.4 and under

Section 2.5 shall be made to Rockefeller and NYU in the ratio
ninety percent (90%) to Rockefeller and ten percent (10%) to NYU.

     2.5    In the case of payments made to Ligand by a third
party to secure the right to use Technical Information or to sell
Products or Processes, Ligand will pay to Rockefeller and NYU
twenty-five percent (25%) of the payments made to Ligand by the
third party; provided, however, that in the situation where the
payment to Ligand is based on the third party's revenues arising
from sale of a Product or use of a Process, then Ligand shall pay
to Rockefeller and NYU the lesser of twenty-five percent (25%) of
the payment received from the third party or a royalty calculated
pursuant to Section 2.4 by treating the third party's sales of such
Products and Processes as Ligand sales.  Payments by a third party
to Ligand to purchase equity in Ligand and to fund research at
Ligand which do not generate net revenue as defined in Section 2.4
shall not be subject to sharing under this Section 2.5.

     2.6    In the event Ligand is required to make payments
to a third party to use Technical Information, it shall be entitled
to credit fifty percent (50%) of that payment against any royalty
owed under this Agreement but in no event may it reduce a payment
owed by more than fifty percent (50%).

     2.7    Ligand will diligently seek to develop Products
and/or Processes using or based on Technical Information.  Ligand
shall be deemed to have met its diligence obligations during the
first five (5) years of the Agreement if, in the aggregate, Ligand,
its Affiliates, licensees and research collaborators expend at
least $4,000,000 directed toward the development of Products and
Processes and support at least ten (10) full time scientist
equivalents in support of that effort.

agree\rockefeller
09\18\92

6

3. <u>Patents</u>

3.1    The Company agrees to reimburse Rockefeller for all amounts expended prior to the date hereof for the preparation, filing, prosecution and maintenance of Licensed Patent Rights licensed to the Company pursuant to Section 2.1 of this Agreement, said amount being $20,791.18 as of September 8, 1992.

3.2    The Company shall continue to reimburse Rockefeller for such reasonable additional filing, prosecution, and maintenance costs as shall be incurred on each such patent application or patent licensed hereunder during the term of such license.

3.3    Rockefeller shall select qualified independent patent counsel reasonably satisfactory to Ligand to file and prosecute all patent applications included in Licensed Patent Rights, including divisionals, continuations, continuations-in-part, reissues, and foreign counterparts. Such counsel shall regularly meet and/or consult with Ligand and/or its designated officers and counsel to keep them advised of the status of patent matters in the normal course. Patent counsel shall be instructed not to file any papers without giving Ligand ample time and opportunity to review and comment. Ligand shall be entitled to determine the countries in which it wishes to obtain and maintain patent protection under this Agreement and shall be free, at any time and at its sole option, to abandon patent prosecution or maintenance in any country of the Territory.

3.4    Ligand shall promptly advise Rockefeller of any decision not to finance the preparation, filing, prosecution or maintenance of any patent application or patent licensed hereunder in adequate time to allow Rockefeller, at its own cost, to effectuate such preparation, filing, prosecution, or maintenance if it desires to do so; and Ligand shall, at the request of Rockefeller, take whatever steps may be necessary to return to Rockefeller all rights which Ligand may have with respect to the

applicable Licensed Patent Rights and Technical Information which
it proposes to abandon.

Nothing herein is intended or shall be construed
as obligating Rockefeller to apply for any U.S. or foreign patents
at its own expense, or to defend, enforce, or support any patent or
patent application which may be included in Licensed Patent Rights
to which it has granted license rights to Ligand; provided,
however, that Rockefeller will cooperate with Ligand in Ligand's
activity in applying for U.S. or foreign patents or in the defense
or enforcement of Licensed Patent Rights.

Nothing herein is intended or shall be construed
as obligating Ligand to maintain its license with respect to any
patent or application licensed hereunder and to finance the
preparation, filing, prosecution or maintenance of any patent
application in any bounty or jurisdiction in which it believes it
is not in the best business interests.

3.5    Ligand shall have the right to institute patent
infringement proceedings against third parties based on any
Licensed Patent Rights licensed hereunder.  If Ligand does not
institute infringement proceedings against such third parties,
Rockefeller shall have the right but not the obligation, to
institute such proceedings.  Within thirty (30) days after notice
of its intention to commence such proceedings given to Ligand and
provided that Ligand does not, within such thirty (3) day period,
institutes its own proceedings, Rockefeller may institute such
proceedings.  The expenses of such proceedings, including lawyers'
fees, shall be borne by the Party instituting suit.  Each Party
shall execute all necessary and proper documents and take all other
appropriate action to allow the other Party to institute and
prosecution such proceedings.  Any award paid by third parties as
a result of such proceedings (whether by way of settlement or
otherwise) shall first be applied toward reimbursement for the
legal fees and expenses incurred, and the excess, if any, shall be

agree\rockefeller
09\18\92                    8

shared on a pro rata basis based on the expenses incurred by each party.

3.6 Should Ligand decide at any time during the term hereof that it will no longer commercially pursue the development of any invention licensed hereunder, Ligand shall promptly notify Rockefeller of its decision and, upon request from Rockefeller, shall take whatever steps are necessary to assure reversion to Rockefeller of all rights to that invention.

3.7 Ligand shall assume the responsibility at its own expense, and using counsel of its choosing, to defend against claims of patent infringement arising from the making, using, or selling of Products and Processes.

4. Payments and Reports

4.1 Within forty-five (45) days of the end of each calendar quarter during the term of this Agreement, beginning with the first quarter in which the obligation to make a payment to Rockefeller arises, Ligand shall submit to Rockefeller and NYU a report in writing setting forth the net revenues (revenues less Fully Burdened Costs) earned from the performance of a Process and the Net Sales of Products, and payments to Ligand which are subject to sharing with Rockefeller and NYU. The report shall include a calculation of the payments owed to Rockefeller and NYU arising therefrom and shall be accompanied by payment to Rockefeller and NYU in the full amount thereof.

4.2 Ligand shall keep adequate records in sufficient detail to enable the payments due from Ligand hereunder to Rockefeller and NYU to be determined, and permit said records to be inspected at any time during regular business hours at its principal place of business by an independent certified public accountant appointed by Rockefeller, or Rockefeller and NYU together but not NYU alone, for this purpose and who is reasonably

agree\rockefeller
09\18\92

9

acceptable to Ligand. The accountant shall be required to enter into a confidentiality agreement with Ligand substantially in the form of the provisions contained in Article 5 herein and shall only report to Rockefeller, and NYU if a joint audit is done, the discrepancy, if any, between the amount owed by Ligand for the audited period and the amount actually paid and discrepancies in the method of calculating Fully Burdened Costs. Ligand shall maintain such records for a minimum of three years. No more than one such audit shall be requested per calendar year. Rockefeller, or Rockefeller and NYU if a joint audit, shall bear the cost of any such audit; provided, however, that where the auditor determines that the payments owed for an audit period exceeds that paid to Rockefeller and NYU by Ligand by more than ten (10) percent, the reasonable cost of the audit shall be borne by Ligand.

5.    Technical Information Transfer

    Rockefeller will diligently cooperate with Ligand to transfer Technical Information to Ligand. Transfer of current Technical Information will be deemed to have successfully occurred for the purposes of Section 2.3 when Rockefeller has transferred to Ligand, and Ligand has successfully expressed, functional proteins from the clones of the genes specifically described in the applications for United States Patents identified in Exhibit "A".

6.    Confidentiality

    6.1    The Parties contemplate that during the course of their relationship arising under this Agreement it may be necessary to provide the other with confidential information to facilitate the performance of their obligations pursuant to this Agreement. The Parties agree, therefore, that information received from the other which is in writing and identified as confidential, or if disclosed orally, is confirmed in writing and designated confidential, shall be maintained in confidence and that reasonable

agree\rockefeller
09\18\92                          10

and prudent practices shall be followed to maintain the information in confidence, including, where necessary, obtaining written confidentiality agreements from employees not already bound by such agreements who have access to the confidential information. Information received in confidence shall be used by a party only for the purpose of and in connection with its performance of this Agreement. The obligation to maintain information in confidence shall survive this Agreement or termination thereof for any reason for a period of five (5) years thereafter. However, a party shall not be obliged to maintain information in confidence which it can show by written documentation: (a) to have been publicly known prior to submission to it; (b) to have been known or available to it prior to submission by the other party; (c) to have become publicly known without fault on its part subsequent to submission by the other party; (d) to have been received by it from a third party legally having possession of the information without obligations of confidentiality; (e) to be required to be disclosed pursuant to order of any court or governmental agency having jurisdiction thereof after notice to the other party sufficient to afford it an opportunity to intervene in the proceeding where disclosure is required; and (f) to be necessarily revealed in the course of marketing any Product or Process which is licensed hereunder.

7. <u>Academic Freedom</u>

Rockefeller and Ligand recognize the traditional freedom of all scientists to publish and present promptly the results of their research. Rockefeller and Ligand also recognize that exclusive patent rights can be jeopardized by public disclosure prior to the filing of suitable patent applications. Therefore, Rockefeller will assure that each proposed publication concerning any technology described in Licensed Patent Rights or which may constitute an Improvement thereof, before submission to a publisher, will be submitted to Ligand for review in connection with preservation of exclusive patent rights. Ligand shall have

agree\rockefeller
09\18\92                         11

thirty (30) days in which to review the publication, which may be extended for an additional thirty (30) days when Ligand provides substantial and reasonable need for such extension. By mutual agreement, this period may be further extended for not more than an additional three (3) months. Ligand will allow for simultaneous submission of the publication to the publisher and Ligand, where appropriate. Any publication by Ligand personnel will also be subject to similar pre-review before publication. Scientists at Rockefeller and Ligand will be expected to treat matters of authorship in a proper collaborative spirit, giving credit where it is due and proceeding in a manner which fosters cooperation and communication.

8.  <u>Warranty</u>

    8.1    Rockefeller warrants that it has the right to grant to the full extent thereof the license granted Ligand hereunder and that it has and will discharge their duty of disclosure to the United States Patent and Trademark Office.

    8.2    EXCEPT AS WARRANTED IN THE PRIOR SECTION 8.01, ROCKEFELLER MAKES NO WARRANTY, EXPRESS OR IMPLIED, INCLUDING ANY EXPRESS OR IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR PARTICULAR PURPOSE.

9.  <u>Publicity</u>

    Ligand will not use directly or by implication the name of Rockefeller, or the name of any member of the faculty or staff of Rockefeller, or any unpublished information or data relating to the investigation for any business, promotional, commercial or other purpose, without the prior written approval of Rockefeller and the faculty or staff member involved; except Ligand may use and disclose such names in its internal communications or in any required governmental reports and filings upon prior disclosure and consultation with Rockefeller, as appropriate.

agree\rockefeller
09\18\92

12

## 10. Product Liability

Ligand agrees to indemnify and hold harmless Rockefeller, its trustees, officers, agents, faculty, employees, and students from any and all liability arising from injury or damage to persons or property resulting directly or indirectly from Ligand's acquisition, use, manufacture, or sale of any Product covered by Licensed Patent Rights or Technical Information licensed hereunder. Ligand further agrees, so long as it is selling any Product, to obtain and maintain in force product liability insurance coverage in amounts reasonably satisfactory to Rockefeller, as appropriate to the risk as determined by reference to reliable standards in the industry, such insurance to specifically name Rockefeller as an additional insured.

## 11. Termination

11.1    The licenses herein granted shall continue for the full term of any patents licensed hereunder as the same or the effectiveness thereof may be extended by any governmental authority, rule or regulation applicable thereto.

11.2    Ligand shall have the right to terminate any license grant at any time upon ninety (90) days' prior written notice to Rockefeller, provided, however, that termination shall not affect Rockefeller's and NYU's rights and privileges as a stockholder of Ligand or their ownership of any vested shares of Ligand.

11.3    Any Party may terminate this Agreement in the event of a material breach by the other party, provided only that the offending Party is given notice of the breach and a reasonable time, not to exceed sixty (60) days, in which to cure such breach.

11.4    Any termination of this Agreement and of any option and/or license granted hereunder shall also terminate any applicable sublicense thereunder.

agree\rockefeller
09\18\92

13

11.5    The Parties acknowledge that Ligand's right to the future developments made at Rockefeller in the laboratory of Dr. James Darnell are an important element of this Agreement. Therefore, in the event that Dr. Darnell for health reasons or otherwise ceases to actively conduct research at Rockefeller as a full time member of the faculty, then Ligand can, without loss of rights under the Agreement, terminate the making of anniversary cash payments under Section 2.3.

12.    Notices

Any notice required to be given pursuant to this Agreement shall be made by personal delivery or, if by mail, then by registered or certified mail, return receipt requested, with postage and fees prepaid, by one Party to the other Party at the addresses noted below.

    In the case of Ligand, notice should be sent to:

        Ligand Pharmaceuticals Incorporated
        9393 Towne Centre Drive, Suite 100
        San Diego, CA  92121
        Attn:  General Counsel

    In the case of Rockefeller, notice should be sent to:

        The Rockefeller University
        1230 York Avenue
        New York, NY  10021
        Attn:  Office of the General Counsel

13.    Law to Govern

This Agreement shall be interpreted and governed in accordance with the laws of the State of New York.

14.    No Partnership

This Agreement shall not constitute a partnership or a joint venture, and neither Party may be bound by the other to any

agree\rockefeller
09\18\92

14

contract, arrangement or understanding except as specifically stated herein.

### 15. <u>No Waiver</u>

The failure of either party to enforce at any time any of the provisions of this Agreement, or any rights in respect thereto, or to exercise any election herein provided, shall in no way be considered to be a waiver of such provisions, rights or elections, or in any way to affect the validity of this Agreement. Exercise by either party any of its rights herein or any of its elections under the terms or covenants herein shall not preclude either party from exercising the same or any other rights in this Agreement, irrespective of any previous action or proceeding taken by either party hereunder.

### 16. <u>Severability</u>

If any provision of this Agreement is judicially determined to be void or unenforceable, such provision shall be deemed to be severable from the other provisions of this Agreement which shall remain in full force and effect. Either Party may request that a provision otherwise void or unenforceable be reformed so as to be valid and enforceable to the maximum extent permitted by law.

### 17. <u>Assignment</u>

This Agreement may not be assigned by either Party without the prior written consent of the other, which consent shall

agree\rockefeller
09\18\92

15

not be unreasonably withheld except that Ligand may assign this Agreement to a successor entity in the case of a merger, acquisition or other reorganization.

### 18.  Resolution of Dispute

The Parties agree that in the event of a dispute between them arising from concerning, or in any way relating to this Agreement, the Parties shall undertake good faith efforts to resolve the same amicably between themselves.

### 19.  Force Majeure

The Parties shall not be liable in any manner for failure or delay in fulfillment of all or party of this Agreement, directly or indirectly caused by acts of God, governmental orders or restrictions, war, war-like condition, revolution, riot, looting, strike, lockout, fire, flood or other similar or dissimilar causes or circumstances beyond the non-performing Party's control.  The non-performing Party shall promptly notify the other Party of the cause or circumstance and shall recommence its performance of its obligations as soon as practicable after the cause or circumstance ceases.

### 20.  Entire Understanding

This Agreement, together with the Exhibits hereto, and the further documents and agreements executed in connection with the transactions contemplated hereby constitute the entire agreement between the Parties and supersedes all prior

agree\rockefeller
09\18\92

16

understandings and agreements by the Parties with respect to the subject matter hereof.

IN WITNESS WHEREOF, the Parties have caused this Agreement to be duly executed as of the day and year first above written.

THE ROCKEFELLER UNIVERSITY

By _Torst Wiml_

Title _President_

LIGAND PHARMACEUTICALS INCORPORATED

By _David E Robinson_

Title _President and CEO_

EXHIBIT "A"

U. S. PATENT APPLICATIONS

1.  TITLE:           "RECEPTOR RECOGNITION FACTOR AND METHODS OF
                     USE THEREOF"
    INVENTORS:       Darnell and Levy
    SERIAL NO.:      07/613,326
    FILED:           November 14, 1990


2.  TITLE:           "RECEPTOR    RECOGNITION    FACTORS,    PROTEIN
                     SEQUENCES AND METHODS OF USE THEREOF"
    INVENTORS:       Darnell, Schindler and Fu
    SERIAL NO.:      07/854,296
    FILED:           March 19, 1992

Index No.

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

THE ROCKEFELLER UNIVERSITY,

Plaintiff,

-against-

LIGLAND PHARMACEUTICALS, INC.,

Defendant.

## SUMMONS AND COMPLAINT

**Foley & Lardner LLP**

ATTORNEYS FOR **Plaintiff**

## 90 PARK AVENUE

BOROUGH OF MANHATTAN              NEW YORK CITY

(212) 682-7474

Due and timely serve of        copy of the within

is hereby admitted this      day of      20__

Attorney for

NEW YORK
COUNTY CLERK'S OFFICE

Exhibit "1"

39

# COMPLETE THIS STUB

ndorse This INDEX NUMBER ON All
pers and advise your adversary of
e number assigned. Sec. 202.5,
niform Rules Of Trial Courts

**INDEX NUMBER FEE**
**$210.00**

DO NOT DETACH

Title of Action or Proceeding to be TYPED or PRINTED by applicant
**SUPREME COURT, NEW YORK COUNTY**

The Rockefeller University

v.

Ligand Pharmaceuticals, Inc.

08600638

```
        RECEIPT
NEW YORK COUNTY CLERK
   60 CENTRE STREET
 NEW YORK, NY 10007
        R141


DEPARTMENT                  AMOUNT

50 COMMERCIAL               165.00
 7 SURCHARGE                 45.00

TOTAL            210.00
CHECK                       210.00


CONS  CASHIER    DATE     TIME   TERM
21565  2345    08 MAR 04  9:02 AM  41-1
```

Exhibit "1"

40

EXHIBIT 2

# LICENSE AGREEMENT

AGREEMENT made as of the <u>30th</u> day of <u>September</u>, 1992 ("Effective Date") by and between LIGAND PHARMACEUTICALS INCORPORATED ("Ligand"), a corporation organized and existing under the laws of the State of Delaware, having a principal place of business at 9393 Towne Centre Drive, San Diego, California 92121, and THE ROCKEFELLER UNIVERSITY ("Rockefeller"), a nonprofit education corporation organized and existing under the laws of the State of New York, having an office at 1230 York Avenue, New York, New York 10021.

## W I T N E S S E T H:

WHEREAS, Dr. James Darnell and his colleagues at Rockefeller and at NYU have developed valuable technology and know-how relating to peptidyl hormone mediated gene expression, including application for patents thereon, which constitutes core technology to be licensed hereunder;

WHEREAS, NYU has assigned to Rockefeller its rights to the core technology;

WHEREAS, Rockefeller has the right to grant exclusive license rights with respect to such core technology and to future developments relating thereto made at Rockefeller in the manner described herein; and

WHEREAS, Ligand wishes to obtain the exclusive license rights described herein for commercial development and application;

NOW, THEREFORE, in consideration of the mutual benefits to be derived hereunder, the parties hereto agree as follows:

agree\rockefeller
09\18\92

1.   Definitions

The following terms will have the meanings assigned to them below when used in this Agreement.

1.1    "Party" shall mean either Ligand or Rockefeller and "Parties" shall mean Ligand and Rockefeller.

1.2    "Affiliate" shall mean a corporation or other entity which directly or indirectly controls, is controlled by or under common control with Ligand. An entity shall be regarded as in control of another if it owns, or directly or indirectly controls, at least 50% of the voting stock or other ownership interest of the other entity, or if it directly or indirectly possesses the power to direct or cause the direction of the management and policies of the other entity by any means whatsoever.

1.3    "Licensed Patent Rights" shall mean

(a)    the patent application(s) set forth on Exhibit "A" attached hereto and all patents which may issue thereon;

(b)    the patent applications which are divisionals, continuations, continuations-in-part, reissues, renewals, foreign counterparts, extensions or additions of the patents and/or applications described in (a) and (b) of this paragraph 1.3, and all patents which may issue thereon;

(c)    and all other patent applications, and patents issuing thereon, filed to cover Technical Information, including divisionals, continuations-in-part, reissues, renewals, foreign counterparts, extensions or additions and patents which may issue thereon.

1.4    "Technical Information" shall mean any and all technical data, information processes, materials and know-how,

whether or not patentable, owned by Rockefeller and existing or
capable of description in a tangible form relating to peptidyl
hormone mediated gene expression (a) developed in the laboratory of
Dr. James Darnell of Rockefeller or Dr. David Levy of NYU as of the
Effective Date and (b) which is subsequently developed at
Rockefeller in the laboratory of Dr. James Darnell during the
period ending five (5) years from the Effective Date.

    1.5    "Product" shall mean any product which embodies or
the use of which employs any invention(s) described or claimed in
Licensed Patent Rights or for which Technical Information was
essential to the discovery or development thereof.

    1.6    "Process" shall mean any process which embodies or
the practice of which employees any invention(s) described or
claimed in Licensed Patent Rights or for which Technical
Information was essential to the discovery or development thereof.

    1.7    "Territory" shall mean the entire world.

    1.8    "Net Sales" shall mean, in the case of sales to
non-Affiliates, the invoiced price by Ligand or Affiliates less (a)
customary trade quantity and cash discounts actually allowed and
taken; (b) allowances actually given for returned, rejected or
recalled Products; actual charges for bad debts; (c) freight and
insurance if included in the price; government mandated rebates;
and (d) value added tax, sales, use or turnover taxes, excise
taxes, and custom duties included in the invoiced price.

2.    License Rights

    2.1    Rockefeller hereby grants to Ligand a sole
exclusive license, including the right to grant royalty bearing
sublicenses under terms consistent with this Agreement under
Licensed Patent Rights and Technical Information, to make, have
made, use and sell Products or practice Processes in any country of

agree\rockefeller
09\18\92

    3

the Territory, except to the extent that Rockefeller's right to do so may be limited under the provisions of the following:

      (a)   35 United States, Section 201 _et seq._, and regulations and rules promulgated thereunder, or

      (b)   other applicable laws or regulations of the United States;

Provided only that Rockefeller is satisfied that the licensee is making a substantial and good faith effort to achieve practical application of the subject invention and its public use, Rockefeller agrees to use reasonable and proper efforts to extend exclusivity of the license consistent with the aforesaid U.S. government rights and policies should U.S. government action limit such exclusivity.

      2.2   In consideration of the Ligand stock to be issued to Rockefeller and NYU as described in Section 2.3 and the cash payments to be made pursuant to Section 2.3, the license to Ligand under Section 2.1 shall be deemed to be fully paid up for research purposes including for the purposes of research done by Ligand or a Ligand sublicensee or collaboratively with a third party to the extent that the third party payments to Ligand do not exceed its fully burdened costs for performance of such research and development.

      2.3   On the Effective Date, Ligand shall transfer to Rockefeller and NYU collectively a total of 150,000 shares of Series G Preferred Stock pursuant to Stock Transfer Agreements of even date herewith, 100,000 shares of which will vest on the Effective Date and 50,000 shares of which will vest in two installments of 25,000 shares on the first and second anniversaries hereof unless this Agreement is sooner terminated as provided herein. On the Effective Date, Ligand will also grant Rockefeller and NYU collectively, five year, net issuance warrants to purchase

agree\rockefeller
09\18\92

4

a total of 100,000 shares of Ligand common stock vesting and exercisable as follows:

(i)    a total of 50,000 shares vesting at the third anniversary of the Effective Date and exercisable at $14.00 per share; and

(ii)    a total of 50,000 shares vesting at the fourth anniversary of the Effective Date exercisable at the fair market value on the vesting date.

As further consideration, Ligand will make cash payments to Rockefeller and NYU pursuant to the following schedule:

        (a) On the Effective Date;
            Rockefeller    $45,000
            NYU            $ 5,000

        (b)    $67,500 to Rockefeller and $7,500 to NYU when the current Technical Information is successfully transferred to Ligand as described in Section 5;

        (c)    $67,500 to Rockefeller and $7,500 to NYU on each of the 1st – 4th anniversaries of the Effective Date.

        2.4    Ligand will pay a royalty of five percent (5%) of its Net Sales of Products and on its net revenues, i.e., gross revenues less fully burdened costs, received from performance of Processes for a third party.  The royalty shall be paid for a term which is the longer of ten (10) years or, on a country by country basis, expiration of the last patent in the Licensed Patent Rights having a claim which reads on the Product or Process or a method of making or using the Product or Process.  Only one royalty will be owed on a Product or Process in the circumstance where the Product or Process is covered by multiple claims in the Licensed Patent Rights.    Royalty payments made under this Section 2.4 and under

agree\rockefeller
09\18\92

5

Section 2.5 shall be made to Rockefeller and NYU in the ratio ninety percent (90%) to Rockefeller and ten percent (10%) to NYU.

     2.5   In the case of payments made to Ligand by a third party to secure the right to use Technical Information or to sell Products or Processes, Ligand will pay to Rockefeller and NYU twenty-five percent (25%) of the payments made to Ligand by the third party; provided, however, that in the situation where the payment to Ligand is based on the third party's revenues arising from sale of a Product or use of a Process, then Ligand shall pay to Rockefeller and NYU the lesser of twenty-five percent (25%) of the payment received from the third party or a royalty calculated pursuant to Section 2.4 by treating the third party's sales of such Products and Processes as Ligand sales. Payments by a third party to Ligand to purchase equity in Ligand and to fund research at Ligand which do not generate net revenue as defined in Section 2.4 shall not be subject to sharing under this Section 2.5.

     2.6   In the event Ligand is required to make payments to a third party to use Technical Information, it shall be entitled to credit fifty percent (50%) of that payment against any royalty owed under this Agreement but in no event may it reduce a payment owed by more than fifty percent (50%).

     2.7   Ligand will diligently seek to develop Products and/or Processes using or based on Technical Information. Ligand shall be deemed to have met its diligence obligations during the first five (5) years of the Agreement if, in the aggregate, Ligand, its Affiliates, licensees and research collaborators expend at least $4,000,000 directed toward the development of Products and Processes and support at least ten (10) full time scientist equivalents in support of that effort.

agree\rockefeller
09\18\92

6

3.    <u>Patents</u>

3.1    The Company agrees to reimburse Rockefeller for all amounts expended prior to the date hereof for the preparation, filing, prosecution and maintenance of Licensed Patent Rights licensed to the Company pursuant to Section 2.1 of this Agreement, said amount being $20,791.18 as of September 8, 1992.

3.2    The Company shall continue to reimburse Rockefeller for such reasonable additional filing, prosecution, and maintenance costs as shall be incurred on each such patent application or patent licensed hereunder during the term of such license.

3.3    Rockefeller shall select qualified independent patent counsel reasonably satisfactory to Ligand to file and prosecute all patent applications included in Licensed Patent Rights, including divisionals, continuations, continuations-in-part, reissues, and foreign counterparts.  Such counsel shall regularly meet and/or consult with Ligand and/or its designated officers and counsel to keep them advised of the status of patent matters in the normal course.  Patent counsel shall be instructed not to file any papers without giving Ligand ample time and opportunity to review and comment.  Ligand shall be entitled to determine the countries in which it wishes to obtain and maintain patent protection under this Agreement and shall be free, at any time and at its sole option, to abandon patent prosecution or maintenance in any country of the Territory.

3.4    Ligand shall promptly advise Rockefeller of any decision not to finance the preparation, filing, prosecution or maintenance of any patent application or patent licensed hereunder in adequate time to allow Rockefeller, at its own cost, to effectuate such preparation, filing, prosecution, or maintenance if it desires to do so; and Ligand shall, at the request of Rockefeller, take whatever steps may be necessary to return to Rockefeller all rights which Ligand may have with respect to the

applicable Licensed Patent Rights and Technical Information  which it proposes to abandon.

Nothing herein is intended or shall be construed as obligating Rockefeller to apply for any U.S. or foreign patents at its own expense, or to defend, enforce, or support any patent or patent application which may be included in Licensed Patent Rights to which it has granted license rights to Ligand; provided, however, that Rockefeller will cooperate with Ligand in Ligand's activity in applying for U.S. or foreign patents or in the defense or enforcement of Licensed Patent Rights.

Nothing herein is intended or shall be construed as obligating Ligand to maintain its license with respect to any patent or application licensed hereunder and to finance the preparation, filing, prosecution or maintenance of any patent application in any bounty or jurisdiction in which it believes it is not in the best business interests.

3.5    Ligand shall have the right to institute patent infringement proceedings against third parties based on any Licensed Patent Rights licensed hereunder.  If Ligand does not institute infringement proceedings against such third parties, Rockefeller shall have the right but not the obligation, to institute such proceedings.  Within thirty (30) days after notice of its intention to commence such proceedings given to Ligand and provided that Ligand does not, within such thirty (3) day period, institutes its own proceedings, Rockefeller may institute such proceedings.  The expenses of such proceedings, including lawyers' fees, shall be borne by the Party instituting suit.  Each Party shall execute all necessary and proper documents and take all other appropriate action to allow the other Party to institute and prosecution such proceedings.  Any award paid by third parties as a result of such proceedings (whether by way of settlement or otherwise) shall first be applied toward reimbursement for the legal fees and expenses incurred, and the excess, if any, shall be

agree\rockefeller
09\18\92

8

shared on a pro rata basis based on the expenses incurred by each party.

3.6     Should Ligand decide at any time during the term hereof that it will no longer commercially pursue the development of any invention licensed hereunder, Ligand shall promptly notify Rockefeller of its decision and, upon request from Rockefeller, shall take whatever steps are necessary to assure reversion to Rockefeller of all rights to that invention.

3.7     Ligand shall assume the responsibility at its own expense, and using counsel of its choosing, to defend against claims of patent infringement arising from the making, using, or selling of Products and Processes.

4.   Payments and Reports
4.1     Within forty-five (45) days of the end of each calendar quarter during the term of this Agreement, beginning with the first quarter in which the obligation to make a payment to Rockefeller arises, Ligand shall submit to Rockefeller and NYU a report in writing setting forth the net revenues (revenues less Fully Burdened Costs) earned from the performance of a Process and the Net Sales of Products, and payments to Ligand which are subject to sharing with Rockefeller and NYU.  The report shall include a calculation of the payments owed to Rockefeller and NYU arising therefrom and shall be accompanied by payment to Rockefeller and NYU in the full amount thereof.

4.2     Ligand shall keep adequate records in sufficient detail to enable the payments due from Ligand hereunder to Rockefeller and NYU to be determined, and permit said records to be inspected at any time during regular business hours at its principal place of business by an independent certified public accountant appointed by Rockefeller, or Rockefeller and NYU together but not NYU alone, for this purpose and who is reasonably

agree\rockefeller
09\18\92

9

acceptable to Ligand. The accountant shall be required to enter into a confidentiality agreement with Ligand substantially in the form of the provisions contained in Article 5 herein and shall only report to Rockefeller, and NYU if a joint audit is done, the discrepancy, if any, between the amount owed by Ligand for the audited period and the amount actually paid and discrepancies in the method of calculating Fully Burdened Costs. Ligand shall maintain such records for a minimum of three years. No more than one such audit shall be requested per calendar year. Rockefeller, or Rockefeller and NYU if a joint audit, shall bear the cost of any such audit; provided, however, that where the auditor determines that the payments owed for an audit period exceeds that paid to Rockefeller and NYU by Ligand by more than ten (10) percent, the reasonable cost of the audit shall be borne by Ligand.

5.   Technical Information Transfer

Rockefeller will diligently cooperate with Ligand to transfer Technical Information to Ligand. Transfer of current Technical Information will be deemed to have successfully occurred for the purposes of Section 2.3 when Rockefeller has transferred to Ligand, and Ligand has successfully expressed, functional proteins from the clones of the genes specifically described in the applications for United States Patents identified in Exhibit "A".

6.   Confidentiality

6.1   The Parties contemplate that during the course of their relationship arising under this Agreement it may be necessary to provide the other with confidential information to facilitate the performance of their obligations pursuant to this Agreement. The Parties agree, therefore, that information received from the other which is in writing and identified as confidential, or if disclosed orally, is confirmed in writing and designated confidential, shall be maintained in confidence and that reasonable

agree\rockefeller
09\18\92

10

and prudent practices shall be followed to maintain the information in confidence, including, where necessary, obtaining written confidentiality agreements from employees not already bound by such agreements who have access to the confidential information. Information received in confidence shall be used by a party only for the purpose of and in connection with its performance of this Agreement. The obligation to maintain information in confidence shall survive this Agreement or termination thereof for any reason for a period of five (5) years thereafter. However, a party shall not be obliged to maintain information in confidence which it can show by written documentation: (a) to have been publicly known prior to submission to it; (b) to have been known or available to it prior to submission by the other party; (c) to have become publicly known without fault on its part subsequent to submission by the other party; (d) to have been received by it from a third party legally having possession of the information without obligations of confidentiality; (e) to be required to be disclosed pursuant to order of any court or governmental agency having jurisdiction thereof after notice to the other party sufficient to afford it an opportunity to intervene in the proceeding where disclosure is required; and (f) to be necessarily revealed in the course of marketing any Product or Process which is licensed hereunder.

7.    Academic Freedom

Rockefeller and Ligand recognize the traditional freedom of all scientists to publish and present promptly the results of their research. Rockefeller and Ligand also recognize that exclusive patent rights can be jeopardized by public disclosure prior to the filing of suitable patent applications. Therefore, Rockefeller will assure that each proposed publication concerning any technology described in Licensed Patent Rights or which may constitute an Improvement thereof, before submission to a publisher, will be submitted to Ligand for review in connection with preservation of exclusive patent rights. Ligand shall have

agree\rockefeller
09\18\92                           11

thirty (30) days in which to review the publication, which may be extended for an additional thirty (30) days when Ligand provides substantial and reasonable need for such extension. By mutual agreement, this period may be further extended for not more than an additional three (3) months. Ligand will allow for simultaneous submission of the publication to the publisher and Ligand, where appropriate. Any publication by Ligand personnel will also be subject to similar pre-review before publication. Scientists at Rockefeller and Ligand will be expected to treat matters of authorship in a proper collaborative spirit, giving credit where it is due and proceeding in a manner which fosters cooperation and communication.

8.    Warranty

    8.1    Rockefeller warrants that it has the right to grant to the full extent thereof the license granted Ligand hereunder and that it has and will discharge their duty of disclosure to the United States Patent and Trademark Office.

    8.2    EXCEPT AS WARRANTED IN THE PRIOR SECTION 8.01, ROCKEFELLER MAKES NO WARRANTY, EXPRESS OR IMPLIED, INCLUDING ANY EXPRESS OR IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR PARTICULAR PURPOSE.

9.    Publicity

    Ligand will not use directly or by implication the name of Rockefeller, or the name of any member of the faculty or staff of Rockefeller, or any unpublished information or data relating to the investigation for any business, promotional, commercial or other purpose, without the prior written approval of Rockefeller and the faculty or staff member involved; except Ligand may use and disclose such names in its internal communications or in any required governmental reports and filings upon prior disclosure and consultation with Rockefeller, as appropriate.

agree\rockefeller
09\18\92

12

### 10. Product Liability

Ligand agrees to indemnify and hold harmless Rockefeller, its trustees, officers, agents, faculty, employees, and students from any and all liability arising from injury or damage to persons or property resulting directly or indirectly from Ligand's acquisition, use, manufacture, or sale of any Product covered by Licensed Patent Rights or Technical Information licensed hereunder. Ligand further agrees, so long as it is selling any Product, to obtain and maintain in force product liability insurance coverage in amounts reasonably satisfactory to Rockefeller, as appropriate to the risk as determined by reference to reliable standards in the industry, such insurance to specifically name Rockefeller as an additional insured.

### 11. Termination

11.1    The licenses herein granted shall continue for the full term of any patents licensed hereunder as the same or the effectiveness thereof may be extended by any governmental authority, rule or regulation applicable thereto.

11.2    Ligand shall have the right to terminate any license grant at any time upon ninety (90) days' prior written notice to Rockefeller, provided, however, that termination shall not affect Rockefeller's and NYU's rights and privileges as a stockholder of Ligand or their ownership of any vested shares of Ligand.

11.3    Any Party may terminate this Agreement in the event of a material breach by the other party, provided only that the offending Party is given notice of the breach and a reasonable time, not to exceed sixty (60) days, in which to cure such breach.

11.4    Any termination of this Agreement and of any option and/or license granted hereunder shall also terminate any applicable sublicense thereunder.

agree\rockefeller
09\18\92

13

11.5    The Parties acknowledge that Ligand's right to the future developments made at Rockefeller in the laboratory of Dr. James Darnell are an important element of this Agreement. Therefore, in the event that Dr. Darnell for health reasons or otherwise ceases to actively conduct research at Rockefeller as a full time member of the faculty, then Ligand can, without loss of rights under the Agreement, terminate the making of anniversary cash payments under Section 2.3.

12.    <u>Notices</u>

Any notice required to be given pursuant to this Agreement shall be made by personal delivery or, if by mail, then by registered or certified mail, return receipt requested, with postage and fees prepaid, by one Party to the other Party at the addresses noted below.

In the case of Ligand, notice should be sent to:

Ligand Pharmaceuticals Incorporated
9393 Towne Centre Drive, Suite 100
San Diego, CA   92121
Attn:   General Counsel

In the case of Rockefeller, notice should be sent to:

The Rockefeller University
1230 York Avenue
New York, NY   10021
Attn:   Office of the General Counsel

13.    <u>Law to Govern</u>

This Agreement shall be interpreted and governed in accordance with the laws of the State of New York.

14.    <u>No Partnership</u>

This Agreement shall not constitute a partnership or a joint venture, and neither Party may be bound by the other to any

agree\rockefeller
09\18\92

14

contract, arrangement or understanding except as specifically stated herein.

## 15. No Waiver

The failure of either party to enforce at any time any of the provisions of this Agreement, or any rights in respect thereto, or to exercise any election herein provided, shall in no way be considered to be a waiver of such provisions, rights or elections, or in any way to affect the validity of this Agreement. Exercise by either party any of its rights herein or any of its elections under the terms or covenants herein shall not preclude either party from exercising the same or any other rights in this Agreement, irrespective of any previous action or proceeding taken by either party hereunder.

## 16. Severability

If any provision of this Agreement is judicially determined to be void or unenforceable, such provision shall be deemed to be severable from the other provisions of this Agreement which shall remain in full force and effect. Either Party may request that a provision otherwise void or unenforceable be reformed so as to be valid and enforceable to the maximum extent permitted by law.

## 17. Assignment

This Agreement may not be assigned by either Party without the prior written consent of the other, which consent shall

agree\rockefeller
09\18\92

not be unreasonably withheld except that Ligand may assign this Agreement to a successor entity in the case of a merger, acquisition or other reorganization.

## 18. Resolution of Dispute

The Parties agree that in the event of a dispute between them arising from concerning, or in any way relating to this Agreement, the Parties shall undertake good faith efforts to resolve the same amicably between themselves.

## 19. Force Majeure

The Parties shall not be liable in any manner for failure or delay in fulfillment of all or party of this Agreement, directly or indirectly caused by acts of God, governmental orders or restrictions, war, war-like condition, revolution, riot, looting, strike, lockout, fire, flood or other similar or dissimilar causes or circumstances beyond the non-performing Party's control. The non-performing Party shall promptly notify the other Party of the cause or circumstance and shall recommence its performance of its obligations as soon as practicable after the cause or circumstance ceases.

## 20. Entire Understanding

This Agreement, together with the Exhibits hereto, and the further documents and agreements executed in connection with the transactions contemplated hereby constitute the entire agreement between the Parties and supersedes all prior

agree\rockefeller
09\18\92

16

understandings and agreements by the Parties with respect to the subject matter hereof.

　　　　IN WITNESS WHEREOF, the Parties have caused this Agreement to be duly executed as of the day and year first above written.

**THE ROCKEFELLER UNIVERSITY**　　　　　**LIGAND PHARMACEUTICALS INCORPORATED**

By _____　　　　By _____

Title　President_____　　　　Title　President and CEO_____

Exhibit "2"
57

EXHIBIT "A"

## U. S. PATENT APPLICATIONS

1.  TITLE:        "RECEPTOR RECOGNITION FACTOR AND METHODS OF
                 USE THEREOF"
    INVENTORS:   Darnell and Levy
    SERIAL NO.:  07/613,326
    FILED:       November 14, 1990


2.  TITLE:        "RECEPTOR    RECOGNITION    FACTORS,    PROTEIN
                 SEQUENCES AND METHODS OF USE THEREOF"
    INVENTORS:   Darnell, Schindler and Fu
    SERIAL NO.:  07/854,296
    FILED:       March 19, 1992

agree\rockefeller
09\18\92                         A-1

EXHIBIT 3



March 13, 2008

Certified Mail, Return Receipt Requested

The Rockefeller University
1230 York Avenue
New York, NY 10021
Attn: Office of the General Counsel

Dear Sirs:

As specified under Article 12 of our Agreement dated September 30th, 1992, (attached as Appendix A) with this letter we terminate the Agreement under Section 11.3 for material breach. Rockefeller has breached its warranty under Section 8.1 of the Agreement, which states:

> 8.1    Rockefeller warrants that it has the right to grant to the full extent thereof the license granted Ligand hereunder and that it has and will discharge their duty of disclosure to the United States Patent and Trademark Office.

Rockefeller did not "discharge their duty of disclosure to the United States Patent and Trademark Office." We have detailed Rockefeller's failure to meet this duty in the attached Appendix B. In summary, in the prosecution of the licensed Rockefeller patents discussed in Appendix B we have identified references of which Rockefeller was aware that were material to the examination of the specified patents, but that were not cited to the Patent and Trademark Office. The references that Rockefeller withheld from the Patent and Trademark Office were material to examination of the specified patents because they render the claims in question obvious when taken alone or in combination with other references. This conduct constitutes a material breach under Section 11.3 of the Agreement.

Furthermore, this breach is incurable. The withholding of such references from the USPTO constitutes inequitable conduct and thus renders the patents listed in Appendix B invalid and unenforceable.

This termination for material breach under Section 11.3 is in addition to our termination of the Agreement under Section 11.2 sent August 9, 2007 (attached as Appendix C). We believe the November 9, 2007 termination date created by the earlier letter to be the effective date for termination of the Agreement. We are simply now providing you notice that we have recently learned of another ground for termination that we are hereby invoking.

Regards,

Charles S. Berkman
Vice President, General Counsel and Secretary

5003772
031208

EXHIBIT 4

**ATTORNEYS AT LAW**

WASHINGTON HARBOUR
3000 K STREET, N.W., SUITE 500
WASHINGTON, D.C.  20007-5143
202.672.5300 TEL
202.672.5399 FAX
foley.com

March 17, 2008

<u>Vɪᴀ E-Mᴀɪʟ</u>

CLIENT/MATTER NUMBER
092230-0102

Charles S. Berkman
General Counsel, Vice President and Secretary
Ligand Pharmaceuticals, Inc.
10275 Science Center Drive
San Diego, CA 92121

Re:     The Rockefeller University/Ligand Pharmaceuticals, Inc.
        Dispute

Dear Charles:

I write in response to your March 11, 2008 and March 13, 2008 letters to Harriet Rabb.

<u>Service of Process.</u>  The statements in your March 11 letter concerning service of process incorrectly recount what happened.  As confirmed in emails by you and Nancy Koch on March 4, 2008, the only agreement that you and Ms. Koch reached on that date was that both parties agreed to accept service of process by Federal Express.  There was no agreement that precluded service by any other means and no agreement that the effective date of service would be March 5.  The facts are that the University sent a service copy to Ligand by Federal Express and also personally served Ligand's New York agent on March 4, and the University did not receive Ligand's complaint sent by Federal Express until March 6.  Ligand's outside counsel at Knobbe Martens was aware that service of Ligand's complaint by Federal Express had not been effectuated on March 5.  On that day, a person from Knobbe Martens left me two telephone messages, indicating that Ligand would personally serve the University unless the parties agreed that Ligand's service would be effective on that date.  Although the University declined to make such an agreement, Ligand did not personally serve the University on March 5.

<u>Ligand's Preemptive Suit.</u>  To the extent you suggest that the University attempted to "gain advantage in priority of suit or other procedural matters," the same can be said of Ligand.  You stated that Ligand has "worked hard to be open with Rockefeller on all matters of the dispute" and "to conduct ourselves with . . . forthrightness in the process."  Those statements are contradicted by Ligand's haste to file a declaratory judgment action in California federal court on the morning of March 4 and Ligand's failure to give advance notice to the University of its intention to file suit.

| | | | | |
|---|---|---|---|---|
| BOSTON | JACKSONVILLE | NEW YORK | SAN FRANCISCO | TOKYO |
| BRUSSELS | LOS ANGELES | ORLANDO | SHANGHAI | WASHINGTON, D.C. |
| CENTURY CITY | MADISON | SACRAMENTO | SILICON VALLEY | |
| CHICAGO | MIAMI | SAN DIEGO | TALLAHASSEE | |
| DETROIT | MILWAUKEE | SAN DIEGO/DEL MAR | TAMPA | |

WASH_3202983.3



**FOLEY**

FOLEY & LARDNER LLP

Charles S. Berkman
March 17, 2008
Page 2

The University, by contrast, was exceptionally open with Ligand, and with you in particular, in stating, well in advance, that the University would file suit when the Tolling Agreement expired on March 4 if the parties had not reached a settlement. At no point during those discussions did Ligand disclose its intention to file a preemptory suit for declaratory relief. While the University believes that Ligand's action ultimately will be dismissed, the University requests that Ligand withdraw its preemptory action at this time so as to conserve valuable time and resources of the parties and the Courts, and to demonstrate Ligand's commitment to forthrightness in the process.

<u>Ligand's Allegation of Conflict and Ethical Breach.</u> Your March 11 letter raises "a potential conflict with [the University's] legal representation" and Ligand's apparent "concern[] that Foley & Lardner may be breaching an ethical obligation to Ligand by representing Rockefeller in the ongoing litigations." The University and Foley & Lardner take your allegation very seriously. Based on the information you provided, including a citation to the prosecution of PCT Application No. WO 95/31722, Foley & Lardner has conducted a careful internal review and has found no ethical conflict as to Foley & Lardner's representation of the University in this matter and Dr. Richard Warburg's prior patent prosecution work while he was at Lyon & Lyon, LLP. We are disconcerted by the fact that Ligand waited until this time to raise this issue. You, Charles, also worked at Lyon & Lyon, LLP, substantially overlapping with Dr. Warburg, and you have known of Foley & Lardner's representation of the University in this matter since the beginning of February 2008, in the course of your own participation along with Ligand's outside counsel in the parties' unusually intensive and open discussions about this matter. We expect that Ligand has engaged in appropriate and extensive due diligence before making this serious accusation. We request that Ligand provide any and all additional information that Ligand may have to support its allegation of conflict and ethical breach immediately, so that a complete and prompt resolution of this matter can occur.

<u>Ligand's Purported Termination.</u> Your March 13 letter purports to raise yet another ground for terminating the September 30, 1992 License Agreement (the "1992 Agreement") for material breach under Section 11.3. You have contended that "Rockefeller did not 'discharge their duty of disclosure to the United States Patent and Trademark Office.'" Contrary to your statement, we emphasize that Rockefeller and its patent attorneys always have discharged their duty to disclose relevant prior art to the U.S. Patent and Trademark Office. We also note that Ligand was involved in the prosecution of Rockefeller's patents and patent applications covered by the 1992 Agreement and never raised any claim of material breach by the University during the past 15 years.

We note that, although we will be evaluating the publications and patents you cite in your March 13 letter, Ligand's most recent attempt to claim termination is a belated and disingenuous attempt to buttress Ligand's invalid termination last August. After digesting the University's explanation in its October 3, 2007 letter as to the reasons why Ligand's termination last August was ineffective, Ligand now has surfaced this novel argument. This new argument fails on several grounds, including the same reasons stated more fully in the October 3 letter. In short, Ligand cannot avoid its payment obligations at this late date, now that Rockefeller has fully performed under the 1992 Agreement. The University's rights to compensation under the terms of the 1992 Agreement vested



**FOLEY & LARDNER LLP**

Charles S. Berkman
March 17, 2008
Page 3

after the University fully performed its part of the bargain through exclusively licensing to Ligand all of its valuable Technical Information and Licensed Patent Rights and providing access to Dr. Darnell and his research for more than the five-year early period of the Agreement. It would make no sense for one party to fully perform its obligations, yet allow the other party to avoid its payment obligations after receiving the full benefit.  Indeed, New York law does not permit a party to avoid its payment obligations by terminating the contract after the other side has fully performed.  For this reason, Rockefeller rejects Ligand's most recent, ineffective termination notice.

Very truly yours,

Anat Hakim

Anat Hakim

EXHIBIT 5

COPY

1  Darrell Olson (State Bar No. 77633)
   KNOBBE, MARTENS, OLSON & BEAR, LLP
2  2040 Main Street
   Fourteenth Floor
3  Irvine, CA 92614
   Phone: (949) 760-0404
4  Facsimile: (949) 760-9502

5  Joseph M. Reisman (State Bar No. 246922)
   Ali S. Razai (State Bar No. 196122)
6  KNOBBE, MARTENS, OLSON & BEAR, LLP
   550 West C Street
7  Suite 1200
   San Diego, CA 92101
8  Phone: (619) 235-8550
   Facsimile: (619) 235-0176

9

10  Attorneys for Plaintiff
    LIGAND PHARMACEUTICALS INCORPORATED
11

12

13                    IN THE UNITED STATES DISTRICT COURT

14                  FOR THE SOUTHERN DISTRICT OF CALIFORNIA

15

16

17                                          '08 CV 4 0 1   BEN WMc

    LIGAND PHARMACEUTICALS          )   Civil Action No.
18  INCORPORATED, a Delaware corporation, )
                                    )   **COMPLAINT FOR DECLARATORY**
19        Plaintiff,                )   **JUDGMENT**
                                    )
20        v.                        )
                                    )
21  THE ROCKEFELLER UNIVERSITY, a   )
    New York not-for-profit corporation, )
22                                  )
          Defendant.                )
23                                  )
                                    )
24  _____ )

25

26

27

28

FILED

MAR 0 4 2008

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                        DEPUTY

# I. **NATURE OF THE ACTION**

1.     This is a civil action under the Declaratory Judgment Act, 28 U.S.C. § 2201, et seq., for declaration of rights between the parties under a License Agreement dated September 30, 1992 ("License Agreement," attached as Exhibit A and incorporated by reference) and under certain United States patents related to the License Agreement.

# II. **PARTIES**

2.     Plaintiff LIGAND PHARMACEUTICALS INCORPORATED (hereinafter "Ligand" or "Plaintiff") is a Delaware corporation with its principal place of business at 10275 Science Center Drive San Diego, California 92121.

3.     Ligand was incorporated in 1987 and since then has been engaged in, *inter alia*, the research and development of drugs for various diseases and disorders.   Ligand currently has less than sixty (60) employees.

4.     Defendant THE ROCKEFELLER UNIVERSITY (hereinafter "Rockefeller" or "Defendant") is a New York not-for-profit corporation with its principal place of business at 1230 York Avenue, New York, New York 10021.

5.     Rockefeller is a university periodically engaged in research and development. Rockefeller currently has 69 heads of laboratories, 200 research and clinical scientists, 350 postdoctoral investigators, 1,050 support staff, 150 Ph.D. students, 50 M.D.-Ph.D. students and 960 alumni according to the Rockefeller website.

6.     NEW YORK UNIVERSITY ("NYU") is a New York not-for-profit corporation with its principal place of business at 70 Washington Square S, New York, New York 10012.

7.     NYU is a university periodically engaged in research and development.  NYU is not a party to the License Agreement or this lawsuit, but in the past it has received payments due to it under the License Agreement.

# III. **JURISDICTION AND VENUE**

8.     This Court has personal jurisdiction over Defendant Rockefeller by virtue of its presence and activities in the state of California, including but not limited to entering into

1   the License Agreement, as rights granted by the License Agreement were to be used in this

2   judicial district, its past ownership interest in Ligand (located in this judicial district) under

3   the License Agreement, as well as activities of Dr. James E. Darnell ("Darnell") in

4   performing services in this judicial district under a Professional Services Agreement

5   ("Services Agreement") dated September 30, 1992.

6          9.      NYU is not being joined in this lawsuit for the following reasons. It is not a

7   party to the License Agreement. Its interests under the License Agreement are subordinate to

8   those of Rockefeller and, on information and belief, those interests are adequately protected

9   by Rockefeller. Finally, Rockefeller, not NYU, is the owner of any intellectual property

10  rights licensed under the License Agreement.

11         10.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1332, 1338

12  and 2201.

13         11.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(a) and

14  (c).

15                              IV. **TECHNOLOGY**

16         12.     Since its inception, and prior to entering into the License Agreement with

17  Rockefeller, Ligand has been actively involved in small molecule drug discovery. For

18  example, Ligand owns intracellular receptor ("IR") technology that relates to families of

19  transcription factors that change cell function by selectively turning on or off specific genes

20  in response to circulating signals that act on cells. Ligand developed (and/or in-licensed from

21  one or more sources other than Rockefeller) certain IR-based transcriptional assays to screen

22  candidate drugs.

23         13.     Thrombopoietin ("TPO") is a peptidyl hormone that activates a signaling

24  cascade in a cell by binding to a receptor on a cell surface. Once bound by TPO, the cell

25  surface receptor initiates a signaling cascade from the cell surface to the nucleus, where

26  specific genes are selectively turned on in response to TPO. This gene regulation is mediated

27  by transcription factors activated by the TPO signaling cascade and has a major effect on cell

28  fate decisions by regulating cell proliferation and differentiation.

14. Ligand developed cell-based assays to screen candidate TPO mimics. These assays included cell proliferation and cell differentiation assays, as well as transcriptional assays. The transcriptional assays developed by Ligand to screen candidate TPO mimics were analogous to the transcriptional assays developed for Ligand's IR program.

15. The transcriptional assays involved use of a reporter construct with produces a signal in response to activated transcription factors in the cell.

16. Ligand's assays were used to discover and develop new drugs that mimic the action of TPO and may be useful in the treatment of a wide variety of diseases and disorders.

## V. FACTUAL BACKGROUND

17. Darnell served on Ligand's Scientific Advisory Board for several years and visited with Ligand scientists at Ligand's facilities and elsewhere in San Diego many times in connection with the License Agreement and/or the Services Agreement.

18. On information and belief, at all times relevant here to, Darnell acted in conjunction with Rockefeller and had authority to act on behalf of Rockefeller to fulfill Rockefeller's obligations under the License Agreement.

19. After negotiations between the parties, Ligand executed two separate agreements on September 30, 1992, the License Agreement with Rockefeller and the Services Agreement with Darnell.

20. The License Agreement was generally directed to the licensing of "Licensed Patent Rights" and "Technical Information" relating to peptidyl hormone mediated gene expression.

21. The Licensed Patent Rights are defined in Section 1.3 of the License Agreement to be patent applications identified in Exhibit A to the License Agreement, related "divisionals, continuations, continuations-in-part, reissues, renewals, foreign counterparts, extension or additions," and any patents which may issue thereon. (Section 1.3, License Agreement).

22. Rockefeller is the identified assignee of United States patents, including: U.S. Pat. No. 6,605,442; U.S. Pat. No. 5,976,835; U.S. Pat. No. 6,013,475; U.S. Pat. No.

6,030,808; U.S. Pat. No. 6,338,949; U.S. Pat. No. 6,124,118; U.S. Pat. No. 7,060,682; U.S. Pat. No. 5,716,622; U.S. Pat. No. 5,883,228; U.S. Pat. No. 6,030,780; U.S. Pat. No. 6,720,154; U.S. Pat. No. 7,115,567; U.S. Pat. No. 6,960,647; and U.S. Pat. No. 7,211,655 ("Rockefeller Patents" attached as Exhibits B through O), which all either claim priority back to the patent applications listed in Exhibit A to the License Agreement or relate to what Rockefeller argues is Technical Information under the License Agreement.

23. Technical Information is defined in Section 1.4 of the License Agreement to include "technical data, information processes, materials and know-how, whether or not patentable" relating to peptidyl mediated gene expression that is owned by Rockefeller and was developed as of the effective date of the License Agreement or during the next five (5) years. (Section 1.4, License Agreement).

24. The License Agreement between Ligand and Rockefeller contemplated that certain of the intellectual property of Rockefeller might be used by Ligand in development of new pharmaceutical agents. (Sections 2.4 and 2.5, License Agreement). Nothing in the License Agreement prohibited Ligand from developing processes and products relating to cell-based assays to screen candidate drugs independent of Rockefeller's intellectual property, as Ligand had done previously with its IR technology.

25. Independent of the rights acquired under the License Agreement, on December 29, 1994, Ligand entered into a Research Development and License Agreement ("GSK License") with SmithKline Beecham Corporation, now GlaxoSmithKline ("GSK"). The GSK License relates to a joint research and development effort by Ligand and GSK directed to discovery of small molecule compounds which act as modulators of certain HEMATOPOIETIC GROWTH FACTORS (including TPO, as defined in Section 1.17 of the GSK License) and to develop pharmaceutical products from such compounds.

26. On information and belief, Rockefeller has been aware of the GSK License since it was signed by Ligand and GSK in 1994.

27. Under the RESEARCH PROGRAM as defined in the GSK License, a cell-based high throughput screen was developed by Ligand to help identify at least one

potentially useful drug known as eltrombopag or PROMACTA® and a back-up thereto known as SB-559448 ("GSK Products"). Under the GSK License, GSK has paid Ligand milestone payments amounting to $8 million for achieving certain milestones under the GSK License.

28.    GSK has made significant progress toward gaining approval for at least one of the GSK Products through the regulatory process before the Food and Drug Administration.

29.    As early as October 2003, Rockefeller became specifically aware of the GSK Products and inquired about and demanded payment from Ligand under the License Agreement for what Rockefeller alleged were uses of its Licensed Patent Rights or Technical Information covered by the License Agreement.

30.    Ligand disputes that the GSK Products are subject to payments under the License Agreement.

31.    Section 2.5 of the License Agreement obligates Ligand to pay Rockefeller only under certain circumstances. The payments described in Section 2.5 generally are twenty five per cent (25%) of payments received from third parties by Ligand if those payments were to secure the right to use Technical Information or the right to sell Products or Processes.

32.    The GSK Products are not Products as the term "Product" is defined under Section 1.5 of the License Agreement. They do not embody or use any invention described or claimed in the Licensed Patent Rights. Furthermore, Technical Information was not essential to their discovery or development. GSK's payments to Ligand are not and will not be to secure any Rockefeller rights that would otherwise prevent GSK from selling the GSK Products. Rockefeller does not own any Licensed Patent Rights or Technical Information that GSK would need to sell the GSK Products. Thus, no payments are due to Rockefeller under the License Agreement.

33.    Rockefeller has alleged the GSK Products embody or use one or more invention(s) described or claimed in the Licensed Patent Rights. In order to qualify as an invention in a claim of an issued patent, however, the alleged invention must be defined by a claim that is valid and enforceable.

34.     Section 11.2 of the License Agreement provides that Ligand shall have the right to terminate any license grant at any time upon ninety days written notice.

35.     On August 9, 2007, pursuant to Section 11.2, Ligand sent by facsimile and U.S. Mail a notice to Rockefeller of its intent to terminate the License Agreement. Pursuant to Section 11.2, the termination was effective under the License Agreement ninety days thereafter or on November 7, 2007.

36.     Since termination of the License Agreement under Section 11.2, Rockefeller has claimed that the License Agreement was not terminated. Rockefeller contends that 25% of past and future payments related to GSK Products received by Ligand must be shared with Rockefeller.

37.     The parties entered into a tolling agreement that contemplated the parties would try to resolve the controversy without the need for litigation. The tolling agreement expired on March 3, 2008. Rockefeller's communications prior to March 3, 2008, including their refusal to extend the tolling agreement and their specific threat of filing a lawsuit against Ligand at the expiration of the tolling agreement, have made Ligand reasonably afraid that it will be sued by Rockefeller on these issues today or within the next few days.

## VI. <u>FIRST CLAIM FOR RELIEF – DECLARATORY JUDGMENT SCOPE OF LICENSED PATENT RIGHTS</u>

38.     Ligand incorporates by reference as though fully set forth herein paragraphs 1 through 37 of this Complaint.

39.     The License Agreement between Ligand and Rockefeller provides for, among other things, a license of Licensed Patent Rights. (Section 2.1, License Agreement).

40.     Rockefeller has alleged that the Rockefeller Patents are included within the Licensed Patent Rights and also that the GSK Products or their use embody or employ the Licensed Patent Rights.

41.     Applying the plain meaning of the words of the License Agreement, the GSK Products and their use do not embody or employ any invention described or claimed in the Licensed Patent Rights.

42.     An actual controversy exists between Rockefeller and Ligand as to whether or not the GSK Products or their use embody or employ Licensed Patent Rights, whether or not the GSK Products or their use embody or employ any invention described or claimed in the Rockefeller Patents and whether or not the payments Rockefeller is demanding under the License Agreement are in fact due.

43.     Even if the GSK Products embody or use an invention merely described in the Rockefeller Patents, the patent laws of the United States protect only inventions defined by valid and enforceable claims and there is an actual controversy as to whether or not any claim of the Rockefeller Patents is valid for failure to comply with any one of 35 USC §§ 101 et seq.

44.     On information and belief, Rockefeller has filed one or more patent applications for the purpose of claiming the GSK Products are subject to payments under the License Agreement, and Rockefeller did so with knowledge that no valid patent should issue. There is an actual controversy as to whether the GSK Products or their use embody or employ any invention described or claimed in any pending patent application and whether any such patent application filed after learning of the GSK Products was filed in good faith under the License Agreement.

**VII. SECOND CLAIM FOR RELIEF – DECLARATORY JUDGMENT SCOPE OF TECHNICAL INFORMATION**

45.     Ligand incorporates by reference as though fully set forth herein paragraphs 1 through 44 of this Complaint.

46.     The License Agreement between Ligand and Rockefeller provides for, among other things, a license of Technical Information of Rockefeller. (Section 2.1, License Agreement).

47.     Rockefeller alleges that Technical Information was essential to the discovery or development of the GSK Products.

48.     Ligand, relying on the plain meaning of the License Agreement, alleges that Technical Information was not used in the discovery or development of the GSK Products.

1  Ligand further alleges under Section 1.4 of the License Agreement Technical Information
2  must be owned by Rockefeller and existing or capable of description in a tangible form and
3  must have been developed in the laboratory of Darnell or of David Levy of NYU as of
4  September 30, 1992 or by Darnell at his laboratory on or before five years from September
5  30, 1992 or by September 30, 1997.  The GSK Products were not developed using Technical
6  Information but rather used either publicly known information, information known or
7  discovered by Ligand and/or GSK, or information received from third parties.

8      49.     An actual controversy exists between Rockefeller and Ligand as to whether or
9  not Technical Information was essential to the discovery or development of the GSK
10  Products.

11      **VII. THIRD CLAIM FOR RELIEF – DECLARATORY JUDGMENT**
12      **TERMINATION**

13      50.     Ligand here incorporates by reference as though fully set forth herein
14  paragraphs 1 through 49 of this Complaint.

15      51.     Rockefeller relies on Section 11.3 of the License Agreement in asserting that,
16  absent a material breach, the "Agreement" cannot be terminated.

17      52.     Ligand claims, in the alternative, that the notice dated August 9, 2007 either
18  terminated the License Agreement in its entirety, subject only to certain specified rights
19  which survived termination, or to the extent any different, terminated all then existing license
20  rights, again subject only to any rights that might survive termination.

21      53.     An actual controversy exists between Rockefeller and Ligand as to whether or
22  not the License Agreement has been terminated and as to the nature of the rights terminated.

23
24      **VIII. DEMAND FOR JUDGMENT**

25      WHEREFORE, Plaintiff requests that:

26      1.      This Court enter a judgment declaring the GSK Products do not embody any
27  invention(s) described or claimed in the Licensed Patent Rights and that the use of the GSK
28  Products do not employ any invention(s) described or claimed in the Licensed Patent Rights;

-8-

2.      This Court enter a judgment declaring that Technical Information was not essential to the discovery or development of the GSK Products;

3.      This Court enter a judgment declaring that Ligand is not liable for any additional payments under the License Agreement beyond those that have already been made;

4.      This Court enter a judgment declaring that the License Agreement was terminated as of November 7, 2007 and that subsequent to termination of the License Agreement, Ligand is not liable for any future payments under the License Agreement;

5.      Plaintiff be awarded costs, attorneys' fees and other relief, both legal and equitable, to which it may be justly entitled;

6.      Plaintiff be awarded relief under 28 U.S.C. § 2202; and

7.      Plaintiff be awarded such other and further relief as this Court deems proper.

                           Respectfully submitted,

                           KNOBBE, MARTENS, OLSON & BEAR, LLP


Dated: __3/3/08__          By: _____
                                Darrell Olson (signature via facsimile)

                           Attorneys for Plaintiff
                           LIGAND PHARMACEUTICALS INCORPORATED

-9-

EXHIBIT 6

SERVICE COPY

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | | |
|---|---|---|
| THE ROCKEFELLER UNIVERSITY, a New York not-for-profit corporation, | x | Index No. 08/600638 |
| | : | |
| | : | **NOTICE OF FILING OF NOTICE OF** |
| Plaintiff, | : | **REMOVAL** |
| | : | |
| v. | : | |
| | : | |
| LIGAND PHARMACEUTICALS INCORPORATED, a Delaware corporation, | : | |
| | : | |
| Defendant. | : | |
| | x | |

Please take notice that pursuant to 28 U.S.C. §1446, § 1441 and Local Rule 81.1 of the

United States District Court for the Southern District of New York, the above captioned action has

been removed to the United States District Court for the Southern District of New York. A true and

correct copy of the Notice of Removal filed by defendant LIGAND PHARMACEUTICALS

INCORPORATED is annexed hereto as Exhibit A. The Notice of Removal was filed with the

Office of the Clerk of the United States District Court for the Southern District of New York on

March 14, 2008.

This Court is respectfully requested to proceed no further in this action unless and until the

action is remanded by the United States District Court for the Southern District of New York.

Dated: New York, New York
       March 14, 2008

Respectfully submitted,

GREENBERG TRAURIG, LLP

By:
Simon Miller
200 Park Avenue
New York, New York 10166
(212) 801-9200


NEW YORK
COUNTY CLERK'S OFFICE

MAR 1 4 2008

Attorneys for Defendant
LIGAND PHARMACEUTICALS INCORPORATED
NOT COMPARED
WITH COPY FILE

–1–

Index No. 08600638                    Proof of S

NY 238,723,623v1 3/14/2008

SERVICE COPY    FILE COPY

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| THE ROCKEFELLER UNIVERSITY, a New York not-for-profit corporation,<br><br>Plaintiff,<br><br>v.<br><br>LIGAND PHARMACEUTICALS INCORPORATED, a Delaware corporation,<br><br>Defendant. | x  Civil Action No.  **08 CV 2755**<br>:<br>:  **NOTICE OF REMOVAL OF CIVIL**<br>:  **ACTION UNDER 28 U.S.C. §1441**<br>:  **(FEDERAL QUESTION AND**<br>:  **DIVERSITY)**    JUDGE CASTEL<br>:<br>:  **Removed from the Supreme Court of the**<br>:  **State of New York, County Of New York**<br>:  **Index No. 600638/08**<br>x |

MAR 1 4 2008 U.S. CASHIERS N.Y.

**PLEASE TAKE NOTICE THAT** defendant Ligand Pharmaceuticals Incorporated (hereinafter "Ligand"), by and through undersigned counsel, without waiving any arguments, claims or defenses (including those available pursuant to Fed. R. Civ. P. 12(b)), hereby removes to this Court the state court action described below.

      1.      On March 4, 2008, an action was commenced in the Supreme Court of the State of New York in and for the County of New York, entitled THE ROCKEFELLER UNIVERSITY, Plaintiff, v. LIGAND PHARMACEUTICALS, INC., Defendant, Index Number 08/600638. A copy of the Complaint is attached hereto as "Exhibit A."

      2.      The first date upon which defendant Ligand received a copy of the said complaint was March 4, 2008, via electronic mail. On March 5, 2008, Defendant Ligand was served with a copy of the said Complaint and a Summons from the said state court. A copy of the Summons is attached hereto as "Exhibit B." As this notice of removal is filed within thirty days of Ligand's receipt of the Summons and Complaint, it is timely filed under 28 U.S.C. § 1446.

**Grounds for Removal**

      3.      This Action may be removed to this Court pursuant to 28 U.S.C. § 1441(b) on two independent bases. First, this action is a civil action of which this Court has original jurisdiction under 28 U.S.C. §1332, based on the complete diversity of citizenship of the parties and the amount in controversy exceeding the statutory minimum. Second, this Court has exclusive jurisdiction over

this action under 28 U.S.C. §1338, which grants district courts exclusive original jurisdiction of any

civil action arising under any Act of Congress relating to patents.

**Diversity Jurisdiction**

4.     As alleged in paragraph 1 of the Complaint, plaintiff The Rockefeller University (the

"University") was, and still is, a New York corporation whose principal place of business is in the

State of New York, as stated in paragraph 1 of the Complaint.  As stated in paragraph 2 of the

Complaint, Defendant Ligand was, at the time of the filing of this action, and still is, a Delaware

corporation having a principal place of business in the State of California.  Ligand is the only

defendant that has been served with the Summons and Complaint in this action.

5.     Accordingly, there is complete diversity of citizenship between the parties to this

Action.

6.     As alleged in the Complaint, the matter in controversy exceeds the sum of $75,000,

exclusive of interests and costs, as at least paragraphs 37 and 46 of the Complaint allege damages

"no less than $1.91 million," and paragraphs 49 and 54 allege damages "in no event less than $1.91

million."

**District Court's Exclusive Jurisdiction Over Actions Pertaining To Patents**

7.     This action is a civil action that may be removed to this Court by defendants

pursuant to the provisions of 28 U.S.C. §1441(b) in that it arises under 28 U.S.C. §1338, granting

the district courts exclusive original jurisdiction of any civil action arising under any Act of

Congress relating to patents.  The plaintiff's right to relief necessarily depends on resolution of a

substantial question of federal patent law, in that the infringement and validity of the patents subject

to the 1992 Agreement between Ligand and the University are necessary elements of all of the

alleged claims.

**WHEREFORE,** Defendant requests that the New York State Supreme Court, New York County, proceed no further with Index No. 600638/08 and that said action be removed from that court to the United States District Court for the Southern District of New York.

Dated: New York, New York
   March 14, 2008

     Respectfully submitted,

     **GREENBERG TRAURIG, LLP**

By: _____
     Simon Miller
     200 Park Avenue
     New York, New York 10166
     (212) 801-9200

     Attorneys for Defendant
     LIGAND PHARMACEUTICALS INCORPORATED

EXHIBIT 7

1

**FOLEY & LARDNER LLP**
402 W. BROADWAY, SUITE 2100
SAN DIEGO, CA 92101-3542

2

TELEPHONE:    619.234.6655
FACSIMILE:     619.234.3510

3

KENNETH S. KLEIN, CA BAR NO. 129172

4

**FOLEY & LARDNER LLP**
3000 K STREET, NW - SUITE 500
WASHINGTON, DC 20007-5101

5

TELEPHONE:    202.672-5300
FACSIMILE:     202.672-5399

6

ANAT HAKIM, (admitted *pro hac vice*)

7

Attorneys for Defendant The Rockefeller University, a New York not-for-profit
corporation,

8

# UNITED STATES DISTRICT COURT

9

## SOUTHERN DISTRICT OF CALIFORNIA

10

11

12

Ligand Pharmaceuticals Incorporated, a
Delaware corporation,

Case No:  08-CV-401 BEN (WMc)

**NOTICE OF MOTION AND MOTION
TO DISMISS OR, IN THE
ALTERNATIVE, TRANSFER OR
STAY THIS ACTION**

13

Plaintiff,

14

vs.

15

The Rockefeller University, a New York
not-for-profit corporation,

Judge:          Roger T. Benitez

16

Defendant.

Date:           June 2, 2008
Time:           10:30 a.m.
Courtroom:    3

17

18

19

TO PLAINTIFF, LIGAND PHARMACEUTICALS INCORPORATED AND TO

20

ITS ATTORNEYS OF RECORD:

21

PLEASE TAKE NOTICE that on June 2, 2008, at 10:30 a.m. or as soon thereafter

22

as the matter may be heard in Courtroom 3 of the Court, located at 940 Front Street, San

23

Diego, CA 92101-8900, defendant, THE ROCKEFELLER UNIVERSITY, moves the

24

Court to dismiss or in the alternative, to transfer or stay this Action on the grounds that

25

this Action is an improper declaratory action that should be dismissed, that there is a

26

first-filed action pending in the Southern District of New York, that the Court lacks

27

personal jurisdiction over The Rockefeller University, that venue is improper, and in the

28

alternative, that transfer is warranted pursuant to 28 U.S.C. §1404.

1

1    This Motion will be based on this Notice of Motion and Motion, the Memorandum

2    of Point and Authorities Filed herewith, the Declaration of Anat Hakim and exhibits

3    thereto, the Declaration of James Lapelle, the pleadings, and such other and further oral

4    and documentary evidence and legal memoranda as may be presented at or by the hearing

5    on said Motion.

6

7    Dated:  March 26, 2008                    FOLEY & LARDNER LLP
                                              KENNETH S. KLEIN
8

9

10                                            By:  /s/_____
                                                  KENNETH S. KLEIN
11                                                Attorneys for Defendant The Rockefeller
                                                  University, a New York not-for-profit
12                                                corporation

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**FOLEY & LARDNER LLP**
402 W. BROADWAY, SUITE 2100
SAN DIEGO, CA 92101-3542

2

TELEPHONE:    619.234.6655
FACSIMILE:    619.234.3510

3

KENNETH S. KLEIN, CA BAR NO. 129172

4

**FOLEY & LARDNER LLP**
3000 K STREET, NW - SUITE 500
WASHINGTON, DC 20007-5101

5

TELEPHONE:    202.672-5300
FACSIMILE:    202.672-5399

6

ANAT HAKIM, Case 3:08-cv-00401-BEN-WMC     Document 9-13     Filed 03/26/2008     Page 1 of

7

Attorneys for Defendant The Rockefeller University, a New York not-for-profit

8

corporation,

9

## UNITED STATES DISTRICT COURT

10

## SOUTHERN DISTRICT OF CALIFORNIA

11

12

**Ligand Pharmaceuticals Incorporated, a Delaware corporation**

13

**Plaintiff,**

14

**vs.**

15

**The Rockefeller University, a New York not-for-profit corporation,**

16

**Defendant.**

17

18

19

20

21

22

23

24

25

26

27

28

Case No:  08-CV-401 BEN (WMc)

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THE ROCKEFELLER UNIVERSITY'S MOTION TO DISMISS, OR, IN THE ALTERNATIVE, TRANSFER OR STAY THIS ACTION**

Judge:         Roger T. Benitez

Date:          June 2, 2008
Time:          10:30 a.m.
Courtroom:     3

**TABLE OF CONTENTS**

Page

I.    THE COURT SHOULD DISMISS THIS CASE ................................................. 7

    A.    THE COURT SHOULD DISMISS THIS CALIFORNIA DECLARATORY ACTION............ 7

        1.    *The Court, In Its Discretion, Should Dismiss This California Declaratory Action* ........................................................................................ 7

        2.    *The Court Should Dismiss This Declaratory Action Which Raises Issues Of New York State Law Encompassed in the New York Action.* .............................. 9

    B.    THE COURT SHOULD DISMISS THIS ACTION FOR LACK OF PERSONAL JURISDICTION.................................................................................... 10

    C.    THE COURT SHOULD DISMISS THIS ACTION FOR IMPROPER VENUE .................... 13

    D.    THE COURT SHOULD DISMISS THIS ACTION IN FAVOR OF THE ROCKEFELLER UNIVERSITY'S FIRST-FILED NEW YORK ACTION. .................................. 14

II.    IN THE ALTERNATIVE, THE COURT SHOULD TRANSFER THIS CASE TO THE SOUTHERN DISTRICT OF NEW YORK............................. 15

    A.    THE SOUTHERN DISTRICT OF NEW YORK IS A VENUE WHERE THIS ACTION COULD AND SHOULD HAVE BEEN BROUGHT ........................................ 16

    B.    TRANSFER OF THIS CASE TO THE SOUTHERN DISTRICT OF NEW YORK IS PROPER UNDER THE FIRST-FILED RULE ............................................... 17

    C.    TRANSFER IS PROPER UNDER THE SECTION 1404(A) FACTORS............................ 18

        1.    *The Convenience of the Parties and Witnesses*.................................... 19

        2.    *The Interests of Justice*.................................................................. 20

            a.    Location Where the Relevant Agreements Were Negotiated and Executed Favors New York ....................................................... 20

            b.    New York is Most Familiar With Governing New York Law .................. 20

i

SDCA_1080071.1

c.  Plaintiff's Choice of Forum, The Parties' Contacts With the Forum And
    Contacts Relating to Ligand's Action In The Forum Favor Transfer .......... 20

d.  The Differences In the Costs of Litigation in the Two Forums Favors
    Transfer ................................................................................ 21

e.  The Availability of Compulsory Process to Compel Attendance of
    Unwilling Non-Party Witnesses And The Ease Of Access To Sources of
    Proof Favors Transfer .............................................................. 22

f.  Judicial Economy Favors the Southern District of New York .................... 23

08-CV-401 BEN WMC

SDCA_1080071.1

# TABLE OF AUTHORITIES

Page

**FEDERAL CASES**

*Air Products & Chemicals, Inc. v. Reichhold Chemicals, Inc.,*
  755 F.2d 1559 (Fed. Cir. 1985)................................................................10

*A.J. Indus., Inc. v. United States Dist. Court for Cent. Dist.,*
  503 F.2d 384 (9th Cir. 1974)...................................................................17

*Alltrade, Inc. v. Uniweld Prods., Inc.,*
  946 F.2d 622 (9th Cir. 1991) ...........................................................14, 18

*Amerisourcebergen Corp. v. Roden,*
  495 F.3d 1143 (9th Cir. 2007) (Ferguson, J., concurring) ...................14

*Applera Corp. V. Illumina, Inc.,*
  282 F.Supp.2d 1120 (N.D. Cal. 2003) ...................................................10

*Breckenridge Pharm. Inc. v. Metabolite Labs., Inc.,*
  444 F.3d 1356 (Fed. Cir. 2006)..............................................................12

*Brighton Collectibles, Inc. v. Coldwater Creek, Inc.m*
  2006 WL 4117032 (S.D. Cal. Nov. 24, 2006)........................................14

*Cannon v. Newmar Corp.,*
  210 F.Supp.2d 461 (S.D.N.Y. 2002)......................................................18

*Cedars-Sinai Med. Ctr. v. Shalala,*
  125 F.3d 765 (9th Cir. 1997) ...........................................................14, 17

*Chong v. Healthtronics, Inc.,*
  No. CV-06-1287, 2007 WL 1836831 (E.D.N.Y. June 20, 2007) ...........18

*Christianson v. Colt Indus. Operating Corp.,*
  486 U.S. 800 (1988)................................................................................10

*Church of Scientology of California v. United States Department of Navy,*
  611 F.2d 738 (9th Cir. 1979) .................................................................14

*Contact Lumber Co. v. P.T. Moges Shipping Co.,*
  918 F.2d 1446 (9th Cir. 1990).................................................................17

*Continental Grain Co. v. The Barge FBL-585,*
  364 U.S. 19 (1960) ...........................................................................15, 17

*Costco Wholesale Corp. v. Liberty Mutual Ins. Co.,*
  472 F.Supp.2d 1183 (S.D. Cal. 2007)................................................22-23

iii

SDCA_1079565.2

*Decker Coal Co. v. Commonwealth Edison Co.*
    805 F.2d 834 (9th Cir. 1986) ..................................................................................16, 20

*Eye Laser Care Center v. MDTV Medical News Now, Inc.,*
    Case No. 03cv371, 2007 U.S. Dist. LEXIS 72744 (S.D. Cal. Sep. 28, 2007) ........... 15-16, 18

*Gehling v. St. George's School of Medicine, Ltd,*
    773 F.2d 539 (3d Cir. 1985)..................................................................................11

*Genentech, Inc. v. Eli Lilly & Co.*
    998 F.2d 931 (Fed. Cir. 1993)...............................................................................14

*Gov't Employees Ins. Co. v. Dizol,*
    133 F. 3d 1220 (9th Cir. 1998) (en banc) .............................................................7-8

*Hanson v. Denckla,*
    357 U.S. 235 (1958)...............................................................................................11

*Hatch v. Reliance Ins. Co.,*
    758 F.2d 409 (9th Cir. 1985) .................................................................................16

*Helicopteros Nacionales de Colombia, S.A. v. Hall,*
    466 U.S. 408 (1984).............................................................................................11

*Hoffman v. Blaski,*
    363 U.S. 335 (1960).............................................................................................16

*In Re Hall Bayoutree Associates Ltd.,*
    939 F.2d 802 (9th Cir. 1991) ...............................................................................21

*Innovative Office Products, Inc. v. Ole Smed and Trade Mgmt.,*
    Case No. EDCV 07-192, 2007 U.S. Dist. LEXIS 76656 (C.D. Cal. Aug. 15, 2007)........ 12-13

*Intuitive Surgical, Inc. v. California Institute of Technology,*
    No. C07-0063-CW, 2007 U.S. Dist. LEXIS 31753 (N.D. Cal. April 18, 2007) ...................14

*Iyalla v. TRT Holdings, Inc.,*
    No. 04 Civ 8114, 2005 WL 1765707 (S.D. N.Y. July 25, 2005) .........................................18

*Jim Arnold Corp. v. Hydrotech Sys., Inc.,*
    109 F.3d 1567 (Fed. Cir. 1997)..............................................................................10

*Jones v. GNC Franchising, Inc.,*
    211 F.3d 495 (9th Cir. 2000) .............................................................................. 15-16, 20

*Langford v. Ameritanz,*
    2006 WL 1328223 (E.D. Cal. 2006).......................................................................22

iv

SDCA_1079565.2

*Luckett v. Delpark*,
  270 U.S. 496 (1926) ...............................................................................................10

*Nakash v. Marciano*,
  882 F.2d 1411 (9th Cir. 1989) ..............................................................................15

*Norris v. Oklahoma City University*
  1993 WL 313122 (N.D. Cal. August 3,1993)........................................................11

*Pacesetter Systems, Inc. v. Medtronic, Inc.*
  678 F.2d 93 (9th Cir. 1982) ............................................................................14, 18

*Pacific Car and Foundry Co. v. Pence*,
  403 F.2d 949 (9th Cir. 1968) .................................................................................20

*Phoenix Assurance PLC*,
  125 F.Supp. 2d 1214 ................................................................................................9

*Phothera, Inc. v. Amir Oron*,
  2007 WL 4259181 (S.D. Cal. Dec. 4, 2007)........................................................7-8

*Prize Frize, Inc. v. Matrix (U.S.) Inc.*,
  167 F.3d 1261 (9th Cir. 1999) ................................................................................9

*Sackett v. Denver & R.G.W.R. Co.*,
  603 F.Supp. 260 (D.Colo)......................................................................................22

*Saleh v. Titan Corp.*,
  361 F.Supp.2d 1152 (S.D. Cal. 2005) ..............................................................19, 23

*Schreiber v. Eli Lily and Co.*,
  2006 WL 782441 (E.D. Pa. March 27, 2006).......................................................21

*Schwarzenegger v. Fred Martin Motor Co.*,
  374 F.3d 797 (9th Cir. 2004) ..........................................................................11-12

*Sinatra v. National Enquirer*,
  854 F.2d 1191 (9th Cir. 1988) ...............................................................................10

*Stainbrook v. Kent*,
  771 F.Supp. 988 (D.Minn. 1991)...........................................................................11

*Stewart Org v. Ricoh Corp.*
  487 U.S. 22 (1988)..................................................................................................15

*Stewart v. Luedtke Engineering Company*,
  2006 WL 334644 (N.D. Cal. Feb. 10, 2006) .........................................................21

*Vitria Technology, Inc. v. Cincinnati Ins. Co.*,
  2005 WL 2431192, *3 (N.D. Cal. Sept. 30, 2005)................................................22

SDCA_1079565.2

*Wang v. L.B. International Inc.,*
    2005 WL 2090672 (W.D. Wash. Aug. 29, 2005). .................................................21

*Williams v. Bowman,*
    157 F.Supp.2d 1103 (N.D. Cal. 2001) ................................................................20

*Wilton v. Seven Falls Co.,*
    515 U.S. 277 (1995)............................................................................................14

*World-Wide Volkswagen Corp. v. Woodson,*
    444 U.S. 286 (1980)............................................................................................11

**STATE CASES**

*Augsbury Corp. v. Petrokey Corp.,*
    470 N.Y.S.2d 787 (3d Dep't 1983) ....................................................................18

**FEDERAL STATUTES**

28 U.S.C. §1338(a) ..................................................................................................9-10

28 U.S.C. §1391 ....................................................................................................13, 16

28 U.S.C. §1404(a) ...........................................................................................15, 17-18

28 U.S.C. § 1453(b) ...................................................................................................10

28 U.S.C. § 2201.......................................................................................................5, 7

28 U.S.C. § 2202..........................................................................................................7

**STATE STATUTES**

*Cal. Civ. Proc. Code* §410.10 (2007) .......................................................................10

**RULES**

Fed. R. Civ. P. 12(b)(2)..............................................................................................10

Fed. R. Civ. P. 12(b)(3).........................................................................................1, 13

Fed R. Civ. P. 12(b)(6)..............................................................................................22

vi

SDCA_1079565.2

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

SDCA_1079565.2

1    The Rockefeller University (the "University") submits this memorandum in

2    support of its motion to dismiss, or, in the alternative, to transfer or stay Plaintiff Ligand

3    Pharmaceuticals, Inc.'s ("Ligand") declaratory action filed in this Court (the "California

4    declaratory action"), in deference to the University's earlier filed action, originally in

5    New York state court and recently removed to the U.S. District Court for the Southern

6    District of New York (the "New York action").

7    Ligand's California declaratory action merits dismissal on four independent

8    grounds:  (1) the University's New York action is the earlier filed and served matter; (2)

9    Ligand's California suit under the Declaratory Judgment Act was a preemptive filing; (3)

10    this Court does not have personal jurisdiction over the University; and (4) Ligand's venue

11    allegations are improper under Rule 12(b)(3) of the Federal Rules of Civil Procedure.  In

12    the alternative, Ligand's California declaratory action should be stayed, or transferred to

13    the Southern District of New York.  In the New York action, which is the earlier filed and

14    served matter, the University seeks damages and injunctive relief based on claims for

15    breach of a September 30, 1992 License Agreement between the University and Ligand

16    (the "1992 Agreement"), unjust enrichment/constructive trust, quantum meruit, specific

17    performance of the University's contractual right under the 1992 Agreement to perform

18    an audit of Ligand, and a declaration that certain products are subject to the terms and

19    payment provisions of the 1992 Agreement.  The New York action and this California

20    declaratory action involve the same state law issues of contract interpretation of the 1992

21    Agreement, which, by its terms, must be interpreted and governed according to New

22    York law.  Furthermore, as discussed within, a number key witnesses are located in or

23    near New York, and Ligand, having registered to do business in New York, is subject to

24    personal jurisdiction of the New York court and cannot claim that New York is an

25    inconvenient forum.  Finally, whereas Ligand in this action seeks a discretionary

26    declaration of rights, the University in the New York action seeks damages for actual

27    injury and in that context, a decision on the same issues Ligand raises here.  Under

28    similar circumstances, the Ninth Circuit has affirmed the district courts' exercise of their

1

1  discretion in dismissing, staying or transferring declaratory actions in favor of parallel

2  proceedings involving the same issues (especially, where as here, the New York court

3  regularly interprets and enforces contracts under New York law) and parties.

4        The University respectfully submits that there are ample reasons for this Court to

5  dismiss this action, or in the alternative, to stay or transfer this action to the Southern

6  District of New York. Ligand should not be permitted unnecessarily to expend the scarce

Case 3:08-cv-00401-BEN-WMC     Document 9-13     Filed 03/20/2008     Page 10 of

7  resources of this Court to decide discretionary issues that necessarily will be addressed

8  and decided in the New York Action and by continuing this action, expose the University

9  to the possibility of inconsistent rulings.

10                              **BACKGROUND**

11        The Rockefeller University owns groundbreaking inventions that are powerful

12  tools to screen for therapeutic drugs and that were discovered by Rockefeller University

13  Professor James E. Darnell Jr.  The University exclusively licensed these valuable

14  inventions to Ligand under the 1992 Agreement.  Working under a 1994 agreement with

15  its exclusive sublicensee SmithKline Beecham ("SKB", now GlaxoSmithKline) ("1994

16  SKB/Ligand Agreement") and using the University's inventions, Ligand identified

17  several pharmaceutical molecules and received several milestone payments from SKB.

18  Ligand has failed to pay the University its contractual share of these milestone payments

19  according to the 1992 Agreement, despite the University's repeated payment requests.

20  Instead, in August 2007, shortly before SKB requested approval from the Food and Drug

21  Administration of Promacta®, one of the pharmaceutical molecules identified under the

22  1994 SKB/Ligand Agreement, and before royalties on Promacta® are anticipated to be

23  paid by SKB to Ligand, Ligand notified the University that Ligand was unilaterally

24  terminating the 1992 Agreement, although not permitted to do so by the license's terms.

25  The University, having fully performed its contractual obligation and faced with Ligand's

26  refusal to honor its payment obligations under the 1992 Agreement, had no recourse but

27  to file suit, and did so in New York State Court.  (*See* Complaint filed in *The Rockefeller*

28  *University v. Ligand Pharmaceuticals, Inc.*, Case No. 08/600638, filed at 9:02 a.m. EST

08-CV-401 BEN WMC

on March 4, 2008, in the Supreme Court of the State of New York in the County of New York (hereinafter, the "New York Complaint"), attached as Exhibit 1 to the Declaration of Anat Hakim ("Hakim Decl."), at pp. 1-2.)

Under Section 2.1 of the 1992 Agreement, the University granted Ligand a sole exclusive world-wide license, under the broadly-defined Licensed Patent Rights and Technical Information of the University, "to make, have made, use and sell Products or practice Processes." (*See* the 1992 License Agreement, attached as Exhibit 2 to the Hakim Decl.) The license related to pioneering technology, which the New York Complaint describes in detail and which is referred to herein as the "STATs Pathway technology." The STATs Pathway technology was discovered by Professor Darnell. Under Section 1.4 of the 1992 Agreement, the license grant to Ligand included an exclusive world-wide license to all developments of Professor Darnell's laboratory relating to the STATs Pathway technology, existing as of the effective date of the 1992 Agreement and for five years thereafter. In connection with the 1992 Agreement, Professor Darnell and members of his laboratory did in fact provide information to Ligand for years regarding the STATs Pathway technology. Over the course of several years, Dr. Darnell provided essential technical information, materials and insight to Ligand relating to the STATs Pathway technology. In addition, the University filed several patent applications and was issued several patents, describing aspects of its pioneering STATs Pathway technology. The technical information and expertise about STATs Pathway technology acquired by Ligand from the University pursuant to the 1992 Agreement was essential to the development of, among other things, a high throughput screen ("HTS") to identify cytokine agonists. The HTS was key to the identification and development of pharmaceutical drug candidates. (*See* Hakim Decl., Exhibit 1 at ¶¶12 and 13).

In return for the University's exclusive world-wide license to this pioneering STATs Pathway technology, Ligand obligated itself to:

///

3

SDCA_1079565.2

a. "diligently seek to develop Products and/or Processes" using or based on the STATs Pathway technology provided to it under the 1992 Agreement (Section 2.7 of the 1992 Agreement);

b. make certain cash payment to the University during the first five years of the Agreement and to give the University an equity interest in Ligand (Sections 2.2 and 2.3 of the 1992 Agreement); and

Case 3:08-cv-00491-BEN-WMC    Document 9-13    Filed 03/26/2008    Page 12 o

c. pay the University a portion of any payments Ligand received from any third party "to secure the right to use Technical Information or to sell Products or Processes," (Section 2.5 of the 1992 Agreement) and a royalty on Ligand's own "Net Sales of Products and on its net revenues . . . received from performance of Processes for a third party." (Section 2.4 of the 1992 Agreement).

(*See* Hakim Decl., Exhibit. 1 at ¶14, Exhibit 2).

The parties' dispute centers on the language of Sections 2.4 and 2.5 of the 1992 Agreement, which address Ligand's payment obligations as to the University's share of milestone and royalty payments from third parties (Section 2.5) and Ligand's royalty payment obligations to the University based on Ligand's own sales of Products or performance of Processes (Section 2.4). (*See* Hakim Decl., Exhibit *2*). In addition, the parties dispute whether Ligand's repeated attempts to terminate the 1992 Agreement first, on August 9, 2007 and then, on March 13, 2008, were effective. The University contends that neither termination is effective under the express termination provisions of the 1992 Agreement. (*See Id;* Ligand's March 13, 2008 letter of termination, attached as Exhibit 3 to the Hakim Decl.; and the University's March 17, 2008 letter rejecting Ligand's termination, attached as Exhibit 4 to the Hakim Decl.). Any judicial determination of these disputed contract terms will be made pursuant to New York law as the 1992 Agreement states that it "shall be interpreted and governed in accordance with the laws of

08-CV-401 BEN WMC

SDCA_1079565.2

1 | the State of New York." (*See* Hakim Decl., Exh. 2, Section 13).

2 |      The parties have, for some time, engaged in discussions in an attempt to resolve
3 | their dispute without litigation. On October 10, 2007, the parties entered into a Tolling
4 | Agreement, which was effective through January 31, 2008. (*See* Hakim Decl., Exh. 1 at
5 | ¶32). On January 17, 2008, the parties amended the Tolling Agreement, extending the
6 | period through March 3, 2008. (*See Id.* at ¶34). During these discussions, the

Case 3:08-cv-00401-BEN-WMC    Document 9-13    Filed 03/26/2008    Page 13 of

7 | University's counsel informed Ligand's counsel that, absent a settlement, the University
8 | would file suit against Ligand for breach of the 1992 Agreement after the Tolling
9 | Agreement expired in order to preserve the University's claims.

10 |      Knowing that the University would file suit under that circumstance, Ligand filed
11 | a Complaint for Declaratory Judgment in this Court at 11:33 a.m. EST (8:33 a.m. PST)
12 | on March 4 (hereinafter, the "California Declaratory Judgment Complaint").[1]  Ligand's
13 | California Declaratory Judgment Complaint contains three claims for relief, all under the
14 | Declaratory Judgment Act, 28 U.S.C. §§ 2201, et seq.  Specifically, Ligand seeks a
15 | declaration as to (1) the applicability and scope of two defined terms in the 1992
16 | Agreement ("Licensed Patent Rights" in Section 1.3 and "Technical Information" in
17 | Section 1.4) as they apply to Ligand's payment obligations under Sections 2.4 and 2.5;
18 | and (2) whether the 1992 Agreement has been terminated and the nature of any rights
19 | terminated. (*See* California Declaratory Judgment Complaint attached as Exhibit 5 to the
20 | Hakim Decl.).  All of these are questions governed by New York State law.

21 |      A few hours before Ligand filed its California Declaratory Judgment Complaint,
22 | the University filed the New York Complaint in New York State court on March 4.  On
23 | March 4, the University completed service of process on Ligand's New York agent.  Two
24 | days later, on March 6, the University was served with Ligand's California Declaratory
25 | Judgment Complaint.  On March 14, 2008, Ligand filed a Notice of Removal, removing

26 |

27 | [1] Solely for the purposes of this Motion to Dismiss, or in the Alternative, Transfer or
28 | Stay, the University will treat the allegations that Ligand made in its California
Declaratory Judgment Complaint as if they were true.

1 | the University's New York State case to the District Court in the Southern District of

2 | New York. (*See* Ligand's March 14, 2008 Notice of Removal, attached as Exhibit 6 to

3 | the Hakim Decl.). On March 21, 2008, Ligand filed a Motion to Dismiss, or, in the

4 | Alternative, to Transfer the New York action to this Court. (*See* Ligand's March 21,

5 | 2008 Motion, attached as Exhibit 7 to the Hakim Decl.).

6 |     The Southern District of New York is the proper forum to determine the parties'

Case 3:08-cv-00401-BEN-WMC    Document 9-13    Filed 03/26/2008    Page 14 of

7 | contract dispute. The Southern District of New York routinely applies and interprets

8 | New York law, as required here under the 1992 Agreement. The University is a New

9 | York not-for-profit education corporation, with its principal place of business in New

10 | York City, New York. (*See* Declaration of James Lapple ("Lapple Decl.'), ¶3). Ligand,

11 | a for-profit company, has voluntarily registered to do business in New York. (*See* Hakim

12 | Decl. Exh. 7 at Exh. D) Professor Darnell, who is 82 years old and a key witness for the

13 | University, resides and works in New York. Certain key former members of Dr.

14 | Darnell's laboratory, including Dr. David Levy, currently at NYU, and others, who

15 | worked on the pioneering STATs Pathway technology with Dr. Darnell and were

16 | involved in providing information to Ligand under the 1992 Agreement continue to work

17 | in New York. These third parties, who are not subject to the subpoena power of the

18 | Southern District of California, would testify about critical early meetings with and

19 | information provided to Ligand by the University under the 1992 Agreement. Other

20 | third-party witnesses, including William Griesar, who resides in Maine, and who was

21 | involved in the negotiations of the 1992 Agreement, would also be expected to testify.

22 | Still another locus of key third-party witness, SKB, Ligand's exclusive sublicensee under

23 | the 1992 Agreement, is located on the East Coast, in Philadelphia, not far from New

24 | York. SKB witnesses, all third-parties, are expected to be key witnesses regarding the

25 | University-licensed technology that was involved in the identification and development

26 | of Promacta® and other products in the pipeline. Unlike the Southern District of

27 | California, these third-parties are either subject to the subpoena power of the Southern

28 | District of New York, and in any event, New York is a far more convenient forum for

08-CV-401 BEN WMC

these potential witnesses.  In addition, the New York action will resolve not only the
contract issues under New York law and actual damages sought by the University but
also the issues raised by Ligand in this California declaratory action.  These factors and
others discussed below warrant dismissal of this case, or, in the alternative, a stay or
transfer of this lawsuit to the Southern District of New York.

Case 3:08-cv-00401-BEN-WMC     Document 9-13     Filed 03/26/2008     Page 15 o

## ARGUMENT

### I.    THE COURT SHOULD DISMISS THIS CASE

#### A.    The Court Should Dismiss This California Declaratory Action.

Ligand's complaint requests only declaratory relief under the Declaratory
Judgment Act, 28 U.S.C. § 2201.[2]  This statute confers discretionary jurisdiction and
provides that a district court "may declare the rights and other legal relations of any
interested party seeking such declaration." *Id.*  A lawsuit seeking federal declaratory
relief must pass constitutional muster by presenting an actual case or controversy and
must fulfill statutory jurisdictional prerequisites. *See Gov't Employees Ins. Co. v. Dizol*,
133 F. 3d 1220, 1222-23 (9th Cir. 1998) (en banc).  Entertaining the declaratory
judgment action must be "appropriate." *See Id.* at 1223.

##### 1.    The Court, In Its Discretion, Should Dismiss This California Declaratory Action

It is established law that federal district courts have discretion to decline to hear a
declaratory judgment action, even though jurisdiction is otherwise proper. *Photothera,
Inc. v. Amir Oron*, no. 07CV490, 2007 WL 4259181 at *2 (S.D. Cal. Dec. 4, 2007)
("[u]nder the Declaratory Judgment Act, 28 U.S.C. Section 2201, et seq., a district court
may decline to exercise jurisdiction over a declaratory action, even though subject matter

---

[2] The Declaratory Judgment Act, 28 U.S.C. Section 2201-02 states, in relevant part, that:

> In a case of actual controversy within its jurisdiction . . . any court of the United
> States, upon the filing of an appropriate pleading, may declare the rights and other
> legal relations of any interested party seeking such declaration, whether or not
> further relief is or could be sought.  Any such declaration shall have the force and
> effect of a final judgment or decree and shall be reviewable as such.

1   jurisdiction is otherwise proper."); *Dizol*, 133 F.3d at 1223 (explaining that it is within

2   the district court's discretion to determine whether a declaratory action is appropriate).[3]

3   According to the Ninth Circuit, factors articulated by the Supreme Court in *Brillhart*

4   "remain the philosophic touchstone for the district court" when it is deciding whether to

5   hear a declaratory judgment action:

Case 3:08-cv-004 01-BEN-WMC    Document 9-13    Filed 03/26/2008    Page 16 of

6         The district court should avoid needless determination of state

7         law issues; it should discourage litigants from filing

8         declaratory actions as a means of forum shopping; and it

9         should avoid duplicative litigation. . . .

10   *Dizol,* 133 F.3d at 1225 (discussing *Brillhart* factors).  In addition to the *Brillhart* factors,

11   the Ninth Circuit points to other considerations, such as:

12         whether the declaratory action will settle all aspects of the

13         controversy; whether the declaratory action will serve a

14         useful purpose in clarifying the legal relations at issue;

15         whether the declaratory action is being sought merely for the

16         purposes of procedural fencing or to obtain a 'res judicata'

17         advantage; or whether the use of a declaratory action will

18         result in entanglement between the federal and state court

19         systems.  In addition, the district court might also consider the

20         convenience of the parties, and the availability and relative

21         convenience of other remedies.

22   *Id.* n. 5 (citation omitted).

23       A court can decline jurisdiction if it determines, for example, that the declaratory

24   action was filed "for an improper tactical purpose" such as, "to improve a bargaining

25   position in ongoing negotiations" or "to anticipate an affirmative defense." *Photothera,*

26

27   [3] The University disputes Ligand's assertion in its California Declaratory Judgment

28   Complaint that this Court has federal question jurisdiction.

08-CV-401 BEN WMC

1   2007 WL 4259181 at *3.  In this case, it appears that the only reason that Ligand filed

2   this declaratory action was that it was forewarned by the University that the University

3   would file suit against Ligand to preserve the University's claims after the Tolling

4   Agreement expired.  Ligand's filing of this declaratory action is an improper attempt at a

5   preemptive strike in anticipation of the University's action for actual damages.

6       **2.    The Court Should Dismiss This Declaratory Action Which**

Case 3:08-cv-00401-BEN-WMC    Document 9-13    Filed 03/26/2008    Page 17 o

7           **Raises Issues Of New York State Law Encompassed in the New**

8                   **York Action.**

9       The New York Complaint presents issues of New York State law relating to

10  Ligand's breach of the 1992 Agreement.  (*See* Hakim Decl., Exh. 1).  The 1992

11  Agreement provides that this license is to be interpreted and governed according to New

12  York State law.  (*See* Hakim Decl., Exh. 2).  Ligand's California Declaratory Judgment

13  Complaint, which seeks a declaration as to how the 1992 Agreement should be

14  interpreted, also raises issues to be decided under New York State, not federal, law.

15  Based on established precedent, this Court should dismiss this declaratory action in

16  deference to the more comprehensive New York action, to avoid litigation in two fora

17  that would waste the resources of the judiciary and the parties.

18      Indeed, even where a declaratory action raises some federal issues, "where state

19  law concerns predominate," it is appropriate for a district court to apply the *Brillhart*

20  factors to the analysis.  *See Phoenix Assurance PLC v. Marimed Found. for Island Health*

21  *Care,* 125 F. Supp. 2d 1214, 1222 (D.C. Haw.) (referring to declaratory judgment cases

22  brought in admiralty and state claims; analyzing *Brillhart* factors and declining

23  jurisdiction under Declaratory Judgment Act).  The Ninth Circuit has noted that

24  tangential issues of patent ownership do not convert a state cause of action into a federal

25  law claim.[4]  *See Prize Frize, Inc. v. Matrix (U.S.) Inc.,* 167 F.3d 1261, 1264 (9th Cir.

26  

27  [4] Pursuant to 28 U.S.C. §1338(a), federal courts have original, exclusive jurisdiction over civil actions relating to patents.  It is "well-settled" that if "a patentee pleads a cause of action based on rights created by a contract, . . . the case is not one 'arising under' the patent laws."  *Jim Arnold Corp. v. Hydrotech*

28  *Sys., Inc.,* 109 F.3d 1567, 1572 (Fed. Cir. 1997).

9

08-CV-401 BEN WMC

1    1999) (citing *Jim Arnold Corp v. Hydrotech Systems, Inc.,* 109 F.3d. 1567, 1572 (Fed.

2    Cir. 1997)) *superseded* on other grounds by 28 U.S.C. § 1453(b) (changing law

3    governing removal of class actions).  In other words, a tangential patent allegation is not

4    sufficient if the "clear gravamen of the complaint" sounds in contract.  *Applera Corp. V.*

5    *Illumina, Inc.,* 282 F.Supp.2d 1120, 1124 (N.D. Cal. 2003) (citing *Air Products &*

6    *Chemicals, Inc. v. Reichhold Chemicals, Inc.,* 755 F.2d 1559, 1561 (Fed. Cir. 1985)).

7        There is extensive precedent holding that suits over failure to pay royalties under a

8    license agreement brought in federal court fail to posit subject matter jurisdiction under

9    28 U.S.C. §1338(a).  The analysis involves a determination as to whether the complaint

10    pleads claims under the patent laws and courts have consistently distinguished patent

11    matters from cases in which construction or enforcement of a contract or license is the

12    issue.  *See Luckett v. Delpark,* 270 U.S. 496, 510-11 (1926) ("Where a patentee

13    complainant makes his suit one for recovery of royalties under a contract of license or

14    assignment, or for damages for a breach of its covenants, or for  a specific performance

15    thereof, . . he does not give the federal district court jurisdiction of the case as one

16    arising under the patent laws."); *Jim Arnold Corp.,* 109 F.3d at 1578-79 (remanding

17    plaintiff's case to state court and finding that suit was premised on state-law-based set of

18    claims arising out of alleged breaches of the assignment agreements).  Indeed, a claim

19    supported by alternative theories in a complaint does not form the basis for Section

20    1338(a) jurisdiction, unless patent law is essential to each of those theories.  *See*

21    *Christianson v. Colt Indus. Operating Corp.,* 486 U.S. 800, 807-08 (1988).  Thus, this

22    Court, in its discretion, should decline to exercise jurisdiction over this action.

23    **B.    The Court Should Dismiss This Action For Lack Of Personal**

24    **Jurisdiction**

25        The University moves to dismiss this action under Rule 12(b)(2) of the Federal

26    Rules of Civil Procedure.  California's long-arm statute extends as far as federal due

27    process limitations allow.  *See Cal. Civ. Proc. Code* §410.10 (2007); *Sinatra v. National*

28    *Enquirer,* 854 F.2d 1191, 1194 (9th Cir. 1988).  In order for a court to exercise personal

08-CV-401 BEN WMC

SDCA_1079565.2

jurisdiction over a nonresident defendant, the defendant must have "minimum contacts" with the forum state "such that the exercise of jurisdiction does not offend traditional notions of fair play and substantial justice." *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 291-92 (1980). Personal jurisdiction may be either general or specific. *Schwarzenegger v. Fred Martin Motor Co.,* 374 F.3d 797, 801 (9th Cir. 2004).

Case 3:08-cv-00401-BEN-WMC    Document 9-13    Filed 03/26/2008    Page 19 of

    This Court lacks general jurisdiction over the University which does not engage in continuous and systematic contacts with California. *Schwarzenegger,* 374 F.3d at 801 ("[f]or general jurisdiction to exist over a nonresident defendant, the defendant must engage in "continuous and systematic general business contacts" that "approximate physical presence" in the forum state.") (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 416 (1984)). The University is a New York not-for-profit education corporation. The University has no office, solicits no business, and has no employees in California. The University does not sell or advertise any goods or services. The University maintains no telephone listing or mailing addresses in the State of California. (*See* Lapple Decl. at ¶¶3-9). In determining personal jurisdiction, courts have historically recognized the unique nature of universities and have declined to entertain personal jurisdiction even where a university has some contacts with the forum, which is not the case here. *See Norris v. Oklahoma City University*, no. C-93-1626-VRW, 1993 WL 313122, *1-2 (N.D. Cal. August 3,1993) (finding no general jurisdiction over university despite some contacts in the forum) (citing *Gehling v. St. George's School of Medicine, Ltd*, 773 F.2d 539, 542-43 (3d Cir. 1985); *Stainbrook v. Kent*, 771 F.Supp. 988, 991 (D.Minn. 1991 (non-forum university's contacts with the forum were negligible and unrelated to the litigation)). The University should not be brought into this Court under general jurisdiction principles.

    This Court likewise lacks specific jurisdiction because Ligand's claims do not arise out of University business transacted in California. In other words, the University did not purposely avail itself of the privilege of conducting activities within California, and has thus not invoked the benefits and protections of its law. *See Hanson v. Denckla,*

1  357 U.S. 235, 253 (1958). To establish specific jurisdiction over the University, it would

2  have to be shown that the University directed its activities towards residents of

3  California, that these activities arise out of or relate to the declaratory causes of action,

4  and that the exercise of jurisdiction over the University would be reasonable.

5  *Schwarzenegger,* 374 F.3d at 802 (setting forth three-prong test).

6          The 1992 Agreement entitles the University to receive milestone and royalty

Case 3:08-cv-00401-BEN-WMC    Document 9-13    Filed 03/26/2008    Page 20 o

7  payments in exchange for the exclusive world-wide license to Ligand of STATs Pathway

8  technology. The parties' dispute arose because Ligand refuses to pay the University the

9  payments due to it under the 1992 Agreement. The core issue in this lawsuit and the

10 lawsuit pending in the Southern District of New York is the University's entitlement to

11 payments from Ligand. The Federal Circuit and courts in this Circuit, have held that

12 where the license contemplates a relationship that involves the mere receipt of royalty

13 payments by the licensor, the licensor is not subject to personal jurisdiction in the forum

14 state where the licensee conducts business. *Innovative Office Products, Inc. v. Ole Smed*

15 *and Trade Mgmt.,* Case No. EDCV 07-192, 2007 U.S. Dist. LEXIS 76656 at *14 (C.D.

16 Cal. Aug. 15, 2007) (citing *Breckenridge Pharm. Inc. v. Metabolite Labs., Inc.,* 444 F.3d

17 1356, 1366 (Fed. Cir. 2006)). "In determining whether personal jurisdiction over the

18 licensor exists, the court must consider whether the license agreement creates an ongoing

19 relationship between the licensor and licensee such that the activities of the latter can be

20 imputed to the former." *Innovative Office Products,* 2007 U.S. Dist. LEXIS 76656 at

21 *14. Whether such a relationship can be imputed is dependent on certain factors, none of

22 which are found here, such as, for example, whether both licensor and licensee have the

23 right to litigate infringement claims; whether the licensor retains the exclusive right to

24 pursue patent infringement claims; whether the licensor exercises control over the

25 licensee's sales or marketing activities; whether the licensor authorizes the licensee to use

26 the licensor's trademarks in marketing or distributing the product; and whether the

27 licensee must obtain prior approval from the licensor before making any representations

28 regarding the licensor's products in any of the licensee's marketing activities. *Id. at* *15-

20(citing cases).  The 1992 Agreement does not include such hallmarks of control by the University, but rather is based on the University's right to receive payments.  This Court should not exercise specific jurisdiction here.

In addition to all of the above, exercising personal jurisdiction in this case would simply be unreasonable. *See Id.* at *22.  As discussed below, the burden on the University of litigating this case in San Diego would be significant.  Moreover, Ligand could obtain relief in the Southern District of New York where it would likely assert its declaratory causes of action as affirmative defenses and/or counterclaims.[5]  Likewise, the interstate judicial system's interest in obtaining the most efficient resolution of controversies is best served by proceeding in New York, where the action is for actual as opposed to declaratory relief.

Case 3:08-cv-00401-BEN-WMc    Document 91-13    Filed 09/26/2008    Page 21 of

**C.    The Court Should Dismiss This Action For Improper Venue**

Ligand alleges that this Court has subject matter jurisdiction based on both diversity and federal question jurisdiction yet Ligand erroneously pleads venue under 28 U.S.C. §1391(a), which is applicable where subject matter jurisdiction is based "only on diversity of citizenship."  In any event, Ligand cannot meet the venue requirements under Section 1391(a) or (b).  The University does not reside in California and is neither subject to personal jurisdiction nor "found" there.  In addition, events and omissions giving rise to the claim occurred in both New York and San Diego, but a *substantial* part of those events or omissions occurred outside of California, in New York where the licensed technology was developed, and the University believes, at SKB in Philadelphia as well, where research, identification and development of Promacta® occurred.  Dismissal under Fed. R. Civ. P. 12(b)(3) is therefore appropriate.

///

**D.    The Court Should Dismiss This Action In Favor Of The Rockefeller**

---

[5] As set forth below, Ligand's challenge to personal jurisdiction in the Southern District of New York will fail at the starting gate in light of the fact that Ligand is registered to do business in New York.

13

08-CV-401 BEN WMC

**University's First-Filed New York Action.**

1
2          The Ninth Circuit acknowledges the "first-to-file" rule as a "generally recognized
3    doctrine of federal comity that permits a district court to decline jurisdiction over an
4    action when a complaint involving the same parties and issues has already been filed in
5    another district." *Pacesetter Systems, Inc. v. Medtronic, Inc.,* 678 F.2d 93, 95-96 (9th Cir.
6    1982) (citations omitted). Under the rule, when cases involving the same parties and
7    issues have been filed in two different districts, the second district court has discretion to
8    transfer, stay, or dismiss the second case in the interest of efficiency and judicial
9    economy. *Amerisourcebergen Corp. v. Roden,* 495 F.3d 1143, 1156 (9th Cir. 2007)
10   (Ferguson, J., concurring) (citing *Cedars-Sinai Med. Ctr. v. Shalala,* 125 F.3d 765, 769
11   (9th Cir. 1997)) (emphasis added); *Pacesetter,* 678 F.2d at 95. Consistent with these
12   principles, the Ninth Circuit has held that the first-to-file rule "should not be disregarded
13   lightly." *Church of Scientology of California v. United States Department of Navy,* 611
14   F.2d 738, 750 (9th Cir. 1979) (citation omitted).

15         Three prerequisites that must be met to invoke the "first-to-file" rule are
16   chronology, identical parties, and identical issues. *See Brighton Collectibles, Inc. v.*
17   *Coldwater Creek, Inc.,* no. CV-1848-H, 2006 WL 4117032 at *2 (S.D. Cal. Nov. 24,
18   2006) (citing *Alltrade, Inc. v. Uniweld Prods., Inc.,* 946 F.2d 622, 625 (9th Cir. 1991)).
19   There is no dispute here that the University has met all three prerequisites. First, the
20   University filed its lawsuit in New York nearly three hours before Ligand filed its
21   declaratory action in this Court. *See Intuitive Surgical, Inc. v. California Institute of*
22   *Technology,* No. C07-0063-CW, 2007 U.S. Dist. LEXIS 31753 at *7-8 (N.D. Cal. April
23   18, 2007) (holding that first-to-file rule is applicable and requires deference to the first-
24   filed court, notwithstanding that the two actions are filed a few hours apart); *Genentech,*
25   *Inc. v. Eli Lilly & Co.,* 998 F.2d 931, 938 (Fed. Cir. 1993) (policy rationale behind first-
26   to-file rule is supported by reasons "just as valid when applied to the situation where one
27   suit precedes the other by a day as they are in a case where a year intervenes between the
28   suits.") *overruled* on other grounds by *Wilton v. Seven Falls Co.,* 515 U.S. 277, 289

08-CV-401 BEN WMC

1   (1995).  Second, the parties in the New York and California actions are identical.  Third,

2   the issues in the two suits are substantially similar or overlapping, with the New York

3   action encompassing issues raised in the California declaratory action.  *See Nakash v.*

4   *Marciano*, 882 F.2d 1411, 1416 (9th Cir. 1989) (first to file rules applies where two

5   proceedings are "substantially similar" even though they are not identical).  With the

6   three prerequisites met, the Court should decline jurisdiction over the case.

7   **II.    IN THE ALTERNATIVE, THE COURT SHOULD TRANSFER THIS CASE**

8   **TO THE SOUTHERN DISTRICT OF NEW YORK**

9          Transfer of civil actions is governed by 28 U.S.C. §1404(a), which states:

10                 For the convenience of parties and witness, in the interest of

11                 justice, a district court may transfer any civil action to any

12                 other district or division where it might have been brought.

13         Faced with a motion to transfer under Section 1404(a), the issue for the Court "is

14  whether or not the balance of convenience to the parties and witnesses and the interest of

15  justice would be served by the transfer."  *Eye Laser Care Center v. MDTV Medical News*

16  *Now, Inc.,* Case No. 03cv371, 2007 U.S. Dist. LEXIS 72744 at *3 (S.D. Cal. Sep. 28,

17  2007) (J. Benitez).  Section 1404 is intended to prevent waste of time, energy and money

18  and to protect litigants, witnesses and the public from unnecessary inconvenience and

19  expense.  *Continental Grain Co. v. The Barge FBL-585*, 364 U.S. 19, 26 (1960) ("To

20  permit a situation in which two cases involving precisely the same issues are

21  simultaneously pending in different District courts leads to the wastefulness of time,

22  energy, and money that § 1404(a) was designed to prevent.").  A decision to transfer an

23  action under Section 1404(a) rests within the sound discretion of the court and is made on

24  a case-by-case basis.  *See Jones v. GNC Franchising, Inc.,* 211 F.3d 495, 498 (9th Cir.

25  2000) ("district court has discretion to adjudicate motions for transfer 'according to an

26  individualized, case-by-case consideration of convenience and fairness.'") (quoting

27  *Stewart Org v. Ricoh Corp.*  487 U.S. 22, 29 (1988)).

28         In determining if an action should be transferred, courts undertake a two-step

08-CV-401 BEN WMC

SDCA_1079565.2

1  analysis.  First, the court determines whether the case could have been brought in the

2  proposed forum.  *Hoffman v. Blaski*, 363 U.S. 335, 342-44 (1960);  *Hatch v. Reliance Ins.*

3  *Co.*, 758 F.2d 409, 414 (9th Cir. 1985).  Second the court determines whether the transfer

4  would promote convenience and fairness weighing (1) the convenience of the parties, (2)

5  the convenience of the witnesses and (3) the interests of justice.  When considering

6  whether a transfer is in the interest of justice courts may consider:  (1) the location where

7  the relevant agreements were negotiated and executed ; (2) the state that is most familiar

8  with the governing law ; (3) the plaintiff's choice of forum; (4) the respective parties'

9  contacts with the forum, (5) the contacts relating to the plaintiff's cause of action in the

10  chosen forum, (6) the differences in the costs of the litigation in the two forums, (7) the

11  availability of compulsory process to compel attendance of unwilling non-party

12  witnesses, and (8) the ease of access to the source of proof.  *See Jones*, 211 F.3d at 498-

13  99;  *Eye Laser Care Center,* Case No. 03cv371, 2007 U.S. Dist. LEXIS 72744 at *3.

14  Other public factors may be considered, including the "administrative difficulties flowing

15  from court congestion."  *Decker Coal Co. v. Commonwealth Edison Co.* 805 F.2d 834,

16  843 (9th Cir. 1986).

17        **A.**     **The Southern District Of New York Is A Venue Where This Action**

18                   **Could And Should Have Been Brought**

19          This California declaratory action could have been brought by Ligand in the

20  Southern District of New York, which has subject matter jurisdiction based on diversity

21  of citizenship,[6] personal jurisdiction over the University, and venue is proper there under

22  28 U.S.C. Section 1391.  *Hoffman,* 363 U.S. at 343-44 (requiring existence of all three).

23  The University resides and is located in the Southern District of New York; Ligand is

24  subject to personal jurisdiction in the Southern District of New York; and a substantial

25  part of the events or omissions giving rise to the claim occurred in New York.  As

26  _____

27  [6] Contrary to the statements Ligand made in its Notice of Removal of the New York
action from New York State court to the Southern District of New York (Hakim Decl.,

28  Exh. 6), there is no basis for federal question jurisdiction.

1   discussed below, this lawsuit not only could but should have been brought in New York.

2   **B.    Transfer Of This Case to the Southern District of New York Is Proper**

3   **Under the First-Filed Rule**

4   Courts often exercise their authority under Section 1404(a) to transfer litigation to

5   other districts in which previously filed related suits are pending in the interests of

6   efficiency and judicial economy. *Cedar Sinai Medical Center*, 125 F.3d at 769 (9th Cir.

Case 3:08-cv-00401-BEN-WMC    Document 9-13    Filed 03/26/2008    Page 25 of

7   1997) ("under [the first to file] rule, when cases involving the same parties and issues

8   have been filed in two different districts, the second district court has discretion to

9   transfer, stay or dismiss the second case in the interest of judicial economy and

10  efficiency).  In fact, in the context of transfer motions, the Ninth Circuit considers such

11  factors as the possibility of consolidation with related litigation and considerations

12  relating to the real party in interest – which favor transfer in this instance. *A.J. Indus.,*

13  *Inc. v. United States Dist. Court for Cent. Dist.*, 503 F.2d 384, 389 (9th Cir. 1974).  The

14  Supreme Court and the Ninth Circuit have held that there is a strong policy favoring the

15  litigation of related claims in the same tribunal so that pretrial discovery can be

16  conducted more efficiently, duplicative litigation can be prevented, thereby saving the

17  time and expense for both parties and witnesses, and inconsistent results can be avoided.

18  *Continental Grain Co.*, 364 U.S. at 26 (1960); *Contact Lumber Co. v. P.T. Moges*

19  *Shipping Co.* Ltd, 918 F.2d 1446, 1452 (9th Cir. 1990) )(noting that there is a significant

20  advantage in having all parties assert their claim in one forum.).

21  In its March 24, 2008 motion to dismiss or transfer, filed in New York, Ligand

22  asserted that the Southern District of New York does not have personal jurisdiction over

23  it.  This assertion is baseless.  In fact, based solely on its registration to do business in

24  New York (and ignoring other extant bases for the New York court to exercise personal

25  jurisdiction over Ligand), Ligand is subject to general personal jurisdiction in New York.

26  It is established law that a foreign corporation's authorization to do business in New York

27  and designation of an agent for service of process is consent to in personam jurisdiction.

28  *See Augsbury Corp. v. Petrokey Corp.*, 470 N.Y.S.2d 787, 789 (3d Dep't 1983) (citations

17

08-CV-401 BEN WMC

omitted); *Iyalla v. TRT Holdings, Inc.*, No. 04 Civ. 8114, 2005 WL 1765707, at *3 (S.D. N.Y. July 25, 2005) ("Under New York law, any corporation registered to do business within the state is subject to personal jurisdiction in the state.") (citing *Cannon v. Newmar Corp.*, 210 F.Supp.2d 461, 463 n.2 (S.D. N.Y. 2002).[7] The University therefore asks this Court to transfer this case to the Southern District of New York so that it can be consolidated with the earlier filed New York action, and all issues relating to the 1992 Agreement can be heard by one court.

Case 3:08-cv-00401-BEN-WMC    Document 9-13    Filed 03/26/2008    Page 26 o

### C.    Transfer Is Proper Under The Section 1404(a) Factors

Ninth Circuit law holds that the court in the earlier filed action normally should decide where an action should be heard.[8] The University therefore asks this Court to defer to the Southern District of New York in deciding the appropriate forum. If this Court goes forward with that determination, however, an analysis of the Section 1404(a) factors weighs heavily in favor of transferring this lawsuit to New York. *See Eye Laser Care Center,* Case No. 03cv371, 2007 U.S. Dist. LEXIS 72744 at *5 (transferring case that was pending for three years and after substantive motion practice had concluded).

///

### 1.    The Convenience of the Parties and Witnesses

The Southern District of New York is a more convenient venue for the University

---

[7] Although two district court decisions reached the contrary conclusion (one of which is the only case cited by Ligand in its brief in the Southern District of New York), the substantial majority of cases echo *Augsbury.* Indeed, subsequent New York district court decisions have expressly questioned the reasoning of the two contrary cases, and then reached the conclusion that filing for authorization to do business in New York is, by itself, sufficient to create personal jurisdiction. *See Chong v. Healthtronics, Inc.*, No. CV-06-1287, 2007 WL 1836831, at *6 n.5 (E.D. N.Y. June 20, 2007) ("*Wright* and *Bellepointe* are not persuasive in light of the majority of federal district courts and New York courts which hold that a filing for authorization to do business in New York is sufficient to subject a foreign corporation to general personal jurisdiction in New York.").

[8] The law in the Ninth Circuit is that the court with the first-filed action should normally weigh the balance of convenience. *Alltrade, Inc.,* 946 F.2d 622 at 628. As a result, this Court should not engage in a balancing of convenience factors but rather defer to the Southern District of New York to decide the appropriate forum and whether an exception to the first-to-file rule is applicable. *See Pacesetter Systems,* 678 F.2d at 96 (respective convenience of the two courts should be addressed to court in first-filed action).

08-CV-401 BEN WMC

SDCA_1079565.2

1  and for non-party witnesses.  The University's principal place of business is in New York

2  City.  Additionally, certain key non-party witnesses are located in or near New York.

3  While courts may consider the convenience of party witnesses, *the convenience of non-*

4  *party witnesses is the more important factor." Saleh v. Titan Corp.*, 361 F.Supp.2d

5  1152, 1160-62 (S.D. Cal. 2005) (where four witnesses had material, first hand knowledge

6  regarding the seminal issues in the case, and they lived near the district that district

Case 3:08-cv-00401-BEN-WMC    Document 9-13    Filed 03/26/2008    Page 27 of

7  would be a more convenient forum.) (emphasis added).  Here, New York is far more

8  convenient for key witnesses, including Dr. Darnell, as well as non-party former

9  members of his laboratory, non-parties that were involved in negotiations of the 1992

10  Agreement, and Ligand's exclusive sublicense SKB (in Philadelphia).  These individuals

11  either work in New York, are subject to the subpoena power of the New York court or

12  would be inconvenienced by this case proceeding in California.  When considering the

13  location of non-parties, courts are instructed to examine the importance of the non-party

14  witnesses as opposed to their sheer number.  *Id*. at 1164.  Given that the University

15  provided critical information to Ligand in the early years of the 1992 Agreement –

16  information that Ligand then sub-licensed to SKB and without which Ligand and SKB

17  could not have developed the technology at issue – and that Dr. Darnell and a number of

18  his former laboratory members were intimately and actively involved in developing and

19  providing that information to Ligand, their testimony will be important .  Likewise, GSK,

20  which is within 100 miles of New York City, is a material non-party witness.  To the

21  extent that Ligand may provide a list of individuals it claims worked on the technology in

22  dispute (as it has done in support of its motion in New York), Ligand has not shown that

23  these individuals, mostly Ligand employees, worked on the critical aspects of the

24  pharmaceutical molecules at issue in this case.  This factor favors New York.

25  ///

26  ///

27  ///

28  ///

08-CV-401 BEN WMC

1

2.        **The Interests of Justice**

2

a.        **Location Where the Relevant Agreements Were**

3

                **Negotiated and Executed Favors New York**

4

The parties' negotiations of the 1992 Agreement were largely conducted by mail

5

or electronic means, as was the execution of the 1992 Agreement.  In the months leading

6

up to the execution of the 1992 Agreement, however, Ligand representatives traveled to

Case 3:08-cv-00401-BEN-WMC    Document 9-13    Filed 03/26/2008    Page 28 of

7

New York to discuss and obtain information about the technology that was ultimately to

8

be licensed.  (Hakim Decl. Exh. 8).  This factor therefore slightly favors New York.

9

b.        **New York is Most Familiar With Governing New York**

10

                **Law**

11

Given that the 1992 Agreement is governed by New York law, considerations of

12

which court is most familiar with the governing law strongly favors transferring this

13

lawsuit to the Southern District of New York.  *See Decker Coal Co.*, 805 F.2d at 843 (9th

14

Cir. 1986) (diversity case should be litigated in "a forum that is at home with the law that

15

must govern the action."); see *Jones*, 211 F.3d at 498 (courts should choose the forum

16

that is "the most familiar with the governing law").[9]

17

c.        **Plaintiff's Choice of Forum, The Parties' Contacts With**

18

                **the Forum And Contacts Relating to Ligand's Action In**

19

                **The Forum Favor Transfer**

20

A plaintiff's choice of forum is not dispositive.  *See Pacific Car and Foundry Co.*

21

*v. Pence*, 403 F.2d 949, 954 (9th Cir. 1968).  "If there is any indication that plaintiff's

22

choice is the result of forum shopping, plaintiff's choice will be accorded little

23

deference."  *Williams v. Bowman*, 157 F.Supp.2d 1103, 1106 (N.D. Cal. 2001) (citation

24

omitted).  Because Ligand's action was preemptive, second-filed, and constitutes

25

improper forum shopping Ligand's choice should be accorded little deference.  In

26

_____

27

[9] While Ligand has attempted to portray this lawsuit as well as the suit pending in New
York as involving patent issues, as discussed above, the fact is that the suits are breach of

28

contract suits, governed by New York State law.

08-CV-401 BEN WMC

1  addition, because there is a question about whether this Court has personal jurisdiction

2  over the University, transfer (or dismissal) is appropriate.  See *e.g. Stewart v. Luedtke*

3  *Engineering Company*, no. C 05-3467 SBA, 2006 WL 334644 at * 5 (transfer of case is

4  appropriate where court lacks personal jurisdiction over plaintiff) (N.D. Cal. Feb. 10,

5  2006);   *In Re Hall Bayoutree Associates Ltd.*, 939 F.2d 802, 805-06 (9th Cir. 1991)

6  (dismissal appropriate where plaintiff's action is brought in bad faith).

Case 3:08-cv-00401-BEN-WMC    Document 9-3    Filed 03/26/2008    Page 29 of

7          Likewise, as set forth above, the University's contacts with California do not

8  support keeping this case in this Court.  In contrast, Ligand is registered to do business in

9  New York and has apparently been doing business in New York for years.  (Hakim Decl.,

10  Exh. 8 at Exh. C ¶10).  Moreover, the fact that the University is a New York not-for-

11  profit education corporation with its principal place of business in New York and that the

12  exclusively licensed technology was developed in Dr. Darnell's lab in New York, favors

13  transfer to New York.

14          **d.      The Differences In the Costs of Litigation in the Two**

15                  **Forums Favors Transfer**

16          For the University, the cost difference between trying this case in the Southern

17  District of New York as compared to the Southern District of California will be

18  significant.  The University is a not-for-profit education corporation, with a focus on

19  biomedical research.  The increased cost of litigating in San Diego would have a

20  significant financial and non-financial impact for the University.  In contrast, Ligand is a

21  public biotech company, with major corporate partners, that can litigate in any federal

22  district court in the country.  *See Schreiber v. Eli Lily and Co.*, no. 05CV2616, 2006 WL

23  782441 at *9 (E.D. Pa. March 27, 2006) (holding that corporation is better able to incur

24  the costs of litigating in a foreign venue then a not-for-profit university); *Wang v. L.B.*

25  *International Inc.*, no. C04-2475JLR, 2005 WL 2090672 *5 (W.D. Wash. Aug. 29, 2005)

26  (holding that under the reduced cost of litigation prong defendant's increased costs in

27  securing witnesses, transporting documents, records, and other evidence to district

28  outweighed plaintiffs costs in coming to transferee district).  It is likely unavoidable that

08-CV-401 BEN WMC

SDCA_1079565.2

1   one of the parties will incur substantial costs whether this case is tried in New York or

2   San Diego, but this factor tips in favor of transfer to New York.

3             e.       **The Availability of Compulsory Process to Compel**

4                      **Attendance of Unwilling Non-Party Witnesses And The**

5                      **Ease Of Access To Sources of Proof Favors Transfer**

6   Courts favor forums "where non-party witnesses will fall under the court's

7   subpoena power." *Langford v. Ameritanz*, no. F 05-1271 AWI DLB, 2006 WL 1328223

8   at *9 (E.D. Cal. 2006) ((citing *Sackett v. Denver & R.G.W.R. Co.*, 603 F.Supp. 260, 262

9   (D.Colo); *See Costco Wholesale Corp. v. Liberty Mutual Ins. Co.*, 472 F.Supp.2d 1183,

10  1194 (S.D. Cal. 2007). "For non-party witnesses, the court's subpoena power extends to

11  anywhere within the district and/or one hundred miles of the place of trial." *Costco*, 472

12  F.2d at 1194 (citing Fed R. Civ. P. 12(b)(6)).  As discussed, above, critical third party

13  witnesses reside in New York City or within subpoena range of the Southern District of

14  New York and would be beyond this court's subpoena power.  *See  Id.* (holding that

15  where witnesses who were beyond the court's subpoena power were only parties who

16  could provide critical testimony, forum in that court's district was not proper.).  In

17  contrast, the vast majority of Ligand's witnesses are Ligand employees for whom

18  compulsory process is not needed because "a party can compel testimony of its

19  employees at trial." *Id.* (citation omitted).  This factor favors the University.

20            With respect to the location of relevant documents and ease of access to sources of

21  proof, the University's documents are located in New York, as are documents in the

22  custody and control of the third parties discussed above.  Given the availability of

23  electronic means for document collection and production, however, the physical location

24  of documents is a less significant factor in the transfer analysis. *See Vitria Technology,*

25  *Inc. v. Cincinnati Ins. Co*, no. C. 05-1951 JW, 2005 WL 2431192, *3 (N.D. Cal. Sept. 30,

26  2005).

27  ///

28  ///

22

SDCA_1079565.2

1

**f.    Judicial Economy Favors the Southern District of New**

2

**York**

3          "In addition to the Jones factors, courts also consider the relative docket

4    congestion of the current forum and the transferee forum." *Costco*, 472 F.Supp.2d at

5    1195 (S.D. Cal. 2007).  The inquiry under this factor is "whether a trial may be speedier

6    in another court because of its less crowded docket." *Scale* 361 F.Supp.2d at 1167

7    (citation omitted).  Given the heavy criminal case docket in this Court, the time to trial in

8    the Southern District of New York is likely to be faster.  This factor also weighs in favor

9    of transfer to New York.

10                                      **CONCLUSION**

11          For the reasons set forth above, The Rockefeller University respectfully requests

12    that this Court dismiss this action, or, in the alternative, stay this action or transfer it to

13    New York.

14

15

16    Dated:  March 26, 2008                    FOLEY & LARDNER LLP
                                                KENNETH S. KLEIN
17                                              ANAT   HAKIM

18

19                                      By:    /S/
                                               KENNETH S. KLEIN
20                                             Attorneys for Defendant The Rockefeller
                                               University, a New York not-for-profit
21                                             corporation.

22

23

24

25

26

27

28

1   **FOLEY & LARDNER LLP**
    402 W. BROADWAY, SUITE 2100
2   SAN DIEGO, CA 92101-3542
    TELEPHONE:    619.234.6655
    FACSIMILE:    619.234.3510
3
    KENNETH S. KLEIN, CA BAR NO. 129172
4   **FOLEY & LARDNER LLP**
    3000 K STREET, NW - SUITE 500
5   WASHINGTON, DC 20007-5101
    TELEPHONE:    202.672-5300
    FACSIMILE:    202.672-5399
6
    ANAT HAKIM (admitted *pro hac vice*)
7
    Attorneys for Defendant The Rockefeller University, a New York not-for-profit
8   corporation,

9                 **UNITED STATES DISTRICT COURT**

10                **SOUTHERN DISTRICT OF CALIFORNIA**

11

12  Ligand Pharmaceuticals Incorporated, a    Case No:  08-CV-401 BEN (WMc)
    Delaware corporation,
13                                            **DECLARATION OF JAMES LAPPLE**
                    Plaintiff,                **IN SUPPORT OF DEFENDANT THE**
14                                            **ROCKEFELLER UNIVERSITY'S**
            vs.                               **MOTION TO DISMISS, OR IN THE**
15                                            **ALTERNATIVE, TRANSFER OR STAY**
    The Rockefeller University, a New York    **THIS ACTION**
16  not-for-profit corporation,
                                              Judge:      Roger T. Benitez
17                  Defendant.
                                              Date:       June 2, 2008
18                                            Time:       10:30 a.m.
                                              Dept:       Courtroom 3
19

20          I, James Lapple, declare as follows:

21          1.      I am employed by The Rockefeller University (the "University") as its Vice

22  President, Finance.  I have worked for the University in that position for the past four

23  years in New York.  I have personal knowledge of the matters asserted herein.

24          2.      As part of my responsibilities as Vice President, Finance, I have an

25  understanding of the University's operations and business and make this declaration to

26  the best of my knowledge and belief.

27          3.      The Rockefeller University is a New York not-for-profit education

28  corporation, with its principal place of business in New York, New York.  All of The

                                    1

1 Rockefeller University's facilities and employees are located in New York.

2     4.     The Rockefeller University does not have an office in California.

3     5.     The Rockefeller University maintains no telephone listing or mailing

4 addresses in the State of California.

5     6.     The Rockefeller University does not sell products in the State of California

6 and does not market or advertise directly to the residents thereof.

7     7.     The Rockefeller University has no research facility, no employees or sales

8 representatives in the State of California.

9     8.     The Rockefeller University does not solicit business in California.

10

11     Pursuant to 28 U.S.C. 1746, I declare under penalty of perjury that the foregoing is

12 true and correct. I executed this Declaration on this 26th day of March, 2008 in New

13 York, New York.

14

15                        James Lapple

16

17

18

19

20

21

22

23

24

25

26

27

28

2

FOLEY & LARDNER LLP
402 W. BROADWAY, SUITE 2100
SAN DIEGO, CA 92101-3542
TELEPHONE:    619.234.6655
FACSIMILE:    619.234.3510

KENNETH S. KLEIN, CA BAR NO. 129172

FOLEY & LARDNER LLP
3000 K STREET, NW - SUITE 500
WASHINGTON, DC 20007-5101
TELEPHONE:    202.672-5300
FACSIMILE:    202.672-5399

ANAT HAKIM, (admitted *pro hac vice*)

Attorneys for Defendant The Rockefeller University, a New York not-for-profit
corporation,

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Ligand Pharmaceuticals Incorporated, a Delaware corporation,<br><br>Plaintiff,<br><br>vs.<br><br>The Rockefeller University, a New York not-for-profit corporation,<br><br>Defendant. | Case No:  08-CV-401 BEN (WMc)<br><br>**DECLARATION OF ANAT HAKIM IN SUPPORT OF DEFENDANT THE ROCKEFELLER UNIVERSITY'S MOTION TO DISMISS, OR IN THE ALTERNATIVE, TRANSFER OR STAY THIS ACTION**<br><br>Judge:        Roger T. Benitez<br><br>Date:         June 2, 2008<br>Time:         10:30 a.m.<br>Dept:         Courtroom 3 |

I, Anat Hakim, declare as follows:

1.      I am an attorney licensed to practice before all courts of the State of New York and am employed by the law firm of Foley & Lardner LLP, attorneys of record for defendant, The Rockefeller University.  I have personal knowledge of the matters asserted herein and, if called as a witness to testify, I could and would competently testify to the matters stated herein.

2.      Attached hereto as Exhibit "1" is a true and correct copy of Summons and Complaint brought by The Rockefeller University against Ligand Pharmaceuticals Incorporated, which The Rockefeller University filed in the Supreme Court of the State

1

of New York in the County of New York on March 4, 2008 at 9:02 a.m. EST.

3.       Attached hereto as Exhibit "2" is a true and correct copy of the 1992 license agreement between Ligand Pharmaceuticals Incorporated and The Rockefeller University.

4.       Attached hereto as Exhibit "3" is a true and correct copy of a March 13, 2008 letter from Charles S. Berkman of Ligand Pharmaceuticals, Inc. to The Office of the General Counsel at The Rockefeller University.

5.       Attached hereto as Exhibit "4" is a true and correct copy of a March 17, 2008 letter from Anat Hakim to Charles S. Berkman of Ligand Pharmaceuticals, Inc.

6.       Attached hereto as Exhibit "5" is a true and correct copy of the complaint filed by Ligand Pharmaceuticals Incorporated against The Rockefeller University in the United States District Court, Southern District of California, on March 4, 2008 at 8:33 a.m. PST.

7.       Attached hereto as Exhibit "6" is a true and correct copy of a March 14, 2008 Notice of Filing of Notice of Removal and Notice of Removal, filed by Ligand Pharmaceuticals Incorporated on March 14, 2008.

8.       Attached hereto as Exhibit "7" is a true and correct copy of Ligand Pharmaceuticals Inc.'s Notice of Motion to Dismiss, or In the Alternative, To Transfer to the Southern District of California, Memorandum in Support, and Supporting Exhibits, which Ligand Pharmaceuticals Inc. filed in the Southern District of New York on March 21, 2008.

9.       Attached hereto as Exhibit "8" is a true and correct copy of a December 22, 1992 letter (Bates stamped RU0002701.001) from James Darnell of The Rockefeller University to Dr. Robert B. Stein of Ligand Pharmaceuticals.

1    10.  Pursuant to 28 U.S.C. 1746, I declare under penalty of perjury that the

2 foregoing is true and correct. I executed this Declaration on this 26th day of March, 2008

3 in Jupiter, Florida.

4

5             Anat Hakim

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT 1

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-----------------------------------------------------------X
                                        :      **SUMMONS**

THE ROCKEFELLER UNIVERSITY,      :

                  Plaintiff,      :      Index No. 08/600638

                          :      Date Purchased: 3/4/08

        v.                    :

                          :

LIGAND PHARMACEUTICALS, INC.,   :      Plaintiff designates New York

                          :      County as the place for trial

             Defendant.      :
-----------------------------------------------------------X

To the above named Defendant:

        YOU ARE HEREBY SUMMONED to answer the complaint in this action, and to serve a copy of your answer, or if the complaint is not served with this summons, to serve a notice of appearance, on the plaintiff's attorneys within 20 days after service of this summons, exclusive of the day of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York); and in the case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

        The basis of the venue designated is NY CPLR § 503(a).

Dated: New York, New York
      March 4, 2008

Plaintiff's Address:
The Rockefeller University
1230 York Avenue
New York, New York 10065

NEW YORK
COUNTY CLERK'S OFFICE

MAR 0 4 2008

NOT COMPARED
WITH COPY FILE

FOLEY & LARDNER LLP

By: *Peter N. Wang*
      Peter N. Wang
      Anat Hakim
      Douglas S. Heffer
      90 Park Avenue
      New York, New York 10016
      (212) 682-7474
      Attorneys for Plaintiff

NYC_154136.1

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
--------------------------------------------------------------------X
                               :

THE ROCKEFELLER UNIVERSITY,           :         Index No.

                  Plaintiff,       :

                         :         **COMPLAINT**

        v.                     :         **JURY TRIAL REQUESTED**

LIGAND PHARMACEUTICALS, INC.       :

                  Defendant.     :

                                 :
--------------------------------------------------------------------X

        Plaintiff, The Rockefeller University, by its attorneys, Foley & Lardner LLP,

complains and alleges as follows:

### NATURE OF THE ACTION

        The Rockefeller University (the "University") owns groundbreaking inventions

that are powerful tools to screen for therapeutic drugs and that were discovered by its esteemed

faculty member Dr. James E. Darnell Jr. The University exclusively licensed this valuable

technology to defendant Ligand Pharmaceuticals, Incorporated ("Ligand") in 1992 ("1992

Agreement"). Working under a 1994 agreement with its exclusive sublicensee SmithKline

Beecham ("SKB", now GlaxoSmithKline) ("1994 SKB/Ligand Agreement") and using the

University's inventions, Ligand identified several pharmaceutical molecules and received several

milestone payments from SKB. Ligand has failed to pay the University its contractual share of

these milestone payments according to the 1992 Agreement, despite the University's repeated

requests. Instead, in August 2007, shortly before SKB requested approval from the Food and

Drug Administration of Promacta®, one of the pharmaceutical molecules identified under the

1994 SKB/Ligand Agreement, and before royalties on Promacta® are anticipated to be paid by

SKB to Ligand, Ligand notified the University that Ligand was unilaterally terminating the 1992

Agreement, although not permitted to do so by its terms. The University, having fully performed

NEW YORK
COUNTY CLERK'S OFFICE

MAR 0 4 2008

NOT COMPARED
WITH COPY FILE

its contractual obligation and faced with Ligand's refusal to honor its payment obligations under the 1992 Agreement, has no other recourse but to file this action.

## PARTIES

1.      Plaintiff The Rockefeller University is, and at all times mentioned herein was, a New York corporation whose principal place of business is at 1230 York Avenue, New York, NY 10065.

2.      Defendant Ligand Pharmaceuticals, Inc. is, and at all times mentioned herein was, a Delaware corporation whose principal place of business is at 10275 Science Center Drive, San Diego, CA 92121. Ligand is a biotechnology company engaged in the discovery and development of new drugs.

## JURISDICTION AND VENUE

3.      This Court has personal jurisdiction over defendant pursuant to CPLR § 301, 302.

4.      Venue is proper in this county pursuant to CPLR § 503(a).

## BACKGROUND OF THE UNIVERSITY-LIGAND COLLABORATION

5.      Founded in 1901, Plaintiff The Rockefeller University is the nation's first biomedical research university. Today, it is internationally renowned for research and graduate education in the biomedical sciences, chemistry and physics. A total of 21 scientists associated with the University have received the Nobel Prize in medicine and physiology or chemistry, 17 University scientists have received Lasker Awards, five have been named MacArthur Fellows and 11 have garnered the National Medal of Science. More than one-third of the current faculty are elected members of the National Academy of Sciences.

6.      Dr. James E. Darnell Jr., M.D. has been a professor at The Rockefeller University since 1974. A pioneering researcher in the field of gene regulation, he is The Rockefeller University Vincent Astor Professor and head of the University's Laboratory of Molecular Cell Biology. Dr. Darnell is an elected member of the National Academy of Sciences.

7.      Prior to Dr Darnell's pioneering research, it was not understood how a large and diverse group of regulatory proteins called cytokines cause cells in the human body to change

2

their behavior in response to changes in the environment. Cytokines play an important role in regulating the human body, for example, stimulating the immune system to fight infection and activating red blood cell or platelet formation. Among Dr Darnell's many discoveries, he elucidated how the binding of a cytokine to a cell surface receptor is communicated to the nucleus of a cell to regulate the expression of a small and select number of genes. The pathway Dr Darnell discovered involves the binding of a cytokine to a cell surface receptor causing certain proteins, which he called Signal Transducers and Activators of Transcription, or STAT proteins, to accumulate in the nucleus, bind to specific genes, cause them to be expressed and thereby change cell behavior ("STATs Pathway").

8.     Dr. Darnell received numerous awards for his pioneering discovery and characterization of the STAT pathway, including the 2002 Albert Lasker Award for Special Achievement in Medical Science: "For an exceptional career in biomedical science during which he opened two fields in biology - RNA processing and cytokine signaling - and fostered the development of many creative scientists." In 2003, the White House awarded Dr. Darnell the National Medal of Science, the nation's highest honor for lifetime achievement in fields of scientific research. Other awards Dr. Darnell has received include the 1997 Passano Award, the 1994 Paul Janssen Prize in Advanced Biotechnology and Medicine and the 1986 Gairdner Foundation International Award.

9.     Dr Darnell invented, based on his understanding of the STAT pathway, a high throughput screen ("HTS") for discovery of new pharmaceuticals that are agonists or antagonists of cytokines. An agonist is a pharmaceutical that binds the same cell surface receptor as the cytokine, while an antagonist is a pharmaceutical that prevents binding of the cytokine to its cell surface. Dr. Darnell's HTS invention was disclosed in a Rockefeller University patent application filed in September 1993. In the HTS, a cell is exposed to a potential pharmaceutical and the activity of a reporter gene, designed by Dr Darnell based on his knowledge of the STATs Pathway, is monitored. Potential pharmaceuticals that mimic cytokine activity and therefore serve as agonists are identified.

3

## 1992 LICENSE AGREEMENT BETWEEN THE UNIVERSITY AND LIGAND

10.    The pioneering STATs Pathway technology that Dr. Darnell discovered and developed while at the University (and which was owned by the University) promised to be a powerful tool to screen for therapeutic drugs. To allow Dr. Darnell's groundbreaking discovery to be utilized for the public good, the University entered into negotiations with Ligand to use this discovery, including HTS, to find valuable new pharmaceuticals.

11.    After negotiation, on September 30, 1992, the University and Ligand entered into a License Agreement. A true and correct copy of the 1992 Agreement is attached hereto as Exhibit A and incorporated herein by reference.

12.    In the 1992 Agreement, the University granted Ligand a sole exclusive world-wide license, under the University's broadly-defined Licensed Patent Rights and Technical Information relating to the STATs Pathway technology, "to make, have made, use and sell Products or practice Processes." *See Exhibit A at Section 2.1.* The license grant to Ligand included an exclusive world-wide license to all developments of Dr. Darnell's laboratory relating to the STATs Pathway technology, existing as of the effective date of the 1992 Agreement and for five years thereafter. *See id. at Section 1.4.* In connection with the 1992 Agreement, Dr. Darnell and members of his laboratory did in fact collaborate with Ligand for years regarding the STATs Pathway technology. Over the course of several years, Dr. Darnell provided essential technical information, materials and insight to Ligand relating to the STATs Pathway technology. In addition, the University filed several patent applications and was issued several patents, describing aspects of its pioneering STATs Pathway technology.

13.    The technical information and expertise about STATs Pathway technology that Ligand acquired from the University pursuant to the 1992 Agreement was essential to the development of, among other things, a HTS to identify cytokine agonists. The HTS was key to the identification and development of pharmaceutical drug candidates.

14.    In return for the University's exclusive world-wide license to this pioneering

4

Exhibit "1"

8

STATs Pathway technology, Ligand obligated itself to:

    a.   "diligently seek to develop Products and/or Processes" using or based on the STATs Pathway technology provided to it under the 1992 Agreement. *See id. at Section 2.7;*

    b.   make certain cash payment to the University during the first five years of the Agreement and to give the University an equity interest in Ligand. *See id. at Sections 2.2 and 2.3; and*

    c.   pay the University a portion of any payments Ligand received from any third party "to secure the right to use Technical Information or to sell Products or Processes," (*see id. at Section 2.5)* and a royalty on Ligand's own "Net Sales of Products and on its net revenues . . . received from performance of Processes for a third party." (*see id. at Section 2.4*).

    15.   Section 2.5 of the 1992 Agreement, which addresses Ligand's payment obligations to the University with respect to milestone and royalty payments it receives from third parties provides:

> In the case of payments made to Ligand by a third party to secure the right to use Technical Information or to sell Products or Processes, Ligand will pay to Rockefeller and NYU twenty-five percent (25%) of the payments made to Ligand by the third party; provided, however, that in the situation where the payment to Ligand is based on the third party's revenues arising from sale of a Product or use of a Process, then Ligand shall pay to Rockefeller and NYU the lesser of twenty-five percent (25%) of the payment received from the third party or a royalty calculated pursuant to Section 2.4 by treating the third party's sales of such Products and Processes as Ligand sales. Payments by a third party to Ligand to purchase equity in Ligand and to fund research at Ligand which do not generate net revenue as defined in Section 2.4 shall not be subject to sharing under this Section 2.5.

    16.   Section 2.4 of the 1992 Agreement, which addresses Ligand's royalty payment obligations to the University based on Ligand's own sales of Products or performance of Processes, provides:

> Ligand will pay a royalty of five percent (5%) of its Net Sales of Products and on its net

5

revenues, i.e., gross revenues less fully burdened costs, received from performance of Processes for a third party. The royalty shall be paid for a term which is the longer of ten (10) years, or, on a country by country basis, expiration of the last patent in the Licensed Patent Rights having a claim which reads on the Product or Process or a method of making or using the Product or Process. Only one royalty will be owed on a Product or Process in the circumstance where the Product or Process is covered by multiple claims in the Licensed Patent Rights. Royalty payments made under this Section 2.4 and under Section 2.5 shall be made to Rockefeller and NYU in the ratio ninety percent (90%) to Rockefeller and ten percent (10%) to NYU.

17.    The 1992 Agreement provides that it "shall be interpreted and governed in accordance with the laws of the State of New York." *See id. at Section 13.*

## 1994 RESEARCH, DEVELOPMENT, AND LICENSE AGREEMENT BETWEEN LIGAND AND SMITHKLINE BEECHAM

18.    On December 29, 1994, Ligand entered into an exclusive research and development collaboration and license with SmithKline Beecham. On information and belief, under the 1994 SKB/Ligand Agreement, the HTS technology that was developed using the University's STATs Pathway technology was to be used by Ligand and SKB to discover and characterize small molecule, orally bioavailable drugs for the treatment of a variety of blood cell deficiencies. On information and belief, Ligand sub-licensed to SKB the STATs Pathway technology that the University exclusively licensed to Ligand.

19.    The 1994 SKB/Ligand Agreement entitles Ligand to payments from SKB for certain milestones reached in connection with the development of research compounds or products as well as royalty payments. In announcing Ligand's collaboration with SKB, Ligand's then-Senior Vice President and Chief Scientific Officer stated in a February 6, 1995 press release:

> We are delighted to have this, our second STATs collaboration within two years of licensing in this exciting technology from Rockefeller University. Our signal transduction area of research affords numerous drug targets to control gene expression. This alliance with the excellent research team at SB provides critical mass and expertise to exploit our recent insights in STATs and HGFs to create new medicines.

6

## DISPUTE BETWEEN THE UNIVERSITY AND LIGAND CONCERNING THE DEVELOPMENT OF PHARMACEUTICAL CANDIDATES

20.    The SKB/Ligand collaboration has led to the identification and development of several pharmaceutical compounds that act via the STATs Pathway, including but not limited to PROMACTA®/REVOLADE® ("PROMACTA®"), an orally active, non-peptide, small molecule thrombopoietin ("TPO") mimetic for the treatment of thrombocytopenia. Thrombocytopenia, or a low number of platelets in the blood, can be a life-threatening condition. Platelets are necessary to the normal process of blood clotting. When someone experiences thrombocytopenia, a cut or bruise might not heal quickly, or at all, without medical intervention. Therefore, patients with a low platelet cell count must take special precautions, and suffer significant risk.

21.    On information and belief, in the fourth quarter of 2007, SKB submitted to the Food & Drug Administration a New Drug Application for PROMACTA® for the treatment of short-term idiopathic thrombocytopenic purpura (ITP). ITP is a disorder characterized by low platelet counts leaving patients at risk of episodes of spontaneous bruising, mucosal bleeding, and in severe cases intracranial hemorrhage. On information and belief, if approved, PROMACTA® would be the first approved oral TPO mimetic. On information and belief, in the fourth quarter of 2007, SKB initiated two Phase III trials in connection with the use of PROMACTA® for hepatitis C, and SKB is studying PROMACTA® for chemotherapy-induced thrombocytopenia (CIT). On information and belief, at least one additional pharmaceutical compound, SB-559448, also developed as part of the SKB/Ligand collaboration, and described as a backup compound to PROMACTA®, is in Phase I clinical trials.

22.    On information and belief, Ligand also has its own thrombopoietin program, which it commenced after its research program with SKB ended, and that program has resulted in the identification and development of Ligand's lead, small-molecule TPO mimetic, LGD-4665, which acts via the STATs Pathway by binding to the thrombopoeitin receptor in a manner

7

similar to TPO and activates the production of platelets by the bone marrow. As of December 2007, Ligand reported that LGD-4665 generated positive Phase I results. Ligand also has stated that it expects to advance the development of LGD-4665 for multiple indications. On information and belief, several additional next generation molecules are in the research phase at Ligand with promising TPO mimetic activities.

23.     On information and belief, each of the compounds described in Paragraphs 20 -22 above, constitute a "Product", as that term is defined in Section 1.5 of the 1992 Agreement. Section 1.5 of the 1992 Agreement defines "Product" as follows:

> any product which embodies or the use of which employs any invention(s) described or claimed in Licensed Patent Rights or for which Technical Information was essential to the discovery or development thereof.

24.     The 1992 Agreement defines "Licensed Patent Rights" as follows:

> (a) the patent application(s) set forth on Exhibit "A" attached hereto and all patents which may issue thereon;
> (b) the patent applications which are divisionals, continuations, continuations-in-part, reissues, renewals, foreign counterparts, extensions or additions of the patents and/or applications described in (a) and (b) of this paragraph 1.3, and all patents which may issue thereon;
> (c ) and all other patent applications, and patents issuing thereon, filed to cover Technical Information, including divisionals, continuations-in-part, reissues, renewals, foreign counterparts, extensions or additions and patents which may issue thereon.

25.     The 1992 Agreement defines "Technical Information" as follows:

> any and all technical data, information processes, materials and know-how, whether or not patentable, owned by Rockefeller and existing or capable of description in a tangible form relating to peptidyl hormone mediated gene expression (a) developed in the laboratory of Dr. James Darnell of Rockefeller or Dr. David Levy of NYU as of the Effective Date and (b) which is subsequently developed at Rockefeller in the laboratory of Dr. James Darnell during the period ending five (5) years form the Effective Date.

26.     Consequently, under Section 2.5 of the 1992 Agreement, the University is entitled to at least 25% of milestone and royalty payments paid to Ligand by SKB to date in connection with such Products.  Similarly, to the extent that Ligand has entered into collaborations with

8

other third parties from which Ligand has received or is entitled to receive payments for Products subject to Section 2.5 of the 1992 Agreement, the University would be entitled to 25% of such payments.

27.     This includes at least $1.91 Million Dollars, which is equal to 25% of the Eight Million Dollars in milestone payments SKB has already made to Ligand to date in connection with the development of PROMACTA® and SB-559448, minus amounts Ligand previously paid the University. *See Exhibit A at Section 2.5.* In addition, to the extent that the Ligand/SKB collaboration results in additional milestone payments by SKB to Ligand in connection with the continued development of PROMACTA®, SB-559448 or the development of other compounds, the University would be entitled to 25% of such milestone payments.

28.     To date, Ligand has refused to pay the University its portion of the milestone payments and has taken the position that no further milestone payments are or will be owing to the University.

29.     In addition to 25% of milestone payments received by Ligand, the University is also entitled to 25% of any royalty payments that SKB would pay to Ligand on sales of PROMACTA®. To the extent that the Ligand/SKB collaboration results in the commercialization of products other than PROMACTA®, such as, for example, products based on SB-559448, the University would be entitled to 25% of royalty payments made to Ligand based on sales of those products as well. Ligand has taken the position that the University is not entitled to any royalties under the 1992 Agreement.

30.     A couple of months before SKB submitted its New Drug Application for PROMACTA® to the Food & Drug Administration, and by letter dated August 9, 2007, Ligand informed the University that Ligand was providing written notice that "Ligand is exercising its right to terminate the above-referenced Agreement. Pursuant to Section 11.2, this termination will be effective on November 7, 2007."

31.     On September 25, 2007, representatives of Ligand and the University met to discuss Ligand's purported termination notice and the University's position that the 1992

9

Agreement could not be terminated after full performance by the University. At the meeting, the University notified Ligand that it was exercising its audit rights under Section 4.2 of the 1992 Agreement.

32.     On October 10, 2007, the University sent Ligand its preliminary audit request and a tolling agreement, which was effective through January 31, 2008.

33.     On or about November 13 or 14, 2007, the University initiated its audit of Ligand. To date, Ligand has refused to fully and adequately comply with the University's audit requests, as amended.

34.     On January 17, 2008, the University and Ligand entered into an Amended Tolling Agreement, which was effective through March 3, 2008.

## FIRST CAUSE OF ACTION

### (Breach of Contract Against Ligand)

35.     Plaintiff incorporates by reference each and every allegation contained in paragraphs 1 through 34 of this Complaint as though fully set forth herein.

36.     The 1992 Agreement between the University and Ligand is a valid and binding contract between the University and Ligand.

37.     Upon information and belief, Plaintiff alleges that Defendant has failed to perform and is in material breach of at least its payment obligations under the 1992 Agreement as described in the foregoing paragraphs of this Complaint. As a direct and proximate result of the breach, the University has been damaged in an amount according to proof at trial, but no less than $1.91 Million Dollars.

38.     Plaintiff the University has fully performed all of its obligations and otherwise complied with all the terms and conditions of the 1992 Agreement.

39.     Plaintiff the University is entitled to recover damages from Defendant for Defendant's material breach of the 1992 Agreement alleged in this Complaint in an amount to be proven at trial.

10

## SECOND CAUSE OF ACTION

### (Unjust Enrichment/Constructive Trust)

40.　Plaintiff incorporates by reference each and every allegation contained in paragraphs 1 through 39 of this Complaint as though fully set forth herein.

41.　A civil plaintiff may recover under the doctrine of unjust enrichment by showing that (a) the plaintiff conferred a benefit on the defendant; (b) the defendant appreciated or enjoyed such benefit; and (c) under the circumstances, it was unfair for the defendant to accept or retain the benefit without paying for it.

42.　At Ligand's specific request, and since 1992, the University provided to Ligand valuable information, know-how and services since 1992 relating to STATs Pathway technology.

43.　The University shared such information, know-how and services while Ligand and the University were in a confidential relationship.

44.　Ligand enjoyed such information, know-how and services and was and has been enriched by such information, know-how and services.

45.　Ligand was and has been unjustly enriched at the University's expense because Ligand has not compensated the University for such information, know-how and services.

46.　The reasonable value of the information, know-how and services that the University provided to Ligand and for which the University has not been compensated to date is no less than $1.91 million.

47.　In equity and good conscience, Ligand should be required to return no less than $1.91 million to the University.

48.　The University has no adequate remedy at law by which it can be compensated for this injury.

49.　By virtue of the foregoing, the University has been damaged in an amount to be proven at trial, but in no event less than $1.91 million.

50.　The University also is entitled to a constructive trust on past and future payments made to Ligand by third parties in connection with the valuable information, know-how and

11

services that the University transferred to Ligand, including but not limited to past payments received and future payments in connection with PROMACTA® and/or SB-559448.

### THIRD CAUSE OF ACTION

### (Quantum Meruit)

51.    Plaintiff incorporates by reference each and every allegation contained in paragraphs 1 through 50 of this Complaint as though fully set forth herein.

52.    Since 1992, the University provided to Ligand valuable information, know-how and services relating to STATs Pathway technology in good faith and with the expectation, based on the parties' discussions, that the University would receive compensation for this valuable information, know-how and services.

53.    Ligand accepted the benefit of the University's valuable information, know-how and services, but has not compensated the University

54.    By virtue of the foregoing, the University has been damaged in an amount to be proven at trial, but in no event less than $1.91 million.

### FOURTH CAUSE OF ACTION

### (Specific Performance of Contractual Right to Perform Audit)

55.    Plaintiff incorporates by reference each and every allegation contained in paragraphs 1 through 54 of this Complaint as though fully set forth herein.

56.    The University is entitled to conduct an audit under Section 4.2 of the 1992 Agreement in order to determine the payments due from Ligand to the University under the 1992 Agreement.

57.    The records that would enable the University, through its auditor, to determine the payments due from Ligand to the University under the 1992 Agreement, are within Ligand's possession and control.

58.    Ligand has failed to provide many records that were requested by the University to its auditor.

59.    The University has no adequate remedy at law.

12

60.     The University is thus entitled to perform an audit of Ligand pursuant to Section 4.2 of the 1992 Agreement.

## FIFTH CAUSE OF ACTION

### (Declaratory Relief Against Ligand)

61.     Plaintiff incorporates by reference each and every allegation contained in paragraphs 1 through 60 of this Complaint as though fully set forth herein.

62.     An actual controversy now exists as to the rights and obligations of Plaintiff the University and Defendant Ligand with respect to the 1992 Agreement. Upon information and belief, Plaintiff the University contends that it is entitled to certain milestone and/or royalty payments provided for under the 1992 Agreement in connection with Defendant's identification and continued development of at least PROMACTA® and SB-559448. Defendant Ligand disputes Plaintiff the University's contention, and asserts that it has no obligation to Plaintiff the University under the 1992 Agreement in connection with PROMACTA® or any other compound or product.

63.     Plaintiff University desires a declaration from this Court as to its rights and Defendant's obligations under the 1992 Agreement confirming that:

  a.  PROMACTA®, SB-559448, and LGD 4665 each are a "Product", within the
      meaning of term as defined in the 1992 Agreement;

  b.  The University is entitled to, and Ligand is obligated to pay, 25% of all milestone
      payments and other consideration related to PROMACTA® and/or SB-559448,
      now due under the 1992 Agreement, including 25% of the milestone payments of
      $2 Million, $1 Million, $2 Million, and $1 Million relating to PROMACTA® and
      25% of the milestone payment of $2 Million relating to SB-559448, as provided
      by Section 2.5 of the 1992 Agreement.

13

c.   The University is entitled to, and Ligand will be obligated to pay in the future, 25% of all milestone and/or royalty payments and other consideration related to PROMACTA® and/or SB-559448 which shall become due under the 1992 Agreement hereafter.

d.   The University is entitled to 25% of milestone and/or royalty payments paid to Ligand by any third party in connection with any Product as that term is defined in the 1992 Agreement.

e.   The University is entitled to a 5% royalty on Ligand's Net Sales of Ligand Products that Ligand may bring forward on its own, and not in connection with a third party, as set forth in Section 2.4 of the 1992 Agreement.

64.     A judicial declaration is necessary and appropriate at this time so that the parties may ascertain their rights and obligations under the 1992 Agreement and Plaintiff the University may obtain the relief to which it is entitled.

WHEREFORE, The Rockefeller University prays for judgment as follows:

1.     Damages according to proof at trial, including interest;

2.     Specific performance of the audit initiated by the University, pursuant to Section 4.2 of the 1992 Agreement;

3.     A constructive trust imposed on payments (milestone and royalty) received from a third-party by Ligand, including but not limited to such payments made in connection with PROMACTA® and/or SB-559448, and on Ligand's Net Sales of Ligand Products that Ligand may bring forward on its own;

4.     A Court Declaration confirming that:

14

a. PROMACTA®, SB-559448, and LGD 4665 each are a "Product", within the meaning of the term as defined in the 1992 Agreement;

b. The University is entitled to, and Ligand is obligated to pay, 25% of all milestone payments and other consideration related to PROMACTA® and/or SB-559448, now due under the 1992 Agreement, including 25% of the milestone payments of $2 Million, $1 Million, $2 Million, and $1 Million relating to PROMACTA® and 25% of the milestone payment of $2 Million relating to SB-559448, as provided by Section 2.5 of the 1992 Agreement.

c. The University is entitled to, and Ligand will be obligated to pay in the future, 25% of all milestone and/or royalty payments and other consideration related to PROMACTA® and/or SB-559448 which shall become due under the 1992 Agreement hereafter.

d. The University is entitled to 25% of milestone and/or royalty payments paid to Ligand by any third party in connection with any Product as that term is defined in the 1992 Agreement.

e. The University is entitled to a 5% royalty on Ligand's Net Sales of Ligand Products that Ligand may bring forward on its own, and not in connection with a third party, as set forth in Section 4.2 of the 1992 Agreement.

5. Costs of suit; and

6. Such other and further relief as the Court may deem just and proper.

15

7.     The University requests a jury trial on all issues so triable.

Dated: New York, New York
       March 4, 2008

                                FOLEY & LARDNER LLP

                                By: *Peter N. Wang* (DB)
                                    Peter N. Wang
                                    Anat Hakim
                                    Douglas S. Heffer
                                    90 Park Avenue
                                    New York, New York 10016
                                    (212) 682-7474
                                    Attorneys for Plaintiff The Rockefeller
                                    University

16

# EXHIBIT A

## LICENSE AGREEMENT

AGREEMENT made as of the 30th day of September , 1992 ("Effective Date") by and between LIGAND PHARMACEUTICALS INCORPORATED ("Ligand"), a corporation organized and existing under the laws of the State of Delaware, having a principal place of business at 9393 Towne Centre Drive, San Diego, California 92121, and THE ROCKEFELLER UNIVERSITY ("Rockefeller"), a nonprofit education corporation organized and existing under the laws of the State of New York, having an office at 1230 York Avenue, New York, New York 10021.

### W I T N E S S E T H:

WHEREAS, Dr. James Darnell and his colleagues at Rockefeller and at NYU have developed valuable technology and know-how relating to peptidyl hormone mediated gene expression, including application for patents thereon, which constitutes core technology to be licensed hereunder;

WHEREAS, NYU has assigned to Rockefeller its rights to the core technology;

WHEREAS, Rockefeller has the right to grant exclusive license rights with respect to such core technology and to future developments relating thereto made at Rockefeller in the manner described herein; and

WHEREAS, Ligand wishes to obtain the exclusive license rights described herein for commercial development and application;

NOW, THEREFORE, in consideration of the mutual benefits to be derived hereunder, the parties hereto agree as follows:

agree\rockefeller
09\18\92



1.   Definitions
        The following terms will have the meanings assigned to
them below when used in this Agreement.

        1.1    "Party" shall mean either Ligand or Rockefeller
and "Parties" shall mean Ligand and Rockefeller.

        1.2    "Affiliate" shall mean a corporation or other
entity which directly or indirectly controls, is controlled by or
under common control with Ligand.  An entity shall be regarded as
in control of another if it owns, or directly or indirectly
controls, at least 50% of the voting stock or other ownership
interest of the other entity, or if it directly or indirectly
possesses the power to direct or cause the direction of the
management  and  policies  of  the  other  entity  by  any  means
whatsoever.

        1.3    "Licensed Patent Rights" shall mean
        (a)    the patent application(s) set forth on
Exhibit "A" attached hereto and all patents which may issue
thereon;

        (b)    the    patent    applications   which   are
divisionals,  continuations,  continuations-in-part,  reissues,
renewals, foreign counterparts, extensions or additions of the
patents and/or applications described in (a) and (b) of this
paragraph 1.3, and all patents which may issue thereon;

        (c)    and all other patent applications, and
patents issuing thereon, filed to cover Technical Information,
including divisionals, continuations-in-part, reissues, renewals,
foreign counterparts, extensions or additions and patents which may
issue thereon.

        1.4    "Technical Information" shall mean any and all
technical data,  information processes,  materials and know-how,

agree\rockefeller
09\18\92

2

Exhibit "1"
23

whether or not patentable, owned by Rockefeller and existing or capable of description in a tangible form relating to peptidyl hormone mediated gene expression (a) developed in the laboratory of Dr. James Darnell of Rockefeller or Dr. David Levy of NYU as of the Effective Date and (b) which is subsequently developed at Rockefeller in the laboratory of Dr. James Darnell during the period ending five (5) years from the Effective Date.

1.5    "Product" shall mean any product which embodies or the use of which employs any invention(s) described or claimed in Licensed Patent Rights or for which Technical Information was essential to the discovery or development thereof.

1.6    "Process" shall mean any process which embodies or the practice of which employees any invention(s) described or claimed in Licensed Patent Rights or for which Technical Information was essential to the discovery or development thereof.

1.7    "Territory" shall mean the entire world.

1.8    "Net Sales" shall mean, in the case of sales to non-Affiliates, the invoiced price by Ligand or Affiliates less (a) customary trade quantity and cash discounts actually allowed and taken; (b) allowances actually given for returned, rejected or recalled Products; actual charges for bad debts; (c) freight and insurance if included in the price; government mandated rebates; and (d) value added tax, sales, use or turnover taxes, excise taxes, and custom duties included in the invoiced price.

2.    <u>License Rights</u>

2.1    Rockefeller hereby grants to Ligand a sole exclusive license, including the right to grant royalty bearing sublicenses under terms consistent with this Agreement under Licensed Patent Rights and Technical Information, to make, have made, use and sell Products or practice Processes in any country of

agree\rockefeller
09\18\92

3

the Territory, except to the extent that Rockefeller's right to do so may be limited under the provisions of the following:

        (a)    35 United States, Section 201 _et seq._, and regulations and rules promulgated thereunder, or

        (b)    other applicable laws or regulations of the United States;

Provided only that Rockefeller is satisfied that the licensee is making a substantial and good faith effort to achieve practical application of the subject invention and its public use, Rockefeller agrees to use reasonable and proper efforts to extend exclusivity of the license consistent with the aforesaid U.S. government rights and policies should U.S. government action limit such exclusivity.

        2.2    In consideration of the Ligand stock to be issued to Rockefeller and NYU as described in Section 2.3 and the cash payments to be made pursuant to Section 2.3, the license to Ligand under Section 2.1 shall be deemed to be fully paid up for research purposes including for the purposes of research done by Ligand or a Ligand sublicensee or collaboratively with a third party to the extent that the third party payments to Ligand do not exceed its fully burdened costs for performance of such research and development.

        2.3    On the Effective Date, Ligand shall transfer to Rockefeller and NYU collectively a total of 150,000 shares of Series G Preferred Stock pursuant to Stock Transfer Agreements of even date herewith, 100,000 shares of which will vest on the Effective Date and 50,000 shares of which will vest in two installments of 25,000 shares on the first and second anniversaries hereof unless this Agreement is sooner terminated as provided herein. On the Effective Date, Ligand will also grant Rockefeller and NYU collectively, five year, net issuance warrants to purchase

a total of 100,000 shares of Ligand common stock vesting and exercisable as follows:

    (i)   a total of 50,000 shares vesting at the third anniversary of the Effective Date and exercisable at $14.00 per share; and

    (ii)   a total of 50,000 shares vesting at the fourth anniversary of the Effective Date exercisable at the fair market value on the vesting date.

As further consideration, Ligand will make cash payments to Rockefeller and NYU pursuant to the following schedule:

    (a) On the Effective Date;
        Rockefeller   $45,000
        NYU       $ 5,000

    (b)   $67,500 to Rockefeller and $7,500 to NYU when the current Technical Information is successfully transferred to Ligand as described in Section 5;

    (c)   $67,500 to Rockefeller and $7,500 to NYU on each of the 1st – 4th anniversaries of the Effective Date.

    2.4   Ligand will pay a royalty of five percent (5%) of its Net Sales of Products and on its net revenues, i.e., gross revenues less fully burdened costs, received from performance of Processes for a third party. The royalty shall be paid for a term which is the longer of ten (10) years or, on a country by country basis, expiration of the last patent in the Licensed Patent Rights having a claim which reads on the Product or Process or a method of making or using the Product or Process. Only one royalty will be owed on a Product or Process in the circumstance where the Product or Process is covered by multiple claims in the Licensed Patent Rights. Royalty payments made under this Section 2.4 and under

agree\rockefeller
09\18\92

5

Exhibit "1"
26

Section 2.5 shall be made to Rockefeller and NYU in the ratio
ninety percent (90%) to Rockefeller and ten percent (10%) to NYU.


     2.5    In the case of payments made to Ligand by a third
party to secure the right to use Technical Information or to sell
Products or Processes, Ligand will pay to Rockefeller and NYU
twenty-five percent (25%) of the payments made to Ligand by the
third party; provided, however, that in the situation where the
payment to Ligand is based on the third party's revenues arising
from sale of a Product or use of a Process, then Ligand shall pay
to Rockefeller and NYU the lesser of twenty-five percent (25%) of
the payment received from the third party or a royalty calculated
pursuant to Section 2.4 by treating the third party's sales of such
Products and Processes as Ligand sales.  Payments by a third party
to Ligand to purchase equity in Ligand and to fund research at
Ligand which do not generate net revenue as defined in Section 2.4
shall not be subject to sharing under this Section 2.5.


     2.6    In the event Ligand is required to make payments
to a third party to use Technical Information, it shall be entitled
to credit fifty percent (50%) of that payment against any royalty
owed under this Agreement but in no event may it reduce a payment
owed by more than fifty percent (50%).


     2.7    Ligand will diligently seek to develop Products
and/or Processes using or based on Technical Information.  Ligand
shall be deemed to have met its diligence obligations during the
first five (5) years of the Agreement if, in the aggregate, Ligand,
its Affiliates, licensees and research collaborators expend at
least $4,000,000 directed toward the development of Products and
Processes and support at least ten (10) full time scientist
equivalents in support of that effort.

3.   Patents

     3.1   The Company agrees to reimburse Rockefeller for
all amounts expended prior to the date hereof for the preparation,
filing, prosecution and maintenance of Licensed Patent Rights
licensed to the Company pursuant to Section 2.1 of this Agreement,
said amount being $20,791.18 as of September 8, 1992.

     3.2   The   Company   shall   continue   to   reimburse
Rockefeller for such reasonable additional filing, prosecution, and
maintenance  costs  as  shall  be  incurred  on  each  such  patent
application or patent licensed hereunder during the term of such
license.

     3.3   Rockefeller shall select qualified independent
patent counsel reasonably satisfactory to Ligand to file and
prosecute all patent applications included in Licensed Patent
Rights, including divisionals, continuations, continuations-in-
part, reissues, and foreign counterparts.   Such counsel shall
regularly meet and/or consult with Ligand and/or its designated
officers and counsel to keep them advised of the status of patent
matters in the normal course.  Patent counsel shall be instructed
not to file any papers without giving Ligand ample time and
opportunity to review and comment.  Ligand shall be entitled to
determine the countries in which it wishes to obtain and maintain
patent protection under this Agreement and shall be free, at any
time and at its sole option, to abandon patent prosecution or
maintenance in any country of the Territory.

     3.4   Ligand shall promptly advise Rockefeller of any
decision not to finance the preparation, filing, prosecution or
maintenance of any patent application or patent licensed hereunder
in adequate time to allow Rockefeller, at its own cost, to
effectuate such preparation, filing, prosecution, or maintenance if
it desires to do so; and Ligand shall, at the request of
Rockefeller, take whatever steps may be necessary to return to
Rockefeller all rights which Ligand may have with respect to the

agree\rockefeller
09\18\92

7

applicable Licensed Patent Rights and Technical Information which
it proposes to abandon.

Nothing herein is intended or shall be construed
as obligating Rockefeller to apply for any U.S. or foreign patents
at its own expense, or to defend, enforce, or support any patent or
patent application which may be included in Licensed Patent Rights
to which it has granted license rights to Ligand; provided,
however, that Rockefeller will cooperate with Ligand in Ligand's
activity in applying for U.S. or foreign patents or in the defense
or enforcement of Licensed Patent Rights.

Nothing herein is intended or shall be construed
as obligating Ligand to maintain its license with respect to any
patent or application licensed hereunder and to finance the
preparation, filing, prosecution or maintenance of any patent
application in any bounty or jurisdiction in which it believes it
is not in the best business interests.

3.5    Ligand shall have the right to institute patent
infringement proceedings against third parties based on any
Licensed Patent Rights licensed hereunder.  If Ligand does not
institute infringement proceedings against such third parties,
Rockefeller shall have the right but not the obligation, to
institute such proceedings.  Within thirty (30) days after notice
of its intention to commence such proceedings given to Ligand and
provided that Ligand does not, within such thirty (3) day period,
institutes its own proceedings, Rockefeller may institute such
proceedings.  The expenses of such proceedings, including lawyers'
fees, shall be borne by the Party instituting suit.  Each Party
shall execute all necessary and proper documents and take all other
appropriate action to allow the other Party to institute and
prosecution such proceedings.  Any award paid by third parties as
a result of such proceedings (whether by way of settlement or
otherwise) shall first be applied toward reimbursement for the
legal fees and expenses incurred, and the excess, if any, shall be

shared on a pro rata basis based on the expenses incurred by each
party.

      3.6    Should Ligand decide at any time during the term
hereof that it will no longer commercially pursue the development
of any invention licensed hereunder, Ligand shall promptly notify
Rockefeller of its decision and, upon request from Rockefeller,
shall take whatever steps are necessary to assure reversion to
Rockefeller of all rights to that invention.

      3.7    Ligand shall assume the responsibility at its own
expense, and using counsel of its choosing, to defend against
claims of patent infringement arising from the making, using, or
selling of Products and Processes.

4.   <u>Payments and Reports</u>

      4.1    Within forty-five (45) days of the end of each
calendar quarter during the term of this Agreement, beginning with
the first quarter in which the obligation to make a payment to
Rockefeller arises, Ligand shall submit to Rockefeller and NYU a
report in writing setting forth the net revenues (revenues less
Fully Burdened Costs) earned from the performance of a Process and
the Net Sales of Products, and payments to Ligand which are subject
to sharing with Rockefeller and NYU. The report shall include a
calculation of the payments owed to Rockefeller and NYU arising
therefrom and shall be accompanied by payment to Rockefeller and
NYU in the full amount thereof.

      4.2    Ligand shall keep adequate records in sufficient
detail to enable the payments due from Ligand hereunder to
Rockefeller and NYU to be determined, and permit said records to be
inspected at any time during regular business hours at its
principal place of business by an independent certified public
accountant appointed by Rockefeller, or Rockefeller and NYU
together but not NYU alone, for this purpose and who is reasonably

agree\rockefeller
09\18\92

9

acceptable to Ligand. The accountant shall be required to enter into a confidentiality agreement with Ligand substantially in the form of the provisions contained in Article 5 herein and shall only report to Rockefeller, and NYU if a joint audit is done, the discrepancy, if any, between the amount owed by Ligand for the audited period and the amount actually paid and discrepancies in the method of calculating Fully Burdened Costs. Ligand shall maintain such records for a minimum of three years. No more than one such audit shall be requested per calendar year. Rockefeller, or Rockefeller and NYU if a joint audit, shall bear the cost of any such audit; provided, however, that where the auditor determines that the payments owed for an audit period exceeds that paid to Rockefeller and NYU by Ligand by more than ten (10) percent, the reasonable cost of the audit shall be borne by Ligand.

5. <u>Technical Information Transfer</u>

Rockefeller will diligently cooperate with Ligand to transfer Technical Information to Ligand. Transfer of current Technical Information will be deemed to have successfully occurred for the purposes of Section 2.3 when Rockefeller has transferred to Ligand, and Ligand has successfully expressed, functional proteins from the clones of the genes specifically described in the applications for United States Patents identified in Exhibit "A".

6. <u>Confidentiality</u>

6.1 The Parties contemplate that during the course of their relationship arising under this Agreement it may be necessary to provide the other with confidential information to facilitate the performance of their obligations pursuant to this Agreement. The Parties agree, therefore, that information received from the other which is in writing and identified as confidential, or if disclosed orally, is confirmed in writing and designated confidential, shall be maintained in confidence and that reasonable

and prudent practices shall be followed to maintain the information in confidence, including, where necessary, obtaining written confidentiality agreements from employees not already bound by such agreements who have access to the confidential information. Information received in confidence shall be used by a party only for the purpose of and in connection with its performance of this Agreement. The obligation to maintain information in confidence shall survive this Agreement or termination thereof for any reason for a period of five (5) years thereafter. However, a party shall not be obliged to maintain information in confidence which it can show by written documentation: (a) to have been publicly known prior to submission to it; (b) to have been known or available to it prior to submission by the other party; (c) to have become publicly known without fault on its part subsequent to submission by the other party; (d) to have been received by it from a third party legally having possession of the information without obligations of confidentiality; (e) to be required to be disclosed pursuant to order of any court or governmental agency having jurisdiction thereof after notice to the other party sufficient to afford it an opportunity to intervene in the proceeding where disclosure is required; and (f) to be necessarily revealed in the course of marketing any Product or Process which is licensed hereunder.

7. Academic Freedom

Rockefeller and Ligand recognize the traditional freedom of all scientists to publish and present promptly the results of their research. Rockefeller and Ligand also recognize that exclusive patent rights can be jeopardized by public disclosure prior to the filing of suitable patent applications. Therefore, Rockefeller will assure that each proposed publication concerning any technology described in Licensed Patent Rights or which may constitute an Improvement thereof, before submission to a publisher, will be submitted to Ligand for review in connection with preservation of exclusive patent rights. Ligand shall have

agree\rockefeller
09\18\92                                  11

thirty (30) days in which to review the publication, which may be extended for an additional thirty (30) days when Ligand provides substantial and reasonable need for such extension. By mutual agreement, this period may be further extended for not more than an additional three (3) months. Ligand will allow for simultaneous submission of the publication to the publisher and Ligand, where appropriate. Any publication by Ligand personnel will also be subject to similar pre-review before publication. Scientists at Rockefeller and Ligand will be expected to treat matters of authorship in a proper collaborative spirit, giving credit where it is due and proceeding in a manner which fosters cooperation and communication.

8.  <u>Warranty</u>

    8.1    Rockefeller warrants that it has the right to grant to the full extent thereof the license granted Ligand hereunder and that it has and will discharge their duty of disclosure to the United States Patent and Trademark Office.

    8.2    EXCEPT AS WARRANTED IN THE PRIOR SECTION 8.01, ROCKEFELLER MAKES NO WARRANTY, EXPRESS OR IMPLIED, INCLUDING ANY EXPRESS OR IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR PARTICULAR PURPOSE.

9.  <u>Publicity</u>

    Ligand will not use directly or by implication the name of Rockefeller, or the name of any member of the faculty or staff of Rockefeller, or any unpublished information or data relating to the investigation for any business, promotional, commercial or other purpose, without the prior written approval of Rockefeller and the faculty or staff member involved; except Ligand may use and disclose such names in its internal communications or in any required governmental reports and filings upon prior disclosure and consultation with Rockefeller, as appropriate.

agree\rockefeller
09\18\92
            12

10. <u>Product Liability</u>

Ligand agrees to indemnify and hold harmless Rockefeller, its trustees, officers, agents, faculty, employees, and students from any and all liability arising from injury or damage to persons or property resulting directly or indirectly from Ligand's acquisition, use, manufacture, or sale of any Product covered by Licensed Patent Rights or Technical Information licensed hereunder. Ligand further agrees, so long as it is selling any Product, to obtain and maintain in force product liability insurance coverage in amounts reasonably satisfactory to Rockefeller, as appropriate to the risk as determined by reference to reliable standards in the industry, such insurance to specifically name Rockefeller as an additional insured.

11. <u>Termination</u>

11.1   The licenses herein granted shall continue for the full term of any patents licensed hereunder as the same or the effectiveness thereof may be extended by any governmental authority, rule or regulation applicable thereto.

11.2   Ligand shall have the right to terminate any license grant at any time upon ninety (90) days' prior written notice to Rockefeller, provided, however, that termination shall not affect Rockefeller's and NYU's rights and privileges as a stockholder of Ligand or their ownership of any vested shares of Ligand.

11.3   Any Party may terminate this Agreement in the event of a material breach by the other party, provided only that the offending Party is given notice of the breach and a reasonable time, not to exceed sixty (60) days, in which to cure such breach.

11.4   Any termination of this Agreement and of any option and/or license granted hereunder shall also terminate any applicable sublicense thereunder.

agree\rockefeller
09\18\92

13

11.5    The Parties acknowledge that Ligand's right to the future developments made at Rockefeller in the laboratory of Dr. James Darnell are an important element of this Agreement. Therefore, in the event that Dr. Darnell for health reasons or otherwise ceases to actively conduct research at Rockefeller as a full time member of the faculty, then Ligand can, without loss of rights under the Agreement, terminate the making of anniversary cash payments under Section 2.3.

12.  Notices

Any notice required to be given pursuant to this Agreement shall be made by personal delivery or, if by mail, then by registered or certified mail, return receipt requested, with postage and fees prepaid, by one Party to the other Party at the addresses noted below.

In the case of Ligand, notice should be sent to:

   Ligand Pharmaceuticals Incorporated
   9393 Towne Centre Drive, Suite 100
   San Diego, CA  92121
   Attn:  General Counsel

In the case of Rockefeller, notice should be sent to:

   The Rockefeller University
   1230 York Avenue
   New York, NY  10021
   Attn:  Office of the General Counsel

13.  Law to Govern

This Agreement shall be interpreted and governed in accordance with the laws of the State of New York.

14.  No Partnership

This Agreement shall not constitute a partnership or a joint venture, and neither Party may be bound by the other to any

agree\rockefeller
09\18\92

14

contract, arrangement or understanding except as specifically stated herein.

### 15. No Waiver

The failure of either party to enforce at any time any of the provisions of this Agreement, or any rights in respect thereto, or to exercise any election herein provided, shall in no way be considered to be a waiver of such provisions, rights or elections, or in any way to affect the validity of this Agreement. Exercise by either party any of its rights herein or any of its elections under the terms or covenants herein shall not preclude either party from exercising the same or any other rights in this Agreement, irrespective of any previous action or proceeding taken by either party hereunder.

### 16. Severability

If any provision of this Agreement is judicially determined to be void or unenforceable, such provision shall be deemed to be severable from the other provisions of this Agreement which shall remain in full force and effect. Either Party may request that a provision otherwise void or unenforceable be reformed so as to be valid and enforceable to the maximum extent permitted by law.

### 17. Assignment

This Agreement may not be assigned by either Party without the prior written consent of the other, which consent shall

agree\rockefeller
09\18\92

15

not be unreasonably withheld except that Ligand may assign this Agreement to a successor entity in the case of a merger, acquisition or other reorganization.

## 18. Resolution of Dispute

The Parties agree that in the event of a dispute between them arising from concerning, or in any way relating to this Agreement, the Parties shall undertake good faith efforts to resolve the same amicably between themselves.

## 19. Force Majeure

The Parties shall not be liable in any manner for failure or delay in fulfillment of all or party of this Agreement, directly or indirectly caused by acts of God, governmental orders or restrictions, war, war-like condition, revolution, riot, looting, strike, lockout, fire, flood or other similar or dissimilar causes or circumstances beyond the non-performing Party's control. The non-performing Party shall promptly notify the other Party of the cause or circumstance and shall recommence its performance of its obligations as soon as practicable after the cause or circumstance ceases.

## 20. Entire Understanding

This Agreement, together with the Exhibits hereto, and the further documents and agreements executed in connection with the transactions contemplated hereby constitute the entire agreement between the Parties and supersedes all prior

agree\rockefeller
09\18\92

16

understandings and agreements by the Parties with respect to the subject matter hereof.

IN WITNESS WHEREOF, the Parties have caused this Agreement to be duly executed as of the day and year first above written.

THE ROCKEFELLER UNIVERSITY

By _Torst Wund_

Title_ President

LIGAND PHARMACEUTICALS INCORPORATED

By_

Title_ President and CEO

EXHIBIT "A"

## U. S. PATENT APPLICATIONS

1.  TITLE:          "RECEPTOR RECOGNITION FACTOR AND METHODS OF
                    USE THEREOF"
    INVENTORS:      Darnell and Levy
    SERIAL NO.:     07/613,326
    FILED:          November 14, 1990


2.  TITLE:          "RECEPTOR    RECOGNITION    FACTORS,    PROTEIN
                    SEQUENCES AND METHODS OF USE THEREOF"
    INVENTORS:      Darnell, Schindler and Fu
    SERIAL NO.:     07/854,296
    FILED:          March 19, 1992

Exhibit "1"
39

Index No.

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

THE ROCKEFELLER UNIVERSITY,

Plaintiff,

-against-

LIGLAND PHARMACEUTICALS, INC.,

Defendant.

## SUMMONS AND COMPLAINT

**Foley & Lardner LLP**

**ATTORNEYS FOR Plaintiff**

### 90  PARK  AVENUE

**BOROUGH OF MANHATTAN**          **NEW YORK CITY**

(212) 682-7474

Due and timely serve of      copy of the within

is hereby admitted this    day of    20__

Attorney for

NEW YORK
COUNTY CLERK'S OFFICE

Exhibit "1"

40

# COMPLETE THIS STUB

ndorse This INDEX NUMBER ON All
pers and advise your adversary of
e number assigned. Sec. 202.5,
niform Rules Of Trial Courts

**INDEX NUMBER FEE**
**$210.00**

DO NOT DETACH

Title of Action or Proceeding to be TYPED or PRINTED by applicant
**SUPREME COURT, NEW YORK COUNTY**

The Rockefeller University

v.

Ligand Pharmaceuticals, Inc.

08600638

```
        RECEIPT
 NEW YORK COUNTY CLERK
    60 CENTRE STREET
  NEW YORK, NY 10007
        R141


DEPARTMENT                  AMOUNT
------------------------------------
50 COMMERCIAL               165.00
 7 SURCHARGE                 45.00

TOTAL                    210.00
CHECK                       210.00
------------------------------------
CONS  CASHIER      DATE    TIME   TERM
21565  2345     08 MAR 04  9:02 AM  41-1
```

EXHIBIT 2

## LICENSE AGREEMENT

AGREEMENT made as of the <u>30th</u> day of <u>September</u>, 1992 ("Effective Date") by and between LIGAND PHARMACEUTICALS INCORPORATED ("Ligand"), a corporation organized and existing under the laws of the State of Delaware, having a principal place of business at 9393 Towne Centre Drive, San Diego, California 92121, and THE ROCKEFELLER UNIVERSITY ("Rockefeller"), a nonprofit education corporation organized and existing under the laws of the State of New York, having an office at 1230 York Avenue, New York, New York 10021.

### W I T N E S S E T H:

WHEREAS, Dr. James Darnell and his colleagues at Rockefeller and at NYU have developed valuable technology and know-how relating to peptidyl hormone mediated gene expression, including application for patents thereon, which constitutes core technology to be licensed hereunder;

WHEREAS, NYU has assigned to Rockefeller its rights to the core technology;

WHEREAS, Rockefeller has the right to grant exclusive license rights with respect to such core technology and to future developments relating thereto made at Rockefeller in the manner described herein; and

WHEREAS, Ligand wishes to obtain the exclusive license rights described herein for commercial development and application;

NOW, THEREFORE, in consideration of the mutual benefits to be derived hereunder, the parties hereto agree as follows:

agree\rockefeller
09\18\92



Exhibit "2"
42

1.    Definitions

The following terms will have the meanings assigned to them below when used in this Agreement.

1.1    "Party" shall mean either Ligand or Rockefeller and "Parties" shall mean Ligand and Rockefeller.

1.2    "Affiliate" shall mean a corporation or other entity which directly or indirectly controls, is controlled by or under common control with Ligand. An entity shall be regarded as in control of another if it owns, or directly or indirectly controls, at least 50% of the voting stock or other ownership interest of the other entity, or if it directly or indirectly possesses the power to direct or cause the direction of the management and policies of the other entity by any means whatsoever.

1.3    "Licensed Patent Rights" shall mean
(a)    the patent application(s) set forth on Exhibit "A" attached hereto and all patents which may issue thereon;

(b)    the patent applications which are divisionals, continuations, continuations-in-part, reissues, renewals, foreign counterparts, extensions or additions of the patents and/or applications described in (a) and (b) of this paragraph 1.3, and all patents which may issue thereon;

(c)    and all other patent applications, and patents issuing thereon, filed to cover Technical Information, including divisionals, continuations-in-part, reissues, renewals, foreign counterparts, extensions or additions and patents which may issue thereon.

1.4    "Technical Information" shall mean any and all technical data, information processes, materials and know-how,

whether or not patentable, owned by Rockefeller and existing or capable of description in a tangible form relating to peptidyl hormone mediated gene expression (a) developed in the laboratory of Dr. James Darnell of Rockefeller or Dr. David Levy of NYU as of the Effective Date and (b) which is subsequently developed at Rockefeller in the laboratory of Dr. James Darnell during the period ending five (5) years from the Effective Date.

1.5   "Product" shall mean any product which embodies or the use of which employs any invention(s) described or claimed in Licensed Patent Rights or for which Technical Information was essential to the discovery or development thereof.

1.6   "Process" shall mean any process which embodies or the practice of which employees any invention(s) described or claimed in Licensed Patent Rights or for which Technical Information was essential to the discovery or development thereof.

1.7   "Territory" shall mean the entire world.

1.8   "Net Sales" shall mean, in the case of sales to non-Affiliates, the invoiced price by Ligand or Affiliates less (a) customary trade quantity and cash discounts actually allowed and taken; (b) allowances actually given for returned, rejected or recalled Products; actual charges for bad debts; (c) freight and insurance if included in the price; government mandated rebates; and (d) value added tax, sales, use or turnover taxes, excise taxes, and custom duties included in the invoiced price.

2.   <u>License Rights</u>

2.1   Rockefeller hereby grants to Ligand a sole exclusive license, including the right to grant royalty bearing sublicenses under terms consistent with this Agreement under Licensed Patent Rights and Technical Information, to make, have made, use and sell Products or practice Processes in any country of

agree\rockefeller
09\18\92                                  3

the Territory, except to the extent that Rockefeller's right to do so may be limited under the provisions of the following:

        (a)    35 United States, Section 201 _et seq._, and regulations and rules promulgated thereunder, or

        (b)    other applicable laws or regulations of the United States;

Provided only that Rockefeller is satisfied that the licensee is making a substantial and good faith effort to achieve practical application of the subject invention and its public use, Rockefeller agrees to use reasonable and proper efforts to extend exclusivity of the license consistent with the aforesaid U.S. government rights and policies should U.S. government action limit such exclusivity.

        2.2    In consideration of the Ligand stock to be issued to Rockefeller and NYU as described in Section 2.3 and the cash payments to be made pursuant to Section 2.3, the license to Ligand under Section 2.1 shall be deemed to be fully paid up for research purposes including for the purposes of research done by Ligand or a Ligand sublicensee or collaboratively with a third party to the extent that the third party payments to Ligand do not exceed its fully burdened costs for performance of such research and development.

        2.3    On the Effective Date, Ligand shall transfer to Rockefeller and NYU collectively a total of 150,000 shares of Series G Preferred Stock pursuant to Stock Transfer Agreements of even date herewith, 100,000 shares of which will vest on the Effective Date and 50,000 shares of which will vest in two installments of 25,000 shares on the first and second anniversaries hereof unless this Agreement is sooner terminated as provided herein. On the Effective Date, Ligand will also grant Rockefeller and NYU collectively, five year, net issuance warrants to purchase

a total of 100,000 shares of Ligand common stock vesting and exercisable as follows:

(i)    a total of 50,000 shares vesting at the third anniversary of the Effective Date and exercisable at $14.00 per share; and

(ii)    a total of 50,000 shares vesting at the fourth anniversary of the Effective Date exercisable at the fair market value on the vesting date.

As further consideration, Ligand will make cash payments to Rockefeller and NYU pursuant to the following schedule:

(a) On the Effective Date;
Rockefeller    $45,000
NYU    $ 5,000

(b)    $67,500 to Rockefeller and $7,500 to NYU when the current Technical Information is successfully transferred to Ligand as described in Section 5;

(c)    $67,500 to Rockefeller and $7,500 to NYU on each of the 1st – 4th anniversaries of the Effective Date.

2.4    Ligand will pay a royalty of five percent (5%) of its Net Sales of Products and on its net revenues, i.e., gross revenues less fully burdened costs, received from performance of Processes for a third party. The royalty shall be paid for a term which is the longer of ten (10) years or, on a country by country basis, expiration of the last patent in the Licensed Patent Rights having a claim which reads on the Product or Process or a method of making or using the Product or Process. Only one royalty will be owed on a Product or Process in the circumstance where the Product or Process is covered by multiple claims in the Licensed Patent Rights. Royalty payments made under this Section 2.4 and under

agree\rockefeller
09\18\92

5

Section 2.5 shall be made to Rockefeller and NYU in the ratio ninety percent (90%) to Rockefeller and ten percent (10%) to NYU.

     2.5    In the case of payments made to Ligand by a third party to secure the right to use Technical Information or to sell Products or Processes, Ligand will pay to Rockefeller and NYU twenty-five percent (25%) of the payments made to Ligand by the third party; provided, however, that in the situation where the payment to Ligand is based on the third party's revenues arising from sale of a Product or use of a Process, then Ligand shall pay to Rockefeller and NYU the lesser of twenty-five percent (25%) of the payment received from the third party or a royalty calculated pursuant to Section 2.4 by treating the third party's sales of such Products and Processes as Ligand sales.  Payments by a third party to Ligand to purchase equity in Ligand and to fund research at Ligand which do not generate net revenue as defined in Section 2.4 shall not be subject to sharing under this Section 2.5.

     2.6    In the event Ligand is required to make payments to a third party to use Technical Information, it shall be entitled to credit fifty percent (50%) of that payment against any royalty owed under this Agreement but in no event may it reduce a payment owed by more than fifty percent (50%).

     2.7    Ligand will diligently seek to develop Products and/or Processes using or based on Technical Information.  Ligand shall be deemed to have met its diligence obligations during the first five (5) years of the Agreement if, in the aggregate, Ligand, its Affiliates, licensees and research collaborators expend at least $4,000,000 directed toward the development of Products and Processes and support at least ten (10) full time scientist equivalents in support of that effort.

3.   <u>Patents</u>

3.1   The Company agrees to reimburse Rockefeller for all amounts expended prior to the date hereof for the preparation, filing, prosecution and maintenance of Licensed Patent Rights licensed to the Company pursuant to Section 2.1 of this Agreement, said amount being $20,791.18 as of September 8, 1992.

3.2   The Company shall continue to reimburse Rockefeller for such reasonable additional filing, prosecution, and maintenance costs as shall be incurred on each such patent application or patent licensed hereunder during the term of such license.

3.3   Rockefeller shall select qualified independent patent counsel reasonably satisfactory to Ligand to file and prosecute all patent applications included in Licensed Patent Rights, including divisionals, continuations, continuations-in-part, reissues, and foreign counterparts.  Such counsel shall regularly meet and/or consult with Ligand and/or its designated officers and counsel to keep them advised of the status of patent matters in the normal course.  Patent counsel shall be instructed not to file any papers without giving Ligand ample time and opportunity to review and comment.  Ligand shall be entitled to determine the countries in which it wishes to obtain and maintain patent protection under this Agreement and shall be free, at any time and at its sole option, to abandon patent prosecution or maintenance in any country of the Territory.

3.4   Ligand shall promptly advise Rockefeller of any decision not to finance the preparation, filing, prosecution or maintenance of any patent application or patent licensed hereunder in adequate time to allow Rockefeller, at its own cost, to effectuate such preparation, filing, prosecution, or maintenance if it desires to do so; and Ligand shall, at the request of Rockefeller, take whatever steps may be necessary to return to Rockefeller all rights which Ligand may have with respect to the

agree\rockefeller
09\18\92

7

applicable Licensed Patent Rights and Technical Information which it proposes to abandon.

Nothing herein is intended or shall be construed as obligating Rockefeller to apply for any U.S. or foreign patents at its own expense, or to defend, enforce, or support any patent or patent application which may be included in Licensed Patent Rights to which it has granted license rights to Ligand; provided, however, that Rockefeller will cooperate with Ligand in Ligand's activity in applying for U.S. or foreign patents or in the defense or enforcement of Licensed Patent Rights.

Nothing herein is intended or shall be construed as obligating Ligand to maintain its license with respect to any patent or application licensed hereunder and to finance the preparation, filing, prosecution or maintenance of any patent application in any bounty or jurisdiction in which it believes it is not in the best business interests.

3.5 Ligand shall have the right to institute patent infringement proceedings against third parties based on any Licensed Patent Rights licensed hereunder. If Ligand does not institute infringement proceedings against such third parties, Rockefeller shall have the right but not the obligation, to institute such proceedings. Within thirty (30) days after notice of its intention to commence such proceedings given to Ligand and provided that Ligand does not, within such thirty (3) day period, institutes its own proceedings, Rockefeller may institute such proceedings. The expenses of such proceedings, including lawyers' fees, shall be borne by the Party instituting suit. Each Party shall execute all necessary and proper documents and take all other appropriate action to allow the other Party to institute and prosecution such proceedings. Any award paid by third parties as a result of such proceedings (whether by way of settlement or otherwise) shall first be applied toward reimbursement for the legal fees and expenses incurred, and the excess, if any, shall be

shared on a pro rata basis based on the expenses incurred by each party.

3.6    Should Ligand decide at any time during the term hereof that it will no longer commercially pursue the development of any invention licensed hereunder, Ligand shall promptly notify Rockefeller of its decision and, upon request from Rockefeller, shall take whatever steps are necessary to assure reversion to Rockefeller of all rights to that invention.

3.7    Ligand shall assume the responsibility at its own expense, and using counsel of its choosing, to defend against claims of patent infringement arising from the making, using, or selling of Products and Processes.

4.    Payments and Reports

4.1    Within forty-five (45) days of the end of each calendar quarter during the term of this Agreement, beginning with the first quarter in which the obligation to make a payment to Rockefeller arises, Ligand shall submit to Rockefeller and NYU a report in writing setting forth the net revenues (revenues less Fully Burdened Costs) earned from the performance of a Process and the Net Sales of Products, and payments to Ligand which are subject to sharing with Rockefeller and NYU. The report shall include a calculation of the payments owed to Rockefeller and NYU arising therefrom and shall be accompanied by payment to Rockefeller and NYU in the full amount thereof.

4.2    Ligand shall keep adequate records in sufficient detail to enable the payments due from Ligand hereunder to Rockefeller and NYU to be determined, and permit said records to be inspected at any time during regular business hours at its principal place of business by an independent certified public accountant appointed by Rockefeller, or Rockefeller and NYU together but not NYU alone, for this purpose and who is reasonably

acceptable to Ligand. The accountant shall be required to enter into a confidentiality agreement with Ligand substantially in the form of the provisions contained in Article 5 herein and shall only report to Rockefeller, and NYU if a joint audit is done, the discrepancy, if any, between the amount owed by Ligand for the audited period and the amount actually paid and discrepancies in the method of calculating Fully Burdened Costs. Ligand shall maintain such records for a minimum of three years. No more than one such audit shall be requested per calendar year. Rockefeller, or Rockefeller and NYU if a joint audit, shall bear the cost of any such audit; provided, however, that where the auditor determines that the payments owed for an audit period exceeds that paid to Rockefeller and NYU by Ligand by more than ten (10) percent, the reasonable cost of the audit shall be borne by Ligand.

5. <u>Technical Information Transfer</u>

Rockefeller will diligently cooperate with Ligand to transfer Technical Information to Ligand. Transfer of current Technical Information will be deemed to have successfully occurred for the purposes of Section 2.3 when Rockefeller has transferred to Ligand, and Ligand has successfully expressed, functional proteins from the clones of the genes specifically described in the applications for United States Patents identified in Exhibit "A".

6. <u>Confidentiality</u>

6.1 The Parties contemplate that during the course of their relationship arising under this Agreement it may be necessary to provide the other with confidential information to facilitate the performance of their obligations pursuant to this Agreement. The Parties agree, therefore, that information received from the other which is in writing and identified as confidential, or if disclosed orally, is confirmed in writing and designated confidential, shall be maintained in confidence and that reasonable

agree\rockefeller
09\18\92

10

and prudent practices shall be followed to maintain the information in confidence, including, where necessary, obtaining written confidentiality agreements from employees not already bound by such agreements who have access to the confidential information. Information received in confidence shall be used by a party only for the purpose of and in connection with its performance of this Agreement. The obligation to maintain information in confidence shall survive this Agreement or termination thereof for any reason for a period of five (5) years thereafter. However, a party shall not be obliged to maintain information in confidence which it can show by written documentation: (a) to have been publicly known prior to submission to it; (b) to have been known or available to it prior to submission by the other party; (c) to have become publicly known without fault on its part subsequent to submission by the other party; (d) to have been received by it from a third party legally having possession of the information without obligations of confidentiality; (e) to be required to be disclosed pursuant to order of any court or governmental agency having jurisdiction thereof after notice to the other party sufficient to afford it an opportunity to intervene in the proceeding where disclosure is required; and (f) to be necessarily revealed in the course of marketing any Product or Process which is licensed hereunder.

### 7. Academic Freedom

Rockefeller and Ligand recognize the traditional freedom of all scientists to publish and present promptly the results of their research. Rockefeller and Ligand also recognize that exclusive patent rights can be jeopardized by public disclosure prior to the filing of suitable patent applications. Therefore, Rockefeller will assure that each proposed publication concerning any technology described in Licensed Patent Rights or which may constitute an Improvement thereof, before submission to a publisher, will be submitted to Ligand for review in connection with preservation of exclusive patent rights. Ligand shall have

agree\rockefeller
09\18\92                                11

thirty (30) days in which to review the publication, which may be extended for an additional thirty (30) days when Ligand provides substantial and reasonable need for such extension.   By mutual agreement, this period may be further extended for not more than an additional three (3) months.   Ligand will allow for simultaneous submission of the publication to the publisher and Ligand, where appropriate.   Any publication by Ligand personnel will also be subject to similar pre-review before publication.   Scientists at Rockefeller and Ligand will be expected to treat matters of authorship in a proper collaborative spirit, giving credit where it is due and proceeding in a manner which fosters cooperation and communication.

8.    Warranty

8.1    Rockefeller warrants that it has the right to grant to the full extent thereof the license granted Ligand hereunder and that it has and will discharge their duty of disclosure to the United States Patent and Trademark Office.

8.2    EXCEPT AS WARRANTED IN THE PRIOR SECTION 8.01, ROCKEFELLER MAKES NO WARRANTY, EXPRESS OR IMPLIED, INCLUDING ANY EXPRESS OR IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR PARTICULAR PURPOSE.

9.    Publicity

Ligand will not use directly or by implication the name of Rockefeller, or the name of any member of the faculty or staff of Rockefeller, or any unpublished information or data relating to the investigation for any business, promotional, commercial or other purpose, without the prior written approval of Rockefeller and the faculty or staff member involved; except Ligand may use and disclose such names in its internal communications or in any required governmental reports and filings upon prior disclosure and consultation with Rockefeller, as appropriate.

agree\rockefeller
09\18\92                              12

10.  Product Liability

Ligand agrees to indemnify and hold harmless Rockefeller, its trustees, officers, agents, faculty, employees, and students from any and all liability arising from injury or damage to persons or property resulting directly or indirectly from Ligand's acquisition, use, manufacture, or sale of any Product covered by Licensed Patent Rights or Technical Information licensed hereunder. Ligand further agrees, so long as it is selling any Product, to obtain and maintain in force product liability insurance coverage in amounts reasonably satisfactory to Rockefeller, as appropriate to the risk as determined by reference to reliable standards in the industry, such insurance to specifically name Rockefeller as an additional insured.

11.  Termination

11.1    The licenses herein granted shall continue for the full term of any patents licensed hereunder as the same or the effectiveness thereof may be extended by any governmental authority, rule or regulation applicable thereto.

11.2    Ligand shall have the right to terminate any license grant at any time upon ninety (90) days' prior written notice to Rockefeller, provided, however, that termination shall not affect Rockefeller's and NYU's rights and privileges as a stockholder of Ligand or their ownership of any vested shares of Ligand.

11.3    Any Party may terminate this Agreement in the event of a material breach by the other party, provided only that the offending Party is given notice of the breach and a reasonable time, not to exceed sixty (60) days, in which to cure such breach.

11.4    Any termination of this Agreement and of any option and/or license granted hereunder shall also terminate any applicable sublicense thereunder.

agree\rockefeller
09\18\92                          13

11.5    The Parties acknowledge that Ligand's right to the future developments made at Rockefeller in the laboratory of Dr. James Darnell are an important element of this Agreement. Therefore, in the event that Dr. Darnell for health reasons or otherwise ceases to actively conduct research at Rockefeller as a full time member of the faculty, then Ligand can, without loss of rights under the Agreement, terminate the making of anniversary cash payments under Section 2.3.

12.  Notices

Any notice required to be given pursuant to this Agreement shall be made by personal delivery or, if by mail, then by registered or certified mail, return receipt requested, with postage and fees prepaid, by one Party to the other Party at the addresses noted below.

        In the case of Ligand, notice should be sent to:
                Ligand Pharmaceuticals Incorporated
                9393 Towne Centre Drive, Suite 100
                San Diego, CA  92121
                Attn:  General Counsel

        In the case of Rockefeller, notice should be sent to:
                The Rockefeller University
                1230 York Avenue
                New York, NY  10021
                Attn:  Office of the General Counsel

13.  Law to Govern

This Agreement shall be interpreted and governed in accordance with the laws of the State of New York.

14.  No Partnership

This Agreement shall not constitute a partnership or a joint venture, and neither Party may be bound by the other to any

agree\rockefeller
09\18\92

14

contract, arrangement or understanding except as specifically stated herein.

### 15. No Waiver

The failure of either party to enforce at any time any of the provisions of this Agreement, or any rights in respect thereto, or to exercise any election herein provided, shall in no way be considered to be a waiver of such provisions, rights or elections, or in any way to affect the validity of this Agreement. Exercise by either party any of its rights herein or any of its elections under the terms or covenants herein shall not preclude either party from exercising the same or any other rights in this Agreement, irrespective of any previous action or proceeding taken by either party hereunder.

### 16. Severability

If any provision of this Agreement is judicially determined to be void or unenforceable, such provision shall be deemed to be severable from the other provisions of this Agreement which shall remain in full force and effect. Either Party may request that a provision otherwise void or unenforceable be reformed so as to be valid and enforceable to the maximum extent permitted by law.

### 17. Assignment

This Agreement may not be assigned by either Party without the prior written consent of the other, which consent shall

agree\rockefeller
09\18\92

15

not be unreasonably withheld except that Ligand may assign this
Agreement to a successor entity in the case of a merger,
acquisition or other reorganization.

### 18. Resolution of Dispute

The Parties agree that in the event of a dispute between
them arising from concerning, or in any way relating to this
Agreement, the Parties shall undertake good faith efforts to
resolve the same amicably between themselves.

### 19. Force Majeure

The Parties shall not be liable in any manner for failure
or delay in fulfillment of all or party of this Agreement, directly
or indirectly caused by acts of God, governmental orders or
restrictions, war, war-like condition, revolution, riot, looting,
strike, lockout, fire, flood or other similar or dissimilar causes
or circumstances beyond the non-performing Party's control. The
non-performing Party shall promptly notify the other Party of the
cause or circumstance and shall recommence its performance of its
obligations as soon as practicable after the cause or circumstance
ceases.

### 20. Entire Understanding

This Agreement, together with the Exhibits hereto, and
the further documents and agreements executed in connection with
the transactions contemplated hereby constitute the entire
agreement between the Parties and supersedes all prior

agree\rockefeller
09\18\92

16

understandings and agreements by the Parties with respect to the subject matter hereof.

   IN WITNESS WHEREOF, the Parties have caused this Agreement to be duly executed as of the day and year first above written.

THE ROCKEFELLER UNIVERSITY

By _Tost Wuul_

Title  President

LIGAND PHARMACEUTICALS INCORPORATED

By _____

Title  President and CEO

agree\rockefeller
09\18\92

17

Exhibit "2"
58

EXHIBIT "A"

## U. S. PATENT APPLICATIONS

1.  TITLE:            "RECEPTOR RECOGNITION FACTOR AND METHODS OF
                      USE THEREOF"
    INVENTORS:        Darnell and Levy
    SERIAL NO.:       07/613,326
    FILED:            November 14, 1990


2.  TITLE:            "RECEPTOR    RECOGNITION    FACTORS,    PROTEIN
                      SEQUENCES AND METHODS OF USE THEREOF"
    INVENTORS:        Darnell, Schindler and Fu
    SERIAL NO.:       07/854,296
    FILED:            March 19, 1992

agree\rockefeller
09\18\92                          A-1

EXHIBIT 3



March 13, 2008

Certified Mail, Return Receipt Requested

The Rockefeller University
1230 York Avenue
New York, NY 10021
Attn: Office of the General Counsel

Dear Sirs:

As specified under Article 12 of our Agreement dated September 30th, 1992, (attached as Appendix A) with this letter we terminate the Agreement under Section 11.3 for material breach. Rockefeller has breached its warranty under Section 8.1 of the Agreement, which states:

> 8.1 Rockefeller warrants that it has the right to grant to the full extent thereof the license granted Ligand hereunder and that it has and will discharge their duty of disclosure to the United States Patent and Trademark Office.

Rockefeller did not "discharge their duty of disclosure to the United States Patent and Trademark Office." We have detailed Rockefeller's failure to meet this duty in the attached Appendix B. In summary, in the prosecution of the licensed Rockefeller patents discussed in Appendix B we have identified references of which Rockefeller was aware that were material to the examination of the specified patents, but that were not cited to the Patent and Trademark Office. The references that Rockefeller withheld from the Patent and Trademark Office were material to examination of the specified patents because they render the claims in question obvious when taken alone or in combination with other references. This conduct constitutes a material breach under Section 11.3 of the Agreement.

Furthermore, this breach is incurable. The withholding of such references from the USPTO constitutes inequitable conduct and thus renders the patents listed in Appendix B invalid and unenforceable.

This termination for material breach under Section 11.3 is in addition to our termination of the Agreement under Section 11.2 sent August 9, 2007 (attached as Appendix C). We believe the November 9, 2007 termination date created by the earlier letter to be the effective date for termination of the Agreement. We are simply now providing you notice that we have recently learned of another ground for termination that we are hereby invoking.

Regards,

Charles S. Berkman
Vice President, General Counsel and Secretary

5003772
031208

Exhibit "3"
60

10275 Science Center Drive • San Diego, CA 92121-1117 • p: (858) 550-7500 • f: (858) 550-1825

EXHIBIT 4

ATTORNEYS AT LAW

WASHINGTON HARBOUR
3000 K STREET, N.W., SUITE 500
WASHINGTON, D.C. 20007-5143
202.672.5300 TEL
202.672.5399 FAX
foley.com

March 17, 2008

VIA E-MAIL

CLIENT/MATTER NUMBER
092230-0102

Charles S. Berkman
General Counsel, Vice President and Secretary
Ligand Pharmaceuticals, Inc.
10275 Science Center Drive
San Diego, CA 92121

       Re:    The Rockefeller University/Ligand Pharmaceuticals, Inc.
               Dispute

Dear Charles:

I write in response to your March 11, 2008 and March 13, 2008 letters to Harriet Rabb.

Service of Process. The statements in your March 11 letter concerning service of process incorrectly recount what happened. As confirmed in emails by you and Nancy Koch on March 4, 2008, the only agreement that you and Ms. Koch reached on that date was that both parties agreed to accept service of process by Federal Express. There was no agreement that precluded service by any other means and no agreement that the effective date of service would be March 5. The facts are that the University sent a service copy to Ligand by Federal Express and also personally served Ligand's New York agent on March 4, and the University did not receive Ligand's complaint sent by Federal Express until March 6. Ligand's outside counsel at Knobbe Martens was aware that service of Ligand's complaint by Federal Express had not been effectuated on March 5. On that day, a person from Knobbe Martens left me two telephone messages, indicating that Ligand would personally serve the University unless the parties agreed that Ligand's service would be effective on that date. Although the University declined to make such an agreement, Ligand did not personally serve the University on March 5.

Ligand's Preemptive Suit. To the extent you suggest that the University attempted to "gain advantage in priority of suit or other procedural matters," the same can be said of Ligand. You stated that Ligand has "worked hard to be open with Rockefeller on all matters of the dispute" and "to conduct ourselves with . . . forthrightness in the process." Those statements are contradicted by Ligand's haste to file a declaratory judgment action in California federal court on the morning of March 4 and Ligand's failure to give advance notice to the University of its intention to file suit.

| | | | | |
|---|---|---|---|---|
| BOSTON | JACKSONVILLE | NEW YORK | SAN FRANCISCO | TOKYO |
| BRUSSELS | LOS ANGELES | ORLANDO | SHANGHAI | WASHINGTON, D.C. |
| CENTURY CITY | MADISON | SACRAMENTO | SILICON VALLEY | |
| CHICAGO | MIAMI | SAN DIEGO | TALLAHASSEE | |
| DETROIT | MILWAUKEE | SAN DIEGO/DEL MAR | TAMPA | |



FOLEY & LARDNER LLP

Charles S. Berkman
March 17, 2008
Page 2

The University, by contrast, was exceptionally open with Ligand, and with you in particular, in stating, well in advance, that the University would file suit when the Tolling Agreement expired on March 4 if the parties had not reached a settlement. At no point during those discussions did Ligand disclose its intention to file a preemptory suit for declaratory relief. While the University believes that Ligand's action ultimately will be dismissed, the University requests that Ligand withdraw its preemptory action at this time so as to conserve valuable time and resources of the parties and the Courts, and to demonstrate Ligand's commitment to forthrightness in the process.

<u>Ligand's Allegation of Conflict and Ethical Breach.</u>  Your March 11 letter raises "a potential conflict with [the University's] legal representation" and Ligand's apparent "concern[] that Foley & Lardner may be breaching an ethical obligation to Ligand by representing Rockefeller in the ongoing litigations."  The University and Foley & Lardner take your allegation very seriously.  Based on the information you provided, including a citation to the prosecution of PCT Application No. WO 95/31722, Foley & Lardner has conducted a careful internal review and has found no ethical conflict as to Foley & Lardner's representation of the University in this matter and Dr. Richard Warburg's prior patent prosecution work while he was at Lyon & Lyon, LLP.  We are disconcerted by the fact that Ligand waited until this time to raise this issue.  You, Charles, also worked at Lyon & Lyon, LLP, substantially overlapping with Dr. Warburg, and you have known of Foley & Lardner's representation of the University in this matter since the beginning of February 2008, in the course of your own participation along with Ligand's outside counsel in the parties' unusually intensive and open discussions about this matter.  We expect that Ligand has engaged in appropriate and extensive due diligence before making this serious accusation.  We request that Ligand provide any and all additional information that Ligand may have to support its allegation of conflict and ethical breach immediately, so that a complete and prompt resolution of this matter can occur.

<u>Ligand's Purported Termination.</u>  Your March 13 letter purports to raise yet another ground for terminating the September 30, 1992 License Agreement (the "1992 Agreement") for material breach under Section 11.3.  You have contended that "Rockefeller did not 'discharge their duty of disclosure to the United States Patent and Trademark Office.'"  Contrary to your statement, we emphasize that Rockefeller and its patent attorneys always have discharged their duty to disclose relevant prior art to the U.S. Patent and Trademark Office. We also note that Ligand was involved in the prosecution of Rockefeller's patents and patent applications covered by the 1992 Agreement and never raised any claim of material breach by the University during the past 15 years.

We note that, although we will be evaluating the publications and patents you cite in your March 13 letter, Ligand's most recent attempt to claim termination is a belated and disingenuous attempt to buttress Ligand's invalid termination last August.  After digesting the University's explanation in its October 3, 2007 letter as to the reasons why Ligand's termination last August was ineffective, Ligand now has surfaced this novel argument.  This new argument fails on several grounds, including the same reasons stated more fully in the October 3 letter.  In short, Ligand cannot avoid its payment obligations at this late date, now that Rockefeller has fully performed under the 1992 Agreement.  The University's rights to compensation under the terms of the 1992 Agreement vested

Exhibit "4"
62

WASH_3202983.3



FOLEY & LARDNER LLP

Charles S. Berkman
March 17, 2008
Page 3

after the University fully performed its part of the bargain through exclusively licensing to Ligand all of its valuable Technical Information and Licensed Patent Rights and providing access to Dr. Darnell and his research for more than the five-year early period of the Agreement. It would make no sense for one party to fully perform its obligations, yet allow the other party to avoid its payment obligations after receiving the full benefit.  Indeed, New York law does not permit a party to avoid its payment obligations by terminating the contract after the other side has fully performed.  For this reason, Rockefeller rejects Ligand's most recent, ineffective termination notice.

Very truly yours,

Anat Hakim

Anat Hakim

WASH_3202983.3

EXHIBIT 5



1    Darrell Olson (State Bar No. 77633)
     KNOBBE, MARTENS, OLSON & BEAR, LLP
2    2040 Main Street
     Fourteenth Floor
3    Irvine, CA 92614
     Phone: (949) 760-0404
4    Facsimile: (949) 760-9502

5    Joseph M. Reisman (State Bar No. 246922)
     Ali S. Razai (State Bar No. 196122)
6    KNOBBE, MARTENS, OLSON & BEAR, LLP
     550 West C Street
7    Suite 1200
     San Diego, CA 92101
8    Phone: (619) 235-8550
     Facsimile: (619) 235-0176
9

10   Attorneys for Plaintiff
     LIGAND PHARMACEUTICALS INCORPORATED
11

12

13                    IN THE UNITED STATES DISTRICT COURT
14
                   FOR THE SOUTHERN DISTRICT OF CALIFORNIA
15

16

17                                          '08 CV 4 0 1   BEN WMc
     _____
18   LIGAND PHARMACEUTICALS          )   Civil Action No.
     INCORPORATED, a Delaware corporation, )
19                                   )   **COMPLAINT FOR DECLARATORY**
              Plaintiff,             )   **JUDGMENT**
20                                   )
          v.                         )
21                                   )
     THE ROCKEFELLER UNIVERSITY, a   )
22   New York not-for-profit corporation, )
                                     )
23            Defendant.             )
                                     )
24   _____ )

25

26

27

28

Exhibit "5"
64

# I. NATURE OF THE ACTION

1.      This is a civil action under the Declaratory Judgment Act, 28 U.S.C. § 2201, et seq., for declaration of rights between the parties under a License Agreement dated September 30, 1992 ("License Agreement," attached as Exhibit A and incorporated by reference) and under certain United States patents related to the License Agreement.

# II. PARTIES

2.      Plaintiff LIGAND PHARMACEUTICALS INCORPORATED (hereinafter "Ligand" or "Plaintiff") is a Delaware corporation with its principal place of business at 10275 Science Center Drive San Diego, California 92121.

3.      Ligand was incorporated in 1987 and since then has been engaged in, *inter alia*, the research and development of drugs for various diseases and disorders.  Ligand currently has less than sixty (60) employees.

4.      Defendant THE ROCKEFELLER UNIVERSITY (hereinafter "Rockefeller" or "Defendant") is a New York not-for-profit corporation with its principal place of business at 1230 York Avenue, New York, New York 10021.

5.      Rockefeller is a university periodically engaged in research and development. Rockefeller currently has 69 heads of laboratories, 200 research and clinical scientists, 350 postdoctoral investigators, 1,050 support staff, 150 Ph.D. students, 50 M.D.-Ph.D. students and 960 alumni according to the Rockefeller website.

6.      NEW YORK UNIVERSITY ("NYU") is a New York not-for-profit corporation with its principal place of business at 70 Washington Square S, New York, New York 10012.

7.      NYU is a university periodically engaged in research and development.  NYU is not a party to the License Agreement or this lawsuit, but in the past it has received payments due to it under the License Agreement.

# III. JURISDICTION AND VENUE

8.      This Court has personal jurisdiction over Defendant Rockefeller by virtue of its presence and activities in the state of California, including but not limited to entering into

-1-

1     the License Agreement, as rights granted by the License Agreement were to be used in this

2     judicial district, its past ownership interest in Ligand (located in this judicial district) under

3     the License Agreement, as well as activities of Dr. James E. Darnell ("Darnell") in

4     performing services in this judicial district under a Professional Services Agreement

5     ("Services Agreement") dated September 30, 1992.

6          9.      NYU is not being joined in this lawsuit for the following reasons. It is not a

7     party to the License Agreement. Its interests under the License Agreement are subordinate to

8     those of Rockefeller and, on information and belief, those interests are adequately protected

9     by Rockefeller. Finally, Rockefeller, not NYU, is the owner of any intellectual property

10     rights licensed under the License Agreement.

11         10.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1332, 1338

12     and 2201.

13         11.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(a) and

14     (c).

15                        **IV. TECHNOLOGY**

16         12.     Since its inception, and prior to entering into the License Agreement with

17     Rockefeller, Ligand has been actively involved in small molecule drug discovery. For

18     example, Ligand owns intracellular receptor ("IR") technology that relates to families of

19     transcription factors that change cell function by selectively turning on or off specific genes

20     in response to circulating signals that act on cells. Ligand developed (and/or in-licensed from

21     one or more sources other than Rockefeller) certain IR-based transcriptional assays to screen

22     candidate drugs.

23         13.     Thrombopoietin ("TPO") is a peptidyl hormone that activates a signaling

24     cascade in a cell by binding to a receptor on a cell surface. Once bound by TPO, the cell

25     surface receptor initiates a signaling cascade from the cell surface to the nucleus, where

26     specific genes are selectively turned on in response to TPO. This gene regulation is mediated

27     by transcription factors activated by the TPO signaling cascade and has a major effect on cell

28     fate decisions by regulating cell proliferation and differentiation.

14.     Ligand developed cell-based assays to screen candidate TPO mimics.  These assays included cell proliferation and cell differentiation assays, as well as transcriptional assays.  The transcriptional assays developed by Ligand to screen candidate TPO mimics were analogous to the transcriptional assays developed for Ligand's IR program.

15.     The transcriptional assays involved use of a reporter construct with produces a signal in response to activated transcription factors in the cell.

16.     Ligand's assays were used to discover and develop new drugs that mimic the action of TPO and may be useful in the treatment of a wide variety of diseases and disorders.

## V. FACTUAL BACKGROUND

17.     Darnell served on Ligand's Scientific Advisory Board for several years and visited with Ligand scientists at Ligand's facilities and elsewhere in San Diego many times in connection with the License Agreement and/or the Services Agreement.

18.     On information and belief, at all times relevant here to, Darnell acted in conjunction with Rockefeller and had authority to act on behalf of Rockefeller to fulfill Rockefeller's obligations under the License Agreement.

19.     After negotiations between the parties, Ligand executed two separate agreements on September 30, 1992, the License Agreement with Rockefeller and the Services Agreement with Darnell.

20.     The License Agreement was generally directed to the licensing of "Licensed Patent Rights" and "Technical Information" relating to peptidyl hormone mediated gene expression.

21.     The Licensed Patent Rights are defined in Section 1.3 of the License Agreement to be patent applications identified in Exhibit A to the License Agreement, related "divisionals, continuations, continuations-in-part, reissues, renewals, foreign counterparts, extension or additions," and any patents which may issue thereon. (Section 1.3, License Agreement).

22.     Rockefeller is the identified assignee of United States patents, including: U.S. Pat. No. 6,605,442; U.S. Pat. No. 5,976,835; U.S. Pat. No. 6,013,475; U.S. Pat. No.

1   6,030,808; U.S. Pat. No. 6,338,949; U.S. Pat. No. 6,124,118; U.S. Pat. No. 7,060,682; U.S.

2   Pat. No. 5,716,622; U.S. Pat. No. 5,883,228; U.S. Pat. No. 6,030,780; U.S. Pat. No.

3   6,720,154; U.S. Pat. No. 7,115,567; U.S. Pat. No. 6,960,647; and U.S. Pat. No. 7,211,655

4   ("Rockefeller Patents" attached as Exhibits B through O), which all either claim priority back

5   to the patent applications listed in Exhibit A to the License Agreement or relate to what

6   Rockefeller argues is Technical Information under the License Agreement.

7       23.     Technical Information is defined in Section 1.4 of the License Agreement to

8   include "technical data, information processes, materials and know-how, whether or not

9   patentable" relating to peptidyl mediated gene expression that is owned by Rockefeller and

10  was developed as of the effective date of the License Agreement or during the next five (5)

11  years. (Section 1.4, License Agreement).

12      24.     The License Agreement between Ligand and Rockefeller contemplated that

13  certain of the intellectual property of Rockefeller might be used by Ligand in development of

14  new pharmaceutical agents. (Sections 2.4 and 2.5, License Agreement).   Nothing in the

15  License Agreement prohibited Ligand from developing processes and products relating to

16  cell-based assays to screen candidate drugs independent of Rockefeller's intellectual

17  property, as Ligand had done previously with its IR technology.

18      25.     Independent of the rights acquired under the License Agreement, on December

19  29, 1994, Ligand entered into a Research Development and License Agreement ("GSK

20  License") with SmithKline Beecham Corporation, now GlaxoSmithKline ("GSK").   The

21  GSK License relates to a joint research and development effort by Ligand and GSK directed

22  to  discovery of small molecule compounds which act as modulators of certain

23  HEMATOPOIETIC GROWTH FACTORS (including TPO, as defined in Section 1.17 of the

24  GSK License) and to develop pharmaceutical products from such compounds.

25      26.     On information and belief, Rockefeller has been aware of the GSK License

26  since it was signed by Ligand and GSK in 1994.

27      27.     Under the RESEARCH PROGRAM as defined in the GSK License, a cell-

28  based high throughput screen was developed by Ligand to help identify at least one

-4-
Exhibit "5"
68

1    potentially useful drug known as eltrombopag or PROMACTA® and a back-up thereto known

2    as SB-559448 ("GSK Products"). Under the GSK License, GSK has paid Ligand milestone

3    payments amounting to $8 million for achieving certain milestones under the GSK License.

4        28.    GSK has made significant progress toward gaining approval for at least one of

5    the GSK Products through the regulatory process before the Food and Drug Administration.

6        29.    As early as October 2003, Rockefeller became specifically aware of the GSK

7    Products and inquired about and demanded payment from Ligand under the License

8    Agreement for what Rockefeller alleged were uses of its Licensed Patent Rights or Technical

9    Information covered by the License Agreement.

10       30.    Ligand disputes that the GSK Products are subject to payments under the

11   License Agreement.

12       31.    Section 2.5 of the License Agreement obligates Ligand to pay Rockefeller

13   only under certain circumstances. The payments described in Section 2.5 generally are

14   twenty five per cent (25%) of payments received from third parties by Ligand if those

15   payments were to secure the right to use Technical Information or the right to sell Products or

16   Processes.

17       32.    The GSK Products are not Products as the term "Product" is defined under

18   Section 1.5 of the License Agreement. They do not embody or use any invention described

19   or claimed in the Licensed Patent Rights. Furthermore, Technical Information was not

20   essential to their discovery or development. GSK's payments to Ligand are not and will not

21   be to secure any Rockefeller rights that would otherwise prevent GSK from selling the GSK

22   Products. Rockefeller does not own any Licensed Patent Rights or Technical Information

23   that GSK would need to sell the GSK Products. Thus, no payments are due to Rockefeller

24   under the License Agreement.

25       33.    Rockefeller has alleged the GSK Products embody or use one or more

26   invention(s) described or claimed in the Licensed Patent Rights. In order to qualify as an

27   invention in a claim of an issued patent, however, the alleged invention must be defined by a

28   claim that is valid and enforceable.

1       34.    Section 11.2 of the License Agreement provides that Ligand shall have the

2    right to terminate any license grant at any time upon ninety days written notice.

3       35.    On August 9, 2007, pursuant to Section 11.2, Ligand sent by facsimile and

4    U.S. Mail a notice to Rockefeller of its intent to terminate the License Agreement. Pursuant

5    to Section 11.2, the termination was effective under the License Agreement ninety days

6    thereafter or on November 7, 2007.

7       36.    Since termination of the License Agreement under Section 11.2, Rockefeller

8    has claimed that the License Agreement was not terminated. Rockefeller contends that 25%

9    of past and future payments related to GSK Products received by Ligand must be shared with

10    Rockefeller.

11       37.    The parties entered into a tolling agreement that contemplated the parties

12    would try to resolve the controversy without the need for litigation. The tolling agreement

13    expired on March 3, 2008. Rockefeller's communications prior to March 3, 2008, including

14    their refusal to extend the tolling agreement and their specific threat of filing a lawsuit against

15    Ligand at the expiration of the tolling agreement, have made Ligand reasonably afraid that it

16    will be sued by Rockefeller on these issues today or within the next few days.

17       **VI. <u>FIRST CLAIM FOR RELIEF – DECLARATORY JUDGMENT SCOPE OF</u>**

18                             **<u>LICENSED PATENT RIGHTS</u>**

19       38.    Ligand incorporates by reference as though fully set forth herein paragraphs 1

20    through 37 of this Complaint.

21       39.    The License Agreement between Ligand and Rockefeller provides for, among

22    other things, a license of Licensed Patent Rights. (Section 2.1, License Agreement).

23       40.    Rockefeller has alleged that the Rockefeller Patents are included within the

24    Licensed Patent Rights and also that the GSK Products or their use embody or employ the

25    Licensed Patent Rights.

26       41.    Applying the plain meaning of the words of the License Agreement, the GSK

27    Products and their use do not embody or employ any invention described or claimed in the

28    Licensed Patent Rights.

42.     An actual controversy exists between Rockefeller and Ligand as to whether or not the GSK Products or their use embody or employ Licensed Patent Rights, whether or not the GSK Products or their use embody or employ any invention described or claimed in the Rockefeller Patents and whether or not the payments Rockefeller is demanding under the License Agreement are in fact due.

43.     Even if the GSK Products embody or use an invention merely described in the Rockefeller Patents, the patent laws of the United States protect only inventions defined by valid and enforceable claims and there is an actual controversy as to whether or not any claim of the Rockefeller Patents is valid for failure to comply with any one of 35 USC §§ 101 et seq.

44.     On information and belief, Rockefeller has filed one or more  patent applications for the purpose of claiming the GSK Products are subject to payments under the License Agreement, and Rockefeller did so with knowledge that no valid patent should issue. There is an actual controversy as to whether the GSK Products or their use embody or employ any invention described or claimed in any pending patent application and whether any such patent application filed after learning of the GSK Products was filed in good faith under the License Agreement.

## VII. SECOND CLAIM FOR RELIEF – DECLARATORY JUDGMENT SCOPE OF TECHNICAL INFORMATION

45.     Ligand incorporates by reference as though fully set forth herein paragraphs 1 through 44 of this Complaint.

46.     The License Agreement between Ligand and Rockefeller provides for, among other things, a license of Technical Information of Rockefeller. (Section 2.1, License Agreement).

47.     Rockefeller alleges that Technical Information was essential to the discovery or development of the GSK Products.

48.     Ligand, relying on the plain meaning of the License Agreement, alleges that Technical Information was not used in the discovery or development of the GSK Products.

1  Ligand further alleges under Section 1.4 of the License Agreement Technical Information
2  must be owned by Rockefeller and existing or capable of description in a tangible form and
3  must have been developed in the laboratory of Darnell or of David Levy of NYU as of
4  September 30, 1992 or by Darnell at his laboratory on or before five years from September
5  30, 1992 or by September 30, 1997. The GSK Products were not developed using Technical
6  Information but rather used either publicly known information, information known or
7  discovered by Ligand and/or GSK, or information received from third parties.

8       49.    An actual controversy exists between Rockefeller and Ligand as to whether or
9  not Technical Information was essential to the discovery or development of the GSK
10 Products.

11 **VII. <u>THIRD CLAIM FOR RELIEF – DECLARATORY JUDGMENT</u>**
12 **<u>TERMINATION</u>**

13      50.    Ligand here incorporates by reference as though fully set forth herein
14 paragraphs 1 through 49 of this Complaint.

15      51.    Rockefeller relies on Section 11.3 of the License Agreement in asserting that,
16 absent a material breach, the "Agreement" cannot be terminated.

17      52.    Ligand claims, in the alternative, that the notice dated August 9, 2007 either
18 terminated the License Agreement in its entirety, subject only to certain specified rights
19 which survived termination, or to the extent any different, terminated all then existing license
20 rights, again subject only to any rights that might survive termination.

21      53.    An actual controversy exists between Rockefeller and Ligand as to whether or
22 not the License Agreement has been terminated and as to the nature of the rights terminated.

23
24 **VIII. <u>DEMAND FOR JUDGMENT</u>**
25 WHEREFORE, Plaintiff requests that:

26     1.    This Court enter a judgment declaring the GSK Products do not embody any
27 invention(s) described or claimed in the Licensed Patent Rights and that the use of the GSK
28 Products do not employ any invention(s) described or claimed in the Licensed Patent Rights;

2.    This Court enter a judgment declaring that Technical Information was not essential to the discovery or development of the GSK Products;

3.    This Court enter a judgment declaring that Ligand is not liable for any additional payments under the License Agreement beyond those that have already been made;

4.    This Court enter a judgment declaring that the License Agreement was terminated as of November 7, 2007 and that subsequent to termination of the License Agreement, Ligand is not liable for any future payments under the License Agreement;

5.    Plaintiff be awarded costs, attorneys' fees and other relief, both legal and equitable, to which it may be justly entitled;

6.    Plaintiff be awarded relief under 28 U.S.C. § 2202; and

7.    Plaintiff be awarded such other and further relief as this Court deems proper.

Respectfully submitted,

KNOBBE, MARTENS, OLSON & BEAR, LLP

Dated: 3/3/08    By: _____
Darrell Olson (signature via facsimile)

Attorneys for Plaintiff
LIGAND PHARMACEUTICALS INCORPORATED

-9-

EXHIBIT 6

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

THE ROCKEFELLER UNIVERSITY, a          x    Index No. 08/600638
New York not-for-profit corporation,        :
                                            :    **NOTICE OF FILING OF NOTICE OF**
                     Plaintiff,             :    **REMOVAL**
                                            :
          v.                                :
                                            :
LIGAND PHARMACEUTICALS                      :
INCORPORATED, a Delaware corporation,       :
                                            :
                     Defendant.             :
                                            x

Please take notice that pursuant to 28 U.S.C. §1446, § 1441 and Local Rule 81.1 of the

United States District Court for the Southern District of New York, the above captioned action has

been removed to the United States District Court for the Southern District of New York. A true and

correct copy of the Notice of Removal filed by defendant LIGAND PHARMACEUTICALS

INCORPORATED is annexed hereto as Exhibit A. The Notice of Removal was filed with the

Office of the Clerk of the United States District Court for the Southern District of New York on

March 14, 2008.

This Court is respectfully requested to proceed no further in this action unless and until the

action is remanded by the United States District Court for the Southern District of New York.

Dated: New York, New York
       March 14, 2008

                              Respectfully submitted,

                              GREENBERG TRAURIG, LLP

                              By:
                                  Simon Miller
                                  200 Park Avenue                   **NEW YORK**
                                  New York, New York 10166    **COUNTY CLERK'S OFFICE**
                                  (212) 801-9200

                                                             **MAR 14 2008**
                              Attorneys for Defendant
                              LIGAND PHARMACEUTICALS INCORPORATED
                                                             **NOT COMPARED**
                                                             **WITH COPY FILE**

*NY 238,723,623v1 3/14/2008*

SERVICE COPY   FILE COPY

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Civil Action No. **08 CV 2755**

THE ROCKEFELLER UNIVERSITY, a
New York not-for-profit corporation,     x

        Plaintiff,     :

        v.     :

LIGAND PHARMACEUTICALS
INCORPORATED, a Delaware corporation,     :

        Defendant.     :

    x

**NOTICE OF REMOVAL OF CIVIL
ACTION UNDER 28 U.S.C. §1441
(FEDERAL QUESTION AND
DIVERSITY)**

**JUDGE CASTEL**

**Removed from the Supreme Court of the
State of New York, County Of New York
Index No. 600638/08**

MAR 1 4 2008
U.S. CASHIERS N.Y.

    **PLEASE TAKE NOTICE THAT** defendant Ligand Pharmaceuticals Incorporated (hereinafter "Ligand"), by and through undersigned counsel, without waiving any arguments, claims or defenses (including those available pursuant to Fed. R. Civ. P. 12(b)), hereby removes to this Court the state court action described below.

    1.    On March 4, 2008, an action was commenced in the Supreme Court of the State of New York in and for the County of New York, entitled THE ROCKEFELLER UNIVERSITY, Plaintiff, v. LIGAND PHARMACEUTICALS, INC., Defendant, Index Number 08/600638. A copy of the Complaint is attached hereto as "Exhibit A."

    2.    The first date upon which defendant Ligand received a copy of the said complaint was March 4, 2008, via electronic mail. On March 5, 2008, Defendant Ligand was served with a copy of the said Complaint and a Summons from the said state court. A copy of the Summons is attached hereto as "Exhibit B." As this notice of removal is filed within thirty days of Ligand's receipt of the Summons and Complaint, it is timely filed under 28 U.S.C. § 1446.

**Grounds for Removal**

    3.    This Action may be removed to this Court pursuant to 28 U.S.C. § 1441(b) on two independent bases. First, this action is a civil action of which this Court has original jurisdiction under 28 U.S.C. §1332, based on the complete diversity of citizenship of the parties and the amount in controversy exceeding the statutory minimum. Second, this Court has exclusive jurisdiction over

this action under 28 U.S.C. §1338, which grants district courts exclusive original jurisdiction of any civil action arising under any Act of Congress relating to patents.

**Diversity Jurisdiction**

4.    As alleged in paragraph 1 of the Complaint, plaintiff The Rockefeller University (the "University") was, and still is, a New York corporation whose principal place of business is in the State of New York, as stated in paragraph 1 of the Complaint. As stated in paragraph 2 of the Complaint, Defendant Ligand was, at the time of the filing of this action, and still is, a Delaware corporation having a principal place of business in the State of California. Ligand is the only defendant that has been served with the Summons and Complaint in this action.

5.    Accordingly, there is complete diversity of citizenship between the parties to this Action.

6.    As alleged in the Complaint, the matter in controversy exceeds the sum of $75,000, exclusive of interests and costs, as at least paragraphs 37 and 46 of the Complaint allege damages "no less than $1.91 million," and paragraphs 49 and 54 allege damages "in no event less than $1.91 million."

**District Court's Exclusive Jurisdiction Over Actions Pertaining To Patents**

7.    This action is a civil action that may be removed to this Court by defendants pursuant to the provisions of 28 U.S.C. §1441(b) in that it arises under 28 U.S.C. §1338, granting the district courts exclusive original jurisdiction of any civil action arising under any Act of Congress relating to patents. The plaintiff's right to relief necessarily depends on resolution of a substantial question of federal patent law, in that the infringement and validity of the patents subject to the 1992 Agreement between Ligand and the University are necessary elements of all of the alleged claims.

Notice of Removal

**WHEREFORE,** Defendant requests that the New York State Supreme Court, New York County, proceed no further with Index No. 600638/08 and that said action be removed from that court to the United States District Court for the Southern District of New York.

Dated: New York, New York
       March 14, 2008

                              Respectfully submitted,

                              **GREENBERG TRAURIG, LLP**

                              By: _____
                                   Simon Miller
                              200 Park Avenue
                              New York, New York 10166
                              (212) 801-9200

                              Attorneys for Defendant
                              LIGAND PHARMACEUTICALS INCORPORATED

Exhibit "6"
77

−3−

Notice of Removal

EXHIBIT 7

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

THE ROCKEFELLER UNIVERSITY,

       Plaintiff,

      v.

LIGAND PHARMACEUTICALS
INCORPORATED,

       Defendant.

08-CV-2775 (KPC)(HP)

## DEFENDANT LIGAND PHARMACEUTICALS INCORPORATE'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS, OR, IN THE ALTERNATIVE, TO TRANSFER TO THE SOUTHERN DISTRICT OF CALIFORNIA

GREENBERG TRAURIG, LLP
Attorneys for Plaintiffs
200 Park Avenue
New York, New York
Telephone: (212) 801 9200
Fax: (212) 801 6400

# TABLE OF CONTENTS

PAGE

I. STATEMENT OF PERTINENT FACTS ........................................................................ 1

II. THIS COURT LACKS PERSONAL JURISDICTION OVER LIGAND .................... 4

    A.    The Exercise of Jurisdiction Would be Improper Under State Law ........... 4

          1.    This Court does not have general personal jurisdiction over Ligand because Ligand is not continuously present in New York ................................................................................... 5

          2.    This Court lacks specific jurisdiction because the claim does not arise out of Ligand business transacted within New York ........ 5

    B.    The Exercise of Jurisdiction Would Violate Due Process ........................... 6

III. ALTERNATIVE MOTION TO TRANSFER -- 28 U.S.C. § 1404(a) .......................... 7

    A.    Transfer to the Southern District of California is Appropriate in This Case ................................................................................................... 7

    B.    The Relevant Factors Strongly Weigh Toward Transfer In This Case ........ 7

          1.    The events giving rise to the suit occurred in California ................ 8

          2.    California would be more convenient to the parties ....................... 8

          3.    California would be more convenient to the witnesses ................... 9

          4.    Most of the relevant proof is located in California .......................... 9

          5.    Many more witnesses can only be served process in California ... 10

          6.    The plaintiff's choice of forum favors transfer .............................. 10

          7.    The forum's familiarity with governing law is at most a neutral factor ................................................................................. 11

          8.    Transferring this case to California would promote trial efficiency .................................................................................... 12

          9.    The interest of justice would be better served in California .......... 13

i

C.   Transfer to the Southern District of California is Warranted
In This Case ..................................................................................................13

IV. CONCLUSION..............................................................................................14

ii

Exhibit "7"
80

## TABLE OF AUTHORITIES

PAGE

**Cases**

*800-Flowers, Inc. v. Intercontinental Florist, Inc.*, 860 F.Supp. 128 (S.D.N.Y.1992) .......7

*Arrow Electronics, Inc. v. Ducommun Inc.*, 724 F.Supp. 264 (S.D.N.Y.1989)................10

*Ashe v. Pepsico*, 443 F.Supp. 84 (S.D.N.Y. 1997) .................................................8

*Atlantic Mut. Ins. Co. v. M/V HUMACAO*, 169 F.Supp.2d 211 (S.D.N.Y. 2001).............12

*Bellepointe, Inc. v. Kohl's Dept. Stores, Inc.* 975 F.Supp. 562 (S.D.N.Y. 1997) ............4, 5

*Billing v Commerce One Inc.*, 186 F.Supp.2d 375 (S.D.N.Y. 2002).................................8

*Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985) ...............................................6

*Credit Suisse Securities (USA) LLC v. Hilliard*, 469 F. Supp.2d 103 (S.D.N.Y. 2007) ...10

*G. Angel Ltd. v. Camper & Nicholsons USA, Inc.*, 2008 WL 351660
(S.D.N.Y. 2008).........................................................................................8, 9

*Hanson v. Denckla*, 357 U.S. 235 (1958) .............................................................6

*Hoffritz for Cutlery, Inc. v. Amjac, Ltd.*, 763 F.2d 55 (2d Cir.1985) .........................5

*Landoil Res. Corp. v. Alexander & Alexander Servs. Inc.*, 918 F.2d 1039 (2d Cir.1991)...5

*Malone v. Commonwealth Edison Co.*, 2 F. Supp. 2d 545 (S.D.N.Y. 1998)......................7

*Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899 (2d Cir. 1981) ..............................12

*Markman v. Westview Instruments, Inc.*, 116 S. Ct. 1384 (1995) ................................11

*McKee Elec. Co. v. Rauland-Borg Corp.*, 20 N.Y.2d 377, 283 N.Y.S.2d 34 (1967) .........6

*Nat'l Patent Dev. Corp. v. Am. Hosp. Supply Corp.*, 616 F.Supp. 114 (S.D.N.Y.1984)...11

*Perrin v. Pearlstein*, 314 F.2d 863 (2d Cir. 1963).................................................11

*Royal Ins. Co.*, 2002 WL 31385815 (S.D.N.Y. 2002).............................................11

*Schnabel v. Ramsey Quantitative Sys., Inc.*, 322 F.Supp.2d 505 (S.D.N.Y.2004) .............9

*Trophy Productions, Inc. v. Cinema-Vue Corp.*, 53 A.D.2d 18 (1976)..........................11

iii

*Veronica Siverls-Dunhamn et al. v. Sueng Huen Lee*, 2006 WL 3298964
(S.D.N.Y. 2006) ................................................................................................7

*Whitaker v. Am. Telecasting, Inc.*, 261 F.3d 196 (2d Cir. 2001) ...........................................4

*Yurman Designs, Inc. v. A.R. Morris Jewelers, L.L.C.*, 41 F. Supp.2d. 453
(S.D.N.Y. 1999) ................................................................................................5

**Federal Statutes**

28 U.S.C. § 1391 .................................................................................................10

28 U.S.C. § 1404 ..................................................................................................7

**Californai Statutes**

Cal. Civ. Proc. Code § 410.10 ...............................................................................7, 10

**New York Statutes**

CPLR § 302 ..........................................................................................................5

iv

Defendant Ligand Pharmaceuticals Incorporated ("Ligand") respectfully submits this memorandum of law in support of its motion, pursuant to Rules 12(b)(2) and 12(b)(3) of the Federal Rules of Civil Procedure to dismiss the Complaint, dated March 4, 2008 (the "Complaint") of Plaintiff The Rockefeller University ("Rockefeller") for lack of personal jurisdiction over Ligand. In the alternative, Ligand moves to transfer this case to the Southern District of California under 28 U.S.C. §1404(a) in favor of Ligand's lawsuit for Declaratory Judgment filed on March 4, 2008, the same date that this lawsuit was originally filed in state court.

This Court lacks personal jurisdiction because Ligand lacks sufficient contacts with this forum to give rise to general or specific personal jurisdiction over Ligand under New York State's long-arm statue or under the Constitution of the United States. Ligand is a Delaware Corporation with headquarters in San Diego, California that has no current business presence in New York.

## I. STATEMENT OF PERTINENT FACTS

### A. Ligand Currently Has No General "Presence" in New York

Formed in 1987, Ligand is a relatively small biotech company that focuses on discovering and developing new drugs for the treatment of various diseases. *Ligand Pharm., Inc. Annual Report (Form 10-K)*, at 4, 36 (Mar. 16, 2007), Declaration of Alan Kessler, ¶¶2-4, Exhibit B; Exhibit A. Ligand is a Delaware corporation, based in San Diego, California, where all of its facilities and employees are located, and where it performs all of its basic discovery research activities. Declaration of Audrey Warfield-Graham ¶4, Exhibit C.

As of March 4, 2008, the date the complaint in this action was filed in state court, Ligand had no "presence" in New York. Specifically, when the complaint was filed, Ligand (1) was not selling any goods or services in New York, (2) did not own, lease or rent any real property in New York, (3) had no facilities of any kind in New York, (4) had no employees, sales representatives or independent contractors in New York, (5) had no telephone listings or mailing addresses in New York, (6) was not conducting any marketing or advertising directed specifically to residents of New York, (7) had no officers who were residents of or domiciled in

1

Exhibit "7"
83

New York, and (8) had never brought suit in the New York courts. *Ligand Pharm., Inc. Annual Report (Form 10-K)*, at 17, 24, 105 (Mar. 16, 2007), Exhibit A; Declaration of Audrey Warfield-Graham, ¶¶5-9, Exhibit C.

## B. Ligand's Past Sales Activities in New York Are Discontinued and Unrelated to This Suit

From about 1998 to about 2007, Ligand did sell two product lines nationwide, and had at least one salesperson in New York. Declaration of Audrey Warfield-Graham, ¶10, Exhibit C. As a result, in 1998, Ligand registered to do business in New York. Declaration of Alan Kessler, ¶5, Exhibit B; N.Y. Secretary of State Records, Exhibit D. However, long before this lawsuit was filed, Ligand sold off both of these product lines and had ceased all of its sales activities in New York. *Ligand Pharmaceuticals Inc. Annual Report (Form 10-K)*, at 3 (March 16, 2007), Exhibit A. Since 2007, Ligand has sold no goods or services in New York (or anywhere else) ceasing its commercial sales activities. Instead, Ligand's ongoing business is premised on targeted internal research activities, which are based out of its San Diego facilities. *Id.*

Importantly, none of the aforementioned, now-discontinued sales activity in New York had any relation or relevance to the current dispute with Rockefeller. Rockefeller's complaint alleges that three thrombopoeitin ("TPO") mimetic compounds (the TPO Compounds) were developed using technology that Rockefeller had licensed to Ligand. *See* Complaint ¶¶20-22. Rockefeller expressly asks this Court for a declaration that eltrombopag (PROMACTA®), SB-559448 and LGD-4665 are each a "Product" within the meaning of the term defined in the 1992 Agreement. Complaint ¶63. As is apparent from Rockefeller's Complaint, none of these compounds has yet to be approved for sale in the United States. See Complaint ¶¶20-22. None of the discontinued products, previously sold by Ligand, were TPO compounds or had any relation to such compounds. Declaration of Keith Marschke, ¶6 Exhibit E.

## C. This Dispute Concerns Ligand's Research Activity in San Diego

Starting in 1987, Ligand invented, in-licensed, developed and used various assays to identify and discover potentially useful small molecule drugs. Declaration of Alan Kessler, ¶¶2-4, Exhibit B; *Ligand Pharm., Inc. Annual Report (Form 10-K)*, at 23, 29, 40 (Mar. 31, 1997), Exhibit F. In 1992, Ligand entered into a License Agreement with Rockefeller ("the

Agreement," attached to Complaint as Exhibit A). *Id.* at 24. Under the Agreement, Rockefeller licensed certain "Technical Information" and "Patent Rights" developed in part by Dr. Robert B. Darnell, M.D., Ph.D. ("Darnell"). *Agreement* at 1. Darnell served on Ligand's Scientific Advisory Board for several years and visited with Ligand scientists in San Diego from 1996 until at least 2001. Declaration of Keith Marschke, ¶12, Exhibit E.

The present dispute concerns whether Ligand used Rockefeller's Patent Rights or Technical Information in the development of the three TPO compounds. Ligand will show that, although it may have used Rockefeller's technology in various programs over the years, none of *those* programs led to the TPO compounds that form the basis of Rockefeller's complaint.

All of the relevant Ligand work was performed in San Diego. Specifically, eltrombopag and SB-559448 were discovered as part of a 1997-2001 research program, conducted under a 1994 Research Development and License Agreement ("GSK License") with SmithKline Beecham Corporation, now GlaxoSmithKline ("GSK"). Declaration of Alan Kessler, ¶¶2-4, Exhibit B; *Ligand Pharm., Inc. Annual Report (Form 10-K)*, at 20 (Mar. 13, 2006), Exhibit G. All of Ligand's work under the GSK License was performed in San Diego. Declaration of Keith Marschke, ¶16, Exhibit E. To the extent any work performed by GSK is relevant to this litigation; none of that work was performed in New York. *Id.* LGD-4665 is a potential pharmaceutical product that was discovered by Ligand in San Diego in a research program that started no earlier than the second half of 2003. *Ligand Pharm., Inc. Annual Report (Form 10-K)*, at 6 (Mar. 16, 2007). GSK had no involvement in the development of LGD-4665. Declaration of Keith Marschke, ¶9, Exhibit E.

Not only was the Ligand work performed in San Diego, all of the laboratory notebooks and other records documenting that work are stored in San Diego. Declaration of Keith Marschke, ¶10, Exhibit E. Moreover, to a great extent, the personnel involved in that work remain in California, although many are no longer in Ligand's employ. Ligand plans to elicit the testimony of individuals who have knowledge about the research efforts that lead to the TPO Compounds. At present, Ligand expects that testimony of at least fifty (50) individuals, all believed to be current California residents, will be relevant in this case. Spreadsheet of Potential

Witnesses, Exhibit H, Declaration of Keith Marschke, ¶¶14-15, Exhibit E; Declaration of Audrey Warfield-Graham, ¶¶14-15, Exhibit C. Accordingly, the evidence and witnesses relating to the Ligand research work at issue are located in California.

**D. This Dispute Should Proceed in the Suit Pending in San Diego Federal Court**

In a letter dated August 9, 2007, Ligand terminated the Agreement under Section 11.2. ("Ligand shall have the right to terminate any license grant at any time..."). For several months, a tolling agreement protected the parties from a first strike lawsuit as the parties attempted to resolve the dispute. However, the day after the tolling agreement expired, Ligand and Rockefeller each filed a lawsuit in its home forum. Thus, on March 4, Rockefeller filed the present suit in New York state court and Ligand filed a declaratory judgment action in federal court in the Southern District of California. California Complaint, Exhibit I. Ligand submits that if the present case is not dismissed, it should be transferred and consolidated with the suit pending in the Southern District of California.

## II. THIS COURT LACKS PERSONAL JURISDICTION OVER LIGAND

Ligand moves to dismiss this action under Rule 12(b)(2) of the Federal Rules of Civil Procedure. On a motion to dismiss for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2), the plaintiff (Rockefeller) bears the burden to demonstrate that the court has jurisdiction. *Whitaker v. Am. Telecasting, Inc.*, 261 F.3d 196, 208 (2d Cir. 2001). To do so, Rockefeller must demonstrate both that jurisdiction is proper in New York under the applicable statute and that the exercise of jurisdiction in New York meets the requirements of due process. *Id.* Rockefeller can show neither.

**A.    The Exercise of Jurisdiction Would be Improper Under State Law**

New York law allows for the exercise of jurisdiction on a foreign corporation such as Ligand under its long arm statute on only two grounds, neither of which apply here: "(1) if the corporation is 'present' in New York, or (2) if the plaintiff's claim arises out of the corporation's transaction of business within the state." *Bellepointe, Inc. v. Kohl's Dept. Stores, Inc.* 975 F.Supp. 562, 564 (S.D.N.Y. 1997) (internal citations omitted).

1. **This Court does not have general personal jurisdiction over Ligand because Ligand is not continuously present in New York**

Under C.P.L.R. §301 a foreign corporation may be subjected to personal jurisdiction if it is "engaged in such a continuous and systematic course of 'doing business' here as to warrant a finding of its 'presence' in this jurisdiction." *Landoil Res. Corp. v. Alexander & Alexander Servs. Inc.*, 918 F.2d 1039, 1043 (2d Cir.1991). The defendant must be present in New York not occasionally or casually, but with a fair measure of permanence and continuity at the time suit is filed. *Landoil*, 918 F.2d at 1043; *Yurman Designs, Inc. v. A.R. Morris Jewelers, L.L.C.*, 41 F. Supp.2d. 453, 457. Ligand has no meaningful presence in this forum, as it has no office, solicits no business, and has no employees in New York. *See, Hoffritz for Cutlery, Inc. v. Amjac, Ltd.*, 763 F.2d 55, 58 (2d Cir.1985). Furthermore, the mere fact that Ligand appointed an agent for service of process in New York in 1998 is insufficient to subject it to personal jurisdiction in New York. *See, Bellepointe, Inc. v. Kohl's Department Stores, Inc.*, 975 F.Supp. 562, 564 (S.D.N.Y.1997).

As noted above, the inquiry focuses on Ligand's "presence" in New York at time the suit was filed: March 4, 2008. As of that date, Ligand had no presence in New York and, therefore, cannot be brought into court under the general jurisdiction provision of New York's long-arm statute. Ligand no longer sells or advertises any goods or services in New York and has no employees or sales persons in New York. Ligand has no facilities of any kind in New York and does not own, lease or rent any real property in New York. Ligand has no telephone listings or addresses in New York. Thus, Ligand does not perform business in New York with the continuity necessary to find general jurisdiction under the statute.

2. **This Court lacks specific jurisdiction because the claim does not arise out of Ligand business transacted within New York**

Under New York C.P.L.R. § 302(a)(1), a foreign corporation may be subject to personal jurisdiction if it "transacts any business within the state or contracts anywhere to provide goods or services in the state" and plaintiff's claim arises out of that business activity. To "transact business" in New York, however, the foreign corporation must "purposely avail [ ] itself of the

privilege of conducting activities within [New York], thus invoking the benefits and protections of its laws." *McKee Elec. Co. v. Rauland-Borg Corp.*, 20 N.Y.2d 377, 382, 283 N.Y.S.2d 34 (1967) (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)). The "totality of the circumstances" determines whether a party has transacted business in New York.

Here, Rockefeller's claim relates to Ligand's activities in discovering and developing the TPO Compounds. This work was simply not conducted in New York. Instead, it occurred in California.

In sum, Ligand is not subject to specific jurisdiction in this forum. Ligand did not transact business in New York and Rockefeller's claim arises out of acts that occurred in California, not New York. Because Ligand has not been continuously present in New York and because the Rockefeller's claim arises out of acts that occurred in California, there is no statutory authority upon which to bring Ligand into this Court. Accordingly, Ligand urges that this suit be dismissed for lack of personal jurisdiction.

**B.     The Exercise of Jurisdiction Would Violate Due Process**

Even if this court had statutory authority to subject Ligand to personal jurisdiction, doing so would violate Ligand's right to due process. In order for a plaintiff to establish "minimum contacts," the defendant must have purposefully availed itself of the privilege of conducting activities in the forum state. *Hanson v. Denckla*, 357 U.S. 235, 253 (1958). In its minimum contacts analysis, the court should consider the quality and nature of the contacts. *Id.* Contacts which are random, fortuitous, or attenuated cannot establish personal jurisdiction. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 486 (1985). Once it has been established that a defendant has minimum contacts with the forum state, the court may evaluate whether the assertion of personal jurisdiction would comport with "fair play and substantial justice." *Id.* at 476, citing *Int'l Shoe*, 326 U.S. at 320. Rockefeller cannot meet its burden to show those minimum contacts or that the exercise of jurisdiction here would be fair. Thus, even if this Court finds that the exercise of jurisdiction is proper under New York's long arm statute, Ligand urges that the Court still dismiss this suit for lack of personal jurisdiction in order to protect Ligand's right to due process.

Exhibit "7"
88

Because, Rockefeller can not meet its burden to show minimum contacts under the New York standard this Court "need not reach the due process analysis." *Veronica Siverls-Dunhamn et al. v. Sueng Huen Lee*, 2006 WL 3298964 at *4 (S.D.N.Y. 2006) (citing *Kreutter v. McFadden Oil Corp.*, 71 N.Y.2d 460, 471).

### III. ALTERNATIVE MOTION TO TRANSFER – 28 U.S.C. §1404(a)

In the alternative, Ligand moves to transfer venue to the Southern District of California under 28 U.S.C. §1404(a). Title 28 U.S.C. § 1404(a) provides that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."

This dispute revolves around Ligand's use of its assay technology in connection with its own potential product, LGD 4665, and in providing services to GSK per the GSK License. The relevant witnesses and documents are almost exclusively in California, more specifically in San Diego. Where those evidentiary issues dominate, transfer is often ordered. *See, 800-Flowers, Inc. v. Intercontinental Florist, Inc.*, 860 F.Supp. 128, 134 (S.D.N.Y.1992).

### A. Transfer to the Southern District of California is Appropriate in This Case

This action could have been brought in the Southern District of California because that district has personal jurisdiction over Ligand and venue is proper there. See 28 U.S.C. § 1391 (providing that a civil action may be brought in "a judicial district where any defendant resides, if all defendants reside in the same State"); Cal. Civ. Proc. Code § 410.10 (West 2006) (a California court may exercise jurisdiction on any basis not inconsistent with the California or U.S. Constitution). Ligand, the only defendant in this matter, resides in California and is located in the Southern District of California.

### B. The Relevant Factors Strongly Weigh Toward Transfer In This Case

This Court has considered nine factors in determining whether a transfer to a foreign district is proper: (1) the location of the events giving rise to the suit; (2) the convenience of the parties; (3) the convenience of the witnesses;(4) the relative ease of access of proof; (5) the availability of process for unwilling witnesses; (6) the plaintiff's choice of forum; (7) a forum's familiarity with the governing law; (8) trial efficiency; and (9) the interest of justice. *Malone v.*

7

*Commonwealth Edison Co.*, 2 F. Supp. 2d 545, 547 (S.D.N.Y. 1998). Of these nine factors, eight favor transfer and one is, at worst, neutral. Furthermore, "[i]n making [the determination of whether to transfer the case], the court cannot resort to the usual rule of thumb according priority to the suit which is first in time, for both of the actions under consideration here were instituted on the same day. Rather, the court must look to the balance of convenience between the available forums." *Ashe v. Pepsico*, 443 F.Supp. 84, 85 (S.D.N.Y. 1997) [internal citations omitted]

### 1.    The events giving rise to the suit occurred in California

"Courts routinely transfer cases when the principal events occurred in another district and the principal witnesses are located there." *G. Angel Ltd. v. Camper & Nicholsons USA, Inc.*, 2008 WL 351660 at *4 (S.D.N.Y. 2008) (*citing Billing v Commerce One Inc.*, 186 F.Supp.2d 375, 377, S.D.N.Y.2002). This Court has found that the location the locus of operative facts is "important factor to be considered in deciding where a case should be tried." *800-Flowers* 860 F.Supp. at 134. In order to determine the locus of operative facts, this Court looks for the "the site of events from which the claim arises." *Id.*

This lawsuit concerns events that occurred in San Diego, California. Ligand's work with the Technical Information provided by Darnell took place in San Diego. Ligand's development of its screening assay technology for the TPO Compounds occurred at its laboratories in San Diego, California. Ligand keeps all of its records and documents about this work in California and all of Ligand's employees who worked on TPO Compounds are, or were at the time, residents of California. See Spreadsheet of Potential Witnesses, Exhibit H; Declaration of Keith Marschke, ¶¶14-15, Exhibit E; Declaration of Audrey Warfield-Graham, ¶¶14-15, Exhibit C.

### 2.    California would be more convenient to the parties

Ligand is in possession of most of the evidence that will be relevant to this case. Because of this fact, it would be a greater burden for Ligand to litigate this controversy in New York than it would be for Rockefeller to bring its case in California. Ligand has over 50 employees and former employees who are potential witnesses in this action, of which almost all reside in California. Rockefeller will most likely only need the testimony of Darnell and a few others.

Because most of the questions of fact concern the research activities of Ligand's employees and the evidence in Ligand's possession, it would be much more expensive for Ligand to move its proof and send its witnesses to New York than it would be for Rockefeller to attend proceedings in California. Furthermore, given the relative size of the parties (for example, Ligand has fewer than 60 employees, whereas Rockefeller has substantially more than 1,000), any cost or inconvenience involved has a greater impact on Ligand than it does on Rockefeller. Because Ligand's inconvenience will be substantially greater if it has to defend a suit in New York than Rockefeller's would be if it were made to answer in California, this factor weighs strongly in favor of a transfer to the Southern District of California.

### 3.   California would be more convenient to the witnesses

The convenience of the forum for witnesses "is probably considered the single most important factor in the analysis of whether a transfer should be granted." *Schnabel v. Ramsey Quantitative Sys., Inc.*, 322 F.Supp.2d 505, 516 (S.D.N.Y.2004). "When weighing this factor, the Court considers the materiality, nature, and quality of each witness, in addition to the number of witnesses in each district." *G. Angel*, 2008 WL 351660 at *4. "Generally, the convenience of a non-party witness is given greater weight than that of a party witness." *Id. (citing* 2002 WL 31385815, at *5).

Most of the key witnesses in this case will be Ligand officers, employees, and former employees. As seen in Exhibit H, potential witnesses are no longer employed at Ligand. The main facts that will be at issue relate to Ligand's development of the TPO Compounds and what information Ligand used in making those developments. Ligand has over 50 employees and former employees who will be potential witnesses in this action. The only potential witnesses from Rockefeller who may be located in New York are Darnell and a reasonably small number of other individuals.

### 4.   Most of the relevant proof is located in California

In order to determine whether any Patent Rights or Technical Information was used in the creation of the TPO Compounds, it will be necessary to depose the numerous Ligand employees and former employees who worked on their development. Furthermore, any and all of Ligand's

9

relevant lab records, notebooks, documents and test results are implicated in this law suit.

### 5. Many more witnesses can only be served process in California

"The availability of process to compel the testimony of important witnesses is an important consideration in transfer motions." *Arrow Electronics, Inc. v. Ducommun Inc.*, 724 F.Supp. 264, 266 (S.D.N.Y.1989). Rockefeller and its employees have a strong interest in the present suit, and are likely to readily testify in either forum. On the other hand, many of Ligand's key witnesses are former employees who may not be willing to come to court and testify. For instance, there are several witnesses who have been involved in the development of the TPO Compounds who still reside in California and may not come to court unless subpoenaed. See Exhibit H.

If this action proceeds in this Court, it will not be possible to compel unwilling California witnesses to testify in New York at trial under Fed. R. Civ. Proc. 45(b)(2). Conversely, if this action were to proceed in San Diego, subpoenas could issue directly from that court under Fed. R. Civ. Proc 45(b)(2)(C) and 90. Cal. Civ. Proc. Code § 410.10 and the California court could compel unwilling witnesses to appear.

Each of the California witnesses would be unavailable for service of process in this forum, but would be available if this matter were transferred to the Southern District of California. Because the California court could compel several key witnesses to appear at trial, this factor strongly favors transfer.

### 6. The plaintiff's choice of forum favors transfer

If the Court grants Ligand's motion, Rockefeller's choice of forum for this action will be denied, but denial of this motion would deny Ligand's choice of forum in San Diego for its separate action. This factor, therefore, at first blush, would appear to be neutral because either outcome is likely to preserve one Plaintiff's and deny the other Plaintiff's choice of forum. However, in this case Rockefeller's choice of forum should be given less weight because Ligand is not subject to personal jurisdiction in New York. This Court has found that transfer is often appropriate in cases in which there is a serious question as to whether the court has personal jurisdiction over the defendants. *See Credit Suisse Securities (USA) LLC v. Hilliard*, 469 F.

Supp.2d 103, 112 (S.D.N.Y. 2007). Here transfer is appropriate because there is, at a minimum, a serious question over whether this court has personal jurisdiction over Ligand.

### 7. The forum's familiarity with governing law is at most a neutral factor

Here, the Agreement has a choice-of-law clause selecting New York state law, but it is not clear that this is controlling. Such provisions are not controlling and may be disregarded where the most significant contacts with the matter in dispute are in another State. *Perrin v. Pearlstein,* 314 F.2d 863, 867 (2d Cir. 1963). Moreover, in the absence of a strong countervailing public policy, the parties to litigation may consent by their conduct to the law to be applied. *Trophy Productions, Inc. v. Cinema-Vue Corp.,* 53 A.D.2d 18, 22, (1976). The Agreement does not mandate venue of any dispute and is silent on the choice of forum. Thus, fora other than New York were contemplated.

Even if New York law is found to be governing, this factor should be given very little weight here because there are no complex issues of New York law at the center of this dispute. "[T]he applicable law factor is entitled to little weight in cases where 'the governing law presents no complex legal questions and has not been shown to be unclear, unsettled or difficult.'" *Royal Ins. Co.,* 2002 WL 31385815, at *8 (quoting *Nat'l Patent Dev. Corp. v. Am. Hosp. Supply Corp.,* 616 F.Supp. 114, 119 (S.D.N.Y.1984)).

In fact, the governing state law is contract law which is not generally unclear, unsettled, or difficult. Moreover, many of the key issues in the case arise under federal patent law. For instance, whether Ligand's TPO compounds fall within Rockefeller's Patent Rights and whether Rockefeller has breached the agreement by failing to discharge its duty of disclosure to the PTO are issues of federal patent law which require, *inter alia,* the Court's determination of the meaning of the claim terms. *See Markman v. Westview Instruments, Inc.,* 116 S. Ct. 1384, aff'g 52 F.3d 967 (Fed. Civ. 1995). These issues arise as a matter of federal patent law, not New York law. Because this case will involve substantial issues of federal law, the importance of the choice of law provision is mitigated.

To the extent interpretation of New York state law is required, there is no doubt that New York businesses often transact business in California and, therefore California courts are quite

familiar with New York. Contracts stipulating to New York law are ubiquitous and there is no reason to believe that the Southern District of California will face any significant difficulty in applying New York law to this controversy, if so required. Because the laws of New York are routinely interpreted by courts of California, this factor should not influence a decision to transfer.

**8.     Transferring this case to California would promote trial efficiency**

Although a Court may initially find that it has jurisdiction over a plaintiff before allowing discovery, the question cannot be finally settled without a pretrial evidentiary hearing or at trial. *Atlantic Mut. Ins. Co. v. M/V HUMACAO*, 169 F.Supp.2d 211, 214 (S.D.N.Y. 2001)( "While a *prima facie* showing of jurisdiction is adequate to defeat a 12(b)(2) motion made before discovery, the party asserting jurisdiction bears the ultimate burden of proving by a preponderance of the evidence at trial or an evidentiary hearing that the court has jurisdiction over the defendant."); *Marine Midland Bank, N.A. v. Miller*, 664 F.2d. 899, 904 ("Eventually, of course, the plaintiff must establish jurisdiction by a preponderance of the evidence, either at a pretrial evidentiary hearing or at trial.").

If this action were to proceed in New York, the parties would ultimately need to engage in jurisdictional discovery and court proceedings on that issue. Moreover, even if this action were to survive a second jurisdictional challenge, the issue would be subject to appeal to the Second Circuit.

In sharp contrast, if this Court transfers the present action to the Southern District of California in its current form then Ligand will be in the position of the defendant and will readily submit to personal jurisdiction in that court. Thus, such a transfer would obviate the need for expensive and time consuming jurisdictional inquiries.

Because transferring this action to the Southern District of California would eliminate the need for jurisdictional discovery, future motions to dismiss, and potential appellate review thereof, such a ruling is interest of trial efficiency. Because granting the present motion would save both parties and the courts considerable amounts of time and resources, this factor weighs strongly in transferring this action to the Southern District of California.

### 9. The interest of justice would be better served in California

As noted above, a considerable proportion of Ligand's key witnesses may not voluntarily appear in any forum. If this case proceeds to a jury trial it is very likely that Darnell will be Rockefeller's key witness. If Ligand is unable to bring most important fact witnesses into the courtroom, Ligand may be unable to compete with Darnell's prestige and charisma. Depriving Ligand access to its key witnesses while allowing Darnell to speak to the jury would unfairly tip the scales in favor of Rockefeller. Thus, Ligand's will be disadvantaged if this case proceeds in a court that does not have subpoena power in California. In order to avoid an unjust result, this case should be transferred to the Southern District of California where Ligand will be able to subpoena all of its key fact witnesses.

Proceeding in New York is also unfair and fails to serve the interests of justice or efficiency in view of the significant issue regarding the lack of personal jurisdiction over Ligand in New York that will result in additional discovery, briefing and possibly appeal if the case is not dismissed or transferred.

### C. Transfer to The Southern District of California is Warranted In This Case

Ligand urges the Court to transfer this case to the Southern District of California on the factors discussed above. Each of the factors above weighs in favor of transfer to the Southern District of California, or is neutral as to transfer. The conveniences of the witnesses and parties, and the interests of justice would be best served by moving this action to the Southern District of California where the entirety of the dispute is already at issue.

## IV. CONCLUSION

For the reasons above, Ligand respectfully requests that this Court grant Ligand's motions to dismiss for lack of personal jurisdiction. In the alternative, Ligand respectfully requests that this Court grant Ligand's alternative motion to transfer this action to the Southern District of California.

Dated: New York, New York
      March 21, 2008

GREENBERG TRAURIG, LLP

Simon Miller
Sean P. Cameron
GREENBERG TRAURIG, LLP
200 Park Avenue
New York, NY 10166
Telephone: (212) 801-9200
Facsimile: (212) 801-6400

Attorneys for Defendant
LIGAND PHARMACEUTICALS
INCORPORATED

OF COUNSEL:

Darrell L. Olson
KNOBBE, MARTENS, OLSON & BEAR, LLP
2040 Main Street, 14th Floor
Irvine, CA 92614
Telephone: (949) 760-0404
Facsimile: (949) 760-9502

and

Joseph M. Reisman
Ali S. Razai
KNOBBE, MARTENS, OLSON & BEAR, LLP
550 West C Street, Suite 1200
San Diego, CA 92101
Telephone: (619) 687-2121
Facsimile: (619) 235-0176



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

THE ROCKEFELLER UNIVERSITY,

       Plaintiff,

    v.

LIGAND PHARMACEUTICALS
INCORPORATED,

       Defendant.

08-CV-2755 (KPC)(HP)

**NOTICE OF MOTION**

**ORAL ARGUMENT REQUESTED**

PLEASE TAKE NOTICE, that upon the accompanying Affirmation of Simon Miller, dated March 21, 2008, and the exhibits attached thereto, and the Memorandum of Law dated March 21, 2008, Defendant Ligand Pharmaceuticals Incorporated ("Ligand"), will move this Court, before the Honorable Kevin P. Castel, at the United States Courthouse, 500 Pearl Street, New York, New York at a date and time to be decided by the Court, for an Order dismissing the Complaint of Plaintiff, The Rockefeller University ("Rockefeller"), for lack of personal jurisdiction over Ligand pursuant to Rules 12(b)(2) and 12(b)(3) of the Federal Rules of Civil Procedure, or, in the alternative, to transfer the above-styled action to the Southern District of California pursuant to 28 U.S.C. § 1404(a).

Dated: New York, New York
      March 21, 2008

GREENBERG TRAURIG, LLP

By: _____
    Simon Miller (SM-6728)
    200 Park Avenue
    New York, New York 10166
    (212) 801-9200
    *Attorneys for Defendant*
    -and-
    KNOBBE, MARTENS, OLSON
    & BEAR, LLP
    Darrell L. Olson
    2040 Main Street, 14th Floor
    Irvine, CA 92614
    (949) 760-0404

    *Of Counsel for Defendant*

    KNOBBE, MARTENS, OLSON
    & BEAR, LLP
    Joseph M. Reisman
    Ali S. Razai
    550 West C Street
    Suite 1200
    San Diego, CA 92101
    (619) 687-2121

    *Of Counsel for Defendant*

TO:   Anat Hakim
     FOLEY & LARDNER LLP
     *Attorneys for Plaintiff*
     3000 K Street, N.W.
     Suite 500
     Washington, DC 20007
     (202) 672-5300

     Peter Wang
     Douglas S. Heffer
     FOLEY & LARDNER LLP
     *Attorneys for Plaintiff*
     90 Park Avenue
     New York, NY 10016
     (212) 682-7474

Exhibit "7"
98

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

THE ROCKEFELLER UNIVERSITY, a
New York not-for-profit corporation,

        Plaintiff,

        v.

LIGAND PHARMACEUTICALS
INCORPORATED, a Delaware corporation,

        Defendant.

Case No. 08 cv 2755 KPC-HP

**AFFIRMATION IN SUPPORT OF
DEFENDANT'S MOTION TO DISMISS
UNDER FRCP 12(B)(2) OR, IN THE
ALTERNATIVE, FRCP 12(B)(3)**

SIMON MILLER, under penalties of perjury, affirms and says:

1.    I am a Shareholder in the law firm of Greenberg Traurig, LLP, counsel for Ligand Pharmaceuticals Incorporated ("Ligand"), defendant in the above referenced matter. I respectfully submit this affirmation in support of Ligand' motion to the dismiss the Complaint, dated March 4, 2008 (the "Complaint") pursuant to Fed. R. Civ. P. 12(b)(2) and 12(b)(3) of the Rules of Civil Procedure and under 28 U.S.C. § 1391 to dismiss the complaint of Plaintiff, The Rockefeller University ("Rockefeller"), for lack of personal jurisdiction over Ligand or improper venue. In the alternative, Ligand moves to transfer this case to the Southern District of California under 28 U.S.C. § 1404(a). A copending case already exists in the Southern District of California, *Ligand Pharmaceuticals Incorporated v. The Rockefeller University*, Civil Action No. 08 CV 401 BEN WMc, in favor of Ligand's lawsuit for declaratory judgment filed on March 4, 2008, the same date that this lawsuit was originally filed in state court.

1.    A copy of the Complaint is annexed hereto Exhibit K.

2.    This Motion is also supported by Exhibits A through J and a supporting memorandum of law, all of which are incorporated by reference herein.

1

WHEREFORE, Ligand Pharmaceuticals Inc. respectfully requests that this case be dismissed for lack of personal jurisdiction or improper venue or, in the alternative, that the case be transferred to the Southern District of California.

Dated: New York, New York
      March 21, 2008

SIMON MILLER

2

# EXHIBIT A

# LIGAND PHARMACEUTICALS INC

### FORM 10-K
(Annual Report)

## Filed 3/16/2007 For Period Ending 12/31/2006

| | |
|---|---|
| Address | 10275 SCIENCE CENTER DRIVE |
| | SAN DIEGO, California 92121-1117 |
| Telephone | 858-550-7500 |
| CIK | 0000886163 |
| Industry | Biotechnology & Drugs |
| Sector | Healthcare |
| Fiscal Year | 12/31 |

Powered By EDGAR Online

http://www.edgar-online.com/
© Copyright 2006. All Rights Reserved
Distribution and use of this document restricted under EDGAR Online's Terms of Use.

Exhibit A
Page 1
Exhibit "7"
102

Case 3:08-cv-00127-BEN-WMC Document 13-9 Filed 04/07/2008 Page 226 of 617

## SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

---

# FORM 10-K

---

Mark One

☑ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the Fiscal Year Ended December 31, 2006

OR

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____ to _____.

Commission File No. 0-20720

# LIGAND PHARMACEUTICALS INCORPORATED
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| Delaware | 77-0160744 |
| (State or other jurisdiction of incorporation or organization) | (IRS Employer Identification No.) |
| 10275 Science Center Drive | 92121-1117 |
| San Diego, CA | (Zip Code) |
| (Address of Principal Executive Offices) | |

Registrant's telephone number, including area code: (858) 550-7500

Securities registered pursuant to Section 12(b) of the Act:

| Title of Each Class | Name of Each Exchange on Which Registered |
|---|---|
| Common Stock, par value $.001 per share | The NASDAQ Global Market of The NASDAQ Stock Market LLC |
| Preferred Share Purchase Rights | The NASDAQ Global Market of The NASDAQ Stock Market LLC |

Securities registered pursuant to Section 12(g) of the Act:
None

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☐   No ☑

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 of Section 15(d) of the Securities Exchange Act of 1934. Yes ☐   No ☑

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☑   No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☑

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer.
Large Accelerated Filer ☐       Accelerated Filer ☑       Non-accelerated Filer ☐

Indicate by check mark whether the registrant is a shell company (as defined in Exchange Act Rule 12b-2 of the Exchange Act).
Yes ☐   No ☑

The aggregate market value of the Registrant's voting and non-voting stock held by non-affiliates was approximately $597.4 million based

Exhibit A

Page 2

Table of Contents

PART I

## Item 1. Business

*Caution: This discussion and analysis may contain predictions, estimates and other forward-looking statements that involve a number of risks and uncertainties, including those discussed in Item 1A. "Risk Factors." This outlook represents our current judgment on the future direction of our business. These statements include those related to our restructuring process, AVINZA royalty revenues, product returns, product development, our 2005 restatement, and material weaknesses or deficiencies in internal control over financial reporting. Actual events or results may differ materially from Ligand's expectations. For example, there can be no assurance that our recognized revenues or expenses will meet any expectations or follow any trend(s), that our internal control over financial reporting will be effective or produce reliable financial information on a timely basis, or that our restructuring process will be successful or yield preferred results. We cannot assure you that the Company will be able to successfully or timely complete its restructuring, that we will receive expected AVINZA royalties to support our ongoing business, or that our internal or partnered pipeline products will progress in their development, gain marketing approval or success in the market. In addition, the Company's ongoing SEC investigation may have an adverse effect on the Company. Such risks and uncertainties, and others, could cause actual results to differ materially from any future performance suggested. We undertake no obligation to release publicly the results of any revisions to these forward-looking statements to reflect events or circumstances arising after the date of this annual report. This caution is made under the safe harbor provisions of Section 21E of the Securities Exchange Act of 1934 as amended.*

References to Ligand Pharmaceuticals Incorporated ("Ligand", the "Company", "we" or "our") include our wholly owned subsidiaries — Ligand Pharmaceuticals (Canada) Incorporated; Ligand Pharmaceuticals International, Inc.; Seragen, Inc. ("Seragen"); and Nexus Equity VI LLC ("Nexus").

We were incorporated in Delaware in 1987. Our principal executive offices are located at 10275 Science Center Drive, San Diego, California, 92121. Our telephone number is (858) 550-7500.

## Overview

We are an early-stage biotech company that focuses on discovering and developing new drugs that address critical unmet medical needs in the areas of thrombocytopenia, cancer, hepatitis C, hormone-related diseases, osteoporosis and inflammatory diseases. We strive to develop drugs that are more effective and/or safer than existing therapies, that are more convenient to administer and that are cost effective. We plan to build a profitable company by generating income from research, milestone, royalty and co-promotion revenues resulting from our collaborations with pharmaceutical partners.

In October 2006, we completed the sale of our oncology product line to Eisai Co., LTD (Tokyo) and Eisai Inc. (New Jersey) for approximately $205.0 million. Of this amount, $185.0 million was received in cash and $20.0 million was funded into an escrow account to support any indemnification claims made by Eisai following the closing of the sale. Such cash proceeds are exclusive of transaction fees and costs. The sale included our four marketed oncology drugs: ONTAK, Targretin capsules, Targretin gel and Panretin gel. In addition, certain of our employees were offered employment by Eisai.

In February 2007, we completed the sale of our AVINZA product line to King Pharmaceuticals, Inc ("King"). We received $280.4 million in net cash proceeds at the closing from King which is net of $15.0 million that was funded into an escrow account to support any indemnification claims made by King following the closing of the sale. The net cash amount represents a purchase price of $246.3 million which includes certain inventory-related adjustments, plus approximately $49.1 million in reimbursement of payments to Organon and others. Such net cash proceeds are exclusive of transaction fees and costs. We have now completed the sale of our commercial businesses, thus allowing us to focus our business strategy on a targeted internal research and development effort. We have what we believe are promising products through our internal development programs, including the potential of LGD-4665, which is currently in clinical development.

We have formed research and development collaborations for our products with numerous global pharmaceutical companies with ongoing clinical programs at GlaxoSmithKline, Wyeth, Pfizer Inc. and TAP Pharmaceutical

3

Table of Contents

| Program | Disease/Indication | Development Phase |
|---|---|---|
| LGD-4665 (Thrombopoietin oral mimetic) | Idiopathic Thrombocytopenia Purpura; other thrombocytopenias | Phase I |
| Selective androgen receptor modulators (agonists) | Hypogonadism, osteoporosis, sexual dysfunction, frailty, cachexia | Pre-clinical |
| Selective glucocorticoid receptor modulators | Inflammation, cancer | Research |
| Selective androgen receptor modulators (antagonists) | Prostate cancer Research | Research |

## Thrombopoietin ("TPO") Research Programs

In our TPO program, we seek to develop our own drug candidates that mimic the activity of thrombopoietin for use in the treatment or prophylaxis of thrombocytopenia with indications in a variety of conditions including Idiopathic Thrombocytopenic Purpura ("ITP"), cancer, hepatitis C and other disorders of blood cell formation. These are large markets with unmet medical needs. For example, the US prevalence of a few target diseases with thrombocytopenia is 200,000 patients with ITP, 1.3 million cancer patients receiving chemotherapy and 2.7 million patients with hepatitis C.

Thrombocytopenia can be caused by insufficient platelet production, splenic sequestration of platelets or increased destruction of platelets predominantly by a patient's own immune system. Thrombocytopenia in cancer patients can be treatment-related (chemotherapy) or cancer-related. Platelet transfusion is the standard of care for thrombocytopenia. However, repeated transfusions can result in the development of platelet alloantibodies that could significantly reduce the effectiveness of transfusions. In addition, patients are at increased risk of infections and allergic reactions. Currently, there is only one approved drug (Neumega) for the prevention of severe thrombocytopenia and the reduction of the need for platelet transfusions in patients with nonmyeloid malignancies. However, we believe that there is a substantial medical need for improved platelet enhancing agents for use in the treatment of thrombocytopenia due to the significant side effects seen with current therapies. Thus, a small molecule TPO mimetic with no apparent immunogenic potential and oral activity that may facilitate dosing may provide an attractive therapeutic profile for a major unmet medical need.

In 1997, we formed a joint research and development alliance with SmithKline Beecham (now GlaxoSmithKline) to focus on the discovery and development of small molecule TPO mimetics. Our partner has two TPO mimetics that were part of our collaboration with them in clinical trials: eltrombopag (Promacta) in Phase II and Phase III trials for multiple indications and SB-559448 in Phase I. For a discussion of these clinical trials, see "Collaborative Research and Development Programs – Thrombopoietin (TPO) Mimetics Collaborative Program – GlaxoSmithKline Collaboration."

After a "wash-out" period following the termination of the research collaboration with GlaxoSmithKline, each party retained rights to perform research and development of new drugs to control hematopoiesis. This wash-out period ended in February 2003 at which time we began to research and later selected a TPO mimetic, LGD-4665, as a clinical candidate and completed preclinical studies in 2006. We initiated Phase I clinical studies in November 2006. We may pursue the specialty applications emerging from our TPO mimetics internally, but may seek collaborations with major pharmaceutical companies to exploit broader clinical applications.

## Selective Androgen Receptor Modulators ("SARM") Research and Development Programs

We are pioneering the development of tissue selective SARMs, a novel class of non-steroidal, orally active molecules that selectively modulate the activity of the androgen receptor in different tissues, providing a wide range of opportunities for the treatment of many diseases and disorders in both men and women. Tissue-selective androgen receptor agonists may provide utility in the treatment of patients with hypogonadism, osteoporosis, sexual dysfunction and frailty. Tissue-selective androgen receptor antagonists may provide utility in the treatment of patients with prostate cancer, acne, androgenetic alopecia and other diseases. The use of androgen antagonists has shown efficacy in the treatment of prostate cancer, with three androgen antagonists currently approved by the FDA

6

Table of Contents

We are also increasingly subject to regulation by the states. A number of states now regulate, for example, pharmaceutical marketing practices and the reporting of marketing activities, controlled substances, clinical trials and general commercial practices. We have developed and are developing a number of policies and procedures to ensure our compliance with these state laws, in addition to the federal regulations described above. Significant resources are now required on an ongoing basis to ensure such compliance. For a discussion of the risks associated with government regulations, see below under "Item 1A. Risk Factors."

**Patents and Proprietary Rights**

We believe that patents and other proprietary rights are important to our business. Our policy is to file patent applications to protect technology, inventions and improvements to our inventions that are considered important to the development of our business. We also rely upon trade secrets, know-how, continuing technological innovations and licensing opportunities to develop and maintain our competitive position.

As of December 31, 2006, we have filed or participated as licensee in the filing of approximately 37 currently pending patent applications in the United States relating to our technology, as well as foreign counterparts of certain of these applications in multiple countries. In addition, we own or have licensed rights covered by approximately 260 patents issued or applications, granted or allowed worldwide, including United States patents and foreign counterparts to United States patents. Except for a few patents and applications that are not material to our commercial success, these patents and applications will expire between 2008 and 2023. Starting in 2007, we receive royalties from King Pharmaceuticals Inc. on AVINZA representing substantially all of our ongoing revenue. AVINZA is expected to have patent protection in the United States until November 2017. Subject to compliance with the terms of the respective agreements, our rights under our licenses with our exclusive licensors extend for the life of the patents covering such developments. For a discussion of the risks associated with patent and proprietary rights, see below under "Item 1A. Risk Factors."

**Human Resources**

As of March 12, 2007, we had 122 full-time employees including 37 employees who will be supporting the Company providing transitional services for various time periods throughout 2007, following the restructuring announced in January 2007. Following the termination of the transitional employees, we expect to have approximately 85 full time employees of whom 55 will be involved directly in scientific research and development activities. Of these employees, 32 hold Ph.D. or M.D. degrees.

16

Table of Contents

## ITEM 1A. RISK FACTORS

*The following is a summary description of some of the many risks we face in our business. You should carefully review these risks in evaluating our business, including the businesses of our subsidiaries. You should also consider the other information described in this report.*

### Risks Related To Us and Our Business.

*Failure to timely or successfully restructure our business could have adverse consequences for the Company.*

✱ We completed the sale of our commercial businesses in February 2007. In connection with these sales we are also restructuring our remaining businesses, principally our research and development. We will also be consolidating our staff and facilities. If we are unable to successfully and timely complete this restructuring, our remaining assets could lose value, we may not be able to retain key employees, we may not have sufficient resources to successfully manage those assets or our business, and we may not be able to perform our obligations under various contracts and commitments. Any of these could have substantial negative impacts on our business and our stock price.

### We are substantially dependent on AVINZA royalties for our revenues.

✱ We recently completed the sale of our two commercial product lines, oncology and pain, which in recent years provided substantially all of our continuing revenue. In each sale we received a one-time upfront cash payment. The consideration for the sale of the pain (AVINZA) franchise also included royalties that we will receive in the future from sales of AVINZA by King Pharmaceuticals, Inc., who acquired the AVINZA rights from us. These consist of a 15% royalty on AVINZA sales for the first 20 months, and then royalty payments ranging from 5-15% of AVINZA sales, depending on the level of total annual sales. These royalties represent and will represent substantially all of our ongoing revenue for the foreseeable future. Although we may also receive royalties and milestones from our partners in various past and future collaborations, the amount of revenue from these royalties and milestones is unknown and highly uncertain.

Thus, any setback that may occur with respect to AVINZA could significantly impair our operating results and/or reduce the market price for our securities. Setbacks could include problems with shipping, distribution, manufacturing, product safety, marketing, government licenses and approvals, intellectual property rights, competition with existing or new products and physician or patient acceptance of the product, as well as higher than expected total rebates, returns or discounts.

AVINZA was licensed from Elan Corporation which is its sole manufacturer. Any problems with Elan's manufacturing operations or capacity could reduce sales of AVINZA, as could any licensing or other contract disputes with Elan, raw materials suppliers, or others.

Similarly, King's AVINZA sales efforts could be affected by a number of factors and decisions regarding its organization, operations, and activities as well as events both related and unrelated to AVINZA. Historically, AVINZA sales efforts, including our own and our prior co-promotion partners, have encountered a number of difficulties, uncertainties and challenges, including sales force reorganizations and lower than expected sales call and prescription volumes, which have hurt and could continue to hurt AVINZA sales growth. AVINZA could also face stiffer competition from existing or future pain products. The negative impact on the product's sales growth in turn may cause our royalties, revenues and earnings to be disappointing.

AVINZA sales also may be susceptible to higher than expected discounts (especially PBM/GPO rebates and Medicaid rebates, which can be substantial), returns and chargebacks and/or slower than expected market penetration that could reduce sales. Other setbacks that AVINZA could face in the sustained-release opioid market include product safety and abuse issues, regulatory action, intellectual property disputes and the inability to obtain sufficient quotas of morphine from the Drug Enforcement Agency ("DEA") to support production requirements.

In particular, with respect to regulatory action and product safety issues, the FDA previously requested expanded warnings on the AVINZA label to alert doctors and patients to the dangers of using AVINZA with alcohol.

17

regulations, we are required to contract with third parties at substantial cost to us. Our annual cost of compliance with these regulations is approximately $0.7 million. We cannot completely eliminate the risk of accidental contamination or injury from the handling and disposing of hazardous materials, whether by us or by our third-party contractors. In the event of any accident, we could be held liable for any damages that result, which could be significant. We believe that we carry reasonably adequate insurance for toxic tort claims.

***Our shareholder rights plan and charter documents may hinder or prevent change of control transactions.***

Our shareholder rights plan and provisions contained in our certificate of incorporation and bylaws may discourage transactions involving an actual or potential change in our ownership. In addition, our Board of Directors may issue shares of preferred stock without any further action by you. Such issuances may have the effect of delaying or preventing a change in our ownership. If changes in our ownership are discouraged, delayed or prevented, it would be more difficult for our current Board of Directors to be removed and replaced, even if you or our other stockholders believe that such actions are in the best interests of us and our stockholders.

## Item 1B. Unresolved Staff Comments

None.

## Item 2. Properties

We currently lease and occupy office and laboratory facilities in San Diego, California. These include a 52,800 square foot facility leased through July 2015 and an 82,500 square foot facility leased through November 2021, which is a building we previously owned and sold and leased back on November 9, 2006 (see note 21). We expect to consolidate our ongoing operations into the 82,500 square foot facility in 2007 and believe that this location will be adequate to meet our near-term space requirements. Following this consolidation, we plan to sub-lease the 52,800 square foot facility.

## Item 3. Legal Proceedings

*Securities Litigation*

The Company was involved in several securities class action and shareholder derivative actions which followed announcements by the Company in 2004 and the subsequent restatement of its financial results in 2005. In June 2006, we announced that these lawsuits had been settled, subject to certain conditions such as court approval.

*Background*

Beginning in August 2004, several purported class action stockholder lawsuits were filed in the United States District Court for the Southern District of California against the Company and certain of its directors and officers. The actions were brought on behalf of purchasers of the Company's common stock during several time periods, the longest of which runs from July 28, 2003 through August 2, 2004. The complaints generally alleged that the Company violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 of the Securities and Exchange Commission by making false and misleading statements, or concealing information about the Company's business, forecasts and financial performance, in particular statements and information related to drug development issues and AVINZA inventory levels. These lawsuits were consolidated and lead plaintiffs appointed. A consolidated complaint was filed by the plaintiffs in March 2005. On September 27, 2005, the court granted the Company's motion to dismiss the consolidated complaint, with leave for plaintiffs to file an amended complaint within 30 days. In December 2005, the plaintiffs filed a second amended complaint again alleging claims under Section 10(b) and 20(a) of the Securities Exchange Act against the Company, David Robinson and Paul Maier. The amended complaint also asserted an expanded Class Period of March 19, 2001 through May 20, 2005 and included allegations arising from the Company's announcement on May 20, 2005 that it would restate certain financial results.

Beginning on or about August 13, 2004, several derivative actions were filed on behalf of the Company by individual stockholders in the Superior Court of California. The complaints named the Company's directors and

24

Table of Contents

commencing as of January 10, 2007. In addition, Mr. Higgins has a performance bonus opportunity with a target of 50% of his salary, up to a maximum of 75%, and received a restricted stock award grant of 150,000 shares of our common stock which vests over two years. We also provided Mr. Higgins with a lump-sum relocation benefit of $100,000. Mr. Higgins' employment agreement provides for severance payments and benefits in the event that employment is terminated under various scenarios, such as a change in control of the Company.

*Reductions in Workforce*

In December 2006, and following the sale of our Oncology Product Line to Eisai, we entered into a plan to eliminate 40 employee positions, across all functional areas, which were no longer deemed necessary considering our decision to sell our commercial assets. Additionally, we terminated 23 AVINZA sales representatives and regional business managers who were not offered positions with King or declined King's offer of employment. The affected employees were informed of the plan in December 2006 with an effective termination date of January 2, 2007. In connection with the termination plan, we recognized operating expenses of approximately $2.9 million in the fourth quarter of 2006, comprised of one-time severance benefits of $2.3 million, stock compensation of $0.3 million, and other costs of $0.3 million. The stock compensation charge resulted from the accelerated vesting and extension of the exercise period of stock options in accordance with severance arrangements of certain senior management members. We paid $0.5 million in December 2006 and the remaining balance in January 2007.

On January 31, 2007 we announced an additional restructuring plan calling for the further elimination of approximately 204 positions across all functional areas. This reduction was made in connection with our efforts to refocus the Company, following the sale of our commercial assets, as a smaller, highly focused research and development and royalty-driven biotech company. Associated with the restructuring and refocused business model, several of our executive officers agreed to step down including our Chief Financial Officer, Chief Scientific Officer and General Counsel. We also announced that our primary operations are expected to be consolidated into one building with the goal to sublet unutilized space. In connection with the restructuring, we expect to take a charge to earnings, the majority of which will be recorded in the first quarter of 2007, of approximately $10.8 million, comprised of one-time severance benefits of $7.5 million, stock compensation of $2.2 million, and other costs of $1.1 million. The stock compensation charge results from the accelerated vesting and extension of the exercise period of stock options in accordance with severance arrangements of certain senior management members.

*Sale and Leaseback of Premises*

On October 25, 2006, we, along with our wholly-owned subsidiary Nexus Equity VI, LLC ("Nexus") entered into an agreement with Slough Estates USA, Inc. ("Slough") for the sale of our real property located in San Diego, California for a purchase price of approximately $47.6 million. This property, with a net book value of approximately $14.5 million, includes one building totaling approximately 82,500 square feet, the land on which the building is situated, and two adjacent vacant lots. As part of the sale transaction, we agreed to leaseback the building for a period of 15 years, as further described below. In connection with the sale transaction, on November 6, 2006, we also paid off the existing mortgage on the building of approximately $11.6 million. The early payment triggered a prepayment penalty of approximately $0.4 million. The sale transaction subsequently closed on November 9, 2006.

Under the terms of the lease, we will pay a basic annual rent of $3.0 million (subject to an annual fixed percentage increase, as set forth in the agreement), plus a 1% annual management fee, property taxes and other normal and necessary expenses associated with the lease such as utilities, repairs and maintenance, etc. We will have the right to extend the lease for two five-year terms and will have the first right of refusal to lease, at market rates, any facilities built on the sold lots.

In accordance with SFAS 13, *Accounting for Leases* , we recognized an immediate pre-tax gain on the sale transaction of approximately $3.1 million and deferred a gain of approximately $29.5 million on the sale of the building. The deferred gain will be recognized on a straight-line basis over the 15 year term of the lease at a rate of approximately $2.0 million per year.

36

*Reduction in Workforce*

On January 31, 2007, the Company announced an additional restructuring plan calling for the elimination of approximately 204 positions across all functional areas. This reduction was made in connection with the efforts to refocus the Company, following the sale of the Company's commercial assets, as a smaller, highly focused research and development and royalty-driven biotech company. Associated with the restructuring and refocused business model, several of the Company's executive officers agreed to step down including the Chief Financial Officer, Chief Scientific Officer and General Counsel. The Company also announced that primary operations are expected to be consolidated into one building with the goal to sublet un-utilized space. In connection with the restructuring, the Company expects to take a charge to earnings, the majority of which will be recorded in the first quarter of 2007, of approximately $10.8 million, comprised of one-time severance benefits of $7.5 million, stock compensation of $2.2 million, and other costs of $1.1 million. The stock compensation charge results from the accelerated vesting and extension of the exercise period of stock options in accordance with severance arrangements of certain senior management members.

*Sale of AVINZA Product Line*

On September 6, 2006, Ligand and King Pharmaceuticals, Inc. ("King"), entered into a purchase agreement (the "AVINZA Purchase Agreement"), pursuant to which King agreed to acquire all of the Company's rights in and to AVINZA in the United States, its territories and Canada, including, among other things, all AVINZA inventory, records and related intellectual property, and assume certain liabilities as set forth in the AVINZA Purchase Agreement (collectively, the "Transaction"). In addition, King, subject to the terms and conditions of the AVINZA Purchase Agreement, agreed to offer employment following the closing of the Transaction (the "Closing") to certain of the Company's existing AVINZA sales representatives or otherwise reimburse the Company for agreed upon severance arrangements offered to any such non-hired representatives.

Pursuant to the AVINZA Purchase Agreement, at Closing on February 26, 2007 (the "Closing Date"), the Company received $280.4 million in net cash proceeds, which is net of $15.0 million that was funded into an escrow account to support potential indemnification claims made by King following the Closing. The net cash received includes the purchase price of $246.3 million which is net of an adjustment of approximately $12.7 million due to estimated retail inventory levels of AVINZA at the Closing Date exceeding targeted levels. This adjustment is subject to the outcome of final studies and review by King which could therefore result in a subsequent adjustment to the net purchase price. The purchase price also reflects a reduction of $6.0 million for anticipated higher cost of goods for King related to the Cardinal Health PTS, LLC ("Cardinal") manufacturing and packaging agreement (see Note 12). At the closing, Ligand agreed to not assign the Cardinal agreement to King, wind down the contract, and remain responsible for any resulting liabilities. The Company will record a charge as a reduction to the gain on the sale of the AVINZA product line in the first quarter of 2007 for any liabilities incurred in connection with the winding down of the Cardinal agreement.

105

# EXHIBIT B

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

THE ROCKEFELLER UNIVERSITY, a          Case No. 08 cv 2755-KPC-HP
New York not-for-profit corporation,

        Plaintiff,

    v.

LIGAND PHARMACEUTICALS
INCORPORATED, a Delaware corporation,

        Defendant.

## DECLARATION OF ALAN KESSLER

I, Alan Kessler, declare as follows:

1.    I am employed by Knobbe Martens Olson & Bear LLP of San Diego California as an Associate. I have been employed by Knobbe for the past six months.

2.    I have knowledge about and a general understanding of SEC filings of Ligand and records of the filings for Ligand. In addition to paper records, I am familiar with the Ligand website, http://investors.ligand.com/index.cfm, where copies of SEC filings from the years 1996 through the present are available for public and investor access.

3.    The SEC filings of Ligand includes reports and other documents made at or near the relevant time period during the course of Ligand's regular business activities and as required by the SEC.

4.    Exhibits A, F and G to the motion to dismiss or transfer, to which I understand this declaration is attached, are true and correct copies of portions of filings made by Ligand with the SEC. The type of filing, Form 10K or other filing, is indicated on the face of the respective Exhibit.

5.    I went to the New York and California Secretary of State on-line records for Ligand Pharmaceuticals and reviewed the State documents. I printed out a compilation of both

New York and California records which are attached as Exhibit D. Exhibit D is a true and correct copy of compilations of Secretary of State Documents from New York and California pertaining to Ligand.

6.     Attached is a true and accurate copy of Rockefeller University's Motion to Dismiss or, In the Alternative, Stay this Action which was filed in the United States District Court- Southern District which I obtained from PACER. This copy is labeled as Exhibit J.

7.     Attached is a true and accurate copy of Ligand Pharmaceuticals' complaint as it was filed in the Southern District of California and which I obtained from the files of Knobbe Martens Olson & Bear LLP. This copy is labeled as Exhibit I.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on March 20th, 2008 in San Diego, California.

Name: _Alan Kessler_
Alan Kessler

5031762
031808

# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

THE ROCKEFELLER UNIVERSITY, a
New York not-for-profit corporation,

       Plaintiff,

     v.

LIGAND PHARMACEUTICALS
INCORPORATED, a Delaware corporation,

       Defendant.

Case No. 08 cv 2755-KPC-HP

## DECLARATION OF AUDREY WARFIELD-GRAHAM

I, Audrey Warfield-Graham, declare as follows:

1.    I am employed by Ligand Pharmaceuticals, Inc. ("Ligand") as Vice President, Human Resources. I have held that position for the past three months and have worked for Ligand for the past thirteen (13) years, all in Human Resources.

2.    I reside in San Diego, California.

3.    As part of my responsibilities as Vice President, Human Resources, I have an understanding of the history of the business of Ligand, including product sales as well as Ligand's business activities in California and elsewhere. Each of the following statements is true to the best of my knowledge:

4.    Ligand is a Delaware corporation, based in San Diego, California, where all of its facilities and employees are located, and where it performs all of its basic discovery research activities.

5.    Ligand owns no real estate nor does it lease or rent any real property in New York.

Exhibit C
Page 1

Exhibit "7"
116

6.   Ligand maintains no telephone listing or mailing addresses in the State of New York.

7.   Ligand does not sell products in the State of New York, nor does it market or advertise directly to the residents thereof.

8.   Ligand has no research facility, no employees or sales representatives in the State of New York.

9.   Ligand has never brought a lawsuit in the State of New York.

10.   I am familiar with Ligand's past commercial activities as well as those at present. From about 1998 to about 2007, Ligand sold two product lines nationwide, including in the State of New York, an oncology product line and a pain and inflammation product known as AVINZA®.

11.   By 2007 Ligand ceased selling and marketing both the oncology line and the AVINZA® product.

12.   By the end of 2007, Ligand's activities were limited to internal research and development activities, virtually all of which is based in Ligand's scientific facility in San Diego, California. Ligand has no facilities outside San Diego.

13.   As part of my job responsibilities for Ligand, I have personal knowledge about Ligand's past and present employees and about the nature of the records and other information kept by Ligand regarding its current and former employees.

14.   I have participated in preparing and have reviewed Exhibit H, which is a true and accurate list of persons employed or formerly employed by Ligand in connection with the development of assays and/or products at issue in this lawsuit.

15.   Exhibit H includes each person's name, last know address, by city and state only to protect confidentiality, and job title, all of which I verified from records I maintain for Ligand or which I personally determined, if there was no current record.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Exhibit C
Page 2
Exhibit "7"
117

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on March 19, 2008 in San Diego, California.

Name:_____

Audrey Warfield-Graham

Exhibit C
Page 3
Exhibit "7"
118

# EXHIBIT D

# NYS Department of State

## Division of Corporations

### Entity Information

---

Selected Entity Name: LIGAND PHARMACEUTICALS INCORPORATED

Selected Entity Status Information

**Current Entity Name:** LIGAND PHARMACEUTICALS INCORPORATED
**Initial DOS Filing Date:** SEPTEMBER 16, 1998
**County:** NEW YORK
**Jurisdiction:** DELAWARE
**Entity Type:** FOREIGN BUSINESS CORPORATION
**Current Entity Status:** ACTIVE

Selected Entity Address Information

**DOS Process (Address to which DOS will mail process if accepted on behalf of the entity)**
C/O C T CORPORATION SYSTEM
111 EIGHTH AVENUE
NEW YORK, NEW YORK, 10011
**Chairman or Chief Executive Officer**
DAVID E ROBINSON
10275 SCIENCE CENTER DR
SAN DIEGO, CALIFORNIA, 92121-1117
**Principal Executive Office**
LIGAND PHARMACEUTICALS INCORPORATED
10275 SCIENCE CENTER DR
SAN DIEGO, CALIFORNIA, 92121-1117
**Registered Agent**
C T CORPORATION SYSTEM
111 EIGHTH AVENUE
NEW YORK, NEW YORK, 10011

NOTE: New York State does not issue organizational identification numbers.

Search Results          New Search

Division of Corporations, State Records and UCC Home Page    NYS Department of State Home Page

Exhibit D
Page 1
Exhibit "7"
120

California Business Search

# California Business Portal

**Secretary of State** DEBRA BOWEN

**DISCLAIMER:** The information displayed here is current as of FEB 29, 2008 and is updated weekly. It is not a complete or certified record of the Corporation.

| Corporation | | |
|---|---|---|
| LIGAND PHARMACEUTICALS INCORPORATED | | |
| **Number:** C1598280 | **Date Filed:** 10/13/1987 | **Status:** active |
| **Jurisdiction:** DELAWARE | | |
| **Address** | | |
| 10275 SCIENCE CENTER DR | | |
| SAN DIEGO, CA 92121 | | |
| **Agent for Service of Process** | | |
| WARNER R BROADDUS | | |
| 10275 SCIENCE CENTER DR | | |
| SAN DIEGO, CA 92121 | | |

Blank fields indicate the information is not contained in the computer file.

If the status of the corporation is "Surrender", the agent for service of process is automatically revoked. Please refer to California Corporations Code Section 2114 for information relating to service upon corporations that have surrendered.

http://kepler.sos.ca.gov/corpdata/ShowAllList?QueryCorpNumber=C1598280&printer=yes      3/5/2008

# EXHIBIT E

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

THE ROCKEFELLER UNIVERSITY, a          Case No. 08 cv 2755-KPC-HP
New York not-for-profit corporation,

        Plaintiff,

    v.

LIGAND PHARMACEUTICALS
INCORPORATED, a Delaware corporation,

        Defendant.

## **DECLARATION OF KEITH B. MARSCHKE**

I, Keith B. Marschke, declare as follows:

1.     I am employed by Ligand Pharmaceuticals, Inc. ("Ligand") as Senior Director of Molecular Science. I have held my current position since October of 2007 and I have worked for Ligand for fourteen (14) years.

2.     I reside in San Diego, California.

3.     As part of my responsibilities as Senior Director, I have an understanding of the history of the business of Ligand, including its research and development and product sales as well as Ligand's research activities in California and elsewhere. Each of the following statements is true to the best of my knowledge.

4.     I have a B.S in Science from Oklahoma Baptist University in 1980 and a Ph.D. in Molecular Pathobiology from Wake Forest University in 1988.

5.     I did a post-doctoral fellowship at the University of North Carolina from 1988 to 1994, at which time I joined Ligand.

6.     I have a technical understanding and knowledge about Ligand's oncology product line and the AVINZA® product, neither of which is currently made or sold by Ligand. Neither is

related to the technology I understand is involved in this lawsuit, thrombopoeitin ("TPO") mimetic compounds and assays for the identification of TPO mimetic compounds.

7.    I know Ligand entered into an agreement (the "GSK Agreement") in 1994 with SmithKline Beecham Corporation, which is now known as GlaxoSmithKline ("GSK").

8.    Virtually all of the work performed by Ligand pursuant to the GSK Agreement was performed in San Diego, California.

9.    LGD-4665 is a potential pharmaceutical product that was discovered by Ligand in San Diego in a research program that started no earlier than the second half of 2003.  GSK had no involvement in the development of LGD-4665.

10.    With respect to LGD-4665, all of the laboratory notebooks and other records documenting the development of LGD-4665 are located in San Diego, California.

11.    In addition, the large majority of the personnel who were involved in the discovery and research of LGD-4665 are presently located in California, as shown in Exhibit H attached to a motion to dismiss or transfer filed in this lawsuit.

12.    Dr. James Darnell is associated with The Rockefeller University, plaintiff in the above-identified lawsuit.  Dr. Darnell has served on Ligand's Scientific Advisory Board for several years and visited Ligand scientists in San Diego for Scientific Advisory Board meetings I attended from 1996 until at least 2001.

13.    As part of my job responsibilities, both past and present, for Ligand, I supervise the people working in research and development of new assays for pharmaceutical compounds. It is and has been my responsibility to have knowledge of the specific skills and job responsibilities of those individuals under my supervision.

14.    I have reviewed the document that is attached to a motion to dismiss or transfer filed in this lawsuit as Exhibit H.  Exhibit H is a true and accurate list of scientists and technical persons employed or formerly employed by Ligand in connection with the development of assays and/or products at issue in this lawsuit.  I am familiar with the technical skills and specific job responsibilities of each of the persons listed.

15. I participated in the preparation of the document referenced as Exhibit H by identifying those persons involved in development of the drugs identified respectively as eltrombopag and LGD-4665.

16. I am familiar with the work done by Ligand and GSK in connection with the GSK Agreement. Ligand's work under the agreement was performed only in San Diego, California and nowhere else. For instance, Ligand performed no such work in New York State.

17. I am familiar with the work performed by Ligand on LGD-4665. That work has been independent of the GSK Agreement.

18. Nearly all of persons knowledgeable about both the GSK Agreement and LGD-4665 reside in or near San Diego, California. Further, all of the laboratory notebooks and other records documenting that work are kept and stored in Ligand's offices in San Diego, California.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on March 20, 2008 in *Cambridge, MA*.

Name: *Keith B. Marschke*
Keith B. Marschke

# EXHIBIT F

# LIGAND PHARMACEUTICALS INC

### FORM 10-K
(Annual Report)

### Filed 3/31/1997 For Period Ending 12/31/1996

| | |
|---|---|
| Address | 10275 SCIENCE CENTER DRIVE |
| | SAN DIEGO, California 92121-1117 |
| Telephone | 858-550-7500 |
| CIK | 0000886163 |
| Industry | Biotechnology & Drugs |
| Sector | Healthcare |
| Fiscal Year | 12/31 |

Generated by EDGAR Online Pro
http://pro.edgar-online.com


EDGAR
Online®

Contact EDGAR Online
Customer Service  203-852-5666
Corporate Sales  212-457-8200

Exhibit F
Page 1
Exhibit "7"

# SECURITIES AND EXCHANGE COMMISSION

## WASHINGTON, D.C. 20549

# FORM 10-K

### MARK ONE

[X] ANNUAL REPORT PURSUANT TO SECTION 13 OR 15 (d) OF THE SECURITIES
EXCHANGE ACT OF 1934
FOR THE FISCAL YEAR ENDED DECEMBER 31, 1996, OR

[ ] TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES
EXCHANGE ACT OF 1934 (NO FEE REQUIRED)

FOR THE TRANSITION PERIOD COMMISSION FILE NUMBER: 0-20720
FROM _____ TO _____ .

# LIGAND PHARMACEUTICALS INCORPORATED

### (EXACT NAME OF REGISTRANT AS SPECIFIED IN ITS CHARTER)

| | |
|---|---|
| DELAWARE | 77-0160744 |
| (STATE OR OTHER JURISDICTION OF INCORPORATION OR ORGANIZATION) | (I.R.S. EMPLOYER IDENTIFICATION NO.) |
| 9393 TOWNE CENTRE DRIVE SAN DIEGO, CA | 92121 (ZIP CODE) |
| (ADDRESS OF PRINCIPAL EXECUTIVE OFFICES) | |

REGISTRANT'S TELEPHONE NUMBER, INCLUDING AREA CODE: (619) 535-3900

SECURITIES REGISTERED PURSUANT TO SECTION 12(b) OF THE ACT:
NONE
SECURITIES REGISTERED PURSUANT TO SECTION 12(g) OF THE ACT:
COMMON STOCK, $.001 PAR VALUE
(TITLE OF CLASS)

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes X No ___

Indicate by check mark if disclosure of delinquent filers pursuant to

Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. [ ]

The aggregate market value of the Registrant's voting stock held by non-affiliates as of February 28, 1997 was $341,654,552. For purposes of this calculation, shares of Common Stock held by directors, officers and 5% stockholders known to Registrant have been deemed to be owned by affiliates.

As of February 28,1997 the registrant had 32,017,640 shares of Common Stock outstanding.

### DOCUMENTS INCORPORATED BY REFERENCE

Portions of the Registrant's Proxy Statement to be filed not later than 120 days after December 31, 1996, in connection with the Registrant's 1997 Annual Meeting of Stockholders, referred to herein as the "Proxy Statement", are incorporated by reference into Part III of this Form 10-K.

and June 2000. If Ligand exercises the ALRT Stock Purchase Option, Allergan has an option to purchase an undivided 50% interest in all of the assets of ALRT at prices ranging from $8.9 million to $15.0 million. Since 1992, Allergan Ireland, a wholly owned subsidiary of Allergan, has made $30.0 million in equity investments in Ligand. As of December 31, 1996, ALRT had provided approximately $30.6 million in research funding to Ligand under the Research and Development Agreement. Based on the current level of product development expenditures, ALRT has announced that it could use substantially all of the funds available for research and development in late 1997 or early 1998, which would trigger the ALRT Stock Purchase Option. The Company has made no determination concerning the exercise of either the ALRT1057 option or the ALRT Stock Purchase Option.

Pfizer Inc. In May 1991, Ligand entered into a five-year collaborative research and development and license agreement with Pfizer to develop better alternative therapies for osteoporosis. Pfizer agreed to provide up to $3.0 million per year in research funding to Ligand in addition to committing significant internal resources. In November 1993, Ligand and Pfizer announced the successful completion of the research phase of their alliance with the identification of a development candidate and backups for the prevention and treatment of osteoporosis. In preclinical studies, the candidates from the program mimic the beneficial effects of estrogen on bone and have an impact on blood serum lipids often associated with cardiac benefits without increasing uterine or breast tissue proliferation. Under the terms of the collaboration, Pfizer has primary responsibility for pharmacology, medicinal chemistry to optimize the drug candidates, preclinical testing, and clinical trials of drug candidates for marketing approval by the FDA and certain other regulatory agencies. Ligand has granted Pfizer exclusive worldwide rights to manufacture and market any compounds jointly developed for osteoporosis. Ligand is to receive up to $7.5 million in milestone payments as development objectives are achieved, in addition to royalties on sales of successful drugs that emerge from the alliance. As of December 31, 1993, Pfizer had made a total of $7.5 million of equity investments in Ligand and had funded approximately $9.4 million in research funding.

In December 1994, Ligand filed suit against Pfizer in the Superior Court of California in San Diego County for breach of contract and for a declaration of future rights as they relate to droloxifene, a compound upon which Ligand performed work at Pfizer's request during the collaboration between Pfizer and Ligand to develop drugs in the field of osteoporosis. Droloxifene is an estrogen antagonist/partial agonist with potential indications in the treatment of osteoporosis and breast cancer as well as other applications. Ligand and Pfizer entered into a settlement agreement with respect to the lawsuit in April 1996. Under the terms of the settlement agreement, Ligand is entitled to receive milestone payments if Pfizer continues development and royalties if Pfizer commercializes droloxifene. At the option of either party, milestone and royalty payments owed Ligand can be satisfied by Pfizer transferring to Ligand shares of Common Stock at an exchange ratio of $12.375 per share. To date, Ligand has received approximately $1.3 million in milestone payments from Pfizer as a result of the continued development of droloxifene. These milestones were paid in the form of an aggregate of 101,011 shares of Common Stock, which were subsequently retired from treasury stock in September 1996. According to announcements by Pfizer, droloxifene has entered Phase II clinical trials for osteoporosis and Phase III clinical trials for breast cancer.

The Salk Institute of Biological Studies. In October 1988, Ligand established an exclusive relationship with The Salk Institute which is one of the leading research centers in the area of IR technology. Dr. Ronald Evans, who cloned and characterized the first IR in 1985 and who invented the co-transfection assay used by Ligand, is a professor in the Gene Expression Laboratory of The Salk Institute and an Investigator of the Howard Hughes Medical Institute. Under the agreement, Ligand has an exclusive, worldwide license to the intracellular receptor technology developed by Dr. Evans' laboratory at The Salk Institute. Subject to compliance with the terms of the agreement, the term of the license extends for the life of the patents covering such developments.

Under the agreement, Ligand made an initial payment to The Salk Institute and issued shares of Common Stock as partial consideration for the license. Ligand is also obligated to make certain royalty payments based on sales of certain products developed using the licensed technology, as well as certain minimum annual royalty payments.

Ligand also entered into exclusive consulting agreements with Dr. Evans that continue through July 1998. Under these agreements, Dr. Evans has purchased Common Stock and has been granted options to purchase Common Stock. As a consultant, Dr. Evans meets on a regular basis with Company personnel to review ongoing research and to assist Ligand in defining the technical objectives of future research. Dr. Evans is also involved in identifying new developments made in other leading academic laboratories which relate to Ligand's research interests. Dr. Evans serves as Chairman of Ligand's Scientific Advisory Board.

Baylor College of Medicine. In January 1990, Ligand established an exclusive relationship with Baylor, which is a leading center of IR technology. Dr. Bert W. O'Malley is a professor and the Chairman of the Center for Reproductive Biology at Baylor and

23

leads IR research at that institution. Important features of Ligand's co-transfection assay were developed in Dr. O'Malley's laboratory and are exclusively licensed by Ligand. Ligand has entered into a series of agreements with Baylor under which it has an exclusive, worldwide license to IR technology developed at Baylor and to future improvements made in Dr. O'Malley's laboratory through March 1997. Subject to compliance with the terms of the agreements, the term of the license may extend for the life of the patents covering such developments.

Ligand works closely with Dr. O'Malley and Baylor in scientific IR research, particularly in the area of sex steroids and orphan IRs. Under the agreement, Ligand is obligated to make payments to Baylor College of Medicine in support of research done in Dr. O'Malley's laboratory for the period from April 1992 through March 1997. Ligand is also obligated to make certain royalty payments based on the sales of products developed using the licensed technology. Ligand also entered into an exclusive consulting agreement with Dr. O'Malley through September 1996. Dr. O'Malley is a member of Ligand's Scientific Advisory Board. Dr. O'Malley has purchased Common Stock and has been granted options to purchase Common Stock.

Rockefeller University. In September 1992, Ligand entered into a worldwide, exclusive license agreement with Rockefeller University and exclusive consulting agreements with Dr. James Darnell of Rockefeller University and Dr. David Levy of NYU to develop and commercialize certain technology involving STATs to control gene expression. Dr. Darnell is one of the leading investigators of the control of gene expression by STATs. Rockefeller University will receive (i) payments upon the transfer of the technology to Ligand and upon the first four anniversary dates of the agreement, (ii) a royalty on any commercialized products and (iii) subject to a vesting schedule, shares of Common Stock and warrants to purchase shares of Common Stock. In consideration of related technology assigned by NYU to Rockefeller University and covered by the license agreement with Ligand, NYU received, subject to a vesting schedule, shares of Common Stock and warrants to purchase shares of Common Stock. Subject to a vesting schedule tied to their consulting agreements, Dr. Darnell and Dr. Levy received shares of Common Stock. In addition, in October 1994 Ligand granted Dr. Darnell options to purchase shares of Common Stock.

In addition to the collaborations discussed above, the Company also has a number of other consulting, licensing, development and academic agreements by which it strives to advance its technology.

## PATENTS AND PROPRIETARY RIGHTS

Ligand believes that patents and other proprietary rights are important to its business. Ligand's policy is to file patent applications to protect technology, inventions and improvements to its inventions that are considered important to the development of its business. Ligand also relies upon trade secrets, know-how, continuing technological innovations and licensing opportunities to develop and maintain its competitive position.

To date, Ligand has filed or participated as licensee in the filing of over 190 currently pending patent applications in the United States relating to Ligand's technology, as well as foreign counterparts of certain of these applications in many countries. In addition, Ligand is the exclusive licensee to rights covered by 150 patents issued or allowed worldwide to The Salk Institute, Baylor and other licensors. Subject to compliance with the terms of the respective agreements, Ligand's rights under its license with The Salk Institute, and other exclusive licensors, extend for the life of the patents covering such developments.

The patent positions of pharmaceutical and biotechnology firms, including Ligand, are uncertain and involve complex legal and factual questions for which important legal principles are largely unresolved. In addition, the coverage claimed in a patent application can be significantly reduced before or after a patent is issued. The situation is also affected by the fact that the patent law of the United States is changed from time to time. For example, during 1995, the patent term was changed from 17 years from patent grant to 20 years from the filing date of the application for patent. Since a patent has no effect until granted, and because the time during which a patent application spends before the Patent Office cannot be predicted, the actual term of a patent cannot be known until it is granted and that term may be substantially less than the 17 years allowed under former law. Also during 1995, certain advantages of U.S. inventors over foreign inventors were eliminated from the patent law. There are currently pending before the Congress other changes to the patent law which may adversely affect pharmaceutical and biotechnology firms. The extent to which the changes made in 1995 and changes which might occur if pending legislation is adopted would affect the operations of Ligand cannot be ascertained. There can be no assurance that any patent applications will result in the issuance of patents or, if any patents are issued, that they will provide significant proprietary protection or, instead, will be circumvented or invalidated. Since under current law patent applications in the United States are maintained in secrecy until foreign counterparts, if any, publish or patents issue and since publication of discoveries in the scientific or patent literature often lag behind actual discoveries, Ligand

24

Exhibit F
Page 4
Exhibit "7"
130

that have been developed and successfully commercialized that interact directly with STATs. Much remains to be learned about the location and function of IRs and STATs. Most of the Company's potential products will require extensive additional development, including preclinical testing and clinical trials, as well as regulatory approvals, prior to commercialization. No assurance can be given that the Company's product development efforts will be successful, that required regulatory approvals from the FDA or equivalent foreign authorities for any indication will be obtained or that any products, if introduced, will be capable of being produced in commercial quantities at reasonable costs or will be successfully marketed. Further, the Company has no sales and only limited marketing capabilities outside Canada, and even if the Company's products in internal development are approved for marketing, there can be no assurance that the Company will be able to develop such capabilities or successfully market such products.

HISTORY OF OPERATING LOSSES; ACCUMULATED DEFICIT; FUTURE CAPITAL NEEDS; UNCERTAINTY OF ADDITIONAL FUNDING. Ligand has experienced significant operating losses since its inception in 1987. As of December 31, 1996, Ligand had an accumulated deficit of approximately $177.6 million. To date, substantially all of Ligand's revenues have consisted of amounts received under collaborative arrangements. The Company expects to incur additional losses at least over the next several years and expects losses to increase as the Company's research and development efforts and clinical trials progress.

The discovery and development of products will require the commitment of substantial resources to conduct research, preclinical testing and clinical trials, to establish pilot scale and commercial scale manufacturing processes and facilities, and to establish and develop quality control, regulatory, marketing, sales and administrative capabilities. The future capital requirements of the Company will depend on many factors, including the pace of scientific progress in its research and development programs, the magnitude of these programs, the scope and results of preclinical testing and clinical trials, the time and costs involved in obtaining regulatory approvals, the costs involved in preparing, filing, prosecuting, maintaining and enforcing patent claims, competing technological and market developments, the ability to establish additional collaborations, changes in existing collaborations, the cost of manufacturing scale-up and the effectiveness of the Company's commercialization activities. To date, Ligand has not generated any revenue from the sales of products developed by Ligand or its collaborative partners. There can be no assurance that Ligand independently or through its collaborations will successfully develop, manufacture or market any products or ever achieve or sustain revenues or profitability from the commercialization of such products. Moreover, even if profitability is achieved, the level of that profitability cannot be accurately predicted. Ligand expects that operating results will fluctuate from quarter to quarter as a result of differences in the timing of expenses incurred and the revenues received from collaborative arrangements and other sources. Some of these fluctuations may be significant. The Company believes that its available cash, cash equivalents, marketable securities and existing sources of funding will be adequate to satisfy its anticipated capital requirements through 1998, assuming the Company does not exercise for cash its options to acquire either the assets related to Oral Panretin (ALRT1057) or Topical Panretin (ALRT1057) or the outstanding callable common stock of ALRT. Based on the current level of product development expenditures, ALRT has announced it could use substantially all of the funds available for research and development in late 1997 or early 1998, which would trigger the ALRT Stock Purchase Option. The Company has made no determination concerning the exercise of either the ALRT1057 Option or the ALRT Stock Purchase Option.

Glycomed's outstanding indebtedness includes $50 million principal amount of 7 1/2% Convertible Subordinated Debentures Due 2003 (the "Debentures"). There can be no assurance that Glycomed will have the funds necessary to pay the interest on and the principal of the Debentures or, if not, that it will be able to refinance the Debentures.

The Company expects that it will seek any additional capital needed to fund its operations through new collaborations, the extension of existing collaborations, or through public or private equity or debt financings. There can be no assurance that additional financing will be available on acceptable terms, if at all. Any inability of the Company to obtain additional financing or of Glycomed to service its obligations under the Debentures could have a material adverse effect on the Company.

UNCERTAINTIES RELATED TO CLINICAL TRIALS. Before obtaining required regulatory approvals for the commercial sale of each product under development, the Company and its collaborators must demonstrate through preclinical studies and clinical trials that such product is safe and efficacious for use. The results of preclinical studies and initial clinical trials are not necessarily predictive of results that will be obtained from large-scale clinical trials, and there can be no assurance that clinical trials of any product under development will demonstrate the safety and efficacy of such product or will result in a marketable product. The safety and efficacy of a therapeutic product under development by the Company must be supported by extensive data from clinical trials. A number of companies have suffered significant setbacks in advanced clinical trials, despite promising results in earlier trials. The failure to demonstrate adequately the safety and efficacy of a therapeutic drug under development would delay or prevent regulatory approval

29

## ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

This annual report on Form 10-K may contain predictions, estimates and other forward-looking statements that involve a number of risks and uncertainties, including those discussed in Item 1 above at "Risks and Uncertainties." While this outlook represents management's current judgment on the future direction of the business, such risks and uncertainties could cause actual results to differ materially from any future performance suggested below. The Company undertakes no obligation to release publicly the results of any revisions to these forward-looking statements to reflect events or circumstances arising after the date hereof.

### OVERVIEW

Since January 1989, the Company has devoted substantially all of its resources to its intracellular receptor and Signal Transducers and Activators of Transcription drug discovery and development programs. The Company has been unprofitable since its inception and expects to incur substantial additional operating losses for the next several years, due to continued requirements for research and development, preclinical testing, regulatory activities, establishment of manufacturing processes and sales and marketing capabilities. The Company expects that losses will fluctuate from quarter to quarter as a result of differences in the timing of expenses incurred and the revenues earned from collaborative arrangements. Some of these fluctuations may be significant. As of December 31, 1996, the Company's accumulated deficit was approximately $177.6 million. In October 1996, the Company completed a public offering of 3,162,500 shares of common stock at $12.00 per share, for net proceeds of approximately $35.3 million.

In May 1995, Glycomed Incorporated ("Glycomed") was merged into a wholly-owned subsidiary of the Company ("the Merger"). Glycomed is a biopharmaceutical company conducting research and development of pharmaceuticals based on biological activities of complex carbohydrates. Each outstanding share of Glycomed common stock was converted into 0.5301 shares of the Company's common stock, resulting in the issuance of 6,942,911 shares of the Company's common stock to Glycomed shareholders. The Merger was accounted for using the purchase method of accounting. The excess of the purchase price over the fair value of the net assets acquired was allocated to in-process technology and was written off, resulting in a one time non-cash charge to results of operations of approximately $19.6 million. The results of operations of Glycomed are included in the Company's consolidated results of operations from the date of the Merger.

In December 1994, the Company and Allergan, Inc. ("Allergan") formed Allergan Ligand Retinoid Therapeutics, Inc. ("ALRT") to continue the research and development activities previously conducted by the Allergan Ligand Joint Venture (the "Joint Venture"). In June 1995, the Company and ALRT completed a public offering of 3,250,000 units (the "Units") with aggregate proceeds of $32.5 million ( the "ALRT Offering") and cash contributions by Allergan and the Company of $50.0 million and $17.5 million, respectively, providing for net proceeds of $94.3 million for retinoid product research and development. Each Unit consisted of one share of ALRT's callable common stock and two warrants, each warrant entitling the holder to purchase one share of the common stock of the Company. Immediately prior to the consummation of the ALRT Offering on June 3, 1995, Allergan Pharmaceuticals (Ireland) Ltd., Inc. made a $6.0 million investment in the Company's common stock. The Company's $17.5 million cash contribution resulted in a one-time charge to operations. The Company also recorded a warrant subscription receivable and corresponding increase in paid-in capital of $5.9 million pursuant to the ALRT Offering. Since June 3, 1995, cash received from ALRT pursuant to a Research and Development Agreement was prorated between contract revenue and the warrant subscription receivable based on their respective values. For the years ended 1996 and 1995, $2.1 million and $1.3 million, respectively, of the revenue proceeds received from ALRT were applied to the warrant subscription receivable. In conjunction with the consummation of the ALRT Offering, all rights held by the Joint Venture were licensed to ALRT. The Company, Allergan and ALRT entered into certain other agreements in connection with the funding of ALRT, including, a Technology License Agreement, a Commercialization Agreement and Services and Administrative Agreements and ALRT granted to Ligand and Allergan an option to acquire certain assets related to Oral and Topical Panretin (ALRT 1057) (the "ALRT 1057 Option") and an option to acquire all the outstanding shares of ALRT callable common stock (the "ALRT Stock Purchase Option").

### RESULTS OF OPERATIONS

Year Ended December 31, 1996 ("1996"), Compared with Year Ended December 31, 1995 ("1995")

The Company had revenues of $ 36.8 million for 1996 compared to revenues of $24.5 million for 1995. The increase in revenues is primarily due to increased revenues from ALRT, milestone revenues from Pfizer Inc. ("Pfizer"), increased revenues under an expanded and amended research and development agreement entered into in January 1996 (which began in September 1994) with Wyeth-Ayerst Laboratories, the pharmaceutical division of American Home Products Corporation ("AHP"), and a full year effect of

40

# EXHIBIT G

# LIGAND PHARMACEUTICALS INC

### FORM 10-K
(Annual Report)

## Filed 3/31/2006 For Period Ending 12/31/2005

| | |
|---|---|
| Address | 10275 SCIENCE CENTER DRIVE |
| | SAN DIEGO, California 92121-1117 |
| Telephone | 858-550-7500 |
| CIK | 0000886163 |
| Industry | Biotechnology & Drugs |
| Sector | Healthcare |
| Fiscal Year | 12/31 |

Powered By EDGAR Online

http://www.edgar-online.com/
© Copyright 2006. All Rights Reserved
Distribution and use of this document restricted under EDGAR Online's Terms of Use.

Exhibit G

Page 1

## SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

---

# FORM 10-K

---

**Mark One**

☑  **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the Fiscal Year Ended December 31, 2005

OR

☐  **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____ to _____.

Commission File No. 0-20720

# LIGAND PHARMACEUTICALS INCORPORATED
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **77-0160744** |
| (State or other jurisdiction of incorporation or organization) | (IRS Employer Identification No.) |
| **10275 Science Center Drive** | **92121-1117** |
| **San Diego, CA** | (Zip Code) |
| (Address of Principal Executive Offices) | |

Registrant's telephone number, including area code: (858) 550-7500

Securities registered pursuant to Section 12(b) of the Act:
None

Securities registered pursuant to Section 12(g) of the Act:
Common Stock, $.001 par value

Preferred Share Purchase Rights
(Title of Class)

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☐   No ☑

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 of Section 15(d) of the Securities Exchange Act of 1934. Yes ☐   No ☑

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☑   No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☑

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer. See definition of "accelerated filer and large accelerated filer" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ☐      Accelerated filer ☑      Non-accelerated filer ☐

Exhibit G

Page 2

Table of Contents

IND track, the compound numbers for which have not been disclosed. If IND's are filed by May 2006, the Company will continue to qualify for milestones and royalties.

*Inflammatory Disease Collaborative Program*

   *Abbott Collaboration.* In July 1994, we entered into a research and development collaboration with Abbott Laboratories ("Abbott") to discover and develop small molecule compounds for the prevention or treatment of inflammatory diseases. The collaborative program includes several molecular approaches to discovering modulators of glucocorticoid receptor activity that have significantly improved therapeutic profiles relative to currently known anti-inflammatory steroids such as prednisone and dexamethasone. The collaboration was focused on the development of novel non-steroidal glucocorticoids that maintain the efficacy of corticosteroids, but lack some or all of corticosteroids' dose-limiting side effects. The research phase concluded in July 1999.

   When the research phase of the collaboration ended in July 1999, Abbott retained rights to certain selective glucocorticoid receptor modulators, or SGRMs, whose development has now been slowed or halted. We retained rights to all other compounds discovered through the collaboration, as well as recaptured technology rights. Abbott will make milestone and royalty payments on products targeted at inflammation resulting from the collaboration. Each party will be responsible for the development, registration, and commercialization of the products in its respective field.

*TPO / Inflamatory Disease / Oncology Collaborative Program*

   *GlaxoSmithKline Collaboration.* In February 1995, we entered into a research and development collaboration with SmithKline Beecham (now GlaxoSmithKline) to use our proprietary expertise to discover and characterize small molecule, orally bioavailable drugs to control hematopoiesis (the formation and development of blood cells) for the treatment of a variety of blood cell deficiencies. In 1998, we announced the discovery of the first non-peptide small molecule that mimics in mice the activity of Granulocyte-Colony Stimulating Factor ("G-CSF"), a natural protein that stimulates production of infection-fighting neutrophils (a type of white blood cell). While this lead compound has only been shown to be active in mice, its discovery is a major scientific milestone and suggests that orally active, small-molecule mimics can be developed not only for G-CSF, but for other cytokines as well.

   A number of lead molecules have been found that mimic the activity of natural growth factors for white cells and platelets. In the fourth quarter of 2002, we earned a $2.0 million milestone payment from GlaxoSmithKline, in connection with the commencement of human trials of eltrombopag (formerly SB-497115, hereafter referred to as "eltrombopag"), an oral, small molecule drug that mimics the activity of thrombopoietin (TPO), a protein factor that promotes growth and production of blood platelets. In February 2005, we announced that we had earned a $1.0 million milestone payment from GlaxoSmithKline with that company's commencement of Phase II trials of eltrombopag. In June 2005, we earned a $2.0 million milestone payment as SB-559448, a second TPO agonist, began Phase I development. Additionally, in February 2006, we earned a $2.0 million milestone in connection with the commencement of Phase III trials of eltrombopag. There are no approved oral TPO agents for the treatment or prevention of thrombocytopenias (decreased platelet count). Investigational use of injectable forms of recombinant human TPO has been effective in raising platelet levels in cancer patients undergoing chemotherapy, and has led to accelerated hematopoietic recovery when given to stem cell donors. Some of these investigational treatments have not moved forward to registration due to the development of neutralizing antibodies. Thus, a small molecule TPO mimic with no apparent immunogenic potential and oral activity that may facilitate dosing may provide an attractive therapeutic profile for a major unmet medical need.

   The research phase of the collaboration concluded in February 2001. Under the collaboration, we have the right to, but have not, selected up to three compounds related to hematopoietic targets for development as anti-cancer products other than those compounds selected for development by GlaxoSmithKline. GlaxoSmithKline has the option to co-promote any selected products with us in North America and to develop and market such products outside North America.

20

# LIGAND PHARMACEUTICALS INC

## FORM NT 10-K
(Notification that Annual Report will be submitted late)

## Filed 3/16/2006 For Period Ending 12/31/2005

| | |
|---|---|
| Address | 10275 SCIENCE CENTER DRIVE |
| | SAN DIEGO, California 92121-1117 |
| Telephone | 858-550-7500 |
| CIK | 0000886163 |
| Industry | Biotechnology & Drugs |
| Sector | Healthcare |
| Fiscal Year | 12/31 |

Powered By EDGAR Online

http://www.edgar-online.com/
© Copyright 2005. All Rights Reserved
Distribution and use of this document restricted under EDGAR Online Terms of Use.

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

## WASHINGTON, D.C. 20549

# FORM 12B-25

### NOTIFICATION OF LATE FILING

(Check one): /X/ Form 10-K / /Form 20-F / /Form 11-K / /Form 10-Q
/ /Form N-SAR LJ / /Form N-CSR

For Period Ended: 12/31/05

/ /Transition Report on Form 10-K
/ /Transition Report on Form 20-F
/ /Transition Report on Form 11-K
/ /Transition Report on Form 10-Q
/ /Transition Report on Form N-SAR For the Transition Period Ended:

Read instruction (on back page) Before Preparing Form. Please Print or Type.

**NOTHING IN THIS FORM SHALL BE CONSTRUED TO IMPLY THAT THE COMMISSION HAS VERIFIED ANY INFORMATION CONTAINED HEREIN.**

If the notification relates to a portion of the filing checked above, identify
the Item(s) to which the notification relates:

NOT APPLICABLE

### PART I -- REGISTRANT INFORMATION

**LIGAND PHARMACEUTICALS INCORPORATED**

Full Name of Registrant

NOT APPLICABLE

Former Name if Applicable

**10275 SCIENCE CENTER DRIVE**

Address of Principal Executive Office (`Street and Number)

SAN DIEGO, CA 92121

City, State and Zip Code

Exhibit G
Page 5

## PART II - RULES 12B-25(B) AND (C)

If the subject report could not be filed without unreasonable effort or expense and the registrant seeks relief pursuant to Rule 12b-25(b), the following should be completed. (Check box if appropriate)

(a) The reason described in reasonable detail in Part III of this form could not be eliminated without unreasonable effort or expense

/ / (b) The subject annual report, semi-annual report, transition report on Form 10-K, Form 20-F, Form 11-K, Form LII N-SAR or Form N-CSR, or portion thereof, will be filed on or before the fifteenth calendar day following the prescribed due date; or the subject quarterly report or transition report on Form l0-Q, or portion thereof, will be filed on or before the fifth calendar day following the prescribed due date; and

(c) The accountant's statement or other exhibit required by Rule 1 2b-25(c) has been attached if applicable.

## PART III - NARRATIVE

State below in reasonable detail why Forms 10-K, 20-F, Il-K, 10-Q, N-SAR, N-CSR, or the transition report or portion thereof, could not be filed within the prescribed time period.

The annual report on Form 10-K of Ligand Pharmaceuticals Incorporated (the "Company") for the period ended December 31, 2005 could not be filed with the Securities and Exchange Commission on a timely basis without unreasonable effort or expense due to the following reasons:

The Company announced that the filing of the Annual Report on Form 10-K for fiscal year 2005 would be delayed to provide additional time to complete the evaluation and audit of internal control over financial reporting required by Section 404 of the Sarbanes-Oxley Act of 2002 ("SOX 404 Review"). The SOX 404 Review was delayed as a result of the restatement of our consolidated financial statements which did not conclude until late in 2005. The Company expects to receive a disclaimer of opinion, i.e., the non-expression of an opinion, related to management's assessment of internal control over financial reporting and the effectiveness of the Company's internal control over financial reporting. The Company also expects to report material weaknesses in internal control over financial reporting when the Form 10-K is filed.

The Company has provided additional information concerning the status of its SOX 404 Review and the Company's current expectations on this and related topics in a press release issued after the market close on March 16, 2006, a copy of which was filed by the Company as an exhibit to its current report on Form 8-K filed with the SEC on March 16, 2006.

## PART IV - OTHER INFORMATION

1. Name and telephone number of person to contact in regard to this notification

| Warner R. Broaddus | (858) | 550-7500 |
|---|---|---|
| (Name) | (Area Code) | (Telephone Number) |

2. Have all other periodic reports required under Section 13 or 15(d) of the Securities Exchange Act of 1934 or Section 30 of the Investment Company Act of 1940 during the preceding 12 months or for such shorter period that the registrant was required to file such report(s) been filed? If answer is no, identify report(s). Yes /X/ No/ /

3. Is it anticipated that any significant change in results of operations from the corresponding period for the last fiscal year will be reflected by the earnings statements to be included in the subject report or portion thereof? Yes /X/ No/ /

If so, attach an explanation of the anticipated change, both narratively and quantitatively, and, if appropriate, state the reasons why a reasonable estimate of the results cannot be made.

Preliminary unaudited results of operations for fiscal year 2005, and comparisons of those results to prior periods, along with a preliminary discussion of those results and comparisons, are included in the Company's press release dated March 16, 2006 and its current report on Form 8-K filed with the SEC on March 16, 2006. The 2005 and the fourth quarter 2005 financial data and discussions presented in the press release are preliminary, unaudited, and unreviewed by BDO Seidman, LLP ("BDO"), the Company's independent public accountants. Consequently, they should be viewed as reflecting the Company's current expectations with due regard to items still to be completed as discussed in the press release. Since the completion of the integrated audit required by the PCAOB's Audit Standard No. 2 for fiscal year 2005 is still ongoing, the 2005 financial data provided in this press release is subject to change and the changes, individually or in the aggregate, may be material to the Company's <u>consolidated financial position, results of operation, or liquidity.</u>

## LIGAND PHARMACEUTICALS INCORPORATED

(Name of Registrant as Specified in Charter)

has caused this notification to be signed on its behalf by the undersigned hereunto duly authorized.

Date    MARCH 16, 2006

By    /S/WARNER R. BROADDUS

Warner R. Broaddus
General Counsel, Vice President & Secretary

Exhibit G
Page 7

Exhibit "7"
140

# EXHIBIT H

# The Rockefeller University v. Ligand Pharmaceuticals

## Ligand Witnesses with Scientific Role in Development of Eltrombopag and LGD-4665

| Potential Witness | Last Known Location | Ligand Title | Anticipated Testimony |
|---|---|---|---|
| Abramian, Donara S | ROCKVILLE, MD 20850 | Assistant Scientist | Ligand Scientific Personnel Involved in the Discovery and Development of Eltrombopag |
| Apuy, Julius | SAN DIEGO, CA 92139 | Sr. Research Scientist | Ligand Scientific Personnel Involved in the Discovery and Development of LGD-4665 |
| Cahiwat, Joseph R. | LA VERNE, CA 91750 | Associate Scientist | Ligand Scientific Personnel Involved in the Discovery and Development of LGD-4665 |
| Chen, Jyun-Hua | SAN DIEGO, CA 92122 | Sr. Research Scientist | Ligand Scientific Personnel Involved in the Discovery and Development of LGD-4665 |
| Dalgard, Jackline E. | DEL MAR, CA 92014 | Research Scientist | Ligand Scientific Personnel Involved in the Discovery and Development of LGD-4665 |
| Dana, Sharon L. | CARLSBAD, CA 92010 | Research Investigator | Ligand Scientific Personnel Involved in the Discovery and Development of LGD-4665 |
| de Grandpre, Louise | SAN DIEGO, CA 92129 | Staff Scientist | Ligand Scientific Personnel Involved in the Discovery and Development of LGD-4665 |
| Delorme, Evelyn * | SAN DIEGO, CA 92122 | Sr. Research Scientist | Ligand Scientific Personnel Involved in the Discovery and Development of Eltrombopag |
| Fields, Antonio | OCEANSIDE, CA 92054 | Research Assistant | Ligand Scientific Personnel Involved in the Discovery and Development of LGD-4665 |
| Fike, John R | WEST LAFAYETTE, IN 47906 | Assistant Scientist | Ligand Scientific Personnel Involved in the Discovery and Development of Eltrombopag |
| Gaylord, Natalie | SPRING VALLEY, CA 91977 | Sr. Mgr. Vivarium | Ligand Scientific Personnel Involved in the Discovery and Development of LGD-4665 |
| Giampa, Leslie * | EL CAJON, CA 92019 | Associate Scientist | Ligand Scientific Personnel Involved in the Discovery and Development of Eltrombopag |
| Gillespie, Gerald A. | SAN DIEGO, CA 92129 | Sr. Research Scientist | Ligand Scientific Personnel Involved in the Discovery and Development of LGD-4665 |
| Gross, Catherine E. | SAN DIEGO, CA 92109 | Sr. Research Associate | Ligand Scientific Personnel Involved in the Discovery and Development of LGD-4665 |
| Haslam, Jennifer A | SAN DIEGO, CA 92124 | Associate Scientist | Ligand Scientific Personnel Involved in the Discovery and Development of Eltrombopag |
| Hong, Mei Hua | SAN DIEGO, CA 92130 | Sr. Research Investigator | Ligand Scientific Personnel Involved in the Discovery and Development of LGD-4665 |
| NG, Beng (Huang, Mingli) | SAN DIEGO, CA 92130 | Associate Scientist | Ligand Scientific Personnel Involved in the Discovery and Development of LGD-4665 |
| Huang, Ruo | SAN DIEGO, CA 92117 | Sr. Research Associate | Ligand Scientific Personnel Involved in the Discovery and Development of LGD-4665 |
| Igno, Cesar | SAN DIEGO, CA 92139 | Sr. Research Associate | Ligand Scientific Personnel Involved in the Discovery and Development of LGD-4665 |
| Iskander, Maya * | SAN DIEGO, CA 92117 | Associate Scientist | Ligand Scientific Personnel Involved in the Discovery and Development of Eltrombopag |

5033652

3/19/2008

Exhibit H
Page 1

| Potential Witness | Last Known Location | Ligand Title | Anticipated Testimony |
|---|---|---|---|
| Kallel, E. Adam | ESCONDIDO, CA 92026 | Sr. Research Investigator | Ligand Scientific Personnel Involved in the Discovery and Development of LGD-4665 |
| Kessler, Linda V | POWAY, CA 92064 | Staff Scientist | Ligand Scientific Personnel Involved in the Discovery and Development of Eltrombopag |
| Lamb, Peter | SOUTH SAN FRANCISCO, CA 94083 | Director, Transcription Research | Ligand Scientific Personnel Involved in the Discovery and Development of Eltrombopag |
| Lau, Thomas | SAN DIEGO, CA 92131 | Associate Scientist | Ligand Scientific Personnel Involved in the Discovery and Development of LGD-4665 |
| Lee, Yong-Hee | SAN DIEGO, CA 92129 | Dir. Drug, Safety & Disposition | Ligand Scientific Personnel Involved in the Discovery and Development of LGD-4665 |
| Luo, Wen | SAN DIEGO, CA 92130 | Research Investigator | Ligand Scientific Personnel Involved in the Discovery and Development of LGD-4665 |
| Mais, Dale E. | VALLEY CENTER, CA 92082 | Research Investigator | Ligand Scientific Personnel Involved in the Discovery and Development of LGD-4665 |
| Marschke, Keith | SAN DIEGO, CA 92128 | Sr. Dir. Molecular Sciences | Ligand Scientific Personnel Involved in the Discovery and Development of LGD-4665 |
| McNeill, Matthew H. | SAN CLEMENTE, CA 92673 | Assistant Scientist | Ligand Scientific Personnel Involved in the Discovery and Development of LGD-4665 |
| Meglasson, Martin | SAN DIEGO, CA 92130 | VP, Discovery Research | Ligand Scientific Personnel Involved in the Discovery and Development of Eltrombopag |
| Miller, Stephen G. * | SAN DIEGO, CA 92130 | Director, New Leads | Ligand Scientific Personnel Involved in the Discovery and Development of LGD-4665 |
| Miller, Todd A. | SAN MARCOS, CA 92069 | Sr. Research Scientist | Ligand Scientific Personnel Involved in the Discovery and Development of LGD-4665 |
| Milocco, Lawrence  H | SOLANA BEACH, CA 92075 | Asst Scientist / Proj Mgt / Mkt Res Analyst | Ligand Scientific Personnel Involved in the Discovery and Development of Eltrombopag |
| Negro-Vilar, Andres  F. | WASHINGTON, DC 20037 | SVP, Research & Dev, CSO | Ligand Scientific Personnel Involved in the Discovery and Development of Eltrombopag |
| Nguyen, Bao N. | SAN DIEGO, CA 92126 | Associate Scientist | Ligand Scientific Personnel Involved in the Discovery and Development of LGD-4665 |
| Penuliar, Richard J. | SAN DIEGO, CA 92120 | Associate Scientist | Ligand Scientific Personnel Involved in the Discovery and Development of LGD-4665 |
| Phillips, Dean P. | SAN MARCOS, CA 92069 | Sr. Research Scientist | Ligand Scientific Personnel Involved in the Discovery and Development of LGD-4665 |
| Rosen, Jonathan I | SAN DIEGO, CA 92131 | VP, Head, Early Discovery Res. | Ligand Scientific Personnel Involved in the Discovery and Development of LGD-4665 & Eltrombopag |
| Rungta, Deepa | SAN DIEGO, CA 92130 | Director of New Leads | Ligand Scientific Personnel Involved in the Discovery and Development of LGD-4665 |
| Ruppar, Daniel A. | SAN ANTONIO, TX 78258 | Assistant Scientist | Ligand Scientific Personnel Involved in the Discovery and Development of LGD-4665 |
| Saliba, Iris | SAN DIEGO, CA 92129 | Scientist | Ligand Scientific Personnel Involved in the Discovery and Development of LGD-4665 |

5033652

| Potential Witness | Last Known Location | Ligand Title | Anticipated Testimony |
|---|---|---|---|
| Sanders, Jennifer | ENCINITAS, CA 92024 | Associate Scientist | Ligand Scientific Personnel Involved in the Discovery and Development of LGD-4665 |
| Seidel, Martin | SAN DIEGO, CA 92122 | Associate Director, Transcription Res | Ligand Scientific Personnel Involved in the Discovery and Development of Eltrombopag |
| Stein, Robert B | WILMINGTON, DE 19807 | SVP, Research & CSO | Ligand Scientific Personnel Involved in the Discovery and Development of Eltrombopag |
| Sun, Hong | SAN DIEGO, CA 92130 | Staff Scientist | Ligand Scientific Personnel Involved in the Discovery and Development of LGD-4665 |
| Syka, Peter | SAN DIEGO, CA 92129 | Staff Scientist | Ligand Scientific Personnel Involved in the Discovery and Development of LGD-4665 |
| Tapley, Peter * | COLLEGEVILLE, PA 19426 | Sr. Research Scientist | Ligand Scientific Personnel Involved in the Discovery and Development of Eltrombopag |
| Tian, Shin-Shay | SAN DIEGO, CA 92130 | Sr. Research Scientist | Ligand Scientific Personnel Involved in the Discovery and Development of Eltrombopag |
| Tyree, Curtis * | SAN DIEGO, CA 92129 | Sr. Research Scientist | Ligand Scientific Personnel Involved in the Discovery and Development of Eltrombopag |
| Valencia, Jorge | CHULA VISTA, CA 91910 | Sr. Research Associate | Ligand Scientific Personnel Involved in the Discovery and Development of LGD-4665 |
| Wardlow, Marilyn | SAN DIEGO, CA 92123 | Scientist | Ligand Scientific Personnel Involved in the Discovery and Development of LGD-4665 |
| Zhi, Lin | SAN DIEGO, CA 92130 | Sr. Dir. Chemistry & Pharma Sci | Ligand Scientific Personnel Involved in the Discovery and Development of LGD-4665 |

Exhibit H

Page 3

Exhibit "7"

144

The Rockefeller University v. Ligand Pharmaceuticals

Other Witnesses

| Potential Witness | Last Known Location | Ligand Title (if applicable) | Anticipated Testimony |
|---|---|---|---|
| Darnell, James | | | Patents and Technology, Rockefeller |
| Griesar, William | CHAMBERLAIN, MAINE | | License Agreement Negotiations for Rockefeller |
| Respess, William L | RANCHO SANTA FE, CA 92067 | SVP, General Counsel | Ligand Scientific Personnel Involved in the License Agreement Negotiations for Ligand |
| Robinson, Earl David | RANCHO SANTA FE, CA 92067 | President & CEO | Ligand Scientific Personnel Involved in the Discovery and Development of Eltrombopag, License Agreement Negotiations for Ligand |
| Tanti, Wendy | CHIRON CORPORATION, CALIFORNIA | | License Agreement Negotiations for Rockefeller |

3/19/2008

5025703

Exhibit H
Page 4
Exhibit "7"
145

# EXHIBIT I

COPY

1  Darrell Olson (State Bar No. 77633)
   KNOBBE, MARTENS, OLSON & BEAR, LLP
2  2040 Main Street
   Fourteenth Floor
3  Irvine, CA 92614
   Phone: (949) 760-0404
4  Facsimile: (949) 760-9502

5  Joseph M. Reisman (State Bar No. 246922)
   Ali S. Razai (State Bar No. 196122)
6  KNOBBE, MARTENS, OLSON & BEAR, LLP
   550 West C Street
7  Suite 1200
   San Diego, CA 92101
8  Phone: (619) 235-8550
   Facsimile: (619) 235-0176

9

10 Attorneys for Plaintiff
   LIGAND PHARMACEUTICALS INCORPORATED

11

12

13

14          IN THE UNITED STATES DISTRICT COURT

15        FOR THE SOUTHERN DISTRICT OF CALIFORNIA

16

17                                    '08 CV 4 0 1   BEN WMc

18 LIGAND PHARMACEUTICALS          )  Civil Action No.
   INCORPORATED, a Delaware corporation, )
19          Plaintiff,             )  COMPLAINT FOR DECLARATORY
                                   )  JUDGMENT
20     v.                          )
                                   )
21 THE ROCKEFELLER UNIVERSITY, a   )
   New York not-for-profit corporation, )
22                                 )
          Defendant.               )
23                                 )
                                   )
24                                 )

25

26

27

28

Exhibit I
Page 1

# I. NATURE OF THE ACTION

1.     This is a civil action under the Declaratory Judgment Act, 28 U.S.C. § 2201, et seq., for declaration of rights between the parties under a License Agreement dated September 30, 1992 ("License Agreement," attached as Exhibit A and incorporated by reference) and under certain United States patents related to the License Agreement.

# II. PARTIES

2.     Plaintiff LIGAND PHARMACEUTICALS INCORPORATED (hereinafter "Ligand" or "Plaintiff") is a Delaware corporation with its principal place of business at 10275 Science Center Drive San Diego, California 92121.

3.     Ligand was incorporated in 1987 and since then has been engaged in, *inter alia*, the research and development of drugs for various diseases and disorders.   Ligand currently has less than sixty (60) employees.

4.     Defendant THE ROCKEFELLER UNIVERSITY (hereinafter "Rockefeller" or "Defendant") is a New York not-for-profit corporation with its principal place of business at 1230 York Avenue, New York, New York 10021.

5.     Rockefeller is a university periodically engaged in research and development. Rockefeller currently has 69 heads of laboratories, 200 research and clinical scientists, 350 postdoctoral investigators, 1,050 support staff, 150 Ph.D. students, 50 M.D.-Ph.D. students and 960 alumni according to the Rockefeller website.

6.     NEW YORK UNIVERSITY ("NYU") is a New York not-for-profit corporation with its principal place of business at 70 Washington Square S, New York, New York 10012.

7.     NYU is a university periodically engaged in research and development. NYU is not a party to the License Agreement or this lawsuit, but in the past it has received payments due to it under the License Agreement.

# III. JURISDICTION AND VENUE

8.     This Court has personal jurisdiction over Defendant Rockefeller by virtue of its presence and activities in the state of California, including but not limited to entering into

-1-

Exhibit I
Page 2
Exhibit "7"
148

the License Agreement, as rights granted by the License Agreement were to be used in this judicial district, its past ownership interest in Ligand (located in this judicial district) under the License Agreement, as well as activities of Dr. James E. Darnell ("Darnell") in performing services in this judicial district under a Professional Services Agreement ("Services Agreement") dated September 30, 1992.

9.     NYU is not being joined in this lawsuit for the following reasons. It is not a party to the License Agreement. Its interests under the License Agreement are subordinate to those of Rockefeller and, on information and belief, those interests are adequately protected by Rockefeller. Finally, Rockefeller, not NYU, is the owner of any intellectual property rights licensed under the License Agreement.

10.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1332, 1338 and 2201.

11.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(a) and (c).

## IV. TECHNOLOGY

12.    Since its inception, and prior to entering into the License Agreement with Rockefeller, Ligand has been actively involved in small molecule drug discovery. For example, Ligand owns intracellular receptor ("IR") technology that relates to families of transcription factors that change cell function by selectively turning on or off specific genes in response to circulating signals that act on cells. Ligand developed (and/or in-licensed from one or more sources other than Rockefeller) certain IR-based transcriptional assays to screen candidate drugs.

13.    Thrombopoietin ("TPO") is a peptidyl hormone that activates a signaling cascade in a cell by binding to a receptor on a cell surface. Once bound by TPO, the cell surface receptor initiates a signaling cascade from the cell surface to the nucleus, where specific genes are selectively turned on in response to TPO. This gene regulation is mediated by transcription factors activated by the TPO signaling cascade and has a major effect on cell fate decisions by regulating cell proliferation and differentiation.

-2-

Exhibit I
Page 3
Exhibit "7"
149

14. Ligand developed cell-based assays to screen candidate TPO mimics. These assays included cell proliferation and cell differentiation assays, as well as transcriptional assays. The transcriptional assays developed by Ligand to screen candidate TPO mimics were analogous to the transcriptional assays developed for Ligand's IR program.

15. The transcriptional assays involved use of a reporter construct with produces a signal in response to activated transcription factors in the cell.

16. Ligand's assays were used to discover and develop new drugs that mimic the action of TPO and may be useful in the treatment of a wide variety of diseases and disorders.

## V. FACTUAL BACKGROUND

17. Darnell served on Ligand's Scientific Advisory Board for several years and visited with Ligand scientists at Ligand's facilities and elsewhere in San Diego many times in connection with the License Agreement and/or the Services Agreement.

18. On information and belief, at all times relevant here to, Darnell acted in conjunction with Rockefeller and had authority to act on behalf of Rockefeller to fulfill Rockefeller's obligations under the License Agreement.

19. After negotiations between the parties, Ligand executed two separate agreements on September 30, 1992, the License Agreement with Rockefeller and the Services Agreement with Darnell.

20. The License Agreement was generally directed to the licensing of "Licensed Patent Rights" and "Technical Information" relating to peptidyl hormone mediated gene expression.

21. The Licensed Patent Rights are defined in Section 1.3 of the License Agreement to be patent applications identified in Exhibit A to the License Agreement, related "divisionals, continuations, continuations-in-part, reissues, renewals, foreign counterparts, extension or additions," and any patents which may issue thereon. (Section 1.3, License Agreement).

22. Rockefeller is the identified assignee of United States patents, including: U.S. Pat. No. 6,605,442; U.S. Pat. No. 5,976,835; U.S. Pat. No. 6,013,475; U.S. Pat. No.

-3-

Exhibit I
Page 4

Exhibit "7"
150

1  6,030,808; U.S. Pat. No. 6,338,949; U.S. Pat. No. 6,124,118; U.S. Pat. No. 7,060,682; U.S.
2  Pat. No. 5,716,622; U.S. Pat. No. 5,883,228; U.S. Pat. No. 6,030,780; U.S. Pat. No.
3  6,720,154; U.S. Pat. No. 7,115,567; U.S. Pat. No. 6,960,647; and U.S. Pat. No. 7,211,655
4  ("Rockefeller Patents" attached as Exhibits B through O), which all either claim priority back
5  to the patent applications listed in Exhibit A to the License Agreement or relate to what
6  Rockefeller argues is Technical Information under the License Agreement.

7      23.    Technical Information is defined in Section 1.4 of the License Agreement to
8  include "technical data, information processes, materials and know-how, whether or not
9  patentable" relating to peptidyl mediated gene expression that is owned by Rockefeller and
10  was developed as of the effective date of the License Agreement or during the next five (5)
11  years. (Section 1.4, License Agreement).

12     24.    The License Agreement between Ligand and Rockefeller contemplated that
13  certain of the intellectual property of Rockefeller might be used by Ligand in development of
14  new pharmaceutical agents. (Sections 2.4 and 2.5, License Agreement). Nothing in the
15  License Agreement prohibited Ligand from developing processes and products relating to
16  cell-based assays to screen candidate drugs independent of Rockefeller's intellectual
17  property, as Ligand had done previously with its IR technology.

18     25.    Independent of the rights acquired under the License Agreement, on December
19  29, 1994, Ligand entered into a Research Development and License Agreement ("GSK
20  License") with SmithKline Beecham Corporation, now GlaxoSmithKline ("GSK"). The
21  GSK License relates to a joint research and development effort by Ligand and GSK directed
22  to discovery of small molecule compounds which act as modulators of certain
23  HEMATOPOIETIC GROWTH FACTORS (including TPO, as defined in Section 1.17 of the
24  GSK License) and to develop pharmaceutical products from such compounds.

25     26.    On information and belief, Rockefeller has been aware of the GSK License
26  since it was signed by Ligand and GSK in 1994.

27     27.    Under the RESEARCH PROGRAM as defined in the GSK License, a cell-
28  based high throughput screen was developed by Ligand to help identify at least one

-4-

Exhibit I
Page 5
Exhibit "7"
151

1   potentially useful drug known as eltrombopag or PROMACTA® and a back-up thereto known
2   as SB-559448 ("GSK Products"). Under the GSK License, GSK has paid Ligand milestone
3   payments amounting to $8 million for achieving certain milestones under the GSK License.

4       28.    GSK has made significant progress toward gaining approval for at least one of
5   the GSK Products through the regulatory process before the Food and Drug Administration.

6       29.    As early as October 2003, Rockefeller became specifically aware of the GSK
7   Products and inquired about and demanded payment from Ligand under the License
8   Agreement for what Rockefeller alleged were uses of its Licensed Patent Rights or Technical
9   Information covered by the License Agreement.

10      30.    Ligand disputes that the GSK Products are subject to payments under the
11  License Agreement.

12      31.    Section 2.5 of the License Agreement obligates Ligand to pay Rockefeller
13  only under certain circumstances. The payments described in Section 2.5 generally are
14  twenty five per cent (25%) of payments received from third parties by Ligand if those
15  payments were to secure the right to use Technical Information or the right to sell Products or
16  Processes.

17      32.    The GSK Products are not Products as the term "Product" is defined under
18  Section 1.5 of the License Agreement. They do not embody or use any invention described
19  or claimed in the Licensed Patent Rights. Furthermore, Technical Information was not
20  essential to their discovery or development. GSK's payments to Ligand are not and will not
21  be to secure any Rockefeller rights that would otherwise prevent GSK from selling the GSK
22  Products. Rockefeller does not own any Licensed Patent Rights or Technical Information
23  that GSK would need to sell the GSK Products. Thus, no payments are due to Rockefeller
24  under the License Agreement.

25      33.    Rockefeller has alleged the GSK Products embody or use one or more
26  invention(s) described or claimed in the Licensed Patent Rights. In order to qualify as an
27  invention in a claim of an issued patent, however, the alleged invention must be defined by a
28  claim that is valid and enforceable.

-5-

Exhibit I
Page 6
Exhibit "7"
152

34.     Section 11.2 of the License Agreement provides that Ligand shall have the right to terminate any license grant at any time upon ninety days written notice.

35.     On August 9, 2007, pursuant to Section 11.2, Ligand sent by facsimile and U.S. Mail a notice to Rockefeller of its intent to terminate the License Agreement. Pursuant to Section 11.2, the termination was effective under the License Agreement ninety days thereafter or on November 7, 2007.

36.     Since termination of the License Agreement under Section 11.2, Rockefeller has claimed that the License Agreement was not terminated. Rockefeller contends that 25% of past and future payments related to GSK Products received by Ligand must be shared with Rockefeller.

37.     The parties entered into a tolling agreement that contemplated the parties would try to resolve the controversy without the need for litigation. The tolling agreement expired on March 3, 2008. Rockefeller's communications prior to March 3, 2008, including their refusal to extend the tolling agreement and their specific threat of filing a lawsuit against Ligand at the expiration of the tolling agreement, have made Ligand reasonably afraid that it will be sued by Rockefeller on these issues today or within the next few days.

## VI. FIRST CLAIM FOR RELIEF – DECLARATORY JUDGMENT SCOPE OF LICENSED PATENT RIGHTS

38.     Ligand incorporates by reference as though fully set forth herein paragraphs 1 through 37 of this Complaint.

39.     The License Agreement between Ligand and Rockefeller provides for, among other things, a license of Licensed Patent Rights. (Section 2.1, License Agreement).

40.     Rockefeller has alleged that the Rockefeller Patents are included within the Licensed Patent Rights and also that the GSK Products or their use embody or employ the Licensed Patent Rights.

41.     Applying the plain meaning of the words of the License Agreement, the GSK Products and their use do not embody or employ any invention described or claimed in the Licensed Patent Rights.

-6-

Exhibit I
Page 7
Exhibit "7"
153

42.     An actual controversy exists between Rockefeller and Ligand as to whether or not the GSK Products or their use embody or employ Licensed Patent Rights, whether or not the GSK Products or their use embody or employ any invention described or claimed in the Rockefeller Patents and whether or not the payments Rockefeller is demanding under the License Agreement are in fact due.

43.     Even if the GSK Products embody or use an invention merely described in the Rockefeller Patents, the patent laws of the United States protect only inventions defined by valid and enforceable claims and there is an actual controversy as to whether or not any claim of the Rockefeller Patents is valid for failure to comply with any one of 35 USC §§ 101 et seq.

44.     On information and belief, Rockefeller has filed one or more  patent applications for the purpose of claiming the GSK Products are subject to payments under the License Agreement, and Rockefeller did so with knowledge that no valid patent should issue. There is an actual controversy as to whether the GSK Products or their use embody or employ any invention described or claimed in any pending patent application and whether any such patent application filed after learning of the GSK Products was filed in good faith under the License Agreement.

**VII. SECOND CLAIM FOR RELIEF – DECLARATORY JUDGMENT SCOPE OF TECHNICAL INFORMATION**

45.     Ligand incorporates by reference as though fully set forth herein paragraphs 1 through 44 of this Complaint.

46.     The License Agreement between Ligand and Rockefeller provides for, among other things, a license of Technical Information of Rockefeller. (Section 2.1, License Agreement).

47.     Rockefeller alleges that Technical Information was essential to the discovery or development of the GSK Products.

48.     Ligand, relying on the plain meaning of the License Agreement, alleges that Technical Information was not used in the discovery or development of the GSK Products.

-7-

Exhibit I
Page 8
Exhibit "7"
154

1   Ligand further alleges under Section 1.4 of the License Agreement Technical Information

2   must be owned by Rockefeller and existing or capable of description in a tangible form and

3   must have been developed in the laboratory of Darnell or of David Levy of NYU as of

4   September 30, 1992 or by Darnell at his laboratory on or before five years from September

5   30, 1992 or by September 30, 1997. The GSK Products were not developed using Technical

6   Information but rather used either publicly known information, information known or

7   discovered by Ligand and/or GSK, or information received from third parties.

8         49.    An actual controversy exists between Rockefeller and Ligand as to whether or

9   not Technical Information was essential to the discovery or development of the GSK

10  Products.

11            **VII. THIRD CLAIM FOR RELIEF – DECLARATORY JUDGMENT**

12                        **TERMINATION**

13         50.    Ligand here incorporates by reference as though fully set forth herein

14   paragraphs 1 through 49 of this Complaint.

15         51.    Rockefeller relies on Section 11.3 of the License Agreement in asserting that,

16   absent a material breach, the "Agreement" cannot be terminated.

17         52.    Ligand claims, in the alternative, that the notice dated August 9, 2007 either

18   terminated the License Agreement in its entirety, subject only to certain specified rights

19   which survived termination, or to the extent any different, terminated all then existing license

20   rights, again subject only to any rights that might survive termination.

21         53.    An actual controversy exists between Rockefeller and Ligand as to whether or

22   not the License Agreement has been terminated and as to the nature of the rights terminated.

23

24                     **VIII. DEMAND FOR JUDGMENT**

25      WHEREFORE, Plaintiff requests that:

26         1.    This Court enter a judgment declaring the GSK Products do not embody any

27   invention(s) described or claimed in the Licensed Patent Rights and that the use of the GSK

28   Products do not employ any invention(s) described or claimed in the Licensed Patent Rights;

-8-

Exhibit I
Page Exhibit "7"
155

1      2.     This Court enter a judgment declaring that Technical Information was not

2   essential to the discovery or development of the GSK Products;

3      3.     This Court enter a judgment declaring that Ligand is not liable for any

4   additional payments under the License Agreement beyond those that have already been made;

5      4.     This Court enter a judgment declaring that the License Agreement   was

6   terminated as of November 7, 2007 and that subsequent to termination of the License

7   Agreement, Ligand is not liable for any future payments under the License Agreement;

8      5.     Plaintiff be awarded costs, attorneys' fees and other relief, both legal and

9   equitable, to which it may be justly entitled;

10      6.     Plaintiff be awarded relief under 28 U.S.C. § 2202; and

11      7.     Plaintiff be awarded such other and further relief as this Court deems proper.

12                    Respectfully submitted,

13                    KNOBBE, MARTENS, OLSON & BEAR, LLP

14

15   Dated: __3/3/08__       By: _Darrell Olson_____

16                    Darrell Olson (signature via facsimile)

17                    Attorneys for Plaintiff

18                    LIGAND PHARMACEUTICALS INCORPORATED

19

20

21

22

23

24

25

26

27

28

-9-

Exhibit I
Page 10

Exhibit "7"
156

# EXHIBIT J

1  **FOLEY & LARDNER LLP**
   402 W. BROADWAY, SUITE 2100
2  SAN DIEGO, CA 92101-3542
   TELEPHONE:    619.234.6655
   FACSIMILE:    619.234.3510
3
   KENNETH S. KLEIN, CA BAR NO. 129172
4
   **FOLEY & LARDNER LLP**
   3000 K STREET, NW - SUITE 500
5  WASHINGTON, DC 20007-5101
   TELEPHONE:    202.672.5300
   FACSIMILE:    202.672.5399
6
   ANAT HAKIM, (to be admitted *pro hac vice*)
7
   Attorneys for Defendant The Rockefeller University, a New York not-for-profit
8  corporation,

9                    **UNITED STATES DISTRICT COURT**

10                 **SOUTHERN DISTRICT OF CALIFORNIA**

11

12 Ligand Pharmaceuticals Incorporated, a       Case No:  08-CV-401 BEN (WMc)
   Delaware corporation,
13                                              **MEMORANDUM IN SUPPORT OF**
                                                **THE ROCKEFELLER UNIVERSITY'S**
                 Plaintiff,                     **MOTION TO DISMISS OR, IN THE**
14                                              **ALTERNATIVE, STAY THIS ACTION**
        vs.
15                                              Judge:      Roger T. Benitez
   The Rockefeller University, a New York
   not-for-profit corporation,
16                                              Date:       April 14, 2008
                 Defendant.                     Time:       10:30 a.m.
17                                              Courtroom:  3

18

19

20

21

22

23

24

25

26

27

28

SDCA_1019324.1

Exhibit J
Page 1

TABLE OF CONTENTS

Page

BACKGROUND...................................................................................................... 1

ARGUMENT .......................................................................................................... 6

I.    PLAINTIFF'S DECLARATORY JUDGMENT ACTION SHOULD BE
DISMISSED IN DEFERENCE TO THE UNIVERSITY'S PENDING NEW
YORK STATE COURT ACTION. ..................................................................... 6

    A.    It Is Well Established That This Court Has The Discretion And
Authority To Decline To Hear This Declaratory Judgment Action. .. 6

    B.    Ligand's California Declaratory Judgment Action Should Be
Dismissed In Deference To The University's Pending
New York State Court Proceeding..................................................... 8

    C.    Dismissal Of A Federal Declaratory Judgment Action Is
Particularly Appropriate Where The Other Pending
Action Is A State Court Proceeding Involving Issues
Predominantly Of State Law............................................................. 10

    D.    Any Jurisdiction And/Or Venue Arguments Ligand
May Seek To Raise In Connection With The New York
State Suit, Are Properly Considered By New York Courts
Rather Than This Court.................................................................... 12

II.    IN THE ALTERNATIVE, THIS ACTION SHOULD BE STAYED.................. 14

CONCLUSION ..................................................................................................... 14

i

SDCA_1019324.1

Exhibit J
Page 2
Exhibit "7"
159

# TABLE OF CONTENTS (CONT.)

                                                                                                 Page

*Prize Frize, Inc. v. Matrix (U.S.) Inc.*,
   167 F.3d 1261 (9th Cir. 1999) ................................................................... 11

*Shell Oil Co. v. Frusetta*,
   290 F.2d 689 (9th Cir. 1961) .................................................................... 13

*Tempco Elec. Heater Corp. v. Omega Eng'g, Inc.*,
   819 F.2d 746 (7th Cir. 1987) .................................................................... 13

*Trippe Mfg. Co. v. Am. Power Conversion Corp.*,
   46 F.3d 624 (7th Cir. 1995) ...................................................................... 13

*Wilton v. Seven Falls Co.*,
   515 U.S. 277 (1995)................................................................................ *Passim*

*Xoxide, Inc. v. Ford Motor Co.*,
   448 F. Supp.2d 1188 (C.D. Cal. 2006) ................................................. 8-9


**FEDERAL STATUTES**

28 U.S.C. §1332 ............................................................................................. 12

28 U.S.C. §1338 ............................................................................................. 12

28 U.S.C. §2201 ............................................................................................. 12

28 U.S.C. §1338 ....................................................................................... 11-12

28 U.S.C. § ...................................................................................................... 13

28 U.S.C. § 1453(b) ....................................................................................... 13

28 U.S.C. § 2201 .............................................................................................. 6

28 U.S.C. §§ 2201, et seq............................................................................... 4

28 U.S.C.A. § 400 ........................................................................................... 7

28 U.S.C. Section 2201-02 ............................................................................ 7

SDCA_1019324.1

Exhibit J
Page 4
Exhibit "7"
160

1    The Rockefeller University (the "University") submits this memorandum in

2    support of its motion to dismiss, or, in the alternative, to stay Plaintiff Ligand

3    Pharmaceuticals, Inc.'s ("Ligand") declaratory action filed in this Court, in deference to a

4    pending New York state action.

5        In the New York state action, which was the earlier filed and served matter, the

6    University seeks damages and injunctive relief based on claims for breach of a September

7    30, 1992 License Agreement between the University and Ligand (the "1992

8    Agreement"), unjust enrichment/constructive trust, quantum meruit, specific performance

9    of the University's contractual right under the 1992 Agreement to perform an audit of

10   Ligand, and a declaration that certain products are subject to the terms and payment

11   provisions of the 1992 Agreement. The New York state action and this declaratory

12   action (which appears to have been filed by Ligand as a preemptive strike against the

13   University) involve the same state law issues of contract interpretation of the 1992

14   Agreement, which, by its terms, must be interpreted and governed according to New

15   York law. Furthermore, as discussed within, many key witnesses are located in New

16   York, and Ligand, having elected to have a presence in New York, cannot claim that New

17   York is an inconvenient forum. Finally, whereas this Court is being asked for a

18   discretionary declaration of rights, the New York state action will necessarily decide

19   those same issues in the context of a suit, alleging actual injury to the University. Under

20   circumstances such as this, the Ninth Circuit has affirmed the exercise of district court

21   discretion in dismissing a federal declaratory action in favor of a parallel state proceeding

22   that involves the same issues (especially, where as here, the New York state court

23   regularly interprets and enforces contracts under New York law) and parties. The

24   University respectfully submits that there are ample reasons for this Court to dismiss this

25   action.

26                              **BACKGROUND**

27       The Rockefeller University owns groundbreaking inventions that are powerful

28   tools to screen for therapeutic drugs which were discovered by Rockefeller University

                                           1

1   Professor James E. Darnell Jr. The University exclusively licensed this valuable

2   technology to Ligand under the 1992 Agreement. Working under a 1994 agreement with

3   its exclusive sublicensee SmithKline Beecham ("SKB", now GlaxoSmithKline) ("1994

4   SKB/Ligand Agreement") and using the University's inventions, Ligand identified

5   several pharmaceutical molecules and received several milestone payments from SKB.

6   Ligand has failed to pay the University its contractual share of these milestone payments

7   according to the 1992 Agreement, despite the University's repeated payment requests.

8   Instead, in August 2007, shortly before SKB requested approval from the Food and Drug

9   Administration of Promacta®, one of the pharmaceutical molecules identified under the

10   1994 SKB/Ligand Agreement, and before royalties on Promacta® are anticipated to be

11   paid by SKB to Ligand, Ligand notified the University that Ligand was unilaterally

12   terminating the 1992 Agreement, although not permitted to do so by the license's terms.

13   The University, having fully performed its contractual obligation and faced with Ligand's

14   refusal to honor its payment obligations under the 1992 Agreement, had no recourse but

15   to file suit, and did so in the Supreme Court of the State of New York, County of New

16   York. (*See* Complaint filed in *The Rockefeller University v. Ligand Pharmaceuticals,*

17   *Inc.*, Case No. 08/600638, filed at 9:02 a.m. EST on March 4, 2008, in the Supreme Court

18   of the State of New York in the County of New York (hereinafter, the "New York

19   Complaint"), attached as Exhibit 1 to the Declaration of Anat Hakim ("Hakim Decl."), at

20   pp. 1-2.)

21       Under Section 2.1 of the 1992 Agreement, the University granted Ligand a sole

22   exclusive world-wide license, under the University's broadly-defined Licensed Patent

23   Rights and Technical Information "to make, have made, use and sell Products or practice

24   Processes." (*See* the 1992 License Agreement, attached as Exhibit 2 to the Hakim Decl.)

25   The license related to pioneering technology, which the New York Complaint describes

26   in detail and which is referred to as the STATs Pathway technology. The STATs

27   Pathway technology was discovered by Professor Darnell. Under Section 1.4 of the 1992

28   Agreement, the license grant to Ligand included an exclusive world-wide license to all

2

1   developments of Professor Darnell's laboratory relating to the STATs Pathway

2   technology, existing as of the effective date of the 1992 Agreement and for five years

3   thereafter. In connection with the 1992 Agreement, Professor Darnell and members of

4   his laboratory did in fact collaborate with Ligand for years regarding the STATs Pathway

5   technology. Over the course of several years, Dr. Darnell provided essential technical

6   information, materials and insight to Ligand relating to the STATs Pathway technology.

7   In addition, the University filed several patent applications and was issued several

8   patents, describing aspects of its pioneering STATs Pathway technology. The technical

9   information and expertise about STATs Pathway technology acquired by Ligand from the

10  University pursuant to the 1992 Agreement was essential to the development of, among

11  other things, a high throughput screen ("HTS") to identify cytokine agonists. The HTS

12  was key to the identification and development of pharmaceutical drug candidates. *(See*

13  Hakim Decl., Exhibit 1 at ¶¶12 and 13).

14          In return for the University's exclusive world-wide license to this pioneering

15  STATs Pathway technology, Ligand obligated itself to:

16          a.  "diligently seek to develop Products and/or Processes" using or based on the

17              STATs Pathway technology provided to it under the 1992 Agreement (Section

18              2.7 of the 1992 Agreement);

19          b.  make certain cash payment to the University during the first five years of the

20              Agreement and to give the University an equity interest in Ligand (Sections

21              2.2 and 2.3 of the 1992 Agreement); and

22          c.  pay the University a portion of any payments Ligand received from any third

23              party "to secure the right to use Technical Information or to sell Products or

24              Processes," (Section 2.5 of the 1992 Agreement) and a royalty on Ligand's

25              own "Net Sales of Products and on its net revenues . . . received from

26              performance of Processes for a third party." (Section 2.4 of the 1992

27              Agreement).

28  *(See* Hakim Decl., Exhibit 1 at ¶14, Exhibit 2).

3

1　　　The parties' dispute centers on the language of Sections 2.4 and 2.5 of the 1992

2　Agreement, which address Ligand's payment obligations as to the University's share of

3　milestone and royalty payments from third parties (Section 2.5) and Ligand's royalty

4　payment obligations to the University based on Ligand's own sales of Products or

5　performance of Processes (Section 2.4). (*See* Hakim Decl., Exhibit 1). In addition, the

6　parties dispute whether Ligand effectively terminated the 1992 Agreement on August 9,

7　2007, which the University contends was not effective under the express termination

8　provisions of the 1992 Agreement. (*See Id.*). Any judicial determination of these

9　disputed contract terms will be made pursuant to New York law -- the 1992 Agreement

10　states that it "shall be interpreted and governed in accordance with the laws of the State

11　of New York." (*See* Hakim Decl., Exhibit 2, Section 13).

12　　　The parties have had ongoing negotiations in an attempt to resolve their dispute

13　without litigation for some time. On October 10, 2007, the parties entered into a Tolling

14　Agreement, which was effective through January 31, 2008. (*See* Hakim Decl., Exhibit 1

15　at ¶32). On January 17, 2008, the parties amended the Tolling Agreement, extending the

16　period through March 3, 2008. (*See Id.* at ¶34). During these discussions, the

17　University's counsel informed Ligand's counsel that the University would sue Ligand for

18　breach of the 1992 Agreement after expiration of the Tolling Agreement, in order to

19　preserve the University's claims.

20　　　Knowing that the University would file suit after the Tolling Agreement expired,

21　Ligand rushed to file a Complaint for Declaratory Judgment in this Court at 11:33 a.m.

22　EST (8:33 a.m. PST) on March 4 (hereinafter, the "California Declaratory Judgment

23　Complaint").[1]  Ligand's California Declaratory Judgment Complaint contains three

24　claims for relief, all under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, et seq.,

25　seeking a declaration of rights between the parties under the 1992 Agreement.

26　Specifically, Ligand seeks a declaration as to (1) the applicability and scope of two

27

28　　[1] Solely for the purposes of this Motion to Dismiss or Stay, the University will treat the allegations that Plaintiff made in its Complaint as if they were true.

4

08-CV-401 BEN WMC

1 | defined terms in the 1992 Agreement ("Licensed Patent Rights" in Section 1.3 and
2 | "Technical Information" in Section 1.4) as they apply to Ligand's payment obligations
3 | under Sections 2.4 and 2.5; and (2) whether the 1992 Agreement has been terminated and
4 | the nature of any rights terminated. (*See* California Declaratory Judgment Complaint
5 | attached as Exhibit 3 to the Hakim Decl.). All of these are questions are governed by
6 | New York state law.

7 | A few hours before Ligand filed its California Declaratory Judgment Complaint,
8 | the University had filed the New York Complaint. Both lawsuits are pending.

9 | New York state court is the proper forum to determine the parties' contract
10 | dispute. New York courts routinely apply and interpret New York law, as required here
11 | under the 1992 Agreement. The University is a New York corporation, with its principal
12 | place of business in New York City, New York. (*See* Hakim. Decl. Exhibit 1, ¶1).
13 | Ligand has elected to register to do business in New York. (*See* (unofficial) New York
14 | Department of State record, attached as Exhibit 4 to the Hakim Decl.). Professor Darnell,
15 | who is 82 years old and a key witness for the University, resides and works in New York,
16 | and several former members of Dr. Darnell's laboratory who worked on the pioneering
17 | STATs technology with Dr. Darnell and have knowledge about meetings with and
18 | information provided to Ligand by the University under the 1992 Agreement, continue to
19 | work in New York. Another key third-party witness, SKB (now GlaxoSmithKline) –
20 | Ligand's exclusive sublicensee under the 1992 Agreement, is located on the East Coast in
21 | Philadelphia, not far from New York. For all of these third-party witnesses, New York is
22 | a more convenient forum. Because the issues raised in Ligand's California Declaratory
23 | Judgment Complaint are duplicative of those raised in the University's New York
24 | Complaint, and because the contract issues to be determined under New York law would
25 | be more properly addressed by the New York state action seeking actual damages or
26 | coercive relief rather than in this California declaratory action, this Court should dismiss,
27 | or in the alternative, stay the California action in deference to the pending New York
28 | state suit.

5

Exhibit J
Page 9
Exhibit "7"
165

## ARGUMENT

I. **PLAINTIFF'S DECLARATORY JUDGMENT ACTION SHOULD BE DISMISSED IN DEFERENCE TO THE UNIVERSITY'S PENDING NEW YORK STATE COURT ACTION.**

    A. <u>It Is Well Established That This Court Has The Discretion And Authority To Decline To Hear This Declaratory Judgment Action.</u>

Ligand's lawsuit asks solely for declaratory relief, invoking this Court's authority to decide matters pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201.[2] This statute confers discretionary jurisdiction and provides that a district court "may declare the rights and other legal relations of any interested party seeking such declaration." *Id.* A lawsuit seeking federal declaratory relief must pass constitutional muster by presenting an actual case or controversy and must also fulfill statutory jurisdictional prerequisites. *See Gov't Employees Ins. Co. v. Dizol,* 133 F. 3d 1220, 1222-23 (9th Cir. 1998) (en banc). Entertaining the declaratory judgment action must also be "appropriate." *See Id.* at 1223.

The Ninth Circuit, the Federal Circuit, and the U.S. Supreme Court all have held that federal district courts have discretion to decline to hear a declaratory judgment action, even though it is within their jurisdiction. *Id.* (explaining that it is within the district court's discretion to determine whether a declaratory action is appropriate); *MedImmune, Inc. v. Genentech, Inc.,* 127 S. Ct. 764, 776 (2007) (reaffirming that trial courts have "unique and substantial discretion" in determining whether to decide cases over which they have declaratory judgment jurisdiction) (quoting *Wilton v. Seven Falls Co.,* 515 U.S. 277, 286 (1995)); *see also Brillhart v. Excess Ins. Co. of America,* 316 U.S.

---

[2] The Declaratory Judgment Act, 28 U.S.C. Section 2201-02 states, in relevant part, that:

> In a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

6

08-CV-401 BEN WMC

1  491, 494 (1942) ("Although the District Court had jurisdiction of the suit under the

2  Federal Declaratory Judgments Act, 28 U.S.C.A. § 400, it was under no compulsion to

3  exercise that jurisdiction."); *Wilton*, 515 U.S. at 287 (describing "the unique breadth of [a

4  federal court's] discretion to decline to enter a declaratory judgment"). According to the

5  Ninth Circuit, factors articulated by the Supreme Court in *Brillhart* "remain the

6  philosophic touchstone for the district court" when it is deciding whether to hear a

7  declaratory judgment action:

8  > The district court should avoid needless determination of state

9  > law issues; it should discourage litigants from filing

10 > declaratory actions as a means of forum shopping; and it

11 > should avoid duplicative litigation. . . If there are parallel state

12 > proceedings involving the same issues and parties pending at

13 > the time the federal declaratory action is filed, there is a

14 > presumption that the entire suit should be heard in state court.

15 > . . federal courts should generally decline to entertain reactive

16 > declaratory actions.

17

18 *Dizol*, 133 F.3d at 1225. In addition to the *Brillhart* factors, the Ninth Circuit points to

19 other considerations, such as:

20 > whether the declaratory action will settle all aspects of the

21 > controversy; whether the declaratory action will serve a

22 > useful purpose in clarifying the legal relations at issue;

23 > whether the declaratory action is being sought merely for the

24 > purposes of procedural fencing or to obtain a 'res judicata'

25 > advantage; or whether the use of a declaratory action will

26 > result in entanglement between the federal and state court

27 > systems. In addition, the district court might also consider the

28 > convenience of the parties, and the availability and relative

7

Exhibit J
Page 11
Exhibit "7"
167

1   convenience of other remedies.

2

3   *Id.* n. 5 (citation omitted).

4        It is thus well within this Court's discretion and authority to decline to exercise

5   jurisdiction over Ligand's California Declaratory Judgment action. Here, it is appropriate

6   for the Court to decline jurisdiction in the exercise of its discretion.

7        B.   Ligand's California Declaratory Judgment Action Should Be

8   Dismissed In Deference To The University's Pending New York State Court Proceeding.

9        Where, as here, there is a parallel state suit pending, the district court's discretion

10  to dismiss a suit for declaratory relief is broad. *See Wilton,* 515 U.S. at 282 (citing

11  *Brillhart,* 316 U.S. 491 (1942)). The Ninth Circuit and courts in this Circuit have held

12  that a plaintiff's declaratory judgment action would serve no useful purpose and is

13  properly denied where the action is merely a preemptive strike against another party who

14  sues the plaintiff for actual damages or coercive relief in another court. *Dizol,* 133 F.3d

15  at 1225; *Exxon Shipping Co. v. Airport Depot Diner, Inc.,* 120 F.3d 166, 168-70 (9th Cir.

16  1997);; *Phoenix Assurance PLC v. Marimed Foundation for Island Health Care*

17  *Training,* 125 F. Supp. 2d 1214, 1221 (D. Hawaii 2000); *Xoxide, Inc. v. Ford Motor Co.,*

18  448 F. Supp.2d 1188, 1192-94 (C.D. Cal. 2006).

19       In fact, it is Ninth Circuit law that "[i]f there are parallel state proceedings

20  involving the same issues and parties pending at the time the federal declaratory action is

21  filed, there is a *presumption* that the entire suit should be heard in state court." *Dizol,*

22  133 F.3d at 1225 (emphasis added) (citing *Chamberlain v. Allstate Ins. Co.,* 931 F.2d

23  1361, 1366-57 (9th Cir. 1991)).[3] The presumption is such that this rule applies even

24  where the state suit is filed *after* the declaratory action. The Ninth Circuit does not

25

26  [3] Even where the issues in the declaratory action and the pending state action are not the same, however, the Ninth Circuit has dismissed the declaratory action and held that "it is enough that the state

27  proceedings arise from the same factual circumstances." *Golden Eagle Ins. Co. v. Travelers Cos.,* 103 F.3d 750, 754-55 (9th Cir. 1996) overruled on other grounds by Gov't Employees Ins. Co. v. Dizol, 133

28  F.3d 1220 (9th Cir. 1998) (holding that question of whether declaratory judgment is appropriate need not be raisesd *sua sponte* by the court).

8

08-CV-401 BEN WMC

adhere to a strict 'first to file' rule in situations where a declaratory judgment action appears to have been filed to preempt litigation in another forum. *Alltrade, Inc. v. Uniweld Products, Inc.*, 946 F.2d 622, 628 (9th Cir. 1991) ("The circumstances under which an exception to the first-to-file rule typically will be made include bad faith, anticipatory suit, and forum shopping ….") (citations omitted); *Xoxide,* 448 F. Supp. at 1192-93 (declaratory judgment plaintiff was first to file but because the record showed that defendant had provided plaintiff with "specific concrete indications that a suit by [defendant] was imminent," the declaratory suit is dismissed.).[4]

Here, the presumption for dismissal is even stronger in light of the fact that the University's New York Complaint was filed first. The University also served its New York Complaint first, having served it on Ligand on March 4; whereas Ligand did not serve its California Declaratory Judgment Complaint on the University until March 6, 2008. Discovery in the University's New York action is underway, as the University served Ligand with its First Set of Requests for Production on March 6, 2008, with a response due from Ligand on March 26. In determining priority, courts must take into consideration not only the filing date, but also the progress of the litigation, which in this case has advanced further in the New York state action. *Moses H. Cone Memorial Hospital v. Mercury Const. Corp.*, 460 U.S. 1, 21 (1983) ("Priority should not be measured exclusively by which complaint was filed first, but rather in terms of how much progress has been made in the two actions.").

Ligand's California Declaratory Judgment action should be dismissed in deference to the University's New York state court action. There can be no doubt that Ligand's declaratory judgment lawsuit, filed after the University's warning of legal action against it, was an attempted "preemptive strike." Moreover, the New York state action was filed and served first, and discovery is underway. The New York forum is more convenient

---

[4] Although not discussed by the Supreme Court as a basis for its decision in either case, the plaintiffs in both *Brillhart* and *Wilton* filed their declaratory judgment actions in federal court before being sued in state court by the defendants. *See Brillhart,* 316 U.S. at 492-93; *Wilton,* 515 U.S. at 280.

9

1  for many key witnesses, including Dr. Darnell, who is 82 years old.  Finally, although not
2  explicitly required by the precedent set forth above, the issues that Ligand seeks to be
3  decided in this declaratory action—whether the products at issue are subject to the
4  payment provisions of the 1992 Agreement and whether the 1992 Agreement has been
5  terminated—undoubtedly will be decided in the University's New York state court action
6  against Ligand for damages, specific performance and declaratory relief in connection
7  with Ligand's breach of the 1992 Agreement (among other causes of action).

8        C.   Dismissal Of A Federal Declaratory Judgment Action Is Particularly
9  Appropriate Where The Other Pending Action Is A State Court Proceeding Involving
10  Issues Predominantly Of State Law.

11       Not only does binding Ninth Circuit precedent support dismissal of a "preemptive
12  strike" declaratory judgment action such as that filed by Ligand in favor of a separate
13  pending action for actual damages or coercive relief, and not only should a second-filed
14  declaratory action be dismissed in favor of a first-filed coercive action, but also the U.S.
15  Supreme Court has held that such dismissals are especially appropriate where the pending
16  state court action for coercive relief involves issues solely of state, not federal, concern.
17  The Supreme Court has held that "it would be *uneconomical* as well as *vexatious* for a
18  federal court to proceed in a declaratory judgment suit where another suit is pending in a
19  state court presenting the same issues, not governed by federal law, between the same
20  parties."  See *Brillhart*, 316 U.S. at 495; *see also Wilton*, 515 U.S. at 283 (reaffirming and
21  following *Brillhart*).  The Court specifically warned lower federal courts against
22  "[g]ratuitous interference with the orderly and comprehensive disposition of a state court
23  litigation" in such a situation, stating: "[w]e are concerned ... with the duty of the federal
24  courts to determine legal issues governing the proper exercise of their jurisdiction."
25  *Brillhart*, 316 U.S. at 1176-77 (reversing and remanding the appellate court's direction
26  that the district court determine the merits of a declaratory judgment action).

27       The University's Complaint in New York presents issues solely of state law.  (*See*
28  Hakim Decl., Exhibit 1).  The allegations are premised on New York state law, as they

10

08-CV-401 BEN WMC

1   arise out of Ligand's breach of the 1992 Agreement. The 1992 Agreement also provides

2   that this license is to be interpreted and governed according to New York state law. The

3   University's Complaint and Ligand's California Declaratory Judgment Complaint, which

4   seeks a declaration as to how the 1992 Agreement should be interpreted, raise issues of

5   state law concern and do not implicate any federal law or interest. Based on Ninth

6   Circuit and Supreme Court precedent, this Court should defer to the New York state court

7   and dismiss this declaratory action. To hold otherwise would result in litigation in two

8   fora, which would be wasteful of the resources of the judiciary, the parties and their

9   counsel, and offend bedrock principles of federalism and comity between state and

10  federal courts.

11        Indeed, even where a declaratory action raises some federal issues, "where state

12  law concerns predominate," it is appropriate for a district court to apply the *Brillhart*

13  factors to the analysis. *See Phoenix Assurance PLC*, 125 F. Supp. 2d at 1222 (referring

14  to declaratory judgment cases brought in admiralty and state claims; analyzing *Brillhart*

15  factors and declining jurisdiction under Declaratory Judgment Act). The Ninth Circuit

16  has observed that the fact that state law remedies sought may tangentially involve issues

17  of patent ownership does not convert the state causes of action into federal law claims.[5]

18  *See Prize Frize, Inc. v. Matrix (U.S.) Inc.*, 167 F.3d 1261, 1264 (9th Cir. 1999) (citing

19  *Jim Arnold Corp. v. Hydrotech Systems, Inc.*, 109 F.3d 1567, 1572 (Fed. Cir. 1997))

20  *superseded* on other grounds by 28 U.S.C. § 1453(b) (changing law governing removal of

21  class actions). Moreover, where a claim is supported by alternative theories in a

22  complaint, that claim does not form the basis for Section 1338(a) jurisdiction unless

23  patent law is essential to each of those theories. *See Christianson v. Colt Indus.*

24  *Operating Corp.*, 486 U.S. 800, 807-08 (1988). In other words, a tangential patent

25  allegation is not sufficient if the "clear gravamen of the complaint" sounds in contract.

26  _____

27  [5] Pursuant to 28 U.S.C. §1338(a), federal courts have original, exclusive jurisdiction over civil actions relating to patents. It is "well-settled" that if "a patentee pleads a cause of action based on rights created

28  by a contract, . . . the case is not one 'arising under' the patent laws." *Jim Arnold Corp. v. Hydrotech Sys., Inc.*, 109 F.3d 1567, 1572 (Fed. Cir. 1997)).

08-CV-401 BEN WMC

Exhibit J
Page 15
Exhibit "7"
171

1   *Applera Corp. V. Illumina, Inc.,* 282 F.Supp.2d 1120, 1124 (N.D. Cal. 2003) (citing *Air*

2   *Products & Chemicals, Inc. v. Reichhold Chemicals, Inc.,* 755 F.2d 1559, 1561 (Fed. Cir.

3   1985)). The significance of this precedent is two-fold: Not only does it mean that even if

4   Ligand's Declaratory Judgment Complaint raises a mix of state and federal issues, it

5   should still be dismissed in favor of the University's New York state case, but it also

6   indicates that this Court lacks subject matter jurisdiction in this case under 28 U.S.C.

7   §1338.[6]

8        There is extensive precedent holding that suits over failure to pay royalties under a

9   license agreement brought in federal court fail to posit subject matter jurisdiction under

10  28 U.S.C. §1338(a). The analysis involves a determination as to whether the complaint

11  pleads claims under the patent laws. Courts have consistently distinguished the latter

12  from cases in which construction or enforcement of a contract or license is the issue, and

13  for which state court, not federal court, subject matter jurisdiction lies. *See Luckett v.*

14  *Delpark,* 270 U.S. 496, 510-11 (1926) ("Where a patentee complainant makes his suit

15  one for recovery of royalties under a contract of license or assignment, or for damages for

16  a breach of its covenants, or for a specific performance thereof, . . he does not give the

17  federal district court jurisdiction of the case as one arising under the patent laws."); *Jim*

18  *Arnold Corp.,* 109 F.3d 1567, 1578-79 (Fed. Cir. 1997) (remanding plaintiff's case to

19  state court after improper removal because federal court did not have subject matter

20  jurisdiction; holding that plaintiff's suit premised on state-law-based set of claims arising

21  out of alleged breaches of the assignment agreements).

22       D.   Any Jurisdiction And/Or Venue Arguments Ligand May Seek To

23  Raise In Connection With The New York State Suit, Are Properly Considered By New

24  York Courts Rather Than This Court.

25       The Ninth Circuit has clearly stated that "[d]eclaratory relief is not authorized so

26  that lower federal courts can sit in judgment over state courts, and it is not a substitute for

27

28  [6] In paragraph 10 of its Declaratory Judgment Complaint, Ligand asserts that this Court has subject matter jurisdiction pursuant to 28 U.S.C. §§1332, 1338 and 2201.

12

08-CV-401 BEN WMC

1  removal." *Exxon Shipping Co.*, 120 F.3d 166, 170 (9th Cir. 1997) (holding that district

2  court abused its discretion in granting declaratory relief to preempt a ruling on federal

3  law issues by state court); *Shell Oil Co. v. Frusetta,* 290 F.2d 689, 694 (9th Cir. 1961)

4  (declaratory relief not available because of "fears" that state court will not provide fair

5  trial; Congress provided for protection through removal statue, not Declaratory Judgment

6  Act); *H.J. Heinz Co. v. Owens,* 189 F.2d 505, 508 (9th Cir. 1951) ("The wholesome

7  purposes of declaratory acts would be aborted by its use as an instrument of procedural

8  fencing either to secure delay or to choose a forum. It was not intended by the act to

9  enable a party to obtain a change of tribunal and thus accomplish in a particular case what

10  could not be accomplished under the removal act . . . "). As a result, the Court should

11  decline any invitation by Ligand to deny this Motion based on an argument that the New

12  York court lacks jurisdiction -- Ligand's declaratory action is not the proper vehicle for

13  such a challenge.[7] *Exxon,* 120 F.3d at 168 ("It should go without saying that a

14  declaratory judgment action must serve some purpose in resolving a dispute. If the relief

15  serves no purpose, or an illegitimate one, then the district court should not grant it.").

16      Likewise, this Court should decline to adjudicate any venue arguments that Ligand

17  may raise, such as alleged inconvenience or hardship, in deference to the New York

18  court.[8] *See Tempco Elec. Heater Corp. v. Omega Eng'g, Inc.,* 819 F.2d 746, 750 n. 6

19  (7th Cir. 1987) (venue contentions, "e.g. [the] contention that the claim arose in Illinois

20  [the jurisdiction in which the declaratory judgment action was filed] rather than

21  Connecticut [the other jurisdiction]," should be addressed by the court handling the

22  action for coercive relief, not the court in which the declaratory judgment action was

23  filed); *Trippe Mfg. Co. v. Am. Power Conversion Corp.,* 46 F.3d 624, 629 (7th Cir. 1995)

24

---

25  [7] Any such challenge to the New York court's jurisdiction would be futile. The University's New York

26  Complaint leaves no doubt that the University's suit is premised on a state-law based set of claims arising out of an alleged breach of the 1992 Agreement.

27  [8] Any attempt to remove and then transfer the New York case to this Court would fail in any event, as

28  there is no basis for federal question jurisdiction over the New York case and the transfer factors under 28 U.S.C. §1404 favor the University.

1  ("Trippe's venue arguments may properly be addressed to and decided by the Rhode
2  Island court, even though the action was first filed in Illinois.")  In any event, having filed
3  with the New York Department of State to do business in New York, Ligand should not
4  be permitted to argue that New York is not a convenient forum for litigation of this New
5  York-based license agreement with a New York university.

6  **II.    IN THE ALTERNATIVE, THIS ACTION SHOULD BE STAYED.**

7          Pursuant to the clear precedent set forth above, the University believes that this Court
8  should decline to exercise jurisdiction over this declaratory action and dismiss the case.  The
9  University recognizes, however, that this Court has the inherent authority to stay this matter
10  pending the resolution of the New York state court litigation.  A federal court's power to stay
11  proceedings "is incidental to the power inherent in every court to control the disposition of the
12  causes on its docket with economy of time and effort for itself, for counsel, and for litigants."
13  *Landis v. North Am. Co.*, 299 U.S. 248, 254 (1936); *see also Wilton*, 515 U.S. at 288-89 (district
14  court may use its discretion to stay or dismiss an action seeking a declaratory judgment).
15  Although the Court has the authority to stay this case until the final disposition of the New York
16  state litigation, the University believes that an order of dismissal is the preferred remedy, based
17  on the precedent set forth above, and because there is no advantage to a stay where the
18  disposition of the state court litigation will moot this action.

19                                    **CONCLUSION**

20          For the reasons set forth above, The Rockefeller University respectfully requests that this
21  Court dismiss this action or, in the alternative, stay this action in deference to the New York state
22  court's resolution of the University's litigation against Ligand Pharmaceuticals, Inc.

23

24  Dated:  March 11, 2008            FOLEY & LARDNER LLP
                                      KENNETH S. KLEIN
25

26                                    By: /s/
27                                        KENNETH S. KLEIN
                                          Attorneys for Defendant The Rockefeller
28                                        University, a New York not-for-profit
                                          corporation

                                    14

                                                    08-CV-401 BEN WMC

# EXHIBIT K

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-------------------------------------------------------------X
                                        :    **SUMMONS**

THE ROCKEFELLER UNIVERSITY,      :

                   Plaintiff,        :    Index No. 08/600638

                               : 

            v.                   :    Date Purchased: 3/4/08

                               : 

LIGAND PHARMACEUTICALS, INC.,    :    Plaintiff designates New York
                               :    County as the place for trial

              Defendant.     : 
-------------------------------------------------------------X

To the above named Defendant:

       YOU ARE HEREBY SUMMONED to answer the complaint in this action, and to serve a copy of your answer, or if the complaint is not served with this summons, to serve a notice of appearance, on the plaintiff's attorneys within 20 days after service of this summons, exclusive of the day of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York); and in the case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

       The basis of the venue designated is NY CPLR § 503(a).

Dated: New York, New York
      March 4, 2008

Plaintiff's Address:
The Rockefeller University
1230 York Avenue
New York, New York 10065

NEW YORK
COUNTY CLERK'S OFFICE

MAR 04 2008

NOT COMPARED
WITH COPY FILE

FOLEY & LARDNER LLP

By: *Peter N. Wang* (DH)
    Peter N. Wang
    Anat Hakim
    Douglas S. Heffer
    90 Park Avenue
    New York, New York 10016
    (212) 682-7474
    Attorneys for Plaintiff

NYC_154136.1

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------------------------X
THE ROCKEFELLER UNIVERSITY,

                Plaintiff,

       v.

LIGAND PHARMACEUTICALS, INC.

                Defendant.

------------------------------------------------------------X

Index No.

**COMPLAINT**

**JURY TRIAL REQUESTED**

        Plaintiff, The Rockefeller University, by its attorneys, Foley & Lardner LLP, complains and alleges as follows:

## NATURE OF THE ACTION

        The Rockefeller University (the "University") owns groundbreaking inventions that are powerful tools to screen for therapeutic drugs and that were discovered by its esteemed faculty member Dr. James E. Darnell Jr. The University exclusively licensed this valuable technology to defendant Ligand Pharmaceuticals, Incorporated ("Ligand") in 1992 ("1992 Agreement"). Working under a 1994 agreement with its exclusive sublicensee SmithKline Beecham ("SKB", now GlaxoSmithKline) ("1994 SKB/Ligand Agreement") and using the University's inventions, Ligand identified several pharmaceutical molecules and received several milestone payments from SKB. Ligand has failed to pay the University its contractual share of these milestone payments according to the 1992 Agreement, despite the University's repeated requests. Instead, in August 2007, shortly before SKB requested approval from the Food and Drug Administration of Promacta®, one of the pharmaceutical molecules identified under the 1994 SKB/Ligand Agreement, and before royalties on Promacta® are anticipated to be paid by SKB to Ligand, Ligand notified the University that Ligand was unilaterally terminating the 1992 Agreement, although not permitted to do so by its terms. The University, having fully performed

NEW YORK
COUNTY CLERKS OFFICE

MAR 0 4 2008

NOT COMPARED
WITH COPY FILE

its contractual obligation and faced with Ligand's refusal to honor its payment obligations under the 1992 Agreement, has no other recourse but to file this action.

## PARTIES

1.    Plaintiff The Rockefeller University is, and at all times mentioned herein was, a New York corporation whose principal place of business is at 1230 York Avenue, New York, NY 10065.

2.    Defendant Ligand Pharmaceuticals, Inc. is, and at all times mentioned herein was, a Delaware corporation whose principal place of business is at 10275 Science Center Drive, San Diego, CA 92121. Ligand is a biotechnology company engaged in the discovery and development of new drugs.

## JURISDICTION AND VENUE

3.    This Court has personal jurisdiction over defendant pursuant to CPLR § 301, 302.

4.    Venue is proper in this county pursuant to CPLR § 503(a).

## BACKGROUND OF THE UNIVERSITY-LIGAND COLLABORATION

5.    Founded in 1901, Plaintiff The Rockefeller University is the nation's first biomedical research university. Today, it is internationally renowned for research and graduate education in the biomedical sciences, chemistry and physics. A total of 21 scientists associated with the University have received the Nobel Prize in medicine and physiology or chemistry, 17 University scientists have received Lasker Awards, five have been named MacArthur Fellows and 11 have garnered the National Medal of Science. More than one-third of the current faculty are elected members of the National Academy of Sciences.

6.    Dr. James E. Darnell Jr., M.D. has been a professor at The Rockefeller University since 1974. A pioneering researcher in the field of gene regulation, he is The Rockefeller University Vincent Astor Professor and head of the University's Laboratory of Molecular Cell Biology. Dr. Darnell is an elected member of the National Academy of Sciences.

7.    Prior to Dr Darnell's pioneering research, it was not understood how a large and diverse group of regulatory proteins called cytokines cause cells in the human body to change

2

Exhibit "7"
178

their behavior in response to changes in the environment. Cytokines play an important role in regulating the human body, for example, stimulating the immune system to fight infection and activating red blood cell or platelet formation. Among Dr Darnell's many discoveries, he elucidated how the binding of a cytokine to a cell surface receptor is communicated to the nucleus of a cell to regulate the expression of a small and select number of genes. The pathway Dr Darnell discovered involves the binding of a cytokine to a cell surface receptor causing certain proteins, which he called Signal Transducers and Activators of Transcription, or STAT proteins, to accumulate in the nucleus, bind to specific genes, cause them to be expressed and thereby change cell behavior ("STATs Pathway").

8.      Dr. Darnell received numerous awards for his pioneering discovery and characterization of the STAT pathway, including the 2002 Albert Lasker Award for Special Achievement in Medical Science: "For an exceptional career in biomedical science during which he opened two fields in biology - RNA processing and cytokine signaling - and fostered the development of many creative scientists." In 2003, the White House awarded Dr. Darnell the National Medal of Science, the nation's highest honor for lifetime achievement in fields of scientific research. Other awards Dr. Darnell has received include the 1997 Passano Award, the 1994 Paul Janssen Prize in Advanced Biotechnology and Medicine and the 1986 Gairdner Foundation International Award.

9.      Dr Darnell invented, based on his understanding of the STAT pathway, a high throughput screen ("HTS") for discovery of new pharmaceuticals that are agonists or antagonists of cytokines. An agonist is a pharmaceutical that binds the same cell surface receptor as the cytokine, while an antagonist is a pharmaceutical that prevents binding of the cytokine to its cell surface. Dr. Darnell's HTS invention was disclosed in a Rockefeller University patent application filed in September 1993. In the HTS, a cell is exposed to a potential pharmaceutical and the activity of a reporter gene, designed by Dr Darnell based on his knowledge of the STATs Pathway, is monitored. Potential pharmaceuticals that mimic cytokine activity and therefore serve as agonists are identified.

3

## 1992 LICENSE AGREEMENT BETWEEN THE UNIVERSITY AND LIGAND

10.    The pioneering STATs Pathway technology that Dr. Darnell discovered and developed while at the University (and which was owned by the University) promised to be a powerful tool to screen for therapeutic drugs. To allow Dr. Darnell's groundbreaking discovery to be utilized for the public good, the University entered into negotiations with Ligand to use this discovery, including HTS, to find valuable new pharmaceuticals.

11.    After negotiation, on September 30, 1992, the University and Ligand entered into a License Agreement. A true and correct copy of the 1992 Agreement is attached hereto as Exhibit A and incorporated herein by reference.

12.    In the 1992 Agreement, the University granted Ligand a sole exclusive world-wide license, under the University's broadly-defined Licensed Patent Rights and Technical Information relating to the STATs Pathway technology, "to make, have made, use and sell Products or practice Processes." *See Exhibit A at Section 2.1.* The license grant to Ligand included an exclusive world-wide license to all developments of Dr. Darnell's laboratory relating to the STATs Pathway technology, existing as of the effective date of the 1992 Agreement and for five years thereafter. *See id. at Section 1.4.* In connection with the 1992 Agreement, Dr. Darnell and members of his laboratory did in fact collaborate with Ligand for years regarding the STATs Pathway technology. Over the course of several years, Dr. Darnell provided essential technical information, materials and insight to Ligand relating to the STATs Pathway technology. In addition, the University filed several patent applications and was issued several patents, describing aspects of its pioneering STATs Pathway technology.

13.    The technical information and expertise about STATs Pathway technology that Ligand acquired from the University pursuant to the 1992 Agreement was essential to the development of, among other things, a HTS to identify cytokine agonists. The HTS was key to the identification and development of pharmaceutical drug candidates.

14.    In return for the University's exclusive world-wide license to this pioneering

4

Exhibit "7"
180

STATs Pathway technology, Ligand obligated itself to:

    a.   "diligently seek to develop Products and/or Processes" using or based on the STATs Pathway technology provided to it under the 1992 Agreement. *See id. at Section 2.7;*

    b.   make certain cash payment to the University during the first five years of the Agreement and to give the University an equity interest in Ligand. *See id. at Sections 2.2 and 2.3; and*

    c.   pay the University a portion of any payments Ligand received from any third party "to secure the right to use Technical Information or to sell Products or Processes," (*see id. at Section 2.5)* and a royalty on Ligand's own "Net Sales of Products and on its net revenues . . . received from performance of Processes for a third party." (*see id. at Section 2.4*).

15.    Section 2.5 of the 1992 Agreement, which addresses Ligand's payment obligations to the University with respect to milestone and royalty payments it receives from third parties provides:

> In the case of payments made to Ligand by a third party to secure the right to use Technical Information or to sell Products or Processes, Ligand will pay to Rockefeller and NYU twenty-five percent (25%) of the payments made to Ligand by the third party; provided, however, that in the situation where the payment to Ligand is based on the third party's revenues arising from sale of a Product or use of a Process, then Ligand shall pay to Rockefeller and NYU the lesser of twenty-five percent (25%) of the payment received from the third party or a royalty calculated pursuant to Section 2.4 by treating the third party's sales of such Products and Processes as Ligand sales. Payments by a third party to Ligand to purchase equity in Ligand and to fund research at Ligand which do not generate net revenue as defined in Section 2.4 shall not be subject to sharing under this Section 2.5.

16.    Section 2.4 of the 1992 Agreement, which addresses Ligand's royalty payment obligations to the University based on Ligand's own sales of Products or performance of Processes, provides:

> Ligand will pay a royalty of five percent (5%) of its Net Sales of Products and on its net

5

revenues, i.e., gross revenues less fully burdened costs, received from performance of Processes for a third party. The royalty shall be paid for a term which is the longer of ten (10) years, or, on a country by country basis, expiration of the last patent in the Licensed Patent Rights having a claim which reads on the Product or Process or a method of making or using the Product or Process. Only one royalty will be owed on a Product or Process in the circumstance where the Product or Process is covered by multiple claims in the Licensed Patent Rights. Royalty payments made under this Section 2.4 and under Section 2.5 shall be made to Rockefeller and NYU in the ratio ninety percent (90%) to Rockefeller and ten percent (10%) to NYU.

17.    The 1992 Agreement provides that it "shall be interpreted and governed in accordance with the laws of the State of New York." *See id. at Section 13.*

## 1994 RESEARCH, DEVELOPMENT, AND LICENSE AGREEMENT BETWEEN LIGAND AND SMITHKLINE BEECHAM

18.    On December 29, 1994, Ligand entered into an exclusive research and development collaboration and license with SmithKline Beecham. On information and belief, under the 1994 SKB/Ligand Agreement, the HTS technology that was developed using the University's STATs Pathway technology was to be used by Ligand and SKB to discover and characterize small molecule, orally bioavailable drugs for the treatment of a variety of blood cell deficiencies. On information and belief, Ligand sub-licensed to SKB the STATs Pathway technology that the University exclusively licensed to Ligand.

19.    The 1994 SKB/Ligand Agreement entitles Ligand to payments from SKB for certain milestones reached in connection with the development of research compounds or products as well as royalty payments. In announcing Ligand's collaboration with SKB, Ligand's then-Senior Vice President and Chief Scientific Officer stated in a February 6, 1995 press release:

> We are delighted to have this, our second STATs collaboration within two years of licensing in this exciting technology from Rockefeller University. Our signal transduction area of research affords numerous drug targets to control gene expression. This alliance with the excellent research team at SB provides critical mass and expertise to exploit our recent insights in STATs and HGFs to create new medicines.

## DISPUTE BETWEEN THE UNIVERSITY AND LIGAND CONCERNING THE DEVELOPMENT OF PHARMACEUTICAL CANDIDATES

20. The SKB/Ligand collaboration has led to the identification and development of several pharmaceutical compounds that act via the STATs Pathway, including but not limited to PROMACTA®/REVOLADE® ("PROMACTA®"), an orally active, non-peptide, small molecule thrombopoietin ("TPO") mimetic for the treatment of thrombocytopenia. Thrombocytopenia, or a low number of platelets in the blood, can be a life-threatening condition. Platelets are necessary to the normal process of blood clotting. When someone experiences thrombocytopenia, a cut or bruise might not heal quickly, or at all, without medical intervention. Therefore, patients with a low platelet cell count must take special precautions, and suffer significant risk.

21. On information and belief, in the fourth quarter of 2007, SKB submitted to the Food & Drug Administration a New Drug Application for PROMACTA® for the treatment of short-term idiopathic thrombocytopenic purpura (ITP). ITP is a disorder characterized by low platelet counts leaving patients at risk of episodes of spontaneous bruising, mucosal bleeding, and in severe cases intracranial hemorrhage. On information and belief, if approved, PROMACTA® would be the first approved oral TPO mimetic. On information and belief, in the fourth quarter of 2007, SKB initiated two Phase III trials in connection with the use of PROMACTA® for hepatitis C, and SKB is studying PROMACTA® for chemotherapy-induced thrombocytopenia (CIT). On information and belief, at least one additional pharmaceutical compound, SB-559448, also developed as part of the SKB/Ligand collaboration, and described as a backup compound to PROMACTA®, is in Phase I clinical trials.

22. On information and belief, Ligand also has its own thrombopoietin program, which it commenced after its research program with SKB ended, and that program has resulted in the identification and development of Ligand's lead, small-molecule TPO mimetic, LGD-4665, which acts via the STATs Pathway by binding to the thrombopoietin receptor in a manner

7

similar to TPO and activates the production of platelets by the bone marrow. As of December 2007, Ligand reported that LGD-4665 generated positive Phase I results. Ligand also has stated that it expects to advance the development of LGD-4665 for multiple indications. On information and belief, several additional next generation molecules are in the research phase at Ligand with promising TPO mimetic activities.

23.     On information and belief, each of the compounds described in Paragraphs 20 -22 above, constitute a "Product", as that term is defined in Section 1.5 of the 1992 Agreement. Section 1.5 of the 1992 Agreement defines "Product" as follows:

> any product which embodies or the use of which employs any invention(s) described or claimed in Licensed Patent Rights or for which Technical Information was essential to the discovery or development thereof.

24.     The 1992 Agreement defines "Licensed Patent Rights" as follows:

> (a) the patent application(s) set forth on Exhibit "A" attached hereto and all patents which may issue thereon;
> (b) the patent applications which are divisionals, continuations, continuations-in-part, reissues, renewals, foreign counterparts, extensions or additions of the patents and/or applications described in (a) and (b) of this paragraph 1.3, and all patents which may issue thereon;
> (c ) and all other patent applications, and patents issuing thereon, filed to cover Technical Information, including divisionals, continuations-in-part, reissues, renewals, foreign counterparts, extensions or additions and patents which may issue thereon.

25.     The 1992 Agreement defines "Technical Information" as follows:

> any and all technical data, information processes, materials and know-how, whether or not patentable, owned by Rockefeller and existing or capable of description in a tangible form relating to peptidyl hormone mediated gene expression (a) developed in the laboratory of Dr. James Darnell of Rockefeller or Dr. David Levy of NYU as of the Effective Date and (b) which is subsequently developed at Rockefeller in the laboratory of Dr. James Darnell during the period ending five (5) years form the Effective Date.

26.     Consequently, under Section 2.5 of the 1992 Agreement, the University is entitled to at least 25% of milestone and royalty payments paid to Ligand by SKB to date in connection with such Products. Similarly, to the extent that Ligand has entered into collaborations with

8

other third parties from which Ligand has received or is entitled to receive payments for Products subject to Section 2.5 of the 1992 Agreement, the University would be entitled to 25% of such payments.

27.     This includes at least $1.91 Million Dollars, which is equal to 25% of the Eight Million Dollars in milestone payments SKB has already made to Ligand to date in connection with the development of PROMACTA® and SB-559448, minus amounts Ligand previously paid the University. *See Exhibit A at Section 2.5.* In addition, to the extent that the Ligand/SKB collaboration results in additional milestone payments by SKB to Ligand in connection with the continued development of PROMACTA®, SB-559448 or the development of other compounds, the University would be entitled to 25% of such milestone payments.

28.     To date, Ligand has refused to pay the University its portion of the milestone payments and has taken the position that no further milestone payments are or will be owing to the University.

29.     In addition to 25% of milestone payments received by Ligand, the University is also entitled to 25% of any royalty payments that SKB would pay to Ligand on sales of PROMACTA®. To the extent that the Ligand/SKB collaboration results in the commercialization of products other than PROMACTA®, such as, for example, products based on SB-559448, the University would be entitled to 25% of royalty payments made to Ligand based on sales of those products as well. Ligand has taken the position that the University is not entitled to any royalties under the 1992 Agreement.

30.     A couple of months before SKB submitted its New Drug Application for PROMACTA® to the Food & Drug Administration, and by letter dated August 9, 2007, Ligand informed the University that Ligand was providing written notice that "Ligand is exercising its right to terminate the above-referenced Agreement. Pursuant to Section 11.2, this termination will be effective on November 7, 2007."

31.     On September 25, 2007, representatives of Ligand and the University met to discuss Ligand's purported termination notice and the University's position that the 1992

9

NYC_154137.1

Agreement could not be terminated after full performance by the University. At the meeting, the University notified Ligand that it was exercising its audit rights under Section 4.2 of the 1992 Agreement.

32.     On October 10, 2007, the University sent Ligand its preliminary audit request and a tolling agreement, which was effective through January 31, 2008.

33.     On or about November 13 or 14, 2007, the University initiated its audit of Ligand. To date, Ligand has refused to fully and adequately comply with the University's audit requests, as amended.

34.     On January 17, 2008, the University and Ligand entered into an Amended Tolling Agreement, which was effective through March 3, 2008.

## FIRST CAUSE OF ACTION

### (Breach of Contract Against Ligand)

35.     Plaintiff incorporates by reference each and every allegation contained in paragraphs 1 through 34 of this Complaint as though fully set forth herein.

36.     The 1992 Agreement between the University and Ligand is a valid and binding contract between the University and Ligand.

37.     Upon information and belief, Plaintiff alleges that Defendant has failed to perform and is in material breach of at least its payment obligations under the 1992 Agreement as described in the foregoing paragraphs of this Complaint. As a direct and proximate result of the breach, the University has been damaged in an amount according to proof at trial, but no less than $1.91 Million Dollars.

38.     Plaintiff the University has fully performed all of its obligations and otherwise complied with all the terms and conditions of the 1992 Agreement.

39.     Plaintiff the University is entitled to recover damages from Defendant for Defendant's material breach of the 1992 Agreement alleged in this Complaint in an amount to be proven at trial.

10

NYC_154137.1

## SECOND CAUSE OF ACTION

### (Unjust Enrichment/Constructive Trust)

40.     Plaintiff incorporates by reference each and every allegation contained in paragraphs 1 through 39 of this Complaint as though fully set forth herein.

41.     A civil plaintiff may recover under the doctrine of unjust enrichment by showing that (a) the plaintiff conferred a benefit on the defendant; (b) the defendant appreciated or enjoyed such benefit; and (c) under the circumstances, it was unfair for the defendant to accept or retain the benefit without paying for it.

42.     At Ligand's specific request, and since 1992, the University provided to Ligand valuable information, know-how and services since 1992 relating to STATs Pathway technology.

43.     The University shared such information, know-how and services while Ligand and the University were in a confidential relationship.

44.     Ligand enjoyed such information, know-how and services and was and has been enriched by such information, know-how and services.

45.     Ligand was and has been unjustly enriched at the University's expense because Ligand has not compensated the University for such information, know-how and services.

46.     The reasonable value of the information, know-how and services that the University provided to Ligand and for which the University has not been compensated to date is no less than $1.91 million.

47.     In equity and good conscience, Ligand should be required to return no less than $1.91 million to the University.

48.     The University has no adequate remedy at law by which it can be compensated for this injury.

49.     By virtue of the foregoing, the University has been damaged in an amount to be proven at trial, but in no event less than $1.91 million.

50.     The University also is entitled to a constructive trust on past and future payments made to Ligand by third parties in connection with the valuable information, know-how and

11

services that the University transferred to Ligand, including but not limited to past payments received and future payments in connection with PROMACTA® and/or SB-559448.

### THIRD CAUSE OF ACTION

#### (Quantum Meruit)

51. Plaintiff incorporates by reference each and every allegation contained in paragraphs 1 through 50 of this Complaint as though fully set forth herein.

52. Since 1992, the University provided to Ligand valuable information, know-how and services relating to STATs Pathway technology in good faith and with the expectation, based on the parties' discussions, that the University would receive compensation for this valuable information, know-how and services.

53. Ligand accepted the benefit of the University's valuable information, know-how and services, but has not compensated the University

54. By virtue of the foregoing, the University has been damaged in an amount to be proven at trial, but in no event less than $1.91 million.

### FOURTH CAUSE OF ACTION

#### (Specific Performance of Contractual Right to Perform Audit)

55. Plaintiff incorporates by reference each and every allegation contained in paragraphs 1 through 54 of this Complaint as though fully set forth herein.

56. The University is entitled to conduct an audit under Section 4.2 of the 1992 Agreement in order to determine the payments due from Ligand to the University under the 1992 Agreement.

57. The records that would enable the University, through its auditor, to determine the payments due from Ligand to the University under the 1992 Agreement, are within Ligand's possession and control.

58. Ligand has failed to provide many records that were requested by the University to its auditor.

59. The University has no adequate remedy at law.

12

NYC_154137.1

60.   The University is thus entitled to perform an audit of Ligand pursuant to Section 4.2 of the 1992 Agreement.

### FIFTH CAUSE OF ACTION

#### (Declaratory Relief Against Ligand)

61.   Plaintiff incorporates by reference each and every allegation contained in paragraphs 1 through 60 of this Complaint as though fully set forth herein.

62.   An actual controversy now exists as to the rights and obligations of Plaintiff the University and Defendant Ligand with respect to the 1992 Agreement. Upon information and belief, Plaintiff the University contends that it is entitled to certain milestone and/or royalty payments provided for under the 1992 Agreement in connection with Defendant's identification and continued development of at least PROMACTA® and SB-559448. Defendant Ligand disputes Plaintiff the University's contention, and asserts that it has no obligation to Plaintiff the University under the 1992 Agreement in connection with PROMACTA® or any other compound or product.

63.   Plaintiff University desires a declaration from this Court as to its rights and Defendant's obligations under the 1992 Agreement confirming that:

   a.  PROMACTA®, SB-559448, and LGD 4665 each are a "Product", within the meaning of term as defined in the 1992 Agreement;

   b.  The University is entitled to, and Ligand is obligated to pay, 25% of all milestone payments and other consideration related to PROMACTA® and/or SB-559448, now due under the 1992 Agreement, including 25% of the milestone payments of $2 Million, $1 Million, $2 Million, and $1 Million relating to PROMACTA® and 25% of the milestone payment of $2 Million relating to SB-559448, as provided by Section 2.5 of the 1992 Agreement.

13

Exhibit "7"
189

c.  The University is entitled to, and Ligand will be obligated to pay in the future, 25% of all milestone and/or royalty payments and other consideration related to PROMACTA® and/or SB-559448 which shall become due under the 1992 Agreement hereafter.

d.  The University is entitled to 25% of milestone and/or royalty payments paid to Ligand by any third party in connection with any Product as that term is defined in the 1992 Agreement.

e.  The University is entitled to a 5% royalty on Ligand's Net Sales of Ligand Products that Ligand may bring forward on its own, and not in connection with a third party, as set forth in Section 2.4 of the 1992 Agreement.

64.     A judicial declaration is necessary and appropriate at this time so that the parties may ascertain their rights and obligations under the 1992 Agreement and Plaintiff the University may obtain the relief to which it is entitled.

WHEREFORE, The Rockefeller University prays for judgment as follows:

1.     Damages according to proof at trial, including interest;

2.     Specific performance of the audit initiated by the University, pursuant to Section 4.2 of the 1992 Agreement;

3.     A constructive trust imposed on payments (milestone and royalty) received from a third-party by Ligand, including but not limited to such payments made in connection with PROMACTA® and/or SB-559448, and on Ligand's Net Sales of Ligand Products that Ligand may bring forward on its own;

4.     A Court Declaration confirming that:

14

Exhibit "7"
190

a. PROMACTA®, SB-559448, and LGD 4665 each are a "Product", within the meaning of the term as defined in the 1992 Agreement;

b. The University is entitled to, and Ligand is obligated to pay, 25% of all milestone payments and other consideration related to PROMACTA® and/or SB-559448, now due under the 1992 Agreement, including 25% of the milestone payments of $2 Million, $1 Million, $2 Million, and $1 Million relating to PROMACTA® and 25% of the milestone payment of $2 Million relating to SB-559448, as provided by Section 2.5 of the 1992 Agreement.

c. The University is entitled to, and Ligand will be obligated to pay in the future, 25% of all milestone and/or royalty payments and other consideration related to PROMACTA® and/or SB-559448 which shall become due under the 1992 Agreement hereafter.

d. The University is entitled to 25% of milestone and/or royalty payments paid to Ligand by any third party in connection with any Product as that term is defined in the 1992 Agreement.

e. The University is entitled to a 5% royalty on Ligand's Net Sales of Ligand Products that Ligand may bring forward on its own, and not in connection with a third party, as set forth in Section 4.2 of the 1992 Agreement.

5. Costs of suit; and

6. Such other and further relief as the Court may deem just and proper.

15

7.    The University requests a jury trial on all issues so triable.

Dated: New York, New York
          March 4, 2008

                                        FOLEY & LARDNER LLP

                                        By: *Peter N. Wang*
                                             Peter N. Wang
                                             Anat Hakim
                                             Douglas S. Heffer
                                             90 Park Avenue
                                             New York, New York 10016
                                             (212) 682-7474
                                             Attorneys for Plaintiff The Rockefeller
                                             University

16

Exhibit "7"
192

## AFFIDAVIT OF SERVICE

STATE OF NEW YORK      )
                             ) ss.:        Case No. 08 CV 2755 (KPC)(HP)

COUNTY OF NEW YORK      )

SEAN CAMERON, being duly sworn, deposes and says:

I am not a party to this action, am over 18 years of age and reside in Brooklyn, New York 11217.

On March 21, 2008, I served the within Notice of Motion by depositing a true copy thereof enclosed in a post-paid wrapper, in an official depository under the exclusive care and custody of the United States Postal Service within New York State, addressed to each of the following persons at the last known address set forth after each name.

Anat Hakim
FOLEY & LARDNER LLP
*Attorneys for Plaintiff*
3000 K Street, N.W.
Suite 500
Washington, DC 20007
(202) 672-5300

Peter Wang
Douglas S. Heffer
FOLEY & LARDNER LLP
*Attorneys for Plaintiff*
90 Park Avenue
New York, NY 10016
(212) 682-7474

SEAN CAMERON

Sworn to before me this
21st day of March, 2008.

Notary Public

CHRISTY SCHAEFFER
Notary Public, State of New York
No. 31-4769958
Qualified in New York County
Commission Expires August 31, 2010

EXHIBIT 8



# THE ROCKEFELLER UNIVERSITY

1230 YORK AVENUE • NEW YORK, NEW YORK 10021-6399

December 22, 1992

Dr. Robert B. Stein
Vice President of Research
Ligand Pharmaceuticals Inc.
9393 Towne Centre Drive
Suite 100
San Diego, CA 92121

Dear Bob:

Thanks very much for your visit on December 10th. It is obvious
from that short conversation that there is much to do but that we'll
have a great deal of stimulation and satisfaction as we work to get it
done.

We have had a number of searching discussions about what antibodies
and nucleic acid oligonucleotides to ask you for. In the end I'm sending
you a longer list than you probably will find reasonable. That we under-
stand and will be happy to have whatever falls above your cut-off line.
There are ten antibodies in order of their most immediate priorities.
They are: 91-SH2 domain, 113-SH2 domain, two antibodies each for the
kinases Jak1A, Tyk2A, Jak2A, and J1B, Ty2B, J2B. The final two are for
internal domains of the interferon $\gamma$ and $\alpha$ receptors, RG and RA.

For the nucleic acid probes that will be required to finish the
patent we list a series of 23 oligos. If this is too many (we have
already made ~20) let me know. When you've had a chance to look this
over give me a call.

Best wishes for the holidays.

Sincerely yours,

James E. Darnell, Jr., M.D.
Professor

JED:lc
Encls.

CONFIDENTIAL

Exhibit "8"
195

RU0002701.001

① 91SH (25 mer)
 — NGGEPDEHAVEPYTKKELSAVTEPD —
② 113SH (25 mer)
 — DDDKVLIYSVQPYTKEVLQSLPLTE —
③ J1A (30 mer)
 — FCAKMRSSKKTEVNLEAPEPGVEVIFYLSD —
④ T2A (30 mer)
 — RGSKPVGDGAQPMAAMGGLKVLLHWAGPGG —
⑤ J2A (30 mer)
 — KHKESETLTEQDVQLYCDFPDIIDVSIKQA
⑥ J1B (21 mer)
 — INKLEEQNPDIVSRKKNQRTE —
⑦ T2B (21 mer)
 — PILKTVHEKYQGQAPSVESVC —
⑧ J2B (21 mer)
 — SLFTPDYELLTENDMLPNMRI —
⑨ RG (30 mer)
 — FGYDKPHVLVDLLVDDSGKESLIGYRPTED —
⑩ RA (30 mer)
 — DEDHKKYSSQTSQDSGNYSNEDESESKTSE —

RU0002702

| NAME: | Sequence | NAME: | Sequence |
|---|---|---|---|
| S2T: | TTTTCCTGTAAGTG | A2T: | CACTTACAGGAAAA |
| S2C: | TCTTCCTGTAAGTG | A2C: | CACTTACAGGAAGA |
| S2G: | TGTTCCTGTAAGTG | A2G: | CACTTACAGGAACA |
| S5G: | TATTGCTGTAAGTG | A5G: | CACTTACAGCAATA |
| S5T: | TATTTCTGTAAGTG | A5T: | CACTTACAGAAATA |
| S7G: | TATTCCGGTAAGTG | A7G: | CACTTACCGGAATA |
| S7A: | TATTCCAGTAAGTG | A7A: | CACTTACTGGAATA |
| S8T: | TATTCCTTTAAGTG | A8T: | CACTTAAAGGAATA |
| S9A: | TATTCCTGAAAGTG | A9A: | CACTTTCAGGAATA |
| S9G: | TATTCCTGGAAGTG | A9G: | CACTTCCAGGAATA |
| S9C: | TATTCCTGCAAGTG | A9C: | CACTTGCAGGAATA |

14 mer for above 22 oligos

13R: (13 mer )

ATTCCTGTAAGTG

Total : 23 oligos

RU0002703

1  **FOLEY & LARDNER LLP**
   402 W. BROADWAY, SUITE 2100
2  SAN DIEGO, CA 92101-3542
   TELEPHONE:    619.234.6655
   FACSIMILE:    619.234.3510
3
   KENNETH S. KLEIN, CA BAR NO. 129172
4
   **FOLEY & LARDNER LLP**
   3000 K STREET, NW - SUITE 500
5  WASHINGTON, DC 20007-5101
   TELEPHONE:    202.672-5300
   FACSIMILE:    202.672-5399
6
   ANAT HAKIM, (Admitted pro hac vice)
7
   Attorneys for Defendant The Rockefeller University, a New York not-for-profit
8  corporation,

9                UNITED STATES DISTRICT COURT

10            SOUTHERN DISTRICT OF CALIFORNIA

11

12 Ligand Pharmaceuticals Incorporated, a      Case No:  08-CV-401 BEN (WMc)
   Delaware corporation,
13                                             **CERTIFICATE OF SERVICE**
              Plaintiff,
14                                             Judge:        Roger T. Benitez
          vs.
15                                             Date:         June 2, 2008
   The Rockefeller University, a New York      Time:         10:30 a.m.
16 not-for-profit corporation,                 Dept:         Courtroom 3

17            Defendant.

18

19

20

21

22

23

24

25

26

27

28

SDCA_1019318.1                                          08-CV-401 BEN WMC

1    **CERTIFICATE OF SERVICE**

2    I hereby certify that on **March 26, 2008**, I caused the following document(s):

3

4    1.    Notice of Motion and Motion to Dismiss or, in the Alternative, Transfer or Stay This Action

5
6    2.    Declaration of Anat Hakim in Support of Defendant the Rockefeller University's Motion to Dismiss, or in the Alternative, Transfer or Stay this Action

Case 3:08-cv-00401-BEN-WMC    Document 13-2    Filed 03/26/2008    Page 2 o

7    3.    Declaration of James Lapple in Support of Defendant the Rockefeller University's Motion to Dismiss, or in the Alternative, Transfer or Stay this Action
8

9    4.    Memorandum of Points and Authorities in Support of Defendant the Rockefeller University's Motion to Dismiss, or in the Alternative, Transfer or Stay this Action
10

11    to be filed electronically with the Clerk of Court through ECF, and that ECF will send an

12    e-notice of the electronic filing to the following:

13

14    Darrell Olson
      KNOBBE, MARTENS, OLSON & BEAR
15    LLP
      2040 Main Street, Fourteenth Floor
16    Irvine, CA 92614
      Phone:        (949) 760-0404
17    Facsimile:    (949) 760-9502

18    litigation@kmob.com,2dlo@kmob.com

19
      a copy was mailed to:
20
      Joseph M. Reisman Ali S. Razai
21    KNOBBE, MARTENS, OLSON & BEAR, LLP
      550 West C Street, Suite 1200
22    San Diego, CA 92101
      Phone:        (619) 235-8550
23    Facsimile:    (619) 235-0176

24
      _X_    BY MAIL
25
           _X_    I am readily familiar with the firm's practice of collection and processing
26                correspondence for mailing with the United States Postal Service; the firm
                  deposits the collected correspondence with the United States Postal
27                Service that same day, in the ordinary course of business, with postage
                  thereon fully prepaid, at **San Diego, California**. I placed the envelope(s)
28                for collection and mailing on the above date following ordinary business
                  practices.

                              1

1

2    __X__    Executed on **March 26, 2008**, at **San Diego, California**.

3    __X__    I declare that I am employed in the office of a member of the bar of this
            court at whose direction the service was made.

4

5                                    Martha X. Zarate

6

7    Case 3:08-cv-00401-BEN-WMC    Document 9-12    Filed 03/26/2008    Page 3 o

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT 8



# THE ROCKEFELLER UNIVERSITY

1230 YORK AVENUE • NEW YORK, NEW YORK 10021-6399

June 17, 1992

Mr. David Robinson
President
Ligand
9393 Towne Center Drive
San Diego, California  92121

Dear David:

Confirming our discussion this morning, we have a meeting in my office scheduled for Thursday, June 25, 1992 at 10:00 a.m. to discuss Ligand's proposal.

From the University's side, I hope to have with me Dr. Jerry Weisbach, our Director of Technology Transfer, as well as my assistant, Terry Solomon.  Jim Darnell is out of town at that time.

It would be helpful if you could bring as much background material concerning Ligand as you can share with us.  Your company is not unknown to us, but part of the process will be for me to bring my management up to speed about your company and its plans.

I look forward to our meeting.

Sincerely,

William H. Griesar

WHG:es

cc:  Dr. James Darnell
     Teresa L. Solomon, Esq.
     Dr. Jerry A. Weisbach



# THE ROCKEFELLER UNIVERSITY

1230 YORK AVENUE • NEW YORK, NEW YORK 10021-6399

December 22, 1992

Dr. Robert B. Stein
Vice President of Research
Ligand Pharmaceuticals Inc.
9393 Towne Centre Drive
Suite 100
San Diego, CA 92121

Dear Bob:

Thanks very much for your visit on December 10th. It is obvious from that short conversation that there is much to do but that we'll have a great deal of stimulation and satisfaction as we work to get it done.

We have had a number of searching discussions about what antibodies and nucleic acid oligonucleotides to ask you for. In the end I'm sending you a longer list than you probably will find reasonable. That we understand and will be happy to have whatever falls above your cut-off line. There are ten antibodies in order of their most immediate priorities. They are: 91-SH2 domain, 113-SH2 domain, two antibodies each for the kinases Jak1A, Tyk2A, Jak2A, and J1B, Ty2B, J2B. The final two are for internal domains of the interferon $\gamma$ and $\alpha$ receptors, RG and RA.

For the nucleic acid probes that will be required to finish the patent we list a series of 23 oligos. If this is too many (we have already made ~20) let me know. When you've had a chance to look this over give me a call.

Best wishes for the holidays.

Sincerely yours,

James E. Darnell, Jr., M.D.
Professor

JED:lc
Encls.

CONFIDENTIAL

RU0002701.001

① 9ISH (25mer)

— NGGEPDEHAVEPYTKKELSAVTEPD —

② 113SH (25mer)

— DDDKVLTYSVQPYTKEVLQSLPLTE —

③ J1A (30mer)

— FCAKMRSSKKTEVNLEAPEPGVEVIFYLSD —

④ T2A (30mer)

— RGSKPVGDGAQPMAAMGGLKVLLHWAGPGG —

⑤ J2A (30mer)

— KHKESELLTEQDVQLYCDFPDITDVSTKQA —

⑥ J1B (21mer)

— INKLEEQNPDIVSRKKNQPTE —

⑦ T2B (21mer)

— PILKTVHEKYQGQAPSVESVC —

⑧ J2B (21mer)

— SLETPDYELLTENDMLPNMRI —

⑨ RG (30mer)

— FGYDKPHVLVDLLVDDSGKESLTGYRPTED —

⑩ RA (30mer)

— DEDHKKYSSQTSQDSGNYSNEDESESKTSE —

CONFIDENTIAL

| NAME: | Sequence | NAME: | Sequence |
|---|---|---|---|
| S2T: | TTTTCCTGTAAGTG | A2T: | CACTTACAGGAAAA |
| S2C: | TCTTCCTGTAAGTG | A2C: | CACTTACAGGAAGA |
| S2G: | TGTTCCTGTAAGTG | A2G: | CACTTACAGGAACA |
| S5G: | TATTGCTGTAAGTG | A5G: | CACTTACAGCAATA |
| S5T: | TATTTCTGTAAGTG | A5T: | CACTTACAGAAATA |
| S7G: | TATTCCGGTAAGTG | A7G: | CACTTACCGGAATA |
| S7A: | TATTCCAGTAAGTG | A7A: | CACTTACTGGAATA |
| S8T: | TATTCCTTTAAGTG | A8T: | CACTTAAAGGAATA |
| S9A: | TATTCCTGAAAGTG | A9A: | CACTTTCAGGAATA |
| S9G: | TATTCCTGGAAGTG | A9G: | CACTTCCAGGAATA |
| S9C: | TATTCCTGCAAGTG | A9C: | CACTTGCAGGAATA |

14 mer for above 22 oligos

13R: (13 mer)

ATTCCTGTAAGTG

Total : 23 oligos

CONFIDENTIAL

RU0002703

EXHIBIT 9

# THE ROCKEFELLER UNIVERSITY

1230 YORK AVENUE • NEW YORK, NEW YORK 10021-6399

## FACSIMILE COVER SHEET

DATE _1/20/93_

TO _Dr. John Rosen, Ligand Pharmaceuticals_

FAX NUMBER _619 535 3906_

NUMBER OF PAGES FOLLOWING THIS ONE _1_

FROM _Lois Cousseau (Dr. J. Darnell's Office)_

NEW FAX NUMBER - 212 **327**-8801

NEW TELEPHONE NUMBER - 212 **327**- _8791_

Dr. Rosen,

Enclosed is a map of the RU campus. As I mentioned, Dr. Darnell will meet with you in his office on Monday, 1/25, at 9:30 AM (Tower Bldg., Room 1021). Your housing accommodations are in Abby Aldrich Hall (2 checks on map) Use the 66th & York Avenue entrance and the guard will direct you.

If you have any questions, please call.

Sincerely,

*Lois Cousseau*

Lois Cousseau
Administrative Secretary to Dr. Darnell

EXHIBIT 10



🖶 Print page   ✉ Email page   📄 Download PDF
« Previous Release | Next Release »

## Ligand Pharmaceuticals Announces Second Quarter Results

### Conference Call Begins at 4:30 P.M. Eastern Time Today

SAN DIEGO, Aug 08, 2007 (BUSINESS WIRE) --

Ligand Pharmaceuticals Incorporated (NASDAQ:LGND) (the "Company" or "Ligand") today announced financial results for the three months ended June 30, 2007 and provided a business update.

Second Quarter Results

The Company sold its commercial oncology product line in October 2006 and sold the AVINZA(R) product line in February 2007. The results of operations related to these products have been reflected as discontinued operations for all reporting periods discussed below.

Total revenues for the second quarter of 2007 were $1.4 million, compared with $1.1 million for the second quarter of 2006. Royalty revenues for the 2007 second quarter were $1.4 million, compared with none for the 2006 second quarter. Collaborative research and development and other revenues for the second quarter of 2007 were none, compared with $1.1 million in the second quarter of 2006.

Operating costs and expenses for the second quarter of 2007 were $16.3 million, compared with $19.1 million for the same 2006 period. The decrease was due primarily to the reduction in headcount as a result of our restructuring during the 2007 first quarter. Operating costs and expenses for the second quarter of 2007 include $0.5 million of share-based compensation expense, compared with $1.2 million for the same 2006 period. The loss from continuing operations for the second quarter of 2007 was $7.7 million, or $0.08 per share, compared with a loss from continuing operations of $17.2 million, or $0.22 per share, for the second quarter of 2006. Income from discontinued operations in the second quarter of 2007 was $7.9 million, or $0.08 per diluted share, compared with $1.2 million, or $0.02 per diluted share, in the comparable 2006 quarter.

Net income for the second quarter of 2007 was $0.2 million, or $0.00 per diluted share, compared with a net loss of $16.0 million, or $0.20 per share, in the second quarter of 2006.

As of June 30, 2007, Ligand had cash, cash equivalents, short-term investments and restricted investments of $117 million. In addition, there is approximately $35 million of cash held in escrow and trust accounts to support potential indemnifiable claims by purchasers of our commercial products and certain current and former members of our Board of Directors. In April 2007 the Company paid a cash dividend of $2.50 per share for a total of $252.7 million. In March 2007, the Company's Board of Directors authorized up to $100 million in share repurchases. As of June 30, 2007, the Company had repurchased 3.8 million shares for a total of $25.4 million.

"We face an active and exciting second half of 2007, with both partnered products and proprietary programs," said John L. Higgins, President and Chief Executive Officer of Ligand Pharmaceuticals. "By the end of the year, we may see an NDA filing for treatment of short-term ITP from GlaxoSmithKline for eltrombopag (Promacta), FDA approval for Wyeth's bazedoxifene (Viviant), two NDA filings with this product alone or in combination with conjugated estrogen (Aprela) by Wyeth for other indications, and an NDA filing by Pfizer for lasofoxifene (Oporia). We also expect to complete the Phase I study with LGD-4665 and present preclinical data on LGD-3303."

Year-to-Date Results

Total revenues for the six months ended June 30, 2007, were $1.6 million, compared with $4.0 million for the first six months of 2006. Royalty revenues for the six months ended June 30, 2007 were $1.4 million, compared with none for the same period in 2006. Collaborative research and development and other revenues for the first half of 2007 were $0.2 million, compared with $4.0 million for the same period in 2006.

Operating costs and expenses for the first six months of 2007 were $46.0 million, compared with $36.3 million for the same period in 2006. The increase was due to one-time expenses recognized in the first quarter of 2007 related to our

restructuring. Operating costs and expenses for the six months ended June 30, 2007 include $6.1 million of share-based compensation expense compared with $2.0 million for the same period in 2006. The loss from continuing operations for the first six months of 2007 was $24.6 million, or $0.24 per share, compared with a loss from continuing operations of $30.9 million, or $0.40 per share, for the first six months of 2006. Income from discontinued operations for the first half of 2007 was $299.1 million, or $2.98 per diluted share, compared with a loss from discontinued operations of $127.3 million, or $1.63 per share, for the first half of 2006.

Net income for the six months ended June 30, 2007 was $274.5 million, or $2.74 per diluted share, compared with a net loss of $158.2 million, or $2.03 per share, for the same period in 2006.

Program Update

The Company also provided the following update on the status of its key internal and partnered programs:

-- LGD-4665 - TPO Mimetic: Ligand continues to advance LGD-4665 (small molecule, non-peptide TPO mimetic) through a Phase I dose-escalation study. In the second quarter we completed the single-dose escalation stage of the trial. In this study of healthy volunteers, the drug was safe and well tolerated. In addition to safety and dosing, the study is designed to measure platelet counts. Statistically significant elevated platelet counts were observed with single-dose administration of LGD-4665. The multiple dose escalation stage of the trial is ongoing. The Company expects to complete the Phase I study by the end of 2007 and is preparing to initiate multiple Phase II trials for different indications in the first half of 2008.

-- GlaxoSmithKline - TPO Mimetic, Eltrombopag: Ligand's partner GlaxoSmithKline reported Phase III data that confirmed increased platelet levels and significantly lowered incidence of bleeding in patients with ITP. Further, GlaxoSmithKline announced that an NDA filing for use in treatment of short-term ITP is expected by the end of 2007/early 2008.

-- Wyeth - SERM (selective estrogen receptor modulator), Bazedoxifene: Ligand's partner Wyeth announced that it received an approvable letter for bazedoxifene (Viviant) from the FDA in April 2007. Wyeth expects to receive FDA action for this product for osteoporosis prevention by the end of 2007. Bazedoxifene (Viviant) NDA filing for osteoporosis treatment is expected in the third quarter of 2007. Wyeth confirmed that it believes the NDA filing for bazedoxifene CE (Aprela) for menopausal symptoms and osteoporosis remains on track for the end of 2007. Wyeth also plans to file bazedoxifene (Viviant) for European review for treatment and prevention of osteoporosis in the third quarter.

-- Pfizer - SERM, Lasofoxifene: Ligand's partner Pfizer announced plans to refile an NDA for lasofoxifene (Oporia) by the end of 2007. Pfizer expects that the results from the PEARL (Postmenopausal Evaluation and Risk Reduction with Lasofoxifene) study will address the FDA's requirements in terms of safety and benefits for this product.

-- TAP - SARM (selective androgen receptor modulator), LGD-2941: Ligand's partner TAP Pharmaceutical Products is continuing its Phase I trial with LGD-2941.

-- LGD-3303 - SARM: Ligand is conducting preclinical studies to prepare LGD-3303 (SARM product candidate) for an IND filing and the initiation of clinical trials in 2008. Data from Ligand's study of the effect of LGD-3303 on bone density and strength in osteopenic rats will be presented at the American Society of Mineral and Bone Research in September 2007.

Upcoming Events

Ligand plans to present at the following investor healthcare conferences for the Fall 2007:

-- Thomas Weisel Partners Healthcare Conference Boston, MA, September 5-7

-- Bear Stearns 20th Annual Healthcare Conference, New York, NY, September 10-11

-- Natexis Bleichroeder Healthcare Conference, New York, NY, October 8

In addition, the Company will present data on LGD-3303, its lead SARM compound, at the following medical conferences:

-- American Society of Bone & Mineral Research Annual Meeting, Honolulu, HI, September 16-19

-- Society for Neuroscience Annual Meeting, San Diego, CA, November 3-7

Conference Call

Ligand management will host a conference call today beginning at 4:30 p.m. Eastern time (1:30 p.m. Pacific time) to discuss this announcement and answer questions. To participate via telephone please dial (877) 356-5578 from the U.S. or (706) 679-0565 from outside the U.S. A replay of the call will be available until September 8, 2007 at 5:30 p.m. Eastern time by dialing (800) 642-1687 from the U.S. or (706) 645-9291 from outside the U.S., and entering passcode 7183186. Individual investors can access the live and archived Webcast through Ligand's web site at www.ligand.com.

About Ligand Pharmaceuticals

Ligand discovers and develops new drugs that address critical unmet medical needs of patients with thrombocytopenia, hepatitis C, certain types of cancer, hormone-related diseases, osteoporosis and inflammatory diseases. Ligand's proprietary drug discovery and development programs are based on its leadership position in gene transcription technology, primarily related to intracellular receptors.

Forward-Looking Statements

This news release contains certain forward-looking statements by Ligand that involve risks and uncertainties and reflect Ligand's judgment as of the date of this release. Actual events or results may differ from Ligand's expectations. For example, we may not be able to meet the 2007 operational forecast set forth herein. We also may not receive expected royalties on AVINZA(R) from King Pharmaceuticals or any other partnered products or from research and development milestones. In addition, our partners may change their plans or timetables regarding our partnered products and expected regulatory actions (e.g., filings, approvals, etc.) may be delayed or may not occur. Any payments expected from third parties may not be received by us due to third party intellectual property or contract restrictions and any amounts received by us may be subject to third party claims. We may not be able to timely or successfully transform the Company or advance any product(s) in our pipeline, for example, LGD-4665 and LGD-3303. In addition, we may have indemnification obligations to King Pharmaceuticals or Eisai in connection with the sales of the AVINZA and oncology product lines. Further, we may not be able to fully complete our reductions in workforce on any particular or expected timeframe, we may not realize the expected operating savings due to our restructuring and we may not be able to successfully or timely complete a transformation of the company, our early stage programs or any specific business or research initiative(s). In addition, we may not be able to successfully implement our strategy, and continue the development of our proprietary programs. The failure to meet expectations with respect to any of the foregoing matters may reduce our stock price. Additional information concerning these and other risk factors affecting Ligand's business can be found in prior press releases available via www.ligand.com as well as in Ligand's public periodic filings with the Securities and Exchange Commission at www.sec.gov including our form 10-Q filed with the SEC on August 8, 2007. Ligand disclaims any intent or obligation to update these forward-looking statements beyond the date of this release. This caution is made under the safe harbor provisions of the Private Securities Litigation Reform Act of 1995.

```
                    LIGAND PHARMACEUTICALS INCORPORATED
                CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS
                      (in thousands, except share data)
```

|  | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
|  | 2007 | 2006 | 2007 | 2006 |
| Revenues: | | | | |
| Royalties | $    1,410 | $       -- | $    1,410 | $       -- |
| Collaborative research and development and other revenues | -- | 1,063 | 235 | 3,977 |
| Total revenues | 1,410 | 1,063 | 1,645 | 3,977 |
| Operating costs and expenses: | | | | |
| Research and development | 8,751 | 10,088 | 24,353 | 18,505 |
| General and administrative | 7,516 | 9,033 | 21,683 | 17,844 |

| | | | | |
|---|---|---|---|---|
| Total operating costs and expenses | 16,267 | 19,121 | 46,036 | 36,349 |
| Accretion of deferred gain on sale leaseback | (491) | -- | (982) | -- |
| Loss from operations | (14,366) | (18,058) | (43,409) | (32,372) |
| Other income | 2,455 | 886 | 5,415 | 1,514 |
| Loss before income taxes | (11,911) | (17,172) | (37,994) | (30,858) |
| Income tax benefit | 4,225 | -- | 13,419 | -- |
| Loss from continuing operations | (7,686) | (17,172) | (24,575) | (30,858) |
| Discontinued operations: | | | | |
| Income (loss) from discontinued operations before income taxes | -- | 1,232 | 5,993 | (127,294) |
| Gain on sale of AVINZA Product Line before income taxes | 283 | -- | 310,414 | -- |
| Adjustment to gain on sale of Oncology Product Line before income taxes | 9,868 | -- | 9,807 | -- |
| Income tax expense on discontinued operations | (2,284) | (18) | (27,137) | (35) |
| Discontinued operations | 7,867 | 1,214 | 299,077 | (127,329) |
| Net income (loss) | $  181 | $  (15,958) | $  274,502 | $  (158,187) |
| Basic and diluted per share amounts: | | | | |
| Loss from continuing operations | $  (0.08) | $  (0.22) | $  (0.24) | $  (0.40) |
| Discontinued operations | 0.08 | 0.02 | 2.98 | (1.63) |
| Net income (loss) | $  0.00 | $  (0.20) | $  2.74 | $  (2.03) |
| Weighted average number of common shares | 99,878,197 | 78,539,820 | 100,279,949 | 78,021,236 |

LIGAND PHARMACEUTICALS INCORPORATED
CONDENSED CONSOLIDATED BALANCE SHEETS

(in thousands)

|  | June 30, 2007 | December 31, 2006 |
|---|---|---|
| **Assets** | | |
| **Current assets:** | | |
| Cash, cash equivalents, short-term investments, and restricted cash | $ 115,400 | $ 210,662 |
| Other current assets | 2,821 | 24,895 |
| Current portion of co-promote termination payments receivable | 13,962 | -- |
| Total current assets | 132,183 | 235,557 |
| Restricted investments | 1,561 | 1,826 |
| Property and equipment, net | 3,783 | 5,551 |
| Acquired technology and product rights, net | -- | 83,083 |
| Long-term portion of co-promote termination payments receivable | 81,010 | -- |
| Restricted indemnity account | 9,939 | -- |
| Other assets | -- | 36 |
| Total assets | $ 228,476 | $ 326,053 |
| **Liabilities and Stockholders' Equity** | | |
| Accounts payable and accrued liabilities | $ 50,143 | $ 58,768 |
| Current portion of deferred revenue, net | -- | 57,981 |
| Current portion of deferred gain | 1,964 | 1,964 |
| Current portion of co-promote termination liability | 13,962 | 12,179 |
| Other current liabilities | 1,989 | 2,168 |
| Note payable | -- | 37,750 |
| Long-term portion of co-promote termination liability | 81,010 | 81,149 |
| Long-term portion of deferred gain | 26,238 | 27,220 |
| Other long-term liabilities | 6,593 | 7,177 |
| Common stock subject to conditional redemption | 12,345 | 12,345 |
| Stockholders' equity | 34,232 | 27,352 |
| Total liabilities and stockholders' equity | $ 228,476 | $ 326,053 |

SOURCE: Ligand Pharmaceuticals Incorporated

Ligand Pharmaceuticals Incorporated
John L. Higgins, President and CEO
Erika Luib, Investor Relations
858-550-7896
or
Lippert/Heilshorn & Associates
Don Markley, 310-691-7100
dmarkley@lhai.com

Copyright Business Wire 2007

News Provided by COMTEX

Close window | Back to top

POWERED BY
BNET.com

FindArticles > Business Wire > Feb 5, 2008 > Article > Print friendly

**Ligand to Present at BIO CEO and Investor Conference on February 12**

SAN DIEGO -- Ligand Pharmaceuticals Incorporated (NASDAQ:LGND) announced today that President and Chief Executive Officer John L. Higgins will present at the BIO CEO and Investor Conference on Tuesday, February 12, 2008, at 11:45 a.m. Eastern time (8:45 a.m. Pacific). The conference takes place at the Waldorf-Astoria Hotel in New York City.

A live webcast of the presentation will be available on the Company's website www.ligand.com. A replay of the presentation will be archived on the site for 30 days.

About Ligand Pharmaceuticals

Ligand discovers and develops new drugs that address critical unmet medical needs of patients in the areas of thrombocytopenia, hepatitis C, cancer, hormone-related diseases, osteoporosis and inflammatory diseases. Ligand's proprietary drug discovery and development programs are based on its leadership position in gene transcription technology, primarily related to intracellular receptors.

COPYRIGHT 2008 Business Wire
COPYRIGHT 2008 Gale Group